1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT SEATTLE

10   THE INSTITUTE OF CETACEAN
     RESEARCH, a Japanese  research
11   foundation; KYODO SENPAKU                No.
     KAISHA, LTD., a Japanese corporation;
12   TOMOYUKI OGAWA, an individual; and       COMPLAINT
     TOSHIYUKI MIURA, an individual,          (Action for Preliminary and Permanent
13                                            Injunctive Relief and Declaratory Relief)
                        Plaintiffs,
14
            v.
15
     SEA SHEPHERD CONSERVATION
16   SOCIETY, an Oregon nonprofit
     corporation, and PAUL WATSON, an
17   individual,

18                      Defendants.

19

20          Plaintiffs allege as follows:

21                          **NATURE OF THE ACTION**

22          1.      The purpose of this action is to enjoin defendants from attacking and

23   endangering the safety of vessels, Masters, crew, and researchers engaged in a research whaling

24   operation in the Southern Ocean (the ocean encircling Antarctica).  Defendants have a history of

25   violently and dangerously attacking these Southern Ocean operations which occur seasonally

26   during late December through March.  Defendants have publicly announced their intention to do

COMPLAINT - 1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   so again commencing in December 2011 under their campaign styled "Divine Wind" (the

2   English translation of "kamikaze").  Defendants have vowed to "stop" plaintiffs even if death is a

3   consequence.

4                                           **PARTIES**

5              2.       Plaintiff The Institute of Cetacean Research ("ICR") is now, and at all

6   relevant times has been, a juridical person organized under the laws of Japan as a scientific

7   research foundation.  ICR charters fully manned vessels from Kyodo Senpaku Kaisha, Ltd.

8   ("Kyodo Senpaku") to engage in the operations described below.

9              3.       Plaintiff Kyodo Senpaku is now, and at all relevant times has been, a

10  corporation duly organized under the laws of Japan.  Kyodo Senpaku is the owner of the vessels

11  and employer of the Masters and crew that have been dispatched to the Southern Ocean to

12  engage in the operations described below.

13             4.       Plaintiffs Tomoyuki Ogawa ("Ogawa") and Toshiyuki Miura ("Miura")

14  are citizens of Japan.  Ogawa is the Master of the NISSHIN MARU in the 2011-2012 research

15  season, and Miura is the Master of the YUSHIN MARU NO. 2 in the 2011-2012 research

16  season.  Both vessels are oceangoing vessels owned by Kyodo Senpaku and under charter to

17  ICR.  They are underway to the Southern Ocean to engage in the research operations described

18  below.  Captain Ogawa and Captain Miura, as Masters, are responsible for the safety and welfare

19  of the crews of their vessels while at sea.

20             5.       Defendant Sea Shepherd Conservation Society ("SSCS") is now, and at all

21  relevant times has been, a nonprofit organization formed under the laws of Oregon.  SSCS

22  maintains its principal place of business at Friday Harbor, Washington.

23             6.       Defendant Paul Watson ("Watson") is the founder and president of SSCS.

24  Watson is also the registered agent of SSCS with an address at Friday Harbor, Washington.

25  Watson is believed to be admitted to the United States for permanent residence, residing at

26

COMPLAINT - 2

PDXDOCS:1951294.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    Friday Harbor, Washington.  In his actions alleged herein, Watson is an agent of SSCS and he

2    directs the affairs of SSCS.

3                           **JURISDICTION AND VENUE**

4            7.      The court has subject matter jurisdiction as follows:

5                    7.1  This action arises under the laws or treaties of the United States as

6    alleged below, and thus jurisdiction exists under 28 U.S.C. § 1331.

7                    7.2  Plaintiffs are citizens or subjects of Japan, defendant SSCS is a citizen

8    of Oregon and Washington, and defendant Watson is deemed a citizen of Washington; thus this

9    action is between citizens of a state and citizens or subjects of a foreign state under 28 U.S.C.

10   § 1332(a)(2).  The amount in controversy exceeds the sum of $75,000 exclusive of interest and

11   costs.

12                   7.3  This action arises under the court's admiralty and maritime

13   jurisdiction under 28 U.S.C. § 1333 as defendants' activities occur on the high seas or occur in

14   Washington and Oregon but result in injury on the high seas.

15                   7.4  This action is by aliens for torts in violation of the law of nations or

16   treaties of the United States, and thus jurisdiction exists under 28 U.S.C. § 1350.

17                   7.5  The court has supplemental jurisdiction over state law claims pursuant

18   to 28 U.S.C. § 1367.

19           8.      Venue in this court exists under 28 U.S.C. § 1391 as defendants reside in

20   this district, defendants are subject to personal jurisdiction in this district, or a substantial part of

21   the acts or omissions giving rise to the claims occur in this district.

22                                **FACTS**

23           9.      ICR is organized and functions for the purpose of engaging in scientific

24   research with respect to whales.  ICR's research activities are conducted at various locations

25   around the world where whales are located, including the Southern Ocean.

26

COMPLAINT - 3

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1        10.    The International Convention for the Regulation of Whaling, *signed at*

2   *Washington* Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72, 4 Bevans 248 (1968) (ratified by

3   United States on July 18, 1947, and entered into force Nov. 10, 1948) (hereinafter "Whaling

4   Convention") is a convention that counts as members Japan and the United States.  Article VIII

5   of the Whaling Convention authorizes member countries to grant its nationals a "special permit

6   authorizing that national to kill, take and treat whales for purposes of scientific research subject

7   to such restrictions as to number and subject to such other conditions as the Contracting

8   Government thinks fit [i.e., Special Permit] . . . ."  Whaling Convention, art. VIII, § 1.  The

9   takings (which may be lethal) authorized by the Special Permit are exempt from any prohibitions

10  of the Whaling Convention on the taking of whales.  Whaling Convention, art. VIII, § 1.  Copies

11  of the Special Permits issued by Japan applicable to ICR's and Kyodo Senpaku's activities in the

12  Southern Ocean for the upcoming season are attached as Exhibit 1.

13       11.    ICR's activities in the Southern Ocean involve nonlethal research

14  techniques, such as sighting surveys, biopsy sampling, photo-id, acoustic surveys for prey

15  species, and the collection of oceanographic data.  In addition, the activities involve lethal

16  sampling as collection of certain information of vital importance to the scientific research

17  requires examination of the internal organs of whales, such as ovaries, earplugs, and stomachs.

18  Earplugs are needed to determine age, ovaries are needed to establish reproduction rates, and

19  stomachs are needed to understand what whales are eating and how much.  Lethal sample sizes

20  are calculated to be the smallest necessary to have a statistically valid study and are small to the

21  size of the population being sampled.  ICR's activities have been authorized by Special Permits

22  issued by Japan.

23       12.    To carry out the activities authorized by the Special Permits, ICR has

24  chartered from Kyodo Senpaku the vessels NISSHIN MARU, YUSHIN MARU, YUSHIN

25  MARU NO. 2, and YUSHIN MARU NO. 3.  Those vessels are underway to the Southern Ocean

26  to engage in research whaling on the high seas, i.e., waters not under the jurisdiction of any

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    nation.  The four vessels have a combined crew of 147 in addition to whale researchers and

2    government inspectors on board.  The vessels' activities in the Southern Ocean will occur from

3    December 2011 to March 2012.

4              13.    Watson and SSCS have engaged in numerous violent and dangerous

5    attacks against persons and vessels engaged in whaling, sealing, and fishing, including, in recent

6    years, those engaged in the operations of ICR and Kyodo Senpaku in the Southern Ocean.

7    Watson established a precursor to SSCS in or about 1977, after he reportedly was expelled from

8    Greenpeace for his physically violent actions directed toward sealers in Canada.  The first vessel

9    Watson claims to have sunk is the SIERRA.  In a July 28, 2003, interview reported in "Infoshop

10   News" on April 20, 2011, Watson claims that in July 1979, using a ship named the

11   SEA SHEPHERD, he "hunted down, rammed, and disabled the pirate whaling ship *Sierra*"

12   because "for 10 years [he] watched as the International Whaling Commission and world

13   governments did nothing to stop a ship that was blatantly flaunting international regulations

14   protecting whales."[1]  He goes on to claim that to finish the campaign against the SIERRA that

15   was only disabled and not sunk, his "crew blew the bottom out of her [SIERRA] in Lisbon

16   harbor [Portugal] and permanently ended her career."[2]

17             14.    Since then, Watson and SSCS claim to have sunk approximately

18   10 vessels in their anti-whaling campaigns.  Indeed, the M/V STEVE IRWIN, one of the vessels

19   used by defendants in their past attacks against whaling, bears on its bridge the insignia of these

20   sunken vessels, represented by flags.  This is depicted in attached Exhibit 2.  In addition, Watson

21   and SSCS claim to have rammed four Japanese vessels.  This is also depicted on the

22   M/V STEVE IRWIN in the form of Japanese flags together with the words "Rammed."  *See*

23   attached Exhibit 3.  Some of defendants' violent past conduct is listed in attached Exhibit 4.

24

25   [1] *See* http://news.infoshop.org/article.php?story=03/07/28/8527562&query=paul+watson (posted July 28, 2003 @ 08:22 AM CDT).

26   [2] *Id.*

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1      15.    Over the recent past, defendants have engaged in increasingly violent and

2  dangerous attacks against ICR's and Kyodo Senpaku's vessels, Masters, crew, and researchers in

3  the Southern Ocean:

4      15.1  In February 2007, the M/V ROBERT HUNTER, now the

5  M/V STEVE IRWIN, rammed a sighting vessel used by ICR for nonlethal research.  In February

6  2007, butyric acid-filled[3] bottles and smoke bombs were launched from the ROBERT HUNTER

7  to the NISSHIN MARU, and two crew members were injured in the attack.  In March 2008, in

8  close-quarters harassment of the NISSHIN MARU, SSCS crew threw approximately a hundred

9  butyric acid-filled bottles at crew of the NISSHIN MARU.  Three men were slightly injured in

10  the attack.  In addition, two SSCS crew illegally boarded the YUSHIN MARU NO. 2 and had to

11  be transferred to the Australian Custom's vessel, the OCEANIC VIKING.

12      15.2  In February 2009, Watson steered the M/V STEVE IRWIN into the

13  YUSHIN MARU NO. 2 and the YUSHIN MARU NO. 3, causing extensive damage to the

14  YUSHIN MARU NO. 3.  Film of the attack on the YUSHIN MARU NO. 3 may be viewed at

15  "ramming_SSV_1.wmv" and "ramming_SSV_2.wmv," Exhibits 5 and 6.[4]  In addition, acid-

16  filled bottles were launched from the M/V STEVE IRWIN toward the YUSHIN MARU NO. 3

17  and its crew.  Watson was filmed shooting a rocket flare towards the YUSHIN MARU NO. 2

18  from the M/V STEVE IRWIN.  Film of this may be viewed at "090205SS2.wmv," Exhibit 7.[5]

19      15.3  In December 2009 and January and February 2010, various attacks

20  on ICR's and Kyodo Senpaku's vessels occurred, resulting in collisions and injuries. Among

21  other attacks, the SSCS vessel M/V BOB BARKER launched a rubber boat that hurled smoke

22  bombs at the SHONAN MARU NO. 2 and repeatedly sought to disable it, that is, cause it to lose

23  

---

24  [3] The International Chemical Safety Card published by the National Institute for Occupational Safety and Health for butyric acid states that the acid may cause skin burns, loss of vision, and shortness of breath.

25  [4] Pursuant to the clerk's instructions, video attachments in the form of .WMV files (Windows Media Video) are being submitted to the court separately via CD/ROM.

26  [5] *See* separate CD/ROM.

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    propulsion or steerage by dragging ropes aimed at the rudder and propeller of the ship.  The

2    SSCS vessel ADY GIL sought to disable the NISSHIN MARU with ropes dragged in the water,

3    and ADY GIL fired bottles filled with butyric acid at the NISSHIN MARU.  Later, the

4    ADY GIL collided with the SHONAN MARU NO. 2, and its skipper subsequently illegally

5    boarded the SHONAN MARU NO. 2.  The M/V BOB BARKER collided with the stern of the

6    YUSHIN MARU NO. 3 in the process of trying to launch butyric acid-containing projectiles.

7    Both the M/V BOB BARKER and the M/V STEVE IRWIN repeatedly deployed ropes with the

8    intent of disabling ICR's and Kyodo Senpaku's vessels.  Three SHONAN MARU NO. 2 sailors

9    were injured by acid attacks.

10           15.4  In January and February 2011, the attacks continued under a SSCS

11    campaign entitled "No Compromise."  Rubber boats from the M/V STEVE IRWIN and

12    M/V BOB BARKER deployed fouling ropes like before and launched butyric acid projectiles

13    and smoke bombs at the YUSHIN MARU NO. 3.  Then the SSCS trimaran GOJIRA engaged in

14    the same activities directed at the YUSHIN MARU NO. 3.  The M/V BOB BARKER and

15    GOJIRA coordinated an attack against the YUSHIN MARU NO. 3 with multiple fouling ropes,

16    two of which entangled in the vessel's propeller.  A photograph of the entangled propeller is

17    attached as Exhibit 8.  Even after the YUSHIN MARU NO. 3 sent a distress signal, the attack

18    continued for a number of hours.  More than 80 butyric acid-filled glass bottles and at least

19    5 smoke bombs were launched against the YUSHIN MARU NO. 3, many of which landed on the

20    vessel.  In February 2011, the GOJIRA attacked the NISSHIN MARU.  On February 9, 2011, the

21    GOJIRA more than 30 times engaged in close-range crossing of the bow of the NISSHIN

22    MARU while drawing ropes or hawsers in an effort to entangle the rudder or propeller of the

23    vessel.  These attacks interfered with the navigation of the NISSHIN MARU and endangered the

24    safety of the vessel and its crew.

25           15.5    On February 9, 2011, smoke bombs and other incendiary devices

26    were launched from the GOJIRA against the NISSHIN MARU.  Two smoke bombs and four

COMPLAINT - 7

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    incendiary devices hit the vessel.  The incendiary devices caused damage to the deck of the

2    vessel and burned a protective net around the vessel.  Approximately 14 parachute-type

3    incendiary devices were also launched from the GOJIRA toward the NISSHIN MARU.  These

4    did not cause serious damage, but they were extremely dangerous due to the risk of fire or

5    explosion and could have inflicted serious damage to the vessel.  Shortly after these attacks,

6    ICR's and Kyodo Senpaku's vessels departed the Southern Ocean to return to Japan before

7    completing the planned operation in order to avoid any injury or threat to life of the crew

8    members and property of the research fleet.

9            16.    Defendants claim that their 2011 operation "No Compromise" was a "great

10    success:  We found the Japanese fleet early, we were able to block their operations and thus shut

11    down their whaling activities . . . a great victory indeed."[6]

12            17.    Emboldened by their "victory," defendants have launched operation

13    "Divine Wind" for the 2012 season.  Defendants intend to deploy three vessels to the Southern

14    Ocean, all of which are either now in Australia being fitted for the operation or en route to the

15    Southern Ocean.  Those vessels are the BRIGITTE BARDOT (the renamed GOJIRA from

16    operation "No Compromise"), the M/V BOB BARKER, and the M/V STEVE IRWIN.  As

17    posted on the SSCS website, "Sea Shepherd will return to the remote waters for their

18    8th Antarctic Whale Defense Campaign with a stronger anti-whaling fleet in early December

19    2011 to protect the great whales."[7]

20            18.    Defendants liken their campaign "Divine Wind" to the typhoons that twice

21    destroyed the Mongolian fleets invading Japan in the late 13th century.  Watson recently stated,

22    "'They will have to kill us to prevent us from intervening once again . . ., and we will undertake

23    whatever risks to our lives will be required to stop this invasion of arrogant greed into what is an

24

25

26

---

[6] *See* <http://www.seashepherd.org/commentary-and-editorials/2011/11/18/operation-divine-wind-q-and-a-with-captain-paul-watson-493> (Q:3) (posted Nov. 18, 2011).

[7] *See* <http://www.seashepherd.org/news-and-media/2011/09/30/hoka-hey-all-systems-go-for-sea-shepherds-operation-divine-wind-1284> (posted Sept. 30, 2011).

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   established sanctuary for the whales.'"[8]  A current crew member of the M/V BOB BARKER is

2   quoted as saying, "'We intend to stop them and we will stop them—that's a promise.'"[9]

3                19.      Unless enjoined as requested below, defendants will very soon engage in

4   attacks on plaintiffs that will seriously endanger the safety of the Masters, their crew and

5   researchers, and the vessels owned by Kyodo Senpaku and chartered by ICR.  Navigating in the

6   Southern Ocean can be dangerous given the cold waters, the presence of icebergs, the possibility

7   of storms, and its isolated location far from ready third-party assistance.  If a ship lost propulsion

8   or steerage due to a successful fouling rope attack, the ship, its Master, crew, and researchers

9   could be put in serious jeopardy, especially in the vicinity of floating ice or if a storm or heavy

10   seas occurred.  The safety and health of the ship's crew are endangered by the launching of

11   projectiles against the ship, especially glass projectiles filled with butyric acid.  A crew member

12   could be blinded in such an attack or receive a blow to the head or body or be cut by pieces of

13   glass.  Such attacks also cause fear or distress in the crew, thus interfering with the normal

14   operations on board.  Incendiary devices like those launched in the past could cause a fire or,

15   even worse, an explosion.  Close-quarter attacks by SSCS vessels run the risk of a collision.

16   Ramming of ICR's and Kyodo Senpaku's ships could cause them (or SSCS vessels) to sink or

17   suffer other serious damage.  The court should declare that defendants' violent tactics employed

18   in the past against ICR's and Kyodo Senpaku's activities in the Southern Ocean are unlawful, and

19   the court should issue the injunctive relief requested below so that plaintiffs' property and the

20   lives of the Masters, their crew, and researchers are not endangered.

21

22

23

24

25   [8] *Id.*

26   [9] *Id.*

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1                                        **<u>CLAIMS</u>**

2                                         **FIRST CLAIM**

3            **(Freedom of Safe Navigation on the High Seas—Declaratory and Injunctive Relief)**

4                20.      Plaintiffs reallege paragraphs 1 through 19 and incorporate them by

5 reference.

6                21.      Freedom of safe navigation on the high seas is an internationally

7 recognized and accepted norm that is specific, universal, and obligatory.  Among other things, it

8 is recognized as follows:

9                21.1  Article 2 of the Convention on the High Seas, *done at Geneva*

10 Apr. 29, 1958, 13.2 U.S.T. 2312 (1962), 450 U.N.T.S. 82 (ratified by United States on Apr. 12,

11 1961, and entered into force Sept. 30, 1962) (hereinafter "High Seas Convention") provides, in

12 part, "Freedom of the high seas is exercised under the conditions laid down by these articles . . . .

13 It comprises, *inter alia*, . . . (1) [f]reedom of navigation . . . ."  A total of 63 nations are parties to

14 the High Seas Convention.

15                21.2  Article 87 of the Convention on the Law of the Sea, *adopted by the*

16 *Third United Nations Conference on the Law of the Sea and opened for signature at*

17 *Montego Bay, Jamaica*, Dec. 10, 1982, 1833 U.N.T.S. 31363 (entered into force Nov. 16, 1994)

18 (hereinafter "UNCLOS") also provides for "freedom of navigation" on the high seas.  A total of

19 162 nations are parties to UNCLOS.  Although the United States has not ratified UNCLOS

20 because of concerns over provisions regarding deep seabed exploration and mining, presidents

21 beginning with former President Ronald Reagan have regarded the other provisions of UNCLOS

22 as reflecting customary international law binding on the United States.

23                21.3  The Convention for the Suppression of Unlawful Acts Against the

24 Safety of Maritime Navigation, *concluded at Rome* Mar. 10, 1988, S. Treaty Doc. No. 101-1,

25 1678 U.N.T.S. 29004, 27 I.L.M. 668 (1988) (entered into force Mar. 1, 1992; ratified by the

26 United States on Dec. 6, 1994, and entered into force by United States on Mar. 6, 1995)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   (hereinafter "SUA Convention") recognized, among other things, that "unlawful acts against the

2   safety of maritime navigation jeopardize the safety of persons and property, seriously affect the

3   operation of maritime services, and undermine the confidence of the peoples of the world in the

4   safety of maritime navigation."  SUA Convention, 4th preamble.  The SUA Convention makes it

5   an offense if a "person unlawfully and intentionally:  . . . (b) performs an act of violence against

6   a person on board a ship if that act is likely to endanger the safe navigation of that ship; or

7   (c) destroys a ship or causes damage to a ship or to its cargo which is likely to endanger the safe

8   navigation of that ship . . . ."  SUA Convention, art. 3, § 1(b)-(c).  An offense is also committed

9   if a person attempts to commit any of the foregoing, abets the commission of any of the

10  foregoing, or threatens to commit any of the foregoing if "likely to endanger the safe navigation

11  of the ship."  Art. 3, § 2.  Each "State Party shall take such measures as may be necessary to

12  establish its jurisdiction over the offences . . . when the offence is committed . . . by a national of

13  that State."  Art. 6, § 1(c).  A total of 157 nations are parties to the SUA Convention.

14              21.4  The Convention on the International Regulations for Preventing

15  Collisions at Sea, *concluded at London on* Oct. 20, 1972, 28.3 U.S.T. 3459, 1050 U.N.T.S.

16  15824 (acceptance by United States on Nov. 23, 1976, and entered into force July 15, 1977)

17  (hereinafter "COLREGs") obligates vessels such as those utilized by defendants to employ

18  methods and means to avoid collisions on the high seas.  Over 150 nations have signed

19  COLREGs.  It became a treaty of the United States on or about July 15, 1977.

20              22.     Defendants have flouted these internationally recognized norms by

21  intentionally and unlawfully interfering with plaintiffs' right to freedom of navigation.  Among

22  other things, defendants have (1) directed vessels and their crew to drag ropes and other devices

23  in front of and around plaintiffs' vessels to disable or slow the vessels; (2) launched

24  acid-containing projectiles against plaintiffs' vessels and crew, causing injury and damage;

25  (3) launched incendiary devices against the vessels and crew; (4) rammed plaintiffs' vessels with

26

COMPLAINT - 11

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    their vessels; and (5) navigated their vessels in a manner endangering plaintiffs' vessels and crew

2    and resulting in collisions between vessels.

3          23.    Defendants have also attempted the foregoing, have abetted the foregoing,

4    and have threatened the foregoing.  Through their Divine Wind operation, defendants have

5    vowed to "stop" plaintiffs' activities in the Southern Ocean even if death ensues.  Defendants

6    intend to "stop" plaintiffs by engaging in the same unlawful practices they have utilized in the

7    past and which violate established international norms that provide for freedom of navigation.

8          24.    Pursuant to 28 U.S.C. § 2201, the court should declare the respective

9    rights and obligations of the parties as respects freedom of navigation in the Southern Ocean and

10   should declare that defendants' campaign against plaintiffs' operations in the Southern Ocean

11   must abide these established international norms and that defendants may not and must not

12   engage in any conduct that is likely to endanger plaintiffs' vessels or crew or endanger the safe

13   navigation of plaintiffs' vessels.

14         25.    Plaintiffs have no speedy or adequate remedy at law.  Accordingly, the

15   court should grant preliminary and permanent injunctive relief enjoining defendants and each of

16   them and their respective officers, agents, servants, employees, attorneys, and other persons who

17   are in active concert or participation with any of them from the following:

18         25.1  Physically attacking any vessel engaged by plaintiffs in the Southern

19   Ocean.

20         25.2  Physically attacking any crew member or person on any vessel

21   engaged by plaintiffs in the Southern Ocean.

22         25.3  Navigating any vessel or other instrumentality in a manner that is

23   likely to endanger the safe navigation of plaintiffs' vessels.  In this respect, absent exigent

24   circumstances, no vessel or other instrumentality under the control or direction of defendants

25   should be permitted to approach closer than a reasonable and safe distance of any vessel engaged

26   by plaintiffs in the Southern Ocean.

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1                                        **SECOND CLAIM**

2               **(Freedom From Piracy—Declaratory and Injunctive Relief)**

3          26.      Plaintiffs reallege paragraphs 1 through 25 and incorporate them by

4 reference.

5          27.      The law of nations universally condemns acts of pirates as *hostes humani*

6 *generis*—enemies of all mankind.  Under the law of nations, violent attacks on vessels on the

7 high seas are regarded as acts of piracy.

8          28.      Treaties also condemn acts of piracy:

9          28.1  The High Seas Convention states that piracy includes (i) any "illegal

10 acts of violence, detention or any act of depredation, committed for private ends by the crew or

11 the passengers of a private ship . . . and directed . . . [o]n the high seas, against another ship . . .

12 or against persons or property on board such ship"; (ii) "[a]ny act of voluntary participation in

13 the operation of a ship . . . with knowledge of facts making it a pirate ship"; and (iii) "[a]ny act of

14 inciting or intentionally facilitating" any of the foregoing acts.  Art. 15, §§ 1-3.

15          28.2  The SUA Convention also defines acts that are acts of piracy.  It

16 recognizes that "unlawful acts against the safety of maritime navigation jeopardize the safety of

17 persons and property, seriously affect the operation of maritime services, and undermine the

18 confidence of the peoples of the world in the safety of maritime navigation."  4th preamble.  The

19 SUA Convention makes it an offense if a "person unlawfully and intentionally:  . . . (b) performs

20 an act of violence against a person on board a ship if that act is likely to endanger the safe

21 navigation of that ship; or (c) destroys a ship or causes damage to a ship or to its cargo which is

22 likely to endanger the safe navigation of that ship . . . ."  Art. 3, § 1(b)-(c).  An offense is also

23 committed if a person attempts to commit any of the foregoing, abets the commission of any of

24 the foregoing, or threatens to commit any of the foregoing if "likely to endanger the safe

25 navigation of the ship."  Art. 3, § 2.

26

COMPLAINT - 13

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1           29.    Piracy is also condemned in the form of internationally recognized and

2  accepted norms that are specific, universal, and obligatory.  UNCLOS, although not a treaty,

3  "has been accepted by the overwhelming majority of the world as reflecting customary

4  international law." *U.S. v. Hasan*, 747 F. Supp. 2d 599, 640 (E.D. Va. 2010) (accepting

5  UNCLOS definition of piracy as "law of nations").  Article 101 of UNCLOS defines piracy in

6  the same manner as the High Seas Convention does.

7           30.    As alleged above, defendants have engaged in acts of piracy in the past

8  against plaintiffs.  Indeed, the vessel M/V STEVE IRWIN, which is commanded by Watson,

9  flies a pirate flag, and Watson deems himself a pirate albeit a "good pirate."[10]  The law does not

10  countenance "good pirates."

11           31.    Defendants' Divine Wind campaign is predicated on committing acts of

12  piracy against plaintiffs.  Defendants intend to cause or to direct acts of violence, depredation,

13  and detention against plaintiffs' vessels and crew for their private ends and to incite or facilitate

14  others to do so.  These acts are likely to endanger the safe navigation of plaintiffs' ships.

15           32.    Pursuant to 28 U.S.C. § 2201, the court should declare the respective

16  rights and obligations of the parties as respects freedom from acts of piracy and should declare

17  that defendants' campaign against plaintiffs' operations in the Southern Ocean must abide these

18  established international norms and that defendants may not and must not engage in any conduct

19  that violates those norms.

20           33.    Plaintiffs have no speedy or adequate remedy at law.  Accordingly, the

21  court should grant preliminary and permanent injunctive relief enjoining defendants and each of

22  them and their respective officers, agents, servants, employees, attorneys, and other persons who

23  are in active concert or participation with any of them from engaging in any acts of piracy.

24

25  _____

26  [10] *See* http://news.infoshop.org/article.php?story=03/07/28/8527562&query=paul+watson (posted July 28, 2003 @ 08:22 AM CDT).

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

**THIRD CLAIM**

**(Freedom From Terrorism—Declaratory and Injunctive Relief)**

34.     Plaintiffs reallege paragraphs 1 through 33 and incorporate them by reference.

35.     The International Convention for the Suppression of the Financing of Terrorism, *done at New York* Dec. 9, 1999, T.I.A.S. No. 13075, 2178 U.N.T.S. 38349 (entered into force Apr. 10, 2002; ratified by United States on Dec. 5, 2011, and entered into force by United States on July 26, 2002) (hereinafter "Financing Convention") is a treaty of the United States and reflects the law of nations.  *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007).  The Financing Convention has been adopted by more than 130 nations, including the United States.

35.1  The Financing Convention provides that it is an offense if a person "by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:  (a) [a]n act which constitutes an offence within the scope of" the SUA Convention.  Art. 2, § 1(a).  A person also commits an offense if that person "[p]articipates as an accomplice" in an offense or "[o]rganizes or directs others to commit an offence."  Art. 2, § 5(a)-(b).

35.2  The Financing Convention also provides that it is an offense if a person "by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:  . . . (b) [a]ny other act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is . . . to compel a government . . . to do or to abstain from doing any act."  Art. 2, § 1(b).

36.     Defendants are engaged in violations of the Financing Convention.  Among other things:

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1          36.1  From their base in Friday Harbor, Washington, defendants

2  unlawfully and willfully provide or collect hundreds of thousands (if not millions) of dollars

3  intending that they be used to carry out acts in violation of the SUA Convention.  Through these

4  funds, defendants are able to send their fleet of ships manned with crews to the Southern Ocean

5  to carry out Divine Wind.  Through operation Divine Wind, defendants intend to engage in acts

6  to endanger the safe navigation of plaintiffs' fleet.

7          36.2  Defendants unlawfully and willfully provide or collect funds

8  intending that they be used, in part, to carry out acts intended to cause death or serious bodily

9  injury to a civilian when the purpose of such an act, by its nature or context, is to compel a

10  government to do or to abstain from doing any act.  Endangering plaintiffs' ships by employing

11  the means defendants have used in the past can be intended only to risk death or serious bodily

12  injury to the individuals aboard those ships.  Defendants' actions are being done in an effort to

13  compel the government of Japan to cease its authorization of research whaling.

14          36.3  Defendants will attempt offenses within the meaning of the

15  Financing Convention, and each defendant participates as an accomplice in offenses and

16  organizes or directs others to commit such offenses.

17          37.     Pursuant to 28 U.S.C. § 2201, the court should declare the respective

18  rights and obligations of the parties and should declare that defendants' conduct violates the

19  Financing Convention.

20          38.     Plaintiffs have no speedy or adequate remedy at law.  Accordingly, the

21  court should grant preliminary and permanent injunctive relief enjoining defendants and each of

22  them and their respective officers, agents, servants, employees, attorneys, and other persons who

23  are in active concert or participation with any of them from (a) expending any money to fund any

24  physical attacks on any vessel engaged by plaintiffs in the Southern Ocean and (b) freezing the

25  accounts of defendants to prevent such expenditures.

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

**FOURTH CLAIM**

**(State Law Claims—Declaratory and Injunctive Relief)**

39.     Plaintiffs reallege paragraphs 1 through 38 and incorporate them by reference.

40.     Defendants' operations are based in Friday Harbor, Washington.  They use their base to raise millions of dollars to fund their campaign against research whaling. Defendants conspire with each another and aid and abet each another in planning, soliciting, recruiting, funding, and directing actions to interfere with plaintiffs' activities through wrongful and dangerous means, including assault, battery and trespass.

41.     As a nonprofit organization, SSCS's funds may be used only for lawful purposes.  SSCS spends hundreds of thousands (if not millions) of dollars to engage in dangerous and unlawful attacks on the vessels and crew engaged in research whaling.

42.     Plaintiffs have no speedy or adequate remedy at law.  Accordingly, the court should grant preliminary and permanent injunctive relief enjoining defendants and each of them and their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with any of them from (a) expending any money to fund any physical attacks on any vessel engaged by plaintiffs in the Southern Ocean or (b) engaging, directly or indirectly, in any such attacks.

WHEREFORE, plaintiffs pray for a judgment in their favor and against defendants, jointly and severally, as follows:

(1)     For declarations declaring the respective rights and obligations of the parties as set forth above;

(2)     For injunctions, preliminarily and permanently enjoining defendants and each of them and their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with any of them from the acts set forth above;

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    (3)    For plaintiffs' costs incurred herein; and

2    (4)    For such further relief as the court deems just and proper.

3    DATED this 8th day of December, 2011.

4                          MILLER NASH LLP

5

6                          s/ John F. Neupert
                           John F. Neupert, P.C., WSBA No. 39883
7                          john.neupert@millernash.com
                           M. Christie Helmer, WSBA No. 41171
8                          (petition for admission or application to appear
                           pro hac vice will be submitted)
9                          chris.helmer@millernash.com
                           James L. Phillips, WSBA No. 13186
10                         james.phillips@millernash.com
                           (503) 224-5858
11                         Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 18

MILLER NASH LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699