1  Honorable Richard A. Jones

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
9                    AT SEATTLE

10 THE INSTITUTE OF CETACEAN
   RESEARCH, a Japanese  research
11 foundation; KYODO SENPAKU
   KAISHA, LTD., a Japanese corporation;      No. C11-2043 RAJ
12 TOMOYUKI OGAWA, an individual; and
   TOSHIYUKI MIURA, an individual,           PLAINTIFFS' MOTION FOR
13                                           PRELIMINARY INJUNCTION
                    Plaintiffs,
14                                           Pursuant to Fed. R. Civ. P. 65(a)
             v.
15                                           **NOTE ON MOTION CALENDAR:**
   SEA SHEPHERD CONSERVATION              **January 6, 2012**
16 SOCIETY, an Oregon nonprofit
   corporation, and PAUL WATSON, an          **ORAL ARGUMENT REQUESTED**
17 individual,

18                  Defendants.

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

**TABLE OF CONTENTS**

**Page**

I.   MOTION.................................................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 2

    A.   Plaintiffs' Activities............................................................................................ 2

    B.   Watson's and SSCS's History of Violent Attacks Against Plaintiffs' Vessels, Crew, and Researchers............................................................................ 3

III. PLAINTIFFS MEET THE STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION .............................................................................. 5

IV.  ARGUMENT ........................................................................................................... 6

    A.   Plaintiffs Will Likely Succeed on the Merits...................................................... 6

        1.   Claims Under International Law and Treaties .......................................... 7

            a.   Freedom of Safe Navigation on the High Seas............................ 8

            b.   Freedom from Piracy ................................................................. 10

            c.   Freedom from Terrorism............................................................ 13

        2.   State-Law Claims ................................................................................... 14

    B.   Plaintiffs Will Be Irreparably Harmed.............................................................. 15

    C.   The Balance of Hardship Tips Decidedly in Plaintiffs' Favor ............................ 17

    D.   The Public Interest Would Be Served by Issuance of an Injunction ................... 19

V.   CONCLUSION....................................................................................................... 20

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - i
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

# I.  MOTION

Plaintiffs The Institute of Cetacean Research ("ICR"), Kyodo Senpaku Kaisha, Ltd.
("Kyodo Senpaku"), Tomoyuki Ogawa ("Captain Ogawa"), and Toshiyuki Miura ("Captain
Miura") bring this action against defendants Sea Shepherd Conservation Society ("SSCS") and its
president and founder, Paul Watson ("Watson") to enjoin them from engaging in physical attacks
on plaintiffs' vessels in the Southern Ocean (the ocean encircling Antarctica).  Over the past few
years, defendants have engaged in repeated, relentless violent attacks against plaintiffs in the
Southern Ocean, ranging from ramming vessels, attempting to disable plaintiffs' ships by dragging
fouling ropes in their path, firing acid-filled glass projectiles at plaintiffs' vessels and their crew
and launching incendiary devices against the vessels and crew, exposing them to risk of fire and
explosion.  This conduct endangers the safety of the vessels and the Masters, crew, and researchers
on board and is in violation of international and domestic law, let alone any rational standard of
human conduct.  Defendants have declared their intent to launch their strongest fleet ever for their
"Operation Divine Wind" (the English translation of "kamikaze") to "stop" plaintiffs, even at the
risk of death.  It is defendants who should be stopped.

Defendants take the position their conduct is justified because they believe
plaintiffs, their crew, and the researchers are engaged in illegal whaling.  Plaintiffs do not believe
their activities are illegal, but that is not the issue before this Court.  Plaintiffs are entitled to be
free from attack by what are essentially self-proclaimed pirates with a base in the state of
Washington.

Pursuant to Fed. R. Civ. P. 65, plaintiffs move the Court to grant preliminary
injunctive relief enjoining defendants and each of them and their respective officers, agents,
members, servants, employees, attorneys, and other persons who are in active concert or
participation with any of them from:

(1)  physically attacking any vessel engaged by plaintiffs in the Southern Ocean;

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1          (2)  physically attacking any crew member or person on any vessel engaged by

2   plaintiffs in the Southern Ocean; and

3          (3)  navigating any vessel or other instrumentality in a manner that is likely to

4   endanger the safe navigation of plaintiffs' vessels in the Southern Ocean.[1]

5          This motion is based on the record and files herein and the declarations filed

6   herewith of Kyodo Senpaku managing director Makoto Ito ("Ito Decl."), Captain Miura

7   ("Cpt. Miura Decl."), Captain Ogawa ("Cpt. Ogawa Decl.") and John F. Neupert ("Neupert

8   Decl.").  Plaintiffs, respectfully, reserve the right to file supplemental support for this motion at

9   or before the hearing on the motion.

10                    **II.   STATEMENT OF FACTS**

11   **A.      Plaintiffs' Activities.**

12          As set forth in the complaint, Dkt. No. 1, verified by Kyodo Senpaku (Ito Decl.

13   ¶ 4), ICR engages in scientific research of whales and has done so for years.  This activity is

14   authorized by Special Permits issued by Japan under the International Convention for the

15   Regulation of Whaling, *signed at Washington* Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72,

16   4 Bevans 248 (1968) (ratified by United States on July 18, 1947, and entered into force Nov. 10,

17   1948) (hereinafter "Whaling Convention").  (*See* Complaint, Dkt. No. 1, Ex. 1.)

18          Japan and the United States are parties to the Whaling Convention, as are many

19   other countries.  The Whaling Convention allows member countries to grant its nationals a

20   "Special Permit" that authorizes "that national to kill, take and treat whales for purposes of

21   scientific research subject to such restrictions as to number and subject to such other conditions

22   as the Contracting Government thinks fit . . . ."  Whaling Convention, art. VIII, § 1.  Takings

23   authorized by the Special Permit are exempt from any of the Whaling Convention's prohibitions

24   _____

25   [1] Plaintiffs intend to present evidence at or before the hearing on the motion to support
     establishment of a specific and defined safety perimeter around plaintiffs' vessels to ensure safe
26   navigation.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1    on the taking of whales.  *Id.*  Japan issued ICR and Kyodo Senpaku Special Permits to conduct

2    research activities in the Southern Ocean for the upcoming season (December 2011-March

3    2012).  (*See* Complaint, Dkt. No. 1, Ex. 1.)  These activities will occur on the high seas, i.e.,

4    waters outside the territorial jurisdiction of any nation.

5              Kyodo Senpaku owns the vessels NISSHIN MARU, YUSHIN MARU, YUSHIN

6    MARU NO. 2, and YUSHIN MARU NO. 3 that have been chartered by ICR to carry out the

7    activities authorized by the Special Permits this season.  (Cpt. Ogawa Decl. ¶ 4; Cpt. Miura Decl.

8    ¶ 4.)  The four vessels have a combined crew of 147 in addition to whale researchers and

9    government inspectors on board the vessels.  (Complaint, Dkt. No. 1, ¶ 12.)  Captain Ogawa, as

10   Master of the NISSHIN MARU, and Captain Miura, as Master of the YUSHIN MARU NO. 2,

11   are responsible for the safety of their crew and vessels while at sea.  (Cpt. Ogawa Decl. ¶ 5;

12   Cpt. Miura Decl. ¶ 5.)

13   **B.      Watson's and SSCS's History of Violent Attacks Against Plaintiffs' Vessels,**
         **Crew, and Researchers.**

14

15             There can be and is no factual dispute about the violence employed by defendants

16   in their effort to halt whaling.  Indeed, Watson flaunts it.

17             Emblazoned on the side of the M/V STEVE IRWIN are the flags of 10 vessels

18   Watson claims to have sunk.  (Complaint, Dkt. No. 1, Ex. 2.)  Likewise, Watson displays the

19   flags of 4 Japanese vessels he claims to have rammed.  (*Id.* at Ex. 3.)  The first vessel Watson

20   claims to have sunk in 1979 was the SIERRA, which he "hunted down, rammed, and disabled

21   the pirate whaling ship *Sierra*" because "for 10 years [he] watched as the International Whaling

22   Commission and world governments did nothing to stop a ship that was blatantly flaunting

23   international regulations protecting whales."  (*Id.* at ¶ 13.)

24             This violence has been employed by SSCS and Watson in their campaigns against

25   research whaling in the Southern Ocean.  The scope and extent of that violence is recounted in

26   the Cpt. Ogawa Decl. and the Cpt. Miura Decl. and is captured in numerous videos and

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE (503) 224-5858 / FAX (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   photographs referenced in the Ito Decl.  (*See* Cpt. Ogawa Decl. ¶¶ 6-12; Cpt. Miura Decl. ¶¶ 6-9;

2   Ito Decl. ¶ 6.)  If the Court were to view only one video to get a sense of how outrageous and

3   dangerous defendants' conduct is, the Court should view the February 2009 ramming of the

4   YUSHIN MARU NO. 3 by the M/V STEVE IRWIN.  (Complaint, Dkt. No. 1, Exs. 5-6.)

5           SSCS's campaign in the Southern Ocean last season (December 2010-February

6   2011) against plaintiffs entitled "No Compromise" was declared by defendants to be a "great

7   success:  We found the Japanese fleet early, we were able to block their operations and thus shut

8   down their whaling activities . . . a great victory indeed."  (Complaint, Dkt. 1, ¶ 16.)  Tactics

9   employed by defendants to achieve their "victory" utilized the vessels M/V BOB BARKER,

10   M/V STEVE IRWIN and a fast trimaran named GOJIRA, now renamed the BRIGITTE

11   BARDOT.  (*Id.* at ¶¶ 15.4, 15.5, 17.)  Those vessels and their crew, including Watson, dragged

12   ropes in the paths of plaintiffs' vessels in an effort to entangle the rudders and propellers and

13   were successful in entangling the rudder of the YUSHIN MARU NO. 3.  (*Id.* at ¶ 15.4.)  Those

14   vessels and rubber boats launched from them fired glass projectiles filled with butyric acid[2] at

15   the YUSHIN MARU NO. 3 and launched incendiary devices against the ship, many of which

16   landed on the vessel.  (Ito Decl. ¶ 6, Exs. 77-132.)

17           Now SSCS and Watson intend to use the same ships used last season to conduct

18   operation "Divine Wind" this season.  As posted on the SSCS website, "Sea Shepherd will return

19   to the remote waters for their 8th Antarctic Whale Defense Campaign with a stronger anti-

20   whaling fleet in early December 2011 to protect the great whales."  (Complaint Dkt. No. 1, ¶ 17.)

21   Watson recently stated, "'They will have to kill us to prevent us from intervening once again . . .,

22   and we will undertake whatever risks to our lives will be required to stop this invasion of

23   arrogant greed into what is an established sanctuary for the whales.'"  (*Id.* at ¶ 18.)  An SSCS

24

[2] The International Chemical Safety Card published by the National Institute for Occupational

25   Safety and Health for butyric acid states that the acid may cause skin burns, loss of vision, and
shortness of breath.  *See* http://www.cdc.gov/niosh/ipcsneng/neng1334.html (last visited Dec. 12,

26   2011).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 4
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1    crew member on the M/V BOB BARKER is quoted as saying, "'We intend to stop them and we

2    will stop them—that's a promise.'" (*Id.*)

3            Just before this action was filed, Watson was quoted in the press as saying, "If

4    they try to load whales then we will be there.  If that means collusions [*sic:* collisions] between

5    the ships then so be it, because we're not going to move."  (Neupert Decl. ¶ 2.)  After learning

6    this action had been filed, the rhetoric continued.  The SSCS website posted a quote from

7    Watson, calling this action "frivolous" and stating, "'[w]e will not be deterred by force, by

8    lawsuits, by bureaucrats, by critics or by any government."  (Neupert Decl. ¶ 3 & Ex. 1.)

9            Defendants recognize no boundaries on their conduct.  But there are boundaries

10   this Court should enforce.  Defendants must be stopped from violent and dangerous attacks on

11   plaintiffs' vessels and crew in the Southern Ocean.  Defendants may protest plaintiffs' actions—

12   but defendants may not engage in violent or dangerous physical attacks against vessels and crew

13   that endanger life and property.

14        **III.   PLAINTIFFS MEET THE STANDARD FOR ISSUANCE OF**
                        **A PRELIMINARY INJUNCTION**
15

16           A preliminary injunction may issue if the claimant demonstrates:  (1) a likelihood

17   of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardship tips

18   in claimant's favor; and (4) that the public interest supports granting the injunction.  *Winter v.*

19   *Natural Res. Def. Council*, 555 U.S. 7, 129 S. Ct. 365 (2008).  The Ninth Circuit follows *Winter*

20   with two variations.

21           First, the Ninth Circuit uses a "serious questions" approach, under which a

22   preliminary injunction will issue when plaintiffs demonstrate "serious questions going to the

23   merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the

24   plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

25   public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137-38 (9th Cir.

26   2011).  This Court utilizes the "serious questions" approach.  *See Mirina Corp. v. Marina*

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 5
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1  *Biotech*, 770 F. Supp. 2d 1153, 1161 (W.D. Wash. 2011); *Riverside Publ'g Co. v. Mercer Publ'g*

2  *LLC*, No. C11-1249-RAJ, 2011 WL 3420421, at *3 (W.D. Wash. Aug. 4, 2011).  The "serious

3  questions" approach is intended to provide flexibility to the district court by allowing the "court

4  to grant a preliminary injunction in situations where it cannot determine with certainty that the

5  moving party is more likely than not to prevail on the merits of the underlying claims, but where

6  the costs outweigh the benefits of not granting the injunction."  *Cottrell*, 632 F.3d at 1133.

7  Second, the Ninth Circuit uses a "sliding scale" approach under which "the

8  elements of the preliminary injunction test are balanced, so that a stronger showing of one

9  element may offset a weaker showing of another."  *Id.* at 1131.  "For example, a stronger

10  showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on

11  the merits."  *Id.* (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813

12  (9th Cir. 2003)).

13  Plaintiffs meet the standard for preliminary injunction under any of these

14  approaches.  As explained more fully below, plaintiffs are likely to succeed on the merits of their

15  claims because defendants are not entitled to attack plaintiffs' vessels.  Defendants' past and

16  threatened conduct violates established international and state law.  Even if there could be some

17  doubt in this regard, plaintiffs' claims raise "serious questions," and, given the undisputed risk to

18  life and property, the threatened injury is substantial and irreparable.  Finally, the public interest

19  will be served by maintaining public order—ensuring that safety at sea is preserved and that

20  defendants are prevented from endangering lives and property.

21  ## IV.  ARGUMENT

22  **A.     Plaintiffs Will Likely Succeed on the Merits.**

23  Plaintiffs have a right of freedom of safe navigation on the high seas, of freedom

24  from piracy, and of freedom from terrorism.  As alleged in the complaint and discussed below,

25  plaintiffs assert claims to injunctive relief to prevent violation of these rights.  These claims arise

26  under international law and treaties (and thus federal statutory and common law), as well as

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1  Washington state common law (assault, battery, and trespass).  The violent and dangerous

2  attacks that defendants have vowed to continue against plaintiffs' vessels, crew, and researchers

3  violate international and common law—and common sense.  Thus, plaintiffs likely will succeed

4  in asserting their rights to injunctive relief, or at the very least raise "serious questions" going to

5  the merits of these claims.

6         1.   <u>Claims Under International Law and Treaties</u>

7         The United States Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 716,

8  124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004), held that under the Alien Tort Statute ("ATS"),

9  28 U.S.C. § 1350,[3] federal courts may recognize claims "based on the present-day law of

10  nations" provided that the claims rest on "norm[s] of international character accepted by the

11  civilized world and defined with a specificity comparable to the features of the 18th-century

12  paradigms . . . ."  *Sosa*, 542 U.S. at 725.

13         When determining "the current state of international law," the *Sosa* Court directed

14  federal courts to "look[] to those sources we have long, albeit cautiously, recognized."  *Sosa*, *id.*

15  at 733.  Those sources include treaties, which "are proper evidence of customary international

16  law because . . . they create *legal obligations* akin to contractual obligations on the States parties

17  to them."  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003); *see also*

18  Restatement (Third) of Foreign Relations Law § 102(3) ("International agreements . . . may lead

19  to the creation of customary international law when such agreements are intended for adherence

20  by states generally and are in fact widely accepted.").

21         In *Sarei v. Rio Tinto, PLC*, Nos. 02–56256, 02–56390 & 09–56381, __ F.3d __,

22  2011 WL 5041927, at *18-27 (9th Cir. Oct. 25, 2011), the court noted that a claim under

23  international law exists provided the internationally recognized norm is "'specific, universal, and

24  obligatory.'"  *Id.* at *2 (quoting *Sosa*, 542 U.S. at 732).  Provided that the international norm

25  _____

26  [3] The ATS grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   meets this standard, the claim arises under federal common law and may be asserted under the

2   ATS and under 28 U.S.C. § 1331.  *Id.* at *10.  The *Sarei* court went on to hold that claims by

3   aliens alleging genocide and war crimes allegedly committed by a foreign corporation overseas

4   met the *Sosa* standard because treaties to which the United States was a party defined those

5   offenses in a manner that was specific, obligatory and universal.[4]  *Id.* at *18, *23.

6            Here, plaintiffs bring three claims for violation of customary international law

7   (and treaties):  freedom of safe navigation, freedom from piracy, and freedom from terrorism.

8   The status of each claim as a violation of customary international law is substantiated by

9   multiple widely-recognized and ratified treaties that define defendants' past and threatened

10  actions as illegal.

11            a.       Freedom of Safe Navigation on the High Seas

12            As might be expected, freedom of safe navigation on the high seas is an

13  internationally recognized and accepted norm, as demonstrated by at least four international

14  treaties.  First, article 2 of the Convention on the High Seas, *done at Geneva* Apr. 29, 1958,

15  13.2 U.S.T. 2312 (1962), 450 U.N.T.S. 82 (ratified by United States on Apr. 12, 1961, and

16  entered into force Sept. 30, 1962) (hereinafter "High Seas Convention") provides, in part,

17  "Freedom of the high seas is exercised under the conditions laid down by these articles . . . .  It

18  comprises, *inter alia*, . . . (1) [f]reedom of navigation . . . ."  A total of 63 nations are parties to

19  the High Seas Convention.  As the Second Circuit recognized, the High Seas Convention is a

20  "contemporary statement of the international concern and accord" regarding the "right of a

21  neutral ship to free passage on the high seas."  *Amerada Hess Shipping Corp. v. Argentine*

22  *Republic*, 830 F.2d 421, 424 (2d Cir. 1987), *rev'd on other grounds*, *Argentine Republic v.*

23  *Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S. Ct. 683, 102 L. Ed. 2d 818 (1989).

24  _____

    [4] One was the Convention on Prevention and Punishment of the Crime of Genocide to which

25  over 140 nations were parties and the other was the Fourth Geneva Convention Relative to the
    Protection of Civilian Persons in Time of War as to which at least 180 nations were parties.

26  *Sarei*, 2011 WL 5041927, at *18-25.

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1          Second, article 87 of the Convention on the Law of the Sea, *adopted by the Third*

2   *United Nations Conference on the Law of the Sea and opened for signature at Montego Bay*,

3   *Jamaica*, Dec. 10, 1982, 1833 U.N.T.S. 31363 (entered into force Nov. 16, 1994) (hereinafter

4   "UNCLOS"), also provides for "freedom of navigation" on the high seas.  Of the 193 member

5   States of the United Nations, 162 are parties to UNCLOS.  The United States has not ratified

6   UNCLOS because of its "regulations related to deep seabed exploration and mining";

7   nevertheless, "the United States has consistently accepted UNCLOS as customary international

8   law for more than 25 years."  *U.S. v. Hasan*, 747 F. Supp. 2d 599, 635-36 (E.D. Va. 2010).  The

9   Ninth Circuit also recognized that UNCLOS reflects customary international law that is specific

10   and obligatory.  *Alvarez-Machain v. United States*, 331 F.3d 604, 612 (9th Cir. 2003) (citing

11   *Hilao v. Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994)), *rev'd on other grounds*, 542 U.S.

12   692 (2004).

13          Third, the Convention for the Suppression of Unlawful Acts Against the Safety of

14   Maritime Navigation, *concluded at Rome* Mar. 10, 1988, S. Treaty Doc. No. 101-1,

15   1678 U.N.T.S. 29004, 27 I.L.M. 668 (1988) (entered into force Mar. 1, 1992; ratified by the

16   United States on Dec. 6, 1994, and entered into force by United States on Mar. 6, 1995)

17   (hereinafter "SUA Convention") recognized, among other things, that "unlawful acts against the

18   safety of maritime navigation jeopardize the safety of persons and property, seriously affect the

19   operation of maritime services, and undermine the confidence of the peoples of the world in the

20   safety of maritime navigation."  SUA Convention, 4th preamble.  The SUA Convention makes it

21   an offense if a "person unlawfully and intentionally: . . . (b) performs an act of violence against

22   a person on board a ship if that act is likely to endanger the safe navigation of that ship; or

23   (c) destroys a ship or causes damage to a ship or to its cargo which is likely to endanger the safe

24   navigation of that ship . . . ."  SUA Convention, art. 3, § 1(b)-(c).  An offense is also committed

25   if a person attempts to commit any of the foregoing, abets the commission of any of the

26   foregoing, or threatens to commit any of the foregoing if "likely to endanger the safe navigation

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   of the ship."  Art. 3, § 2.  Each "State Party shall take such measures as may be necessary to

2   establish its jurisdiction over the offences . . . when the offence is committed . . . by a national of

3   that State."  Art. 6, § 1(c).  A total of 157 nations have ratified the SUA Convention.

4            Finally, the Convention on the International Regulations for Preventing Collisions

5   at Sea, *concluded at London on* Oct. 20, 1972, 28.3 U.S.T. 3459, 1050 U.N.T.S. 15824

6   (acceptance by United States on Nov. 23, 1976, and entered into force July 15, 1977) (hereinafter

7   "COLREGs"), obligates vessels such as those utilized by defendants to employ methods and

8   means to *avoid collisions* on the high seas (not to cause collisions).  Over 150 nations have

9   signed COLREGs.  It became a treaty of the United States on or about July 15, 1977.  *See*

10   33 U.S.C. § 1602 (citing Ex. Ord. No. 11964, Jan. 19, 1977, 42 F.R. 4327).

11            Defendants have flouted these internationally recognized norms by intentionally

12   and unlawfully interfering with plaintiffs' right to freedom of navigation.  Among other things,

13   defendants have (1) directed vessels and their crew to drag ropes and other devices in front of

14   and around plaintiffs' vessels to disable or slow the vessels; (2) launched acid-containing

15   projectiles against plaintiffs' vessels and crew, causing injury and damage; (3) launched

16   incendiary devices against the vessels and crew; (4) rammed plaintiffs' vessels with their vessels;

17   and (5) navigated their vessels in a manner endangering plaintiffs' vessels and crew and resulting

18   in collisions between vessels.  (*See* Cpt. Ogawa Decl. ¶¶ 6-12; Cpt. Miura Decl. ¶¶ 6-9.)

19            Through "Operation Divine Wind," defendants have vowed to increase their

20   efforts to "stop" plaintiffs' activities in the Southern Ocean even if death ensues.  It cannot be

21   doubted that defendants intend to "stop" plaintiffs by engaging in the same unlawful practices

22   they have utilized in the past and which violate the international norms set forth in the High Seas

23   Convention, UNCLOS, the SUA Convention and COLREGs.

24           b.    <u>Freedom from Piracy</u>

25            The law of nations universally condemns acts of pirates as *hostes humani*

26   *generis*—enemies of all mankind.  *See U.S. v Shi*, 525 F.3d 709, 723 (9th Cir. 2008).  Given this

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 10
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1    universal condemnation, the Supreme Court recognized piracy as one of the three original

2    violations giving rise to a claim under the ATS.  *See Sosa*, 546 U.S. at 715.  Under the common

3    law and law of nations, as set forth in UNCLOS, the High Seas Convention, and the

4    SUA Convention, violent attacks on vessels on the high seas, such as the attacks committed by

5    defendants, are acts of piracy.

6            The High Seas Convention and UNCLOS define piracy as (i) any "illegal acts of

7    violence, detention or any act of depredation, committed for private ends by the crew or the

8    passengers of a private ship . . . and directed . . . [o]n the high seas, against another ship . . . or

9    against persons or property on board such ship"; (ii) "[a]ny act of voluntary participation in the

10   operation of a ship . . . with knowledge of facts making it a pirate ship"; and (iii) "[a]ny act of

11   inciting or intentionally facilitating" any of the foregoing acts.  High Seas Convention Art. 15,

12   §§ 1, 3; UNCLOS § 101.[5]  "[T]he international crime of piracy is definitively reflected in both

13   the High Seas Convention and UNCLOS, and UNCLOS has been accepted by the overwhelming

14   majority of the world as reflecting customary international law."  *Hasan*, 747 F. Supp. 2d at 640.

15   The definition of "piracy" in UNCLOS "has a norm-creating character and reflects an existing

16   norm of customary international law that is binding on even those nations that are not a party to

17   [UNCLOS], including the United States."  *Id.* at 634.

18           The SUA Convention also defines acts of piracy.  It recognizes that "unlawful

19   acts against the safety of maritime navigation jeopardize the safety of persons and property,

20   seriously affect the operation of maritime services, and undermine the confidence of the peoples

21   of the world in the safety of maritime navigation."  4th preamble.  The SUA Convention makes it

22   an offense if a "person unlawfully and intentionally:  . . . (b) performs an act of violence against

23   a person on board a ship if that act is likely to endanger the safe navigation of that ship; or

24   (c) destroys a ship or causes damage to a ship or to its cargo which is likely to endanger the safe

25   _____

26   [5] *See Hasan*, 747 F. Supp. 2d at 620 (noting that UNCLOS "defines piracy in exactly the same terms as the 1958 High Seas Convention, with only negligible stylistic changes").

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 11
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1 navigation of that ship . . . ."  Art. 3, § 1(b)-(c).  An offense is also committed if a person

2 attempts to commit any of the foregoing, abets the commission of any of the foregoing, or

3 threatens to commit any of the foregoing if "likely to endanger the safe navigation of the ship."

4 Art. 3, § 2.

5        Given the universal nature of the crime of piracy, Congress accepted as the

6 definition of piracy those acts as "defined by the law of nations."  18 U.S.C. § 1651.[6]  As one

7 court explained, "Congress necessarily left it to the federal courts to determine the definition of

8 piracy under the law of nations based on the international consensus at the time of the alleged

9 offense." *Hasan*, 747 F. Supp. 2d at 623.  Federal courts responded by adopting the definitions

10 of piracy in the conventions mentioned above. *See id.* at 619-20 (recognizing as international

11 law the High Sea Convention's and UNCLOS's definition of piracy:  "illegal acts of violence,

12 detention or any act of depredation, committed for private ends by the crew or the passengers of

13 a private ship . . . and directed . . . [o]n the high seas, against another ship . . . or against persons

14 or property on board such ship").  Thus, in *Hasan*, the court held that acts on the high seas of

15 persons in one vessel charging another vessel and shooting at it constituted acts of piracy, as did

16 the acts of others who maintained the vessel that launched the pirate boats. *See id.* at 641-42.

17        Defendants impliedly concede they are pirates.  The flagship of Watson and

18 SSCS, the M/V STEVE IRWIN, flies a pirate's flag.  Watson acknowledges he is a pirate, albeit

19 a "good pirate."  (Complaint, Dkt. No. 1, ¶ 30.)  And, by definition, there are no "good pirates."

20        Irrespective of defendants' self-characterization as pirates, their conduct is

21 indisputably acts of piracy.  The whole point of their violent attacks against the vessels and crew

22 is to advance their "private ends" (a violation of the High Seas Convention and UNCLOS), and

23 those same acts endanger safe navigation (a violation of the SUA Convention).  Defendants' past

24

25 _____

[6] 18 U.S.C. § 1651 provides:  "Whoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall
26 be imprisoned for life."

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    and threatened actions endanger the safe navigation of plaintiffs' ships and are acts of piracy in

2    violation of the High Seas Convention, UNCLOS, and the SUA Convention.

3              c.      Freedom from Terrorism

4              The International Convention for the Suppression of the Financing of Terrorism,

5    *done at New York* Dec. 9, 1999, T.I.A.S. No. 13075, 2178 U.N.T.S. 38349 (entered into force

6    Apr. 10, 2002; ratified by United States on Dec. 5, 2001, and entered into force by United States

7    on July 26, 2002) (hereinafter "Financing Convention") is a treaty of the United States and

8    reflects the law of nations.  *See Almog v. Arab Bank*, 471 F. Supp. 2d, 257, 277-78 (E.D.N.Y.

9    2007) (plaintiffs stated a claim under ATS for defendant's alleged violation of the Financing

10   Convention in financing suicide bombings by terrorist organizations in Israel).  The Financing

11   Convention has been ratified by more than 130 United Nations Member States, including the

12   United States (ratification instrument deposited June 26, 2002).[7]

13             The Financing Convention provides that it is an offense if a person "by any

14   means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the

15   intention that they should be used or in the knowledge that they are to be used, in full or in part,

16   in order to carry out:  (a) [a]n act which constitutes an offence within the scope of" the SUA

17   Convention.  Art. 2, § 1(a).  A person also commits an offense if that person "[p]articipates as an

18   accomplice" in an offense or "[o]rganizes or directs others to commit an offence."  Art. 2,

19   § 5(a), (b).  Additionally, it is an offense if a person "by any means, directly or indirectly,

20   unlawfully and wilfully, provides or collects funds with the intention that they should be used or

21   in the knowledge that they are to be used, in full or in part, in order to carry out:  . . . (b) [a]ny

22   other act intended to cause death or serious bodily injury to a civilian . . . when the purpose of

23

24

25   [7] The United States made criminal those acts prohibited by the Financing Convention through the
     Suppression of the Financing of Terrorism Convention Implementation Act of 2002.  *See*
26   18 U.S.C. § 2339C.

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1  such act, by its nature or context, is . . . to compel a government . . . to do or to abstain from

2  doing any act."  Art. 2, § 1(b).

3        Defendants' collection and use of SSCS funds to finance violent attacks under

4  "Operation Divine Wind" is a violation of the Funding Convention (and 18 U.S.C. § 2339C) in

5  two separate respects.  First, Watson and SSCS collect and provide funds to carry out attacks that

6  are in contravention of the SUA Convention.  Secondly, they collect and provide funds knowing

7  and intending that the funds will be used to carry out attacks against plaintiffs that are intended

8  to cause at least serious bodily injury to crew members and researchers (civilians) and thereby

9  compel the government of Japan to cease its authorization of research whaling.

10        Plaintiffs do not presently seek preliminary injunctive relief under this aspect of

11  their complaint.  Relief under this claim is presently focused on the freezing of assets of SSCS

12  that might be used to fund violent attacks.  Assuming the violent attacks are enjoined (and the

13  injunction obeyed), there should be no need to freeze funds on a preliminary injunction basis.

14      2.   <u>State-Law Claims</u>

15        This Court also has jurisdiction over plaintiff's state-law tort claims for conspiracy

16  and aiding and abetting the commission of torts.  Tort causes of action are "transitory in nature"

17  and therefore may be maintained in any court that has personal jurisdiction over the defendant.

18  *Mendoza v. Neudorfer Eng'rs, Inc.*, 145 Wn. App. 146, 156, 185 P.3d 1204 (2008); *see also*

19  *Lansverk v. Studebaker-Packard Corp.*, 54 Wn.2d 124, 125, 338 P.2d 747 (1959), *overruled on*

20  *other grounds*, *Werner v. Werner*, 84 Wn.2d 360, 526 P.2d 370 (1974) ("This is a transitory tort

21  action, and the defendant is subject to suit in any state where it can be served with process . . .").

22  As residents of Washington, defendants are subject to personal jurisdiction in all Washington

23  courts.  *See SCM v. Protek*, 136 Wn. App. 569, 574, 150 P.3d 141 (2007) ("A state exercises

24  personal jurisdiction in the following ways:  consent, domicile, residence, presence, appearance

25  in an action, and/or doing business in a state.").  Therefore, this Court has jurisdiction over

26  plaintiffs' state-law claims.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 14
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1    Defendants are liable for civil conspiracy if "(1) two or more people combined to

2    accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful

3    means; and (2) the conspirators entered into an agreement to accomplish the conspiracy."

4    *All Star Gas, Inc., of Wash. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000) (citing

5    *Wilson v. State*, 84 Wn. App. 332, 350-51, 929 P.2d 448 (1996), *cert. denied*, 522 U.S. 949,

6    118 S. Ct. 368, 139 L. Ed. 2d 286 (1997)).  Defendants have conspired to violate numerous

7    sources of international law as described above, as well as the common law of assault, battery,

8    and trespass.[8]  Defendants' fundraising, planning, and organizing for Operation Divine Wind is

9    nothing more than a conspiracy to commit assaults, batteries, and trespasses against plaintiffs'

10   vessels, crew members, and researchers.  Therefore, plaintiffs are likely to succeed on their

11   claims under state law.

12   **B.      Plaintiffs Will Be Irreparably Harmed.**

13   It cannot reasonably be disputed that plaintiffs will suffer irreparable injury if

14   defendants are not enjoined from dangerous and violent acts that threaten the safety of the

15   plaintiffs' vessels and the crew and researchers on board.  In the context of protest activities,

16   courts find irreparable harm when a defendant's actions threaten the health and safety of those

17   against whom the defendant is protesting.  For example, in *Lac du Flambeau v. Stop Treaty*

18   *Abuse-Wisconsin*, the plaintiffs, members of the Chippewa Indian tribe with treaty rights to spear

19   walleye, sought to enjoin the defendants' violent interference with plaintiffs' spearing.

20   759 F. Supp. 1339 (W.D. Wis. 1991).  Defendants "endangered the lives of spearers by

21   intentionally creating wakes to make it more difficult for spearers to fish . . . and . . . create the

22   risk that the spearer will fall from the boat into the recently thawed water."  *Id.* at 1344.  The

23

---

24   [8] An assault is any act that causes a person apprehension that harmful or offensive contact is
     imminent, and a battery is the intentional infliction of harmful or offensive contact with a person.
25   *McKinney v. Tukwila*, 103 Wn. App. 391, 408, 13 P.3d 631 (2000).  Trespass to personal
     property is the act of causing harm to a thing in which the possessor has a legally protected
26   interest.  Restatement (Second) of Torts § 218(d).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 15
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1   court held that plaintiffs faced "irreparable harm from the continu[ed] nature of the private

2   defendants' illegal activities . . . [and that] plaintiffs [would] continue to suffer from the improper

3   actions of the private defendants absent injunctive relief." *Id.* at 1353.

4           This type of irreparable harm to health and safety also is commonly considered in

5   the context of anti-abortion protests.  *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S.

6   753, 759, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994) (upholding a permanent injunction barring

7   anti-abortion protestors from protesting in such a manner that risked "the health, safety and

8   rights" of the women going to the clinics.); *Portland Fem. Women's Health Ctr. v. Advocates for

9   Life*, 859 F.2d 681, 686 (9th Cir. 1988) (upholding an injunction where the enjoined behavior

10  was "endanger[ing] the health and safety of" the patients at the hospital); *Roe v. Operation

11  Rescue*, 919 F.2d 857, 862 (3d Cir. 1990) (upholding a temporary restraining order aimed at

12  protecting women visiting an abortion clinic from "physical and emotional harm.").

13          In *Advocates for Life*, for example, defendants were a nonprofit corporation and

14  others engaged in right-to-life advocacy.  859 F.2d at 683.  They gathered at abortion clinics and

15  engaged in demonstrations that included bumping, grabbing, and pushing the plaintiff's clients to

16  impede the clients' passage into the clinic.  *Id.*  In its preliminary injunction order, the district

17  court recognized that the defendants' actions "are likely to continue in the future in a similar

18  manner in which they have taken place in the past" and that the "conduct raises the risk of

19  medical complications and injury to clients." *Id.* The Ninth Circuit agreed, and, recognizing the

20  "irreparable harm" that could result from defendants' continued endangerment of "the health and

21  safety of [the plaintiff's] patients[,]" upheld the preliminary injunction.  *Id.* at 686.

22          Unless enjoined, defendants will very soon engage in attacks far more egregious

23  than those in *Lac du Flambeau* and *Advocates for Life*.  Defendants' attacks will endanger the

24  safety of the Masters, their crew and researchers, and the vessels owned by Kyodo Senpaku and

25  chartered by ICR.  Navigating in the Southern Ocean is dangerous given the cold waters,

26  presence of icebergs, possibility of storms, and its isolated location far from ready third-party

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 16
(C11-2043 RAJ)

PDXDOCS:1952044.1

**MILLER NASH LLP**
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    assistance.  (*See* Cpt. Ogawa Decl. ¶ 13; Cpt. Miura Decl. ¶ 10.)  If a ship lost propulsion or

2    steerage due to a successful fouling rope attack, the ship, its Master, crew and researchers could

3    be put in serious jeopardy, especially in the vicinity of floating ice or if a storm or heavy seas

4    occurred.  (*Id.*)

5            Defendants' use of acid-filled glass projectiles launched against plaintiffs' vessels

6    and crew runs the risk of injury, including the risk of blinding a crew member.  (*See* Cpt. Ogawa

7    Decl. ¶ 14; Cpt. Miura Decl. ¶ 11.)  Defendants' use of incendiary devices like those launched in

8    the past could cause a fire or, even worse, an explosion.  (*See* Cpt. Ogawa Decl. ¶ 15; Cpt. Miura

9    Decl. ¶ 12.)  Close-quarter attacks by SSCS vessels or rubber boats launched from SSCS vessels

10   run the risk of a collision with plaintiffs' vessels.  (*See* Cpt. Ogawa Decl. ¶ 16; Cpt. Miura Decl.

11   ¶ 13.)  Defendants' ramming of plaintiffs' vessels could cause them to sink or suffer other serious

12   damage.  (*Id.*)

13           There is little doubt that plaintiffs face irreparable harm if defendants are not

14   enjoined.

15   **C.    The Balance of Hardship Tips Decidedly in Plaintiffs' Favor.**

16           There is also little doubt that the balance of hardship tips decidedly in plaintiffs'

17   favor.  After all, defendants will suffer no hardship if enjoined—they remain free to protest but

18   will be enjoined from protesting in a violent and dangerous manner.

19           When protest activities are balanced against threats to physical safety, safety

20   prevails, especially when the protest activities involve illegal conduct.  In *Lac du Flambeau*, the

21   defendants argued that the balance of hardships tipped in *their* favor because the injunction

22   would "restrict[] actions" that "infringe on their right of free speech guaranteed by the First

23   Amendment." 759 F. Supp. at 1353.  The court disagreed, explaining that "the First Amendment

24   does not provide [the defendants] with a right to threaten, assault or commit battery on

25   plaintiffs[,]" and therefore the "balance of potential harm to the parties weigh in favor of issuing

26   the injunction." *Id.*

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 17
(C11-2043 RAJ)

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

PDXDOCS:1952044.1

1    Similarly, in *Planned Parenthood v. Am. Coal. of Life Activists*, when considering

2  a motion for preliminary injunction against anti-abortion protestors, the court held:

3    I find that the balance of hardships weighs overwhelmingly in plaintiffs' favor.  In
     the absence of an injunction, plaintiffs will continue to live as they did before the
4    trial:  clad in bulletproof vests and disguises, borrowing cars and varying routes to
     avoid detection, and constantly in fear of the bodily harm with which they have
5    been threatened.

6    By contrast, the prohibition of unlawful activities imposes no burden on
     defendants.  Defendants may protest abortion using legitimate, lawful means.
7

8  41 F. Supp. 2d 1130, 1154 (D. Or. 1999), *aff'd in part, rev'd in part on other grounds*, 290 F.3d

9  1058 (9th Cir. 2002); *see also Northeast Women's Ctr. v. McMonagle*, 745 F. Supp. 1082, 1088

10  (E.D. Pa. 1990) (finding the balance of hardships tips in favor of plaintiffs because protestors "do

11  not possess an unrestricted right to convey their beliefs in any way they desire, regardless of the

12  unlawful consequences and impact their actions have on others."); *U.S. v. White*, 893 F. Supp.

13  1423, 1438 (C.D. Cal. 1995) (holding that the balance of hardships tips in physician's favor

14  because of the importance in "ensuring the basic safety and freedom of movement of [the

15  physician and his wife]").

16    Similarly, here the balance of hardships tips strongly in favor of plaintiffs, who

17  are threatened with harm to their safety and property.  On the other hand, the only "injury" the

18  defendants could suffer would be "the prohibition of unlawful activities" during their protests.

19  *See Planned Parenthood*, 41 F. Supp. 2d at 1154; *see also Wilson v. CHAMPUS*, 866 F. Supp.

20  903, 906 (E.D. Va. 1994) (holding that "Defendant cannot seriously argue against this Court's

21  finding that the balance of harms analysis strongly favors the Plaintiff" when "the Plaintiff may

22  lose her life.").  Because plaintiffs' interest in freedom from dangerous and violent attacks on the

23  high seas outweighs defendants' interests in illegal protests, the balance of hardships tips in favor

24  of plaintiffs.

25

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1    **D.      The Public Interest Would Be Served by Issuance of an Injunction.**

2    While "public interest" is a factor to be considered by the Court, "[w]hen the

3    reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the

4    public interest will be 'at most a neutral factor in the analysis . . . .'" *Stormans, Inc. v. Selecky*,

5    586 F.3d 1109, 1138-39 (9th Cir. 2009) (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931

6    (9th Cir. 2003)).  Because the injunction here is narrow in scope and affects only the parties and

7    no other persons, the public interest is a neutral factor in the Court's preliminary injunction

8    analysis.

9    But even if the public interest were to be considered, the public interest is served

10   by ensuring that protests include only lawful and safe conduct.  *See Lac de Flambeau*,

11   759 F. Supp. at 1354 (holding that the injunction against violent protestors would "promote" the

12   public interest because the "public has a strong interest in protecting the rights of all persons

13   from unlawful interference from others.").  This common-sense recognition that plaintiffs are to

14   be free from violent and dangerous attacks in the Southern Ocean is recognized by the

15   International Whaling Commission.  By consensus, the International Whaling Commission

16   adopted a resolution in July 2011 that states in part that it "**AGREES** that the resolution of

17   differences on issues regarding whales and whaling should not be pursued through violent

18   actions that risk human life and property at sea."  (Neupert Decl. ¶ 4 & Ex. 2.)

19   This, combined with the universally accepted interest in ensuring safe navigation

20   and freedom from piracy, demonstrates that the public interest is well served by enjoining

21   defendants' actions.  An injunction would require defendants' compliance with international and

22   domestic law that protects the safety and lives of both plaintiffs and defendants in the Southern

23   Ocean.

24

25

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1

## V.  CONCLUSION

2        For the foregoing reasons, plaintiffs respectfully ask this Court to grant plaintiffs'

3  motion for preliminary injunction.

4        DATED this 14th day of December, 2011.

5

6

7

8

                By:     s/ John F. Neupert
                By:     s/ M. Christie Helmer
                By:     s/ James L. Phillips
                John F. Neupert, P.C. #39883
                M. Christie Helmer #41171 (*admitted pro hac vice*)
                James L. Phillips #13186
                MILLER NASH LLP
                111 S.W. Fifth Avenue, Suite 3400
                Portland, Oregon  97204-3699
                Telephone:  (503) 224-5858 or (206) 622-8484
                Fax:  (503) 224-0155
                E-mail:   john.neupert@millernash.com
                          chris.helmer@millernash.com
                          james.phillips@millernash.com
                *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699

1          I hereby certify that on December 14, 2011, I electronically filed the foregoing

2    Plaintiffs' Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF

3    system, which will send notification of such filing to the following:

4          Daniel P. Harris
      dan@harrismoure.com
5          Charles P. Moure
      charles@harrismoure.com
6          Rachel E. Buker
      rachel@harrismoure.com
7          HARRIS & MOURE, PLLC
      600 Stewart Street, Suite 1200
8          Seattle, Washington  98101
      Telephone:  (206) 224-5657
9          Fax:  (206) 224-5659
      *Attorneys for Defendants*
10

11   and I hereby certify that I have mailed by United States Postal Service the document to the

12   following non-CM/ECF participants:

13         Not applicable

14

15         DATED this 14th day of December, 2011.

16

17                   By:      s/ John F. Neupert
                John F. Neupert, P.C. #39883
18                   *Of Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

**MILLER NASH** LLP
ATTORNEYS AT LAW
PHONE  (503) 224-5858 / FAX  (503) 224-0155
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204-3699