# Exhibit 1

FILE NO. 151874 -12

ARTICLES OF INCORPORATION

OF

SEA SHEPHERD CONSERVATION SOCIETY

**FILED**
IN THE OFFICE OF THE CORPORATION
COMMISSIONER OF THE STATE OF OREGON
APR 6 - 1981
**FRANK J. HEALY**
CORPORATION COMMISSIONER

The undersigned natural person of the age of eighteen years or more, acting as incorporator under the Oregon Nonprofit Corporation Law, adopts the following Articles of Incorporation:

### ARTICLE 1

NAME:  The name of this corporation is SEA SHEPHERD CONSERVATION SOCIETY and its duration shall be perpetual.

### ARTICLE 2

PURPOSES:  The purposes for which the corporation is organized are:

2.1  To promote awareness of environmental problems, alternatives and solutions among the people of the United States and the World.

2.2  To educate the general public as to the importance of ecological stability and sound environmental management.

2.3  To research, develop and promote innovative environmentally sound alternatives to industries and institutions.

2.4  To provide funding for scientific research in the fields of ecology, applied anthropology, environmental planning, agriculture, aquaculture and urban engineering and to provide funding for scholarships to the general pubilic for study in those same fields.

2.5  To initiate action to oppose industrial and/or institutional development projects which endanger or threaten the health and welfare of human populations.

2.6  To initiate action on behalf of endangered or threatened species of flora and fauna when necessary to insure continued survival.

2.7  To initiate action to prevent the misuse of natural habitat if such misuse demonstrates evidence of potential ecological damage.

2.8  To foster cooperation among Nations to protect ecosystems in accordance with the common heritage principle and to provide guidance in the formulation and enactment of international law designed to protect the environment within the tenents of the common heritage principle.

SEA SHEPHERD CONSERVATION SOCIE



15187412-12796432         ZIMGNEW

2.9  To do everything incidental and necessary to promote and attain the foregoing objects throughout the United States and the World.

2.10 To engage in any lawful activities, none of which is for profit, for which corporations may be organized under ORS Chapter 61.  No part of the assets, income or profit of the corporation shall be distributable to, or inure to the benefit of, its members, directors or officers, except to the extent permitted under ORS Chapter 61.

2.11 This corporation is organized exclusively for charitable, scientific, literary and/or educational purposes within the meaning of section 501 (c)(3) of the Internal Revenue Code.

2.12 Notwithstanding any other provision of these Articles, the corporation shall not carry on any activities not permitted to be carried on by an organization exempt from Federal Income Tax under section 501 (c)(3) of the Internal Revenue Code.  No part of the activities of the corporation shall be carrying on propaganda, or otherwise attempting to influence legislation, or participating in or intervening in, any political campaign on behalf of any candidate for public office.

## ARTICLE 3

MEMBERSHIP:  The corporation shall have members divided into one or more classes as stated in the Bylaws.  The members shall have voting rights as stated in the Bylaws.

## ARTICLE 4

DIRECTORS:  The number of directors of this corporation shall be fixed by the Bylaws and may be increased or decreased from time to time in the manner specified therein.  The manner in which directors are selected and the length of their term of office shall be in accordance with the Bylaws.  The number of directors constituting the initial board of directors is three, and the names and addresses of the persons who are to serve until the first annual meeting or until their successors are elected and shall qualify are:

| | |
|---|---|
| Margaret A. Downey | 7460 SW Canyon Drive Portland, Oregon  97228 |
| Paul Watson | P.O. Box 48446 Vancouver, British Columbia, Canada VX71A2 |
| David Smith | 7460 SW Canyon Drive Portland, Oregon  97228 |

## ARTICLE 5

BYLAWS:  The Board of Directors shall have the power to adopt, amend or repeal the Bylaws for this corporation.

## ARTICLE 6

AMENDMENTS OF ARTICLES OF INCORPORATION:  The corporation reserves the right to amend or repeal, by the affirmative vote of a majority of its Board of Directors entitled to vote thereon, any of the provisions contained in these Articles of Incorporation, and the rights of the members of this corporation are granted subject to this reservation.

## ARTICLE 7

DISTRIBUTION OR DISSOLUTION OR LIQUIDATION:  In the event of the dissolution or liquidation of the corporation, whether voluntary or involuntary, no member shall be entitled to any distribution or division of its remaining property or its proceeds, and the balance of all money and other property received by the corporation form any source, after the payment of all debts and obligations of the corporation, shall be used or distributed, subject to the order of the Courts of the State Oregon, as then provided by law, exclusively for purposes within those allowed under Article 2 herein and within the intendment of section 501 (c)(3) of the Internal Revenue Code of 1954 and the regulations thereunder as they exist at that time.

## ARTICLE 8

REGISTERED AGENT/OFFICE:  The address of the initial registered office of the corporation is 1030 SW Taylor, Portland, Oregon 97205, and the name of its registered agent at such address is James Coon.

## ARTICLE 9

INCORPORATOR:  The name and address of the incorporator is

Kent V. Snyder
6477 SW Parkhill Way
Portland, Oregon  97201

I, the undersigned incorporator, declare under penalties of perjury that I have examined the foregoing and to the best of my knowledge and belief, it is true, correct and complete.

_____          Dated this 20TH day of March, 1981.
KENT V. SNYDER

**INSTRUCTIONS – See Reverse Side**        **FILE NUMBER** NP - 151874

**1.**        **CHANGE OF REGISTERED AGENT AND OFFICE**

_____
                    (EXACT NAME OF CORPORATION)

by resolution adopted by its Board of Directors has:

   A. Changed its Registered Agent to _____ ;

   B. Changed its Registered Office to _____
                                          (Street Address)

*(P.O. Box)        (City)        (State)        (Zip Code)

I, the undersigned officer, declare under penalty of perjury that I
have examined the foregoing statement and, to the best of my
knowledge and belief, it is true, correct and complete.

_____    _____    _____
   (Date)         (Signature of Officer)      (Title)


**II.**        **CHANGE OF REGISTERED OFFICE ADDRESS ONLY**

**SEA SHEPHERD CONSERVATION SOCIETY**
                    (NAME OF CORPORATION)

The Registered Office address has been changed to:

**5441 S.W. Macadam Avenue, Suite 300**
                (Street address)        *(P.O. Box)

**Portland, Oregon 97201**
(City)                (State)                (Zip)

A copy of the statement has been mailed to the corporation.

I, the undersigned Registered Agent, declare under penalty of
perjury that I have examined the foregoing statement and, to the
best of my knowledge and belief, it is true, correct and complete.

8/7/84        ≈≈≈≈≈≈≈≈≈        Attorney
  (Date)        (Signature of Registered Agent)        (Title)
                James S. Coon


GC-4 (3/84)                **(See Reverse Side)**

# Exhibit 2

# REGISTRATION  CERTIFICATE

| Official Number | Name of Ship |
|---|---|
| 859712 | BRIGITTE BARDOT |

## General Particulars

| Home Port | Call Sign | Year of Registration | Year of Completion |
|---|---|---|---|
| Fremantle | | 2011 | 1998 |
| **Type** | **Build** | **Stem** | **Stern** |
| Pleasure craft | Round | Plumb | Raked reverse |
| **Rigging** | **No. of Decks** | **No. of Bulkheads** | **No. of Masts** |
| None | 2 | 12 | 0 |
| **Principal Material of Construction** | **Length** | **Maximum Breadth** | **Moulded Depth Amidships** |
| GRP | 33.15 m. | 14.06 m. | 2.20 m. |
| **Brake Power** | **Indicated Power** | **Shaft Power** | **Estimated Speed** |
| 398 x 2  kW | 500 x 2  bhp | | 22  kn. |

| Place of Construction |
|---|
| Southampton, United Kingdom |

## Particulars of Propulsion

| Method of Propulsion | Power Transmission |
|---|---|
| Motor | Twin screw |

| No. and Type of Boilers |
|---|
| |

| No. and Type of Engines |
|---|
| Two 6 cylinder, Cummins QSC 500 diesel, Serial Number: 73082550, 73082923 |

## Particulars of Tonnage

| Type of Tonnage Certificate |
|---|
| International |

| Gross Tonnage | Net/Register Tonnage |
|---|---|
| 95 | 29 |

| Alternative Tonnage |
|---|
| |

## Certification

I, **Trish MALONE, Registrar of Ships** , certify that the ship, particulars of which are set out above, is duly registered under the Shipping Registration Act 1981 and that those particulars and the particulars of ownership and particulars of registered agent that are set out below, are in accordance with the relevant entry in the Australian Register of Ships.

Certificate RC11041  granted 21 April 2011

## Particulars of Registered Agent

| Name of Registered Agent | Address |
|---|---|
| MACLEAN  Lockhart | Suite 7, 288 Brunswick Street, Fitzroy, Victoria, 3065, Australia |

## Particulars of Ownership

| No. of Shares | Name  of the Owner | Address | Nationality |
|---|---|---|---|
| 64 | SEA SHEPHERD AUSTRALIA LIMITED | Suite 7, 288 Brunswick Street, Fitzroy, Victoria, 3065, Australia | Australian |

FILE COPY

## Endorsement of Master

| Name of  Master | Address | No. of Certificate of Competency (if applicable) | Date and Signature of delegate of the Registrar |
|---|---|---|---|
| | | | |

Important Notes

1.  A Registration Certificate is required to be carried for the lawful navigation of any ship proceeding on overseas voyages and on those occasions must be produced to a Customs officer.
2.  A Registration Certificate is not a title document. A search of the Register will reveal the current registered ownership and registered encumbrances and caveats.
3.  It is an offence for a person to use a Registration Certificate which contains entries not made by or endorsed by the Registrar or Deputy Registrar of Ships or by a delegate of the Registrar (Section 25).
4.  Upon transfer of ownership of a registered ship:
    - This Certificate must be handed to the new owner, or to the Registrar upon request.
    - The new owner must forward the Certificate together with the prescribed documentation evidencing the transfer to the Registrar within 14 days of the transfer.
5.  Should the ship be lost, broken up or sold to foreigners the Registrar must be notified immediately and the Certificate, if existing, given to the Registrar. Changes of ownership, address or other registered particulars should be notified to the Registrar within 14 days.
6.  The ship's name, home port, official number and tonnage (or length overall) must be marked according to law on the ship at all times. It is an offence to change any markings on a registered ship without the Registrar's authorisation.
7.  For further information, contact the:

Registrar of Ships
Australian Shipping Registration Office
GPO Box 2181
Canberra  ACT  2601
Australia

Telephone: (02) 6279 5925
Facsimile: (02) 6279 5922
E-mail: sro@amsa.gov.au
Web: www.amsa.gov.au

**Zeebrief**    **(Certificate of Registry)**

---

# IN NAAM VAN HARE MAJESTEIT DE KONINGIN DER NEDERLANDEN

*IN THE NAME OF HER MAJESTY THE QUEEN OF THE NETHERLANDS*

Gelet op artikel 4, 5 en 6 eerste lid, van de Zeebrievenwet (Stb. 1992, 544);
*Having regard to sections 4, 5 and 6 (subsection 1) of the Certificates of Registry Act (Bulletin of Acts, Orders and decrees 1992, 544);*

| | |
|---|---|
| **Hierbij wordt verklaard dat:** <br> *This is to certify that:* | **het Motorjacht** <br> *the Motor yacht* |
| **genaamd:** <br> *name of vessel:* | **BOB BARKER** |
| **roepnaam:** <br> *call sign:* | |
| **romp gebouwd van:** <br> *hull constructed of:* | **STAAL** <br> STEEL |
| **te:** <br> *at:* | **FREDRIKSTAD (NOORWEGEN)** <br> NORWAY |
| **in het jaar:** <br> *in the year:* | **1950** |
| **verbouwjaar:** <br> *year of conversion:* | |
| **hebbende:** <br> *having:* | **BRUG, KOEL-, COMMUNICATIE- EN OPSLAGRUIMTE, SCHOORSTEEN, 9 HUTTEN, TOILETTEN, KOMBUIS, DUBBELE HUT, DOUCHE, BOEGSCHROEFRUIMTE, ACCOMMODATIES EN MACHINEKAMER;** <br><br> BRIDGE, COOLING, COMMUNICATION AND STORAGE SPACE, FUNNEL, 9 CABINS, TOILETS, GALLEY, DOUBLE CABIN, SHOWER, BOW THRUSTER SPACE, ACCOMMODATION AND ENGINEROOM; |

| | | |
|---|---|---|
| **voortbewogen door:** <br> *propelled by:* <br> **DEUTZ SBV 12628** | **met een vermogen van (kW):** <br> *with a rated capacity of:* <br> **3000** | **motornummer(s):** <br> *motornumber(s):* <br> **6983823** |

| | |
|---|---|
| **de bruto tonnage is:** <br> *gross tonnage:* | **488** |
| **de netto tonnage is:** <br> *net tonnage:* | **236** |
| **teboekgesteld in het scheeps- register te Nederland onder nummer:** <br> *has been entered in the Ship's register at The Netherlands under registration number:* | **22777 Z 2010** |

# Zeebrief   (Certificate of Registry)

toebehorende aan:
*owned by:*

**Stichting Sea Sheperd Conservation Society**
**Berkenlaan 11**
**3771 XV  BARNEVELD**
**NEDERLAND**

een Nederlands zeeschip is in de zin van het Wetboek van Koophandel en dat het gerechtigd is de Nederlandse
vlag te voeren.
*Is a Dutch seagoing vessel within the meaning of the Commercial Code and is entitled to fly the Dutch flag.*

Afgegeven te Rotterdam, **28-06-2010**
*Issued at Rotterdam ,*

**DE MINISTER VAN VERKEER EN WATERSTAAT,**
*THE MINISTER OF TRANSPORT, PUBLIC WORKS AND WATER MANAGEMENT,*

namens deze,
*on his behalf,*

**HET AFDELINGSHOOFD TOELATING EN CONTINUERING,**
*THE UNITMANAGER CERTIFICATIONS AND PERMITS,*

H. Boaman Koch MPA

Paginanummer: 3 van 3        SI Schip id: **53854**         Certificaatnummer: **6856/2010**
*Pagenumber:        of          SI Vessel id:*                *Certificatenumber:*

**Zeebrief    (Certificate of Registry)**

Ruimte voor het aftekenen door Nederlandse diplomatieke of consulaire ambtenaren.
*Space for endorsements by Dutch diplomatic or consular officials.*

Paginanummer: 1 van 3
Pagenumber: of
Zeebrief (Certificate of Registry)

Schip id: 50466
Ship id:

Certificaatnummer: 11193/2008
Certificatenumber:

Case 1:11-cv-02043-JLR Document 54-1 Filed 01/30/12 Page 12 of 83

# IN NAAM VAN HARE MAJESTEIT DE KONINGIN DER NEDERLANDEN

*IN THE NAME OF HER MAJESTY THE QUEEN OF THE NETHERLANDS*

Gelet op artikel 4, 5 en 6 eerste lid, van de Zeebrievenwet (Stb. 1992, 544);
*Having regard to sections 4, 5 and 6 (subsection 1) of the Certificates of Registry Act (Bulletin of Acts, Orders and decrees 1992, 544);*

| | |
|---|---|
| Hierbij wordt verklaard dat: *This is to certify that:* | **het** Motorjacht *the* Motor yacht |
| genaamd: *name of vessel:* | **STEVE IRWIN** |
| roepnaam: *call sign:* | **PC 9093** |
| romp gebouwd van: *hull constructed of:* | **STAAL** STEEL |
| te: *at:* | **ABERDEEN (VERENIGD KONINKRIJK)** UNITED KINGDOM |
| in het jaar: *in the year:* | **1975** |
| verbouwjaar: *year of conversion:* | |
| hebbende: | **BAK, 3 DEKHUIZEN, SCHOORSTEEN EN STABILISATIETANK;** |
| having: | FORECASTLE, 3 ROUNDHOUSES, FUNNEL AND STABILISATION TANK; |

| voortbewogen door: *propelled by:* | met een vermogen van (kW): *with a rated capacity of:* | motornummer(s): *motornumber(s):* |
|---|---|---|
| **BRITISH POLAR -** | **3089** | **E 3083** |
| **BRITISH POLAR -** | **3089** | **E 3084** |

| | |
|---|---|
| de bruto tonnage is: gross tonnage: | **1017** |
| de netto tonnage is: net tonnage: | **305** |
| teboekgesteld in het scheeps- register te Nederland onder nummer: *has been entered in the Ship's register at The Netherlands under registration number:* | **21389 Z 2007** |

Model ZDJAC 30.03.2007 HT/MVV
Sectie Meting

**Zeebrief   (Certificate of Registry)**

toebehorende aan:         **Sea Shepherd UK**
*owned by:*                **DITTON FIELDS 126**
                          **CB5 8QL  CAMBRIDGE**
                          **VERENIGD KONINKRIJK**

een Nederlands zeeschip is in de zin van het Wetboek van Koophandel en dat het gerechtigd is de Nederlandse vlag te voeren.
*Is a Dutch seagoing vessel within the meaning of the Commercial Code and is entitled to fly the Dutch flag.*

Afgegeven te Rotterdam, **22-10-2008**
*Issued at Rotterdam ,*

**door de Minister van Verkeer en Waterstaat,**
*by the Minister of Transport, Public Works & Water Management,*

en namens deze,
*and signed on his or her behalf by,*

**De Inspecteur-generaal Inspectie Verkeer en Waterstaat,**
namens deze,

*The Inspector general Transport and Water Management Inspectorate,*
*on his behalf,*

*Model ZDJAC 30.03.2007 HT/MVV*
*Sectie Meting*

Pagenummer: 3 van 3   SI Schip id: 50466   Certificaatnummer: 11193/2008
*Pagenumber:*   *of*   *SI Vessel id:*   *Certificatenumber:*

**Zeebrief**   (Certificate of Registry)

Ruimte voor het aftekenen door Nederlandse diplomatieke of consulaire ambtenaren.
*Space for endorsements by Dutch diplomatic or consular officials.*

Model 2DJAC  30.03.2007  HT/MVV
Sectie Meting

# Exhibit 3



[Home] [Databases] [WorldLII] [Search] [Feedback]

# Federal Court of Australia Decisions

**You are here:**  AustLII >> Databases >> Federal Court of Australia Decisions >> 2008 >> **[2008] FCA 3**
[Database Search] [Name Search] [Recent Decisions] [Noteup] [Download] [Help]

---

## Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2008] FCA 3 (15 January 2008)

Last Updated: 15 January 2008

**FEDERAL COURT OF AUSTRALIA**

**Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2008] FCA 3**

**ENVIRONMENT** – contravention by respondent of *Environment Protection and Biodiversity Conservation Act 1999* (Cth)

**PRACTICE AND PROCEDURE** – public interest injunction – discretion whether to grant relief – futility

*Antarctic Treaty (Environment Protection) Act 1980* (Cth) s 7
*Environment Protection and Biodiversity Conservation Act 1999* (Cth) ss 3, 5, 225, 229, 229A, 229B, 229C, 229D, 230, 231, 238, 475, 498B
*Evidence Act 1995* (Cth) ss 87, 88
*Trade Practices Act 1974* (Cth) s 80

*International Convention for the Regulation of Whaling* [1948] ATS 18
*United Nations Convention on the Law of the Sea* [1994] ATS 31

*Abebe v Commonwealth* [1999] HCA 14; (1999) 197 CLR 510 referred to
*Bass v Permanent Trustee* [1999] HCA 9; (1999) 198 CLR 334 referred to
*Citron v Zündel (No 4)* (2002) 41 CHRR D/274 referred to
*Mabo v Queensland (No 2)* [1992] HCA 23; (1992) 175 CLR 1 cited
*Simonton v Australian Prudential Regulation Authority* [2006] FCAFC 118; (2006) 152 FCR 129 cited
*Truth About Motorways v Macquarie Infrastructure Investment Management Ltd* [2000] HCA 11; (2000) 200 CLR 591 referred to
*Vincent v Peacock* [1973] 1 NSWLR 466 referred to

**HUMANE SOCIETY INTERNATIONAL INC v KYODO SENPAKU KAISHA LTD
NSD 1519 OF 2004**

**ALLSOP J
15 JANUARY 2008
SYDNEY**

**IN THE FEDERAL COURT OF AUSTRALIA
NEW SOUTH WALES DISTRICT REGISTRY**                    **NSD 1519 OF 2004**

| | |
|---|---|
| **BETWEEN:** | **HUMANE SOCIETY INTERNATIONAL INC**<br>**Applicant** |
| **AND:** | **KYODO SENPAKU KAISHA LTD**<br>**Respondent** |

**JUDGE:**            **ALLSOP J**

**DATE OF ORDER:**   **15 JANUARY 2008**

**WHERE MADE:**      **SYDNEY**

1. THE COURT DECLARES that the respondent has killed, injured, taken and interfered with Antarctic minke whales (*Balaenoptera bonaerensis*) and fin whales (*Balaenoptera physalus*) and injured, taken and interfered with humpback whales (*Megaptera novaeangliae*) in the Australian Whale Sanctuary in contravention of sections 229, 229A, 229B and 229C of the *Environment Protection and Biodiversity Conservation Act 1999* (Cth), (the "Act"), and has treated and possessed such whales killed or taken in the Australian Whale Sanctuary in contravention of sections 229D and 230 of the Act, without permission or authorisation under sections 231, 232 or 238 of the Act.

2. THE COURT ORDERS that the respondent be restrained from killing, injuring, taking or interfering with any Antarctic minke whale (*Balaenoptera bonaerensis*), fin whale (*Balaenoptera physalus*) or humpback whale (*Megaptera novaeangliae*) in the Australian Whale Sanctuary, or treating or possessing any such whale killed or taken in the Australian Whale Sanctuary, unless permitted or authorised under sections 231, 232 or 238 of the *Environment Protection and Biodiversity Conservation Act 1999* (Cth).

Note: Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

**IN THE FEDERAL COURT OF AUSTRALIA**
**NEW SOUTH WALES DISTRICT REGISTRY**                      **NSD 1519 OF 2004**
BETWEEN:          **HUMANE SOCIETY INTERNATIONAL INC**
                  **Applicant**
AND:              **KYODO SENPAKU KAISHA LTD**
                  **Respondent**


JUDGE:            **ALLSOP J**
DATE:             **15 JANUARY 2008**
PLACE:            **SYDNEY**


**REASONS FOR JUDGMENT**


**Background**

1 These reasons should be read against the background of the earlier judgments on service: *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2004] FCA 1510;* (2004) 212 ALR 551, *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2005] FCA 664* (the two judgments containing my original reasons for refusing leave to serve outside Australia), *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2006] FCAFC 116;* (2006) 154 FCR 425 (the Full Court judgment), and *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2007] FCA 124* (my reasons on substituted service). I do not propose to repeat matters there discussed. Phrases and terms used in these reasons (if otherwise undefined or unexplained) are to be understood by reference to those earlier reasons.

2 This is an application under section 475 of the *Environment Protection and Biodiversity Conservation Act 1999* (Cth) (the "EPBC Act") for injunctive relief and accompanying declarations in relation to whaling activities undertaken by the respondent in the Australian Whale Sanctuary, in contravention of ss 229-230 of the EPBC Act. References to section numbers are to provisions of the EPBC Act unless otherwise stated.

3 The respondent is a company incorporated in Japan, which the evidence reveals is the owner of a number of ships from which it has engaged, and is likely in the future to engage, in the killing of various species of whales in the Australian Whale Sanctuary. The respondent has engaged in such activity pursuant to the Japanese Whaling Research Program under Special Permit in the Antarctic (JARPA), issued under Article VIII of the *International Convention for the Regulation of Whaling* (opened for signature 2 December 1946) 1948 ATS 18 (entered into force 10

November 1948) (the "Whaling Convention") and monitored by the International Whaling Commission ("IWC"). From 2005, a second, more extensive, whaling programme has been undertaken by the respondent under a special permit, known as JARPA II.

4 The applicant is a public interest organisation incorporated in New South Wales, whose stated objectives include promotion of the "enhancement and conservation of all wild plants and animals". The applicant qualifies as an "interested person" pursuant to s 475(7) of the EPBC Act, and is therefore entitled to bring an action claiming the relief sought: see *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2004] FCA 1510;* (2004) 212 ALR 551 at [15].

**The EPBC Act**

5 The EPBC Act was enacted by the Commonwealth Parliament in 1999. The objects stated in s 3 of the EPBC Act include, amongst other things, the protection of the environment, particularly for matters of national environmental significance, conservation of biodiversity and heritage and promotion of ecologically sustainable development.

6 The EPBC Act is drafted in wide terms. It applies throughout Australia, including its external territories (s 5(1)), and to adjacent waters claimed as Australia's Exclusive Economic Zone. It applies to all persons and all vessels within territorial Australia and the exclusive economic zone, including persons who are not Australian citizens and vessels that are not registered Australian vessels: s 5(4).

7 One of the stated means by which the Parliament has expressed its intention to achieve the objects of the Act is by the establishment of the Australian Whale Sanctuary "to ensure the conservation of whales and other cetaceans": s 3(2)(e)(ii). The Australian Whale Sanctuary is established by s 225 of the EPBC Act, which is in the following terms:

*(1) The Australian Whale Sanctuary is established in order to give formal recognition of the high level of protection and management afforded to cetaceans in Commonwealth marine areas and prescribed waters.*

*(2) The Australian Whale Sanctuary comprises:*

*(a) any waters of the sea inside the seaward boundary of the exclusive economic zone, except:*

*(i) waters, rights in respect of which have been vested in a State by section 4 of the Coastal Waters (State Title) Act 1980 or in the Northern Territory by section 4 of the Coastal Waters (Northern Territory Title) Act 1980; and*

*(ii) waters within the limits of a State or the Northern Territory; and*

*(b) any waters over the continental shelf, except:*

*(i) waters, rights in respect of which have been vested in a State by section 4 of the Coastal Waters (State Title) Act 1980 or in the Northern Territory by section 4 of the Coastal Waters (Northern Territory Title) Act 1980; and*

*(ii) waters within the limits of a State or the Northern Territory; and*

*(iii) waters covered by paragraph (a); and*

*(c) so much of the coastal waters of a State or the Northern Territory as are prescribed waters.*

8 Sections 229 to 230 make it an offence to kill, injure, intentionally take or otherwise deal with a cetacean in the Australian Whale Sanctuary. The relevant provisions are as follows:

**229** *Killing or injuring a cetacean*

*(1) A person is guilty of an offence if:*

*(a) the person takes an action; and*

*(b) the action results in the death or injury of a cetacean; and*

*(c) the cetacean is in:*

*(i) the Australian Whale Sanctuary (but not the coastal waters, or a part of the coastal waters, of a State or the Northern Territory for which a declaration under section 228 is in force); or*

*(ii) waters beyond the outer limits of the Australian Whale Sanctuary.*

*(1A) Strict liability applies to paragraph (1)(c).*

*(2) The offence is punishable on conviction by imprisonment for not more than 2 years or a fine not exceeding 1,000 penalty units, or both.*

**229A** *Strict liability for killing or injuring a cetacean*

*(1) A person is guilty of an offence if:*

*(a) the person takes an action; and*

*(b) the action results in the death or injury of a cetacean; and*

*(c) the cetacean is in:*

*(i) the Australian Whale Sanctuary (but not the coastal waters, or a part of the coastal waters, of a State or the Northern Territory for which a declaration under section 228 is in force); or*

*(ii) waters beyond the outer limits of the Australian Whale Sanctuary.*

*(2) Strict liability applies to paragraphs (1)(a), (b) and (c).*

*(3) The offence is punishable on conviction by a fine not exceeding 500 penalty units.*

**229B** *Intentionally taking etc. a cetacean*

*(1) A person is guilty of an offence if:*

*(a) the person takes, trades, keeps, moves or interferes with a cetacean; and*

*(b) the cetacean is in:*

*(i) the Australian Whale Sanctuary (but not the coastal waters, or a part of the coastal waters, of a State or the Northern Territory for which a declaration under section 228 is in force); or*

*(ii) waters beyond the outer limits of the Australian Whale Sanctuary.*

*(2) Strict liability applies to paragraph (1)(b).*

*(3) The offence is punishable on conviction by imprisonment for not more than 2 years or a fine not exceeding 1,000 penalty units, or both.*

*(4) In this Act:*

*interfere with a cetacean includes harass, chase, herd, tag, mark or brand the cetacean.*

*trade a cetacean:*

*(a) includes:*

*(i) buy the cetacean, agree to receive it under an agreement to buy, agree to accept it under such an agreement or acquire it by barter; or*

*(ii) sell the cetacean, offer it for sale, agree to sell it, have it in possession for the purpose of sale, deliver it for the purpose of sale, receive it for the purpose of sale or dispose of it by barter for the purpose of gain or advancement; or*

*(iii) cause or allow any of the acts referred to in subparagraph (i) or (ii) to be done; but*

*(b) does not include export the cetacean from Australia or an external Territory or import it into Australia or an external Territory.*

**229C** *Strict liability for taking etc. a cetacean*

*(1) A person is guilty of an offence if:*

*(a) the person takes, trades, keeps, moves or interferes with a cetacean; and*

*(b) the cetacean is in:*

*(i) the Australian Whale Sanctuary (but not the coastal waters, or a part of the coastal waters, of a State or the Northern Territory for which a declaration under section 228 is in force); or*

*(ii) waters beyond the outer limits of the Australian Whale Sanctuary.*

*(2) Strict liability applies to paragraphs (1)(a) and (b).*

*(3) The offence is punishable on conviction by a fine not exceeding 500 penalty units.*

**229D** *Treating cetaceans*

*Treating unlawfully killed or taken cetaceans*

*(1) A person is guilty of an offence if:*

*(a) the person treats a cetacean; and*

*(b) the cetacean has been:*

*(i) killed in contravention of section 229 or 229A; or*

*(ii) taken in contravention of section 229B or 229C.*

*(2) An offence against subsection (1) is punishable on conviction by imprisonment for not more than 2 years or a fine not exceeding 1,000 penalty units, or both.*

*Treating unlawfully imported cetaceans*

*(2A) A person commits an offence if:*

*(a) the person treats a cetacean; and*

*(b) the cetacean has been unlawfully imported.*

*(2B) An offence against subsection (2A) is punishable on conviction by imprisonment for not more than 5 years or a fine not exceeding 1,000 penalty units, or both.*

*(3) In this Act:*

*treat a cetacean means divide or cut up, or extract any product from, the cetacean.*

**230** *Possession of cetaceans*

*Possession of unlawfully killed cetaceans*

*(1) A person is guilty of an offence if:*

*(a) the person has in his or her possession:*

*(i) a cetacean; or*

*(ii) a part of a cetacean; or*

*(iii) a product derived from a cetacean; and*

*(b) the cetacean has been:*
*(i) killed in contravention of section 229 or 229A; or*

*(ii) taken in contravention of section 229B or 229C.*

*(2) An offence against subsection (1) is punishable on conviction by imprisonment for not more than 2 years or a fine not exceeding 1,000 penalty units, or both.*

*Possession of unlawfully imported cetaceans*

*(3) A person commits an offence if:*

*(a) the person has in his or her possession:*

*(i) a cetacean; or*

*(ii) a part of a cetacean; or*

*(iii) a product derived from a cetacean; and*

*(b) the cetacean, part or product, as the case may be, has been unlawfully imported.*

*(4) An offence against subsection (3) is punishable on conviction by imprisonment for not more than 5 years or a fine not exceeding 1,000 penalty units, or both.*

9 A "cetacean" is defined in schedule 1 to the Act as "a member of the sub-order Mysticeti or Odontoceti of the Order Cetacea". Relevantly, Antarctic minke whales, fin whales and humpback whales are cetaceans as defined by the EPBC Act.

10 The Commonwealth Director of Prosecutions is responsible for prosecuting any offences under the EPBC Act, a decision which is made independently of the Executive Government. To date, the DPP has not sought to prosecute the respondent or others for undertaking the activity

complained of by the applicant. In the absence of, or in addition to, criminal prosecution, section 475 of the Act gives the Minister, or an "interested person", standing to seek in a civil action an injunction to restrain conduct that would amount to an offence. This is what has been sought in this case. The section plainly gives *locus standi* to the applicant to seek the orders in this proceeding, without seeking the fiat of the Attorney-General and without any attendant complexities that might otherwise arise in the civil enforcement or prevention of conduct that is provided for by the criminal law (here by the same Commonwealth statute).

## UNCLOS

11 Territorial claims for some form of sovereignty over waters adjacent to a state are regulated in international law by the *United Nations Convention on the Law of the Sea* done at Montego Bay, 10 December 1982 ("UNCLOS"). Article 57 of UNCLOS defines the exclusive economic zone of a coastal state as not exceeding 200 nautical miles from the baseline from which the territorial sea is measured.

12 Australia's claimed exclusive economic zone extends to the waters adjacent to the baseline of Australia's external territories, including, importantly for this matter, the Australian Antarctic Territory. By virtue of the statutory definition in s 225 of the EPBC Act, the waters within 200 nautical miles from the Australian Antarctic Territory land mass are within the Australian Whale Sanctuary.

13 Australia's claim to sovereignty over the Australian Antarctic Territory is recognised only by four nations (New Zealand, France, Norway and the United Kingdom), themselves with asserted (and otherwise disputed) claims over various parts of the Antarctic land mass. Japan rejects Australia's purported exercise of jurisdiction over waters that are considered by Japan to be the high seas. This is not a ground for invalidity of the EPBC Act: the sovereign claim by Australia to the Australian Antarctic Territory is not a matter capable of being questioned in this Court in this proceeding: cf *Mabo v Queensland (No 2) [1992] HCA 23;* (1992) 175 CLR 1. These matters of sovereignty and international recognition (and lack of extensiveness thereof) can be taken to have been before, and well recognised by, Parliament when it enacted the EPBC Act.

14 A claim to an exclusive economic zone does not amount to sovereignty for all purposes. See *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd [2005] FCA 664* at [11] – [13] for a discussion of the rights flowing from a claim to the exclusive economic zone.

## History of the litigation

15 The applicant commenced proceedings in this Court on 19 October 2004. On the same day, the applicant also filed a notice of motion, together with supporting affidavits, seeking leave to serve the respondent out of the jurisdiction in Japan, in accordance with Order 8 rule 2 of the Federal Court Rules. On 23 November 2004, I ordered the applicant to serve copies of documents in the proceeding on the Attorney-General for the Commonwealth, on the basis that it was appropriate that he be informed of the nature of the matter.

16 In due course, the Attorney-General filed submissions as *amicus curiae*. The substance of those submissions was that the subject matter of the proceedings was a matter best dealt with by the Executive Government, and it was not appropriate for the Court to exercise its discretion to grant relief, either to serve the respondent out of the jurisdiction, or final relief of the nature of the declarations and injunctions sought. After considering submissions both from the Attorney-General and the applicant, I gave judgment on 27 May 2005, dismissing the motion: see *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd* [2005] FCA 664. I do not propose to set out my reasons enunciated therein; it is sufficient to say that, in light of the international position, including the view of Japan that the assertion of jurisdiction in this matter would be a breach of international law, including, but not limited to, the Whaling Convention, of the place of an international body, the IWC, to deal with the issue of the killing of whales for scientific or other purposes, of the expression of the Executive Government of its (non-justiciable) view of Australia's long-term national interest, of the placing of the Court at the centre of an international dispute (indeed, helping to promote such a dispute) between Australia and a friendly foreign power, and of the likelihood that any attempt to enforce an injunction against the respondent would be futile (a matter that was never seriously contested by the applicant on the application for leave to serve out of Australia), I was not persuaded that the Court's exercise of discretion to grant leave to serve the respondent outside the jurisdiction was appropriate.

17 On that day, senior counsel for the applicant made an application for leave to appeal under the Federal Court Rules, as he was entitled to do. I granted that leave.

18 The applicant was successful on appeal to the Full Court: see *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd* [2006] FCAFC 116; (2006) 154 FCR 425. The Full Court unanimously held that the considerations to which I referred (which were broadly characterised by the Full Court as "political") should not affect the exercise of judicial discretion where, as here, the action is otherwise justiciable. The joint judgment of Black CJ and Finkelstein J at [12] and [13] (with which propositions Moore J concurred at [38]) stated:

*...It may be accepted that whilst legal disputes may occur in a political context, the exclusively political dimension of the dispute is non-justiciable. It is appropriately non-justiciable because the Court lacks competence to resolve disputes and issues of an exclusively political type, the resolution of which will involve the application of non-judicial norms: compare* Japan Whaling Association v American Cetacean Society *(1986) 487 US 221 at 230.*

*Even if, in special circumstances, there is occasion for political considerations to be taken into account in deciding whether an action should be permitted to go forward, there is no room, in our view, for those considerations where, as here, the Parliament has provided that the action is justiciable in an Australian court:* R v Bow Street Metropolitan Stipendiary Magistrate; Ex parte Pinochet Ugarte [1998] UKHL 41; *[2000] 1 AC 61 at 107.*

19 Further, the majority of the Full Court (Black CJ and Finkelstein J, *contra* Moore J) stated that considerations of futility of enforcement of any final relief were premature when determining whether or not to exercise discretion to allow service out of the jurisdiction. The majority said the following at [14] – [16]:

*On the question of futility, that is the lack of means of making an injunction effective, we also disagree with the approach of the primary judge in several respects. First, while it may be accepted that an injunction is by its nature a discretionary remedy which may be refused if it cannot be enforced, the question whether an injunction should be granted is to be dealt with either in an application (if there be one) to set aside service (*Agar v Hyde *at 574-575) or, more appropriately, when the application itself is heard and not when the court is deciding whether there should be leave to serve out of the jurisdiction (see, by analogy,* Helicopter Utilities Pty Ltd v Australian National Airlines Commission (*1963) 80 WN NSW 48 at 51).*

*Second, it seems to us that the judge in effect imposed upon the appellant the obligation of showing that an injunction would be a useful remedy. In fact the reverse is true. It is the defendant who has the onus of showing that it has no assets within the jurisdiction which could be sequestrated in punishment for contempt:* Hospital for Sick Children (Board of Governors) v Walt Disney Productions Inc *[1968] Ch 52 at 71.*

*Third, we consider that when asked to grant an injunction, the court should not necessarily contemplate that it would be disobeyed:* In re Liddell's Settlement Trusts [1936] Ch 365 at 373-374; Castanho v Brown & Root (UK) Ltd *[1981] AC 557 at 574;* Republic of Haiti v Duvalier *[1990] 1 QB 202 at 216;* South Bucks District Council v Porter *[2003] UKHL 26; [2003] 2 AC 558 at 580. There are many cases where parties out of the jurisdiction have been subjected to an injunction regarding their conduct abroad. The cases to which we have referred show that if a person is properly served in accordance with the court's exorbitant jurisdiction, that person (so far as the jurisdiction of the court is concerned) is in the same position as a person who is within its territorial jurisdiction. Nevertheless, in an appropriate case the judge may refuse to grant an injunction because the defendant is outside the jurisdiction and is likely to ignore the order. It will all depend upon the circumstances and, at the present stage of these proceedings, they are not yet known.*

## Service and non-appearance of the respondent

20 Following the Full Court judgment, the applicant attempted, unsuccessfully, to serve the respondent in Japan via diplomatic channels. The Japanese Ministry of Foreign Affairs, in a note verbale dated 26 October 2006, refused to allow the documents to be accepted for service on the grounds that "this issue relates to waters and a matter over which Japan does not recognise Australia's jurisdiction". The applicant then filed a notice of motion on 31 January 2007, seeking substituted service upon the respondent in accordance with Order 7 rule 9 of the Federal Court Rules.

21 On 2 February 2007, I made the following orders for service upon the respondent:

*1. The applicant be permitted to serve the originating process on the respondent in Japan by:*

*(a) Serving the following documents on or before 1 April 2007:*

*(i) Copies in English of the amended application and the amended statement of claim;*

*(ii) Copies in Japanese of the amended application and the amended statement of claim; and*

*(iii) A copy of this order in English and Japanese.*

*(b) Serving the documents referred to in 1(a) on the respondent by:*

*(i) Sending by registered post addressed to the managing director of the respondent at the following address, being the respondent's registered place of business: 4-5 Toyomi-cho, Chuo-ku, Tokyo, Japan; and*

*(ii) Serving the said documents at the respondent's registered place of business: 4-5 Toyomi-cho, Chuo-ku, Tokyo, Japan.*

22 The applicant relied on an affidavit of Emily Lucienne Besser, a solicitor of the firm representing the applicant, affirmed 6 August 2007, in relation to service upon the respondent by registered post. Ms Besser deposed that on 27 February 2007, copies of the relevant documents were sent to the respondent by registered post in accordance with order (1)(b)(i) of the orders of 2 February 2007. Exhibit ELB-2 to that affidavit is the registered post receipt, identifying the respondent's address. Exhibit ELB-3 is a copy of the envelope sent to the respondent, which was returned on 12 March 2007. The envelope was unopened and was marked with Japanese characters, the translation of which reads "refuse to receive".

23 The applicant also relied upon an affidavit of Diana Beaton, affirmed 31 August 2007. Ms Beaton is an administrative assistant at the firm representing the applicant. Ms Beaton deposed that on 27 July 2007, she sent by registered post a further copy of the relevant documents to the respondent's registered address in Tokyo. That package was also returned, unopened, marked "RETOUR/REFUSE".

24 In relation to the personal service upon the respondent at its offices in Tokyo, the applicant read the affidavit of Mikio Hisamatsu, affirmed 24 March 2007. Mr Hisamatsu, a lawyer, attended the respondent's office in Tokyo on 21 February 2007. Mr Hisamatsu attended upon the respondent's General Affairs Department, and handed the package of service documents to a woman there, identifying the package as legal documents to be served upon the company. Mr Hisamatsu deposed that the woman took the envelope, but indicated that she was not authorised to accept service. Mr Hisamatsu was then confronted by a man who identified himself as the "sub-department leader" of the respondent. That person was holding the package, but also stated he would not accept service. Mr Hisamatsu then deposed that the sub-department leader returned with an apparently more senior person, who again refused to accept service on the grounds that "you have not identified yourself, this envelope is not sealed and there is no name on it". The senior person attempted to return the package to Mr Hisamatsu. However, Mr Hisamatsu refused to accept it and left the building, leaving the package with the employees of the respondent.

25 Based on the above, I am satisfied that the applicant has served the relevant documents on the respondent in accordance with the orders of 2 February 2007 and that the respondent was aware of the proceeding against it in this Court.

26 After reserving judgment on this matter, I directed the applicant to write to the Attorney-General for the Commonwealth to ascertain whether he remained of the same view as expressed in his submissions relating to leave to serve out of the jurisdiction. In a letter dated 12 October 2007, the Attorney-General's advisors expressed the opinion that the service by the applicant was defective and that "Japan would view neither the proceedings nor any judgment arising from them as legitimate". However, in circumstances such as these, where the Full Court of this Court has ordered that the respondent be served out of the jurisdiction, and where the Japanese Government has declined to assist in that service (as outlined above), I am of the opinion that the orders of 2 February 2007 are in accordance with the Rules. In so saying, I refer to my reasons given for granting substituted service (given on 16 February 2007): see *Humane Society International Inc v Kyodo Senpaku Kaisha Ltd* [2007] FCA 124.

27 Following substituted service, the matter was called on for hearing on 18 September 2007. The respondent did not file a notice of appearance prior to that time and did not appear on the morning of the hearing. The respondent was called outside the Court, but failed to appear. The matter then proceeded without the respondent being present. The applicant did not seek orders on a default basis, but proceeded to prove the matters required to establish the claim.

## Pleadings

28 The applicant originally sought leave to serve upon the respondent a pleading to the effect that the whaling conducted pursuant to the Japanese Whaling Research Program under Special Permit in the Antarctic (JARPA) by the respondent was not scientific whaling. Leave was not given to serve a pleading containing that allegation, as the allegation was not particularised. There was no appeal from that part of the original decision to refuse leave to serve out of Australia. In the circumstances, this proceeding has been conducted on the premise that JARPA (and later JARPA II) are not challenged as lawful permits under the Whaling Convention and thus it was not asserted that the impugned activity of the respondent was and is not scientific research.

29 The amended statement of claim asserts the following:

• That the respondent has intentionally engaged in a series of activities that have resulted in Antarctic minke whales and fin whales being killed, taken and interfered with, and humpback whales being taken and interfered with, within the Australian Whale Sanctuary, and subsequently intentionally treated and possessed in contravention of ss 229, 229A, 229B, 229C, 229D and 230 of the EPBC Act;

• That the conduct was done in accordance with the Japanese Whaling Research Program under Special Permit in the Antarctic (JARPA) issued by the government of Japan under Article VIII of the Whaling Convention;

• That JARPA is not a recognised foreign authority for the purposes of subsection 7(1) of the *Antarctic Treaty (Environment Protection) Act 1980* (Cth).

• That the respondent is not permitted or authorised to kill, take, interfere with, treat or possess whales in accordance with ss 231, 232 or 238 of the EPBC Act;

• That, unless restrained, the respondent will in the future intentionally kill, take and interfere with within the Australian Whale Sanctuary, and subsequently intentionally treat and possess Antarctic minke whales, fin whales and humpback whales in contravention of the EPBC Act.

**The hearing**

30 The evidence reveals that the whaling activity in the waters off Antarctica was undertaken by a fleet of five vessels: the MV *Kyoshin Maru No 2*, a sighting and survey vessel that steamed ahead of the fleet to locate whale pods; the MV *Yushin Maru*, the MV *Kyo Maru No 1* and the MV *Toshi Maru No 25*, being sampling or "catcher" vessels used for hunting and killing whales; and the MV *Nisshin Maru*, being the base ship where the slaughtered whales were processed and research carried out. The MV *Toshi Maru No 25* was retired prior to the 2002/2003 season and was replaced with the MV *Yushin Maru No 2*. The MV *Kaikoh Maru*, a second sighting and survey vessel, also participated in the 2005/2006 and 2006/2007 whaling seasons.

31 The evidence of the registration of each of the vessels *Kyoshin Maru No 2, Yushin Maru, Yushin Maru No 2, Kyo Maru No 1, Kaikoh Maru, Toshi Maru No 25* and *Nisshin Maru* discloses that the respondent is the owner of the vessels. That is sufficient *prima facie* evidence of ownership: *Tisand Pty Ltd v The Owners of the Ship MV Cape Moreton (Ex Freya) [2005] FCAFC 68;* (2005) 143 FCR 43 at 85 [171]. There was no suggestion in the evidence that the registration was, or was likely to be, in any way inaccurate. Although the respondent's purposes, as stated in its company registration certificate, include "conducting shipping and lease of vessels", there is no evidence to suggest that that the vessels were either demise or time chartered when they were engaged in the whaling activity.

32 Under JARPA, the whaling activity was conducted in two groups of areas, alternating on a biennial basis. In the 2001/2002 and 2003/2004 seasons, whaling was conducted south of latitude 60deg. S to the ice edge of the Antarctic land mass between longitude 35deg. E and longitude 130deg. E (referred to as Area IV and Area IIIE). In the 2000/2001, 2002/2003 and 2004/2005 seasons, whaling was conducted south of latitude 60deg. S to the ice edge of the Antarctic land mass between longitude 130deg. E and longitude 145deg. W (referred to as Area V and Area VIW). After the introduction of JARPA II, the internal boundaries were shifted such that in the 2005/2006 season, whaling occurred between 35deg. E and 175deg. E and in 2006/2007, between 175deg. E and 145deg. W.

33 The applicant relied upon reports submitted by the respondent to the IWC pursuant to JARPA (and from the 2005/2006 season onwards, JARPA II) to establish the respondent's whaling activity in the Antarctic. The reports identify that whale pods were located and pursued by the sighting and survey vessels in a manner that falls within the statutory definition of "interfering" with a cetacean within the scope of 229B(1) and (4).

34 The numbers of whales killed in the waters off Antarctica each season, as outlined by the reports, are as follows:

| Whaling season | Number of Antarctic minke whales killed under JARPA and JARPA II | Number of fin whales killed under JARPA and JARPA II |
|:---:|:---:|:---:|
| 2000/2001 | 440 | 0 |
| 2001/2002 | 440 | 0 |
| 2002/2003 | 440 | 0 |
| 2003/2004 | 440 | 0 |
| 2004/2005 | 440 | 0 |
| 2005/2006 | 853 | 10 |
| 2006/2007 | 505 | 3 |
| Total | 3,558 | 13 |

35 The reports indicate that no humpback whales were killed under the JARPA II regime during the "feasibility study" period, which comprised the 2005/2006 and 2006/2007 seasons. However, the 2006/2007 report stated that the "full-scale JARPA II will start from the 2007/08 season", during which time the respondent expected to take 50 humpback whales, 50 fin whales and 850 Antarctic minke whales each season. I therefore conclude that it is likely that the respondent will kill humpback whales in future seasons.

36 The 2005/2006 and 2006/2007 reports stated that "biopsy samples" were taken from humpback whales, as well as other whale species, by use of a compound crossbow. I am satisfied that this non-lethal method of sampling amounted to injuring, interfering with and treating a cetacean within the definition of the EPBC Act.

37 The applicant tendered photographs annexed to an affidavit of Kieran Paul Mulvaney, a Greenpeace whaling protester, which identify that after slaughter, the whales were taken aboard the MV *Nisshin Maru* and dissected. This is consistent with the respondent's cruise reports and is on its face a breach of s 230 of the EPBC Act.

38 The cruise reports filed with the IWC acknowledge the assistance of employees of the respondent in the preparation of the report. It is reasonably open to infer (and I do) that the authors of the report include employees of the company, and that the representations made in the reports go to a matter within the scope of the employees' employment and authority: the *Evidence Act 1995* (Cth), ss 87 and 88.

39 The area in which the fleet conducted its whaling activities extends beyond the boundaries of the Australian Whale Sanctuary. Nevertheless, by overlaying a map of the Australian Whale Sanctuary over the maps in the cruise reports identifying the locations at which whales were taken, I conclude that a significant number of the whales were taken inside the Australian Whale Sanctuary.

40 The Australian Government has not issued a permit under s 238 of the EPBC Act authorising these acts. On the basis of the above, the applicant has established on the balance of probabilities

that the fleet has engaged in conduct that contravenes ss 229, 229A, 229B, 229C, 229D and 230 of the EPBC Act, and intends to continue doing so in the future under the JARPA II regime.

41 Attribution of acts of individuals to a body corporate for the purposes of the EPBC Act is prescribed by s 498B(1), which is in the following terms:

*Any conduct engaged in on behalf of a body corporate:*
*(a) by a director, employee or agent of the body corporate within the scope of his or her actual or apparent authority; or*

*(b) by any other person at the direction or with the consent or agreement (whether express or implied) of a director, employee or agent of the body corporate, where the giving of the direction, consent or agreement is within the scope of the actual or apparent authority of the director, employee or agent;*

*is to be taken, for the purposes of this Act, to have been engaged in also by the body corporate unless the body corporate establishes that the body corporate took reasonable precautions and exercised due diligence to avoid the conduct.*

42 The respondent is the entity authorised by the Japanese Government to conduct the whaling. No direct evidence has been adduced to establish that the crews of the vessel were employees of the respondent. I infer, however, that the crews of the various vessels in the fleet were acting in accordance with the respondent's authority, under JARPA and JARPA II.

43 Based on the facts outlined above, I am satisfied that the respondent is responsible for the actions of the whaling fleet for the purposes of the EPBC Act.

44 For the reasons already given in earlier reasons, I am satisfied that the EPBC Act applies to the Australian Whale Sanctuary and that there is no recognised foreign authority for the purposes of s 7(1) of the *Antarctic Treaty (Environment Protection) Act 1980* (Cth). In reaching this latter conclusion, I have acted on the submissions and material put on by the applicant and the concession of the Attorney-General, both referred to at [40] of my reasons published on 27 May 2005 ([2005] FCA 664). Thus, I am satisfied that the respondent has contravened the EPBC Act, as alleged.

**Discretion**

45 The Full Court made its views clear (unanimously) as to the taking into account of what Black CJ and Finkelstein J called in their reasons "political" questions, at the point of leave to serve out of the jurisdiction. Once leave has been granted, and the matter is before the Court to be resolved in the exercise of federal jurisdiction, it follows *a fortiori* from the Full Court's views as to the irrelevance of those matters at the point of decision whether to grant leave to serve process outside Australia that they are irrelevant at the point of final relief. Though it does not matter for the resolution of this proceeding, it may well be that the breadth or range of discretionary matters is wider at the point of deciding upon leave to serve out of Australia than at the point of decision about final relief. In any event, in accordance with the reasons of the Full

Court, I can give no weight or relevance to the considerations that, when combined with futility, influenced my earlier decision. I therefore turn to futility, as a separate issue.

46 The respondent has, on the evidence, no presence or assets within the jurisdiction. Unless the respondent's vessels enter Australia, thus exposing themselves to possible arrest or seizure, the applicant acknowledges that there is no practical mechanism by which orders of this Court can be enforced (supplementary submissions, paragraph 36).

47 In addition to paragraphs [14] – [16] of the majority judgment of the Full Court of this Court on appeal (excerpted above), Black CJ and Finkelstein J said the following on futility at [18] – [20]:

*There is another way of considering the question of futility. The injunctive relief that the appellant seeks is relief by way of statutory injunction under s 475 of the EPBC Act. That section authorises the grant of what has been called a public interest injunction: see* ICI Australia Operations Pty Ltd v TPC [1992] FCA 474*; (1992) 38 FCR 248 at 256. Section 475 and the related provisions in Div 14 of Pt 17 of the EPBC Act have their counterpart in* s 80 *of the* Trade Practices Act 1974 *(Cth) ('the TP Act') upon which they appear to have been largely modelled.*

*Parliament has determined that it is in the public interest that the enforcement provisions of the EPBC Act should be unusually comprehensive in scope. Section 475 of the EPBC Act and its related provisions form part of a much larger enforcement scheme contained in the 21 divisions of Pt 17. The provisions include the conferral of powers of seizure and forfeiture, powers to board and detain vessels and authority to continue a pursuit on the high seas.*

*It is an important and distinctive feature of Div 14 of Pt 17 of the EPBC Act that, like s 80(4) of the TP Act, the Federal Court is expressly empowered to grant an injunction restraining a person from engaging in conduct whether or not it appears to the Court that the person intends to engage again in conduct of that kind and, even, whether or not there is a significant risk of injury or damage to the environment if the person engages or continues to engage in conduct of that kind: see s 479(1)(a) and (c).*

Further, at [21], the majority said:

*Although 'deterrence' is more commonly used in the vocabulary of the law than 'education', the two ideas are closely connected and must surely overlap in areas where a statute aims to regulate conduct. Thus, there being a 'matter' (see [28] below), the grant of a statutory public interest injunction to mark the disapproval of the Court of conduct which the Parliament has proscribed, or to discourage others from acting in a similar way, can be seen as also having an educative element. For that reason alone the grant of such an injunction may be seen, here, as potentially advancing the regulatory objects of the EPBC Act. Indeed, some of those objects are expressed directly in the language of 'promotion', including the object provided for by s 3(1)(c), namely to promote the conservation of biodiversity, which is an object that the legislation links to the establishment of an Australian Whale Sanctuary 'to ensure the conservation of whales and other cetaceans': s 3(2)(e)(ii).*

48 The majority compared the terms of section 475 of the EPBC Act with similar provisions in s 80 of the *Trade Practices Act* (at [23] – [25]).

49 Moore J did not agree with the majority on the question of futility of enforcement. His Honour was of the opinion that both long-standing common law authorities and recent High Court dicta support the proposition that relief should not be granted unless it would be effectual (or unless it there are reasonable grounds to believe an injunction will be efficacious in the future). In support of this proposition, Moore J cited the following authorities:

*Abebe v Commonwealth [1999] HCA 14;* (1999) 197 CLR 510 at [31] per Gleeson CJ and McHugh J:

*The term "matter" has meaning only in the context of a legal proceeding, as the passages from* South Australia v Victoria, Re Judiciary and Navigation Acts, Stack v Coast Securities (No 9) Pty Ltd *and* Attorney-General (NSW) v Commonwealth Savings Bank *demonstrate. A "matter" cannot exist in the abstract. If there is no legal remedy for a "wrong", there can be no "matter". A legally enforceable remedy is as essential to the existence of a "matter" as the right, duty or liability which gives rise to the remedy. Without the right to bring a curial proceeding, there can be no "matter". If a person breaches a legal duty which is unenforceable in a court of justice, there can be no "matter". Such duties are not unknown to the law. For example, in* Australian Broadcasting Corp v Redmore Pty Ltd, *this court had to consider the effect on a contract of a statutory provision which prohibited the making of the contract without the approval of a minister. The prohibition arose in a context where s 8(1) of the relevant Act imposed a duty on the board of the appellant to ensure that it did not contravene any provision of the Act but s 8(3) provided that "[n]othing in this section shall be taken to impose on the Board a duty that is enforceable by proceedings in a court". Although the point did not arise for decision, it is plain that breach of the prohibition was incapable of giving rise to a "matter".*

(footnotes omitted)

*Truth About Motorways v Macquarie Infrastructure Investment Management Ltd [2000] HCA 11;* (2000) 200 CLR 591 at [49] per Gaudron J:

*Absent the availability of relief related to the wrong which the plaintiff alleges, no immediate right, duty or liability is established by the court's determination. Similarly, if there is no available remedy, there is no administration of the relevant law. Thus, as Gleeson CJ and McHugh J pointed out in* Abebe v Commonwealth, *"[i]f there is no legal remedy for a `wrong', there can be no `matter' ".*

*Bass v Permanent Trustee [1999] HCA 9;* (1999) 198 CLR 334 at [47]:

*Because the object of the judicial process is the final determination of the rights of the parties to an action, courts have traditionally refused to provide answers to hypothetical questions or to give advisory opinions. The jurisdiction with respect to declaratory relief has developed with an awareness of that traditional attitude. In* Re F (Mental Patient: Sterilisation), *Lord Goff of Chieveley said that:*

a declaration will not be granted where the question under consideration is not a real question, nor where the person seeking the declaration has no real interest in it, nor where the declaration is sought without proper argument, for example, in default of defence or on admissions or by consent.

*By "not a real question", his Lordship was identifying what he called the "hypothetical or academic". The jurisdiction includes the power to declare that conduct which has not yet taken place will not be in breach of a contract or a law and such a declaration will not be hypothetical in the relevant sense. Barwick CJ pointed this out in* Commonwealth v Sterling Nicholas Duty Free Pty Ltd. *However, that is not the present case.*

(footnotes omitted)

50 The applicant submitted that a broad range of remedies are appropriate in attempting to enforce an order for contempt. In this regard, the applicant cited the case of *Simonton v Australian Prudential Regulation Authority [2006] FCAFC 118; (2006) 152 FCR 129, in particular [70] – [74].*

51 The question of futility can, however, also be seen from a perspective of disobedience. To do so requires the setting to one side of the refusal by Japan to recognise Australia's claim to Antarctica. It is not for this Court to question Australia's claim or Parliament's mandate in the EPBC Act, which is based on Australia's claim. Thus, this perspective can be seen to be relevant for this Court to take into account (even if from another perspective, for instance that of Japan, the perspective is flawed). So viewed, it (futility arising from disobedience and an inability to bring about obedience) may bring to mind what was said by Hardie, Hutley and Bowen JJA in *Vincent v Peacock* [1973] 1 NSWLR 466 at 468:

*In our opinion, it is not a ground for refusing an injunction that it would not have a practical effect, where its failure to have a practical effect is because the defendant disobeys it.*

52 Further, one cannot ignore the public interest nature of the claim and the complete recognition by the Parliament of that type of claim and of the lack of wide international recognition of Australia's claim to the relevant part of Antarctica: see the majority of the Full Court reasons at [2006] FCAFC 116; 154 FCR 425 and [21] – [24]; and see also *Citron v Zündel (No 4)* (2002) 41 CHRR D/274 at [298] – [301].

53 In the light of the reasons of the majority of the Full Court, I cannot conclude that the practical difficulty (if not impossibility) of enforcement is a reason to withhold relief.

54 On the material placed before the Court, I am satisfied that the respondent has contravened ss 229, 229A, 229B, 229C, 229D and 230 of the EPBC Act in relation to Antarctic minke whales and fin whales by killing, injuring, taking and interfering with them and the treating and possessing of them and by injuring, interfering with and treating and possessing humpback whales and that, unless restrained, it will continue to kill, injure, take and interfere with them, and treat and possess them.

55 In all the circumstances, the orders of the Court will be:

1. The Court declares that the respondent has killed, injured, taken and interfered with Antarctic minke whales (*Balaenoptera bonaerensis*) and fin whales (*Balaenoptera physalus*) and injured, taken and interfered with humpback whales (*Megaptera novaeangliae*) in the Australian Whale Sanctuary in contravention of sections 229, 229A, 229B and 229C of the *Environment Protection and Biodiversity Conservation Act 1999* (Cth), (the "Act"), and has treated and possessed such whales killed or taken in the Australian Whale Sanctuary in contravention of sections 229D and 230 of the Act, without permission or authorisation under sections 231, 232 or 238 of the Act.

2. The Court orders that the respondent be restrained from killing, injuring, taking or interfering with any Antarctic minke whale (*Balaenoptera bonaerensis*), fin whale (*Balaenoptera physalus*) or humpback whale (*Megaptera novaeangliae*) in the Australian Whale Sanctuary, or treating or possessing any such whale killed or taken in the Australian Whale Sanctuary, unless permitted or authorised under sections 231, 232 or 238 of the *Environment Protection and Biodiversity Conservation Act 1999* (Cth).

56 Neither the application nor the amended application contained a request for an order for costs. I thus make no such order.

I certify that the preceding fifty-six (56) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Allsop.


Associate:
Dated: 15 January 2008

| | |
|---|---|
| Counsel for the Applicant: | Mr S Gageler SC with Mr C McGrath |
| Solicitor for the Applicant: | Environmental Defender's Office (NSW) Ltd |
| Counsel for the Respondent: | The Respondent did not appear |
| Date of Hearing: | 18 September 2007 |
| Date of Judgment: | 15 January 2008 |

# Exhibit 4

 # INTERNATIONAL COURT OF JUSTICE

Peace Palace, Carnegieplein 2, 2517 KJ  The Hague, Netherlands
Tel.:  +31 (0)70 302 2323  Fax:  +31 (0)70 364 9928
Website:  www.icj-cij.org

## Press Release
Unofficial

No. 2010/16
1 June 2010

### Australia institutes proceedings against Japan  for alleged breach of international obligations concerning whaling

THE HAGUE,  1 June 2010.    Australia yesterday instituted proceedings before the International Court of Justice against the Government of Japan, alleging that

"Japan's continued pursuit of a large scale programme of whaling under the Second Phase of its Japanese Whale Research Programme under Special Permit in the Antarctic ("JARPA II") [is] in breach of obligations assumed by Japan under the International Convention for the Regulation of Whaling ("ICRW"), as well as its other international obligations for the preservation of marine mammals and marine environment".

The Applicant contends, in particular, that Japan "has breached and is continuing to breach the following obligations under the ICRW:

(a) the obligation under paragraph 10 (e) of the Schedule to the ICRW to observe in good faith the zero catch limit in relation to the killing of whales for commercial purposes;  and

(b) the obligation under paragraph 7 (b) of the Schedule to the ICRW to act in good faith to refrain from undertaking commercial whaling of humpback and fin whales in the Southern Ocean Sanctuary."

Australia points out that

"having regard to the scale of the JARPA II programme, the lack of any demonstrated relevance for the conservation and management of whale stocks, and to the risks presented to targeted species and stocks, the JARPA II programme cannot be justified under Article VIII of the ICRW" (this article regulates the granting of special permits to kill, take and treat whales for purposes of scientific research).

Australia alleges further that Japan has also breached and is continuing to breach, inter alia, its obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora and under the Convention on Biological Diversity.

- 2 -

At the end of its Application, Australia requests the Court to adjudge and declare that "Japan is in breach of its international obligations in implementing the JARPA II programme in the Southern Ocean", and to order that Japan:

"(a) cease implementation of JARPA II;

(b) revoke any authorisations, permits or licences allowing the activities which are the subject of this application to be undertaken; and

(c) provide assurances and guarantees that it will not take any further action under the JARPA II or any similar programme until such programme has been brought into conformity with its obligations under international law."

*

Australia explains in its Application that it has consistently opposed Japan's JARPA II programme, both through individual protests and demarches and through relevant international forums, including the International Whaling Commission.

*

As the basis for the jurisdiction of the Court, the Applicant invokes the provisions of Article 36, paragraph 2, of the Court's Statute, referring to the declarations recognizing the Court's jurisdiction as compulsory made by Australia on 22 March 2002 and by Japan on 9 July 2007.

_____

Australia's Application will be available shortly on the Court's website (www.icj-cij.org).

Information Department:

Mr. Andrey Poskakukhin, First Secretary of the Court, Head of Department (+31 (0)70 302 2336)
Mr. Boris Heim, Information Officer (+31 (0)70 302 2337)
Ms Joanne Moore, Associate Information Officer (+31 (0)70 302 2394)
Ms Barbara Dalsbaek, Administrative Assistant (+31 (0) 70 302 2396)

# Exhibit 5

# INTERNATIONAL COURT OF JUSTICE

Peace Palace, Carnegieplein 2, 2517 KJ The Hague, Netherlands
Tel.: +31 (0)70 302 2323   Fax: +31 (0)70 364 9928
Website: www.icj-cij.org

## Press Release
Unofficial

No. 2010/23
20 July 2010

### Whaling in the Antarctic
### (Australia v. Japan)

### Fixing of time-limits for the filing of the initial pleadings

THE HAGUE, 20 July 2010.  The International Court of Justice (ICJ), the principal judicial organ of the United Nations, has fixed time-limits for the filing of the initial pleadings in the case concerning Whaling in the Antarctic (Australia v. Japan).

By an Order of 13 July 2010, the Court fixed 9 May 2011 as the time-limit for the filing of a Memorial by Australia and 9 March 2012 as the time-limit for the filing of a Counter-Memorial by Japan.

The Court adopted the Order taking into account the agreement of the Parties. The subsequent procedure has been reserved for further decision.

History of the proceedings

The history of the proceedings can be found in Press Release No. 2010/16 of 1 June 2010, available on the Court's website (www.icj-cij.org).

———————

The full text of the Order of the Court will be available shortly on the Court's website.

———————

Information Department:

Mr. Andrey Poskakukhin, First Secretary of the Court, Head of Department (+31 (0)70 302 2336)
Mr. Boris Heim, Information Officer (+31 (0)70 302 2337)
Ms Joanne Moore, Associate Information Officer (+31 (0)70 302 2394)

# Exhibit 6



## International Whaling Commission

The Commission        Meetings        Conservation and Management        Publications

IN THIS SECTION:
ANNUAL MEETINGS
PRESS RELEASES
RESOLUTIONS
REPORTS
FUTURE MEETINGS

# 2005 RESOLUTIONS

**The resolutions made at the IWC annual meeting in Ulsan, Republic of Korea 2005**

Print this page

## CONTENTS

| | |
|---|---|
| Resolution 2005-1 | Resolution on JARPA II |
| Resolution 2005-2 | Resolution on facilitating closer cooperation among the range states to expedite sighting surveys for the common minke whales off the Korean peninsula |
| Resolution 2005-3 | Resolution on the western North Pacific gray whale |
| Resolution 2005-4 | Resolution to advance the RMS process |
| Back to 2005 meeting | Return to previous section |

---

### Resolution 2005-1

### RESOLUTION ON JARPA II

AWARE that Article VIII of the International Convention for the Regulation of Whaling allows Contracting Governments to grant Special Permits for the purpose of scientific research on whales;

RECALLING that since the moratorium on commercial whaling came into force in 1985/86, the IWC has adopted over 30 resolutions on Special Permit whaling in which it has generally expressed its opinion that Special Permit whaling should: be terminated and scientific research limited to non-lethal methods only (2003-2); refrain from involving the killing of cetaceans in sanctuaries (1998-4); ensure that the recovery of populations is not impeded (1987); and take account of the comments of the Scientific Committee (1987).

ALSO RECALLING Resolution 2003-3 that no additional Japanese Whale Research Program under Special Permit in the Antarctic (JARPA) programs be considered until the Scientific Committee has completed an in-depth review of the results of JARPA;

FURTHER RECALLING that earlier this year the Government of Japan concluded JARPA - an 18-year program of whaling under Special Permit in Antarctic waters;

NOTING that the results of the JARPA program have not been reviewed by the Scientific Committee this year;

CONCERNED that more than 6,800 Antarctic minke whales (*Balaenoptera bonaerensis*) have been killed in Antarctic waters under the 18 year of JARPA, compared with a total of 840 whales killed globally by Japan for scientific research in the 31 year period prior to the moratorium;

NOTING that it is the Government of Japan's stated intention to more than double the annual catch of Antarctic minke whales and also take 50 fin whales (*B. physalus*) and 50 humpback whales (*Megaptera novaeangliae*) under the proposed JARPA II program;

NOTING that the Third Circumpolar Survey indicates that the abundance of Antarctic minke

whales is substantially lower than the earlier estimate of 760 000, and that the Scientific Committee is working to identify factors contributing to the differences between the two surveys;

CONCERNED that there are no agreed data to indicate that endangered fin whale populations have increased since the cessation of whaling;

ALSO NOTING that some humpback whales which will be targeted by JARPA II belong to small, vulnerable breeding populations around small island States in the South Pacific and that even small takes could have a detrimental effect on the recovery and survival of such populations;

ALSO CONCERNED that JARPA II may have an adverse impact on established long-term whale research projects involving humpback whales;

**NOW THEREFORE THE COMMISSION:**

REQUESTS the Scientific Committee to review the outcomes of JARPA as soon as possible; and

STRONGLY URGES the Government of Japan to withdraw its JARPA II proposal or to revise it so that any information needed to meet the stated objectives of the proposal is obtained using non-lethal means.

——————————————————————— TOP ———————————————————————

**Resolution 2005-2**

**RESOLUTION ON FACILITATING CLOSER COOPERATION AMONG THE RANGE STATES TO EXPEDITE SIGHTING SURVEYS FOR THE COMMON MINKE WHALES OFF THE KOREAN PENINSULA**

RECOGNISING THAT the common minke whale stock migrating off Korea, Russia, China and Japan should be conserved and managed appropriately, and that the Scientific Committee is now preparing the in-depth assessment for this stock;

NOTING THAT the spatio-temporal coverage of the past research on this stock for a population assessment was restricted and that data and samples for stock identification are still insufficient;

NOTING THAT the Commission has classified this stock as a "Protected Stock" and a comprehensive assessment has not been conducted during the past twenty years;

**NOW THEREFORE THE COMMISSION:**

WELCOMES a workshop for non-lethal research collaboration on this stock to be held in Ulsan early in 2006 to be hosted by the Republic of Korea and encourages all range states and other interested parties to participate in the workshop;

REQUESTS the relevant countries that have unsurveyed waters under their jurisdictions to conduct cooperative non-lethal scientific research for the 2006 surveys;

RECOMMENDS THAT scientists from range states and other countries, in association with the IWC Scientific Committee, collaborate and harmonise efforts to develop a research programme and conduct analyses of data, and that funds to be provided.

——————————————————————— TOP ———————————————————————

**Resolution 2005-3**

**RESOLUTION ON THE WESTERN NORTH PACIFIC GRAY WHALE**

RECALLING Resolution 2001-3, which inter alia called on range states and others to actively pursue all practicable actions to eliminate anthropogenic mortality and minimize anthropogenic disturbance to the western gray whale population; and Resolution 2004-1, which *inter alia* called upon range states to develop or expand national monitoring and research programmes on western gray whales;

on western gray whales;

WELCOMING the report of the Independent Scientific Review Panel (ISRP) set up by IUCN, to which the IWC Secretariat contributed, the work carried out under the Russian national program, and the work carried out under the Russia-US program;

WELCOMING the cooperation between Sakhalin Energy Investment Corporation Ltd (SEIC) and IUCN to address the potential impacts of their oil and gas activities on western gray whales;

WELCOMING the desire to re-route the planned platform-to-shore oil and gas pipelines around instead of through the gray whale feeding ground off Piltun Lagoon;

REMAINING CONCERNED that noise generated during the pipeline, platform emplacement and onshore construction in the coming season will impinge upon the Piltun feeding ground;

ENCOURAGED by the finding of the Review Panel that the population of Western Gray Whales appears to have increased over the period 1994-2003, even using low abundance estimates; but

CONCERNED that the Review Panel found that the population includes less than 30 reproductive females, and that one population model using the lowest abundance level of all presented found that a hypothesised additional death of just one female whale per year could drive the population to extinction before 2050;

NOTING WITH CONCERN that, despite the efforts by the Japanese authorities and peoples concerned not to disturb the animal and release it from entanglement, a female gray whale was drowned in a set net in Tokyo Bay on May 10, 2005;

### NOW THEREFORE THE COMMISSION:

CALLS upon range states to take all practical measures to avoid all anthropogenic mortality, and in particular to develop and implement strategies to prevent accidental deaths;

CALLS UPON all organisations concerned with oil and gas projects to take all practicable measures to ensure that received noise levels in the Piltun feeding ground are reduced to a minimum and are in accordance with any future recommendations of the IWC Scientific Committee;

SUPPORTS the ISRP proposal for a comprehensive strategy to save western gray whales and their habitat;

FURTHER CALLS UPON all organisations, range states, authorities, scientists and other stakeholders concerned with developments in the waters around Sakhalin Island to support the efforts to develop a framework for collaborative research, monitoring and mitigation efforts between oil companies, independent experts, national programmes and authorities and the IWC and other intergovernmental organisations, and that they share all relevant data collected;

REQUESTS the Secretariat continue to offer its services and scientific expertise to appropriate collaborative efforts to develop a comprehensive strategy and ensure continued effective monitoring of the population.

 **TOP**

### Resolution 2005-4

### RESOLUTION TO ADVANCE THE RMS PROCESS

THE COMMISSION:

AGREES to hold an intersessional meeting to advance the work of the Working Group on the Revised Management Scheme (RMS) and that of the Small Drafting Group, as established by Resolution 2004-6, with particular emphasis on any outstanding issues and taking as a starting point the Group's report to this Commission (IWC/57/RMS 3).

AGREES to hold a meeting of the RMS Working Group in connection with IWC 58 to discuss the remaining issues that must be resolved before adoption of the RMS can be considered.

AGREES to consider, if appropriate, ministerial, diplomatic, or other high-level possibilities to resolve these issues among the Contracting Governments to the Convention.




Last Updated: 24/06/05                    **Return to top**                    **Print this page**

All pages © The International Whaling Commission 2008

# Exhibit 7

# CONTENTS

| | |
|---|---|
| Resolution 2007-1 | Resolution on JARPA |
| Resolution 2007-2 | Resolution on safety at sea and protection of the environment |
| Resolution 2007-3 | Resolution on the non-lethal use of cetaceans |
| Resolution 2007-4 | Resolution on CITES |
| Resolution 2007-5 | Resolution: The Vaquita, from critically endangered to facing extinction |
| Back to 2007 meeting | Return to previous section |

---

**Resolution 2007-1**

**RESOLUTION ON JARPA**

WHEREAS paragraph 7(b) of the Schedule establishes a sanctuary in the Southern Ocean;

RECALLING that the Commission has repeatedly requested Contracting Parties to refrain from issuing special permits for research involving the killing of whales within the Southern Ocean Sanctuary, has expressed deep concern at continuing lethal research within the Southern Ocean Sanctuary, and has also recommended that scientific research involving the killing of cetaceans should only be permitted where critically important research needs are addressed;

CONSCIOUS that the Scientific Committee last year convened a workshop to analyse the results of JARPA 1, which is reported in SC/59/REP 1;

NOTING that the Workshop agreed that none of the goals of JARPA 1 had been reached, and that the results of the JARPA 1 programme are not required for management under the RMP;

FURTHER NOTING that the Government of Japan has authorised a new special permit programme in the Antarctic, JARPA II, in which the take of minke whales has been more than doubled, and fin whales and humpback whales have been added to the list of targeted species;

CONCERNED that fin whales in the Southern Hemisphere are currently classified as endangered, and that humpback whales in the JARPA II research area may include individuals from depleted breeding populations overwintering in the waters of certain Pacific Islands;

CONVINCED that the aims of JARPA II do not address critically important research needs;

NOW THEREFORE THE COMMISSION

CALLS UPON the Government of Japan to address the 31 recommendations listed in Appendix 4 of Annex O of the Scientific Committee report relating to the December 2006 review of the JARPA I programme to the satisfaction of the Scientific Committee;

FURTHER CALLS UPON the Government of Japan to suspend indefinitely the lethal aspects of JARPA II conducted within the Southern Ocean Whale Sanctuary.

————————————————————————— **TOP** —————————————————————————

**Resolution 2007-2**

Secretariat note of 30/7/07

Note the version of this Resolution initially posted on the website on 30 May did not incorporate revisions

agreed by the Commission during plenary discussions. The revisions are included in this version in italics.

## RESOLUTION ON SAFETY AT SEA AND PROTECTION OF THE ENVIRONMENT

WHEREAS the safety of vessels and crew, the order of maritime navigation, and environmental protection, are, and have long been, the common interests of nations worldwide;

WHEREAS the Commission and Contracting Governments support the right to legitimate and peaceful forms of protest and demonstration;

RECALLING that the 58th Annual Meeting of the Commission adopted Resolution 2006-2 in which the Commission agreed and declared that the Commission and its Contracting Governments did not condone any actions that are a risk to human life and property in relation to the activities of vessels at sea, and urged persons and entities to refrain from such acts;

SERIOUSLY CONCERNED that certain confrontations and actions at sea relating to whaling and whale research activities risk human life, property, the marine environment, and the order of maritime navigation, and may lead to grave accidents;

RECOGNISING the need for all States to take actions, in accordance with relevant rules of international law and respective national laws and regulations, to cooperate as appropriate to prevent and suppress actions that risk human life and property at sea;

RECALLING the Convention on the International Regulations for Preventing Collisions at Sea which set uniform principles and rules for avoiding collisions at sea;

NOTING the general obligation in Article 192 of the United Nations Convention on the Law of the Sea that States protect and preserve the marine environment as well as Article 194 (1) and (5) on the need to prevent, reduce and control pollution in the marine environment including by taking measures necessary to protect and preserve rare or fragile ecosystems as well as the habitat of depleted, threatened or endangered species and other forms of marine life;

FURTHER NOTING that Article 197 of UNCLOS requires that States co-operate on a global basis and, as appropriate, on a regional basis, directly or through competent international organisations, in formulating and elaborating international rules, standards and recommended practices and procedures consistent with UNCLOS, for the protection and preservation of the marine environment, taking into account characteristic regional features;

MINDFUL of the fact that issues relating to confrontation between vessels at sea and in port have been discussed by this Commission as well as in other international fora including the International Maritime Organisation;

RECALLING applicable international instruments, including the Convention for the Suppression of Unlawful Acts against the Safety of Navigation, relating to international cooperation for the prevention of unlawful acts against the safety of maritime navigation and actions against alleged offenders;

NOTING also that MARPOL 73/78 and in particular its Annexes I and V designate the Antarctic as a Special Area due to the ecological importance of the fragile ecosystems of the area;

NOW THEREFORE THE COMMISSION

AGREES AND DECLARES again that the Commission and its Contracting Governments do not condone *and in fact condemn* any actions that are a risk to human life and property in relation to the activities of vessels at sea;

URGES persons and entities to refrain from such acts;

FURTHER URGES Contracting Governments to have regard for the importance of protecting the environment, and in particular the fragile Antarctic environment;

URGES *all* Contracting Governments *concerned* to take appropriate measures, consistent with IMO guidelines, in order to ensure that the substance and spirit of this Resolution are observed both domestically and internationally;

URGES Contracting Governments to take actions, in accordance with relevant rules of international law and respective national laws and regulations, to cooperate [ ] to prevent and suppress actions that risk human life and property at sea and with respect to alleged offenders;

URGES Contracting Governments to cooperate in accordance with UNCLOS and other relevant instruments in the investigation of incidents at sea including those which might pose a risk to life or the environment.

———————————————————————— TOP ————————————————————————

## Resolution 2007-3

### RESOLUTION ON THE NON-LETHAL USE OF CETACEANS

RECALLING the objective of the 1946 International Convention for the Regulation of Whaling to safeguard the natural resources represented by whale stocks for the benefit of future generations;

NOTING that many coastal States, including developing countries, have adopted policies of non-lethal use of cetaceans in the waters under their jurisdiction, in accordance with their sovereign rights reinforced by, *inter alia*, the United Nations Convention on the Law of the Sea (UNCLOS) and the Rio Declaration;

AWARE that most whale species are highly migratory and thus shared biodiversity resources;

CONCERNED that negotiations aimed at resolving the impasses at the International Whaling Commission must address the issue of non-lethal use to take into account the interests of a substantial portion of IWC membership;

NOTING that, under domestic management by coastal States, non-lethal utilization of whales is a rapidly growing activity that provides substantial socio-economic opportunities, including promoting employment in coastal communities, especially in developing countries;
NOTING FURTHER that the moratorium on commercial whaling has been in effect since 1986 and has contributed to the recovery of some cetacean populations essential for the promotion of non-lethal uses in many countries;

CONCERNED that whales in the 21st Century face a wider range of threats than those envisaged when the ICRW was concluded in 1946;

NOTING that the Buenos Aires Declaration states that "high quality and well managed implementation of whale watching tourism promotes economic growth and social and cultural development of local communities, bringing educational and scientific benefits, whilst contributing to the protection of cetacean populations";

NOW THEREFORE THE COMMISSION:

RECOGNISES the valuable benefits that can be derived from the non-lethal uses of cetaceans as a resource, both in terms of socio-economic and scientific development;

RECOGNISES non-lethal use as a legitimate management strategy;

ENCOURAGES member States to work constructively towards the incorporation of the needs of non-lethal users of whale resources in any future decisions and agreements.

———————————————————————— TOP ————————————————————————

## Resolution 2007-4

RESOLUTION ON CITES

RECOGNISING that the International Whaling Commission (IWC) is the internationally competent organisation for the conservation and management of whale stocks;

FURTHER RECOGNISING that the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) passed Resolution Conf 11.4 (Rev COP12) which acknowledges the IWC as the major source of information on whale stocks around the world;

NOTING that the IWC Scientific Committee continuously reviews the status of all whale stocks;

NOTING that the moratorium on commercial whaling has been in effect since 1986, remains in effect and the reasons for the moratorium remain valid;

WELCOMING the continuing cooperation between CITES and the IWC on issues related to international trade in whale products, and urging all governments to continue to support IWC and CITES obligations with respect to this issue;

FURTHER NOTING the existence of CITES Resolution Conference 11.4 (Rev. CoP12) on the Conservation of cetaceans, trade in cetacean specimens and the relationship with the International Whaling Commission which interalia expresses concern that international trade in meat and other products of whales is lacking adequate international monitoring or control, recognises that the IWC is the major source of information on whale stocks around the world and recommends that the Parties to CITES agree not to issue any import or export permit, or certificate for introduction from the sea under CITES for primarily commercial purposes for any specimen of a species or stock protected from commercial whaling by the International Convention for the Regulation of Whaling;

NOW THEREFORE THE COMMISSION:

AFFIRMS that the moratorium on commercial whaling remains in place and that the reasons for the moratorium are still relevant;

EXPRESSES APPRECIATION that CITES recognises the IWC's Scientific Committee as the universally recognised international organisation with international expertise to review and evaluate the status of the world's whale stocks;

REAFFIRMS the important role of CITES in supporting the IWC's management decisions with regard to the conservation of whale stocks and the importance of continued cooperation between CITES and IWC;

REAFFIRMS the importance of continued cooperation between CITES and IWC with regard to the conservation of whale stocks through the regulation and management of international trade in whale products;

CONSIDERS that the IWC has not yet completed the necessary measures to regulate commercial whaling;

CONSIDERS that any weakening of existing restrictions on trade under CITES could have significant adverse effects on the moratorium on commercial whaling and increase threats to whales;

REQUESTS Contracting Governments to respect the relationship between the two conventions and not to seek the transfer of cetacean species from CITES Appendix I.

FURTHER REQUESTS the secretariat to send a copy of this resolution to the CITES secretariat.

———————————————————————————————— TOP ————————————————————————————————

## Resolution 2007-5

### RESOLUTION: THE VAQUITA, FROM CRITICALLY ENDANGERED TO FACING EXTINCTION

CONCERNED with the finding of the Scientific Committee concurring with the recent results of the baiji survey in the Yangzte River that has led the scientific community to conclude that the baiji is functionally extinct. It is the first cetacean species to disappear in modern times. The main factors that drove the baiji (*Lipotes vexillifer*) to extinction were habitat degradation and incidental catch.

RECALLING that since 1991 the IWC SC has recommended that conservation actions must be taken immediately to eliminate bycatch of the vaquita (*Phocoena sinus*) in the northernmost Gulf of California, Mexico, to prevent its extinction. Moreover, since 1997 the International Committee for the Recovery of Vaquita (CIRVA) has recommended that bycatch be reduced to zero by banning entangling nets throughout the vaquita's range whilst noting the difficulties involved in trying to reconcile the vaquita's need for immediate protection with the needs of the affected people.

FURTHER RECALLING that IUCN has listed the vaquita as Vulnerable in 1978, Endangered in 1990 and Critically Endangered since 1996.

NOTING that CIRVA recommended a staged reduction in fishing effort starting in January 2000, with the expectation that gillnetting would be completely eliminated by January 2002.

FURTHER NOTING that in March 2007 the IUCN Director-General expressed, through a letter to the President of Mexico, that organization's grave concern about the future of the vaquita. IUCN also acknowledged the serious social and economic implications of banning the use of entangling nets in the Northern Gulf and indicated that conservation efforts must include programs that will help meet the needs of people in the region.

FURTHER NOTING that Mexico has followed many of the recommendations to protect and monitor the vaquita, e.g. by closing the totoaba fishery, protecting the vaquita's habitat through Marine Protected Areas (Biosphere Reserve of the Upper Gulf of California and Delta of the Colorado River and the recently declared Vaquita Refuge), and implementing an acoustic monitoring program.

FURTHER RECALLING that the Ministry of Environment and Natural Resources and the Ministry of Agriculture, Livestock and Fisheries have been working cooperatively with several non-governmental organizations to implement a comprehensive recovery plan with a strong socio-economic component as recommended by CIRVA.

FURTHER CONCERNED that progress towards reducing/eliminating entanglement has been very slow despite efforts to ban gillnets from the vaquita's core area of occurrence and elsewhere in the Northern Gulf. The baiji experience shows that extinction can happen rapidly and without evidence of a steady or prolonged decline, if appropriate conservation actions are not taken promptly.

FURTHER NOTING that the vaquita's survival is at a critical juncture. The best hope for the species is that the international community and non-governmental organizations will support the Government of Mexico by providing technical and financial assistance in the implementation of CIRVA's Recovery Plan and the Biosphere Reserve.

NOW THEREFORE THE COMMISSION:

COMMENDS Mexico's intense recent efforts to prevent the extinction of the vaquita despite the difficulties involved in reducing bycatch to zero, and especially given the difficulties of providing alternative livelihoods to isolated fishing communities in the Northern Gulf.

FURTHER COMMENDS the President of Mexico for the recent announcement on the Conservation Program for Endangered Species (PROCER), which calls for the implementation of specific Species Conservation Action Programs (PACE) for a list of selected species. The vaquita is among the top five species on this list.

URGES the Members of IWC and the world community to support Mexico's efforts to prevent the extinction of the vaquita by reducing bycatch to zero in the immediate future and assisting in providing financial resources and technical as well as socio-economic expertise.

# Exhibit 8



ARTICLE IN PRESS

Available online at www.sciencedirect.com


ScienceDirect

Marine Policy ∎ (∎∎∎∎) ∎∎∎–∎∎∎



MARINE POLICY

www.elsevier.com/locate/marpol

# The whaling issue: Conservation, confusion, and casuistry

Phillip J. Clapham[a,b,*], Simon Childerhouse[b,c], Nicolas J. Gales[d], Lorenzo Rojas-Bracho[e], Michael F. Tillman[f], Robert L. Brownell Jr.[g]

[a]*Alaska Fisheries Science Center, 7600 Sand Point Way NE, Seattle WA 98115, USA*
[b]*South Pacific Whale Research Consortium, Box 3069, Avarua, Rarotonga, Cook Islands*
[c]*Marine Conservation Unit, Department of Conservation, PO Box 10-420, Wellington, New Zealand*
[d]*Australian Antarctic Division, Channel Highway, Kingston 7050, Tasmania, Australia*
[e]*Programa de Mamíferos Marinos, Instituto Nacional de Ecología/CICESE, Km 107 Carretera Ensenada-Tijuana, Ensenada, BC 22869, México*
[f]*Center for Marine Biodiversity and Conservation, Scripps Institution of Oceanography, University of California San Diego, La Jolla, CA 92093, USA*
[g]*Southwest Fisheries Science Center, 1352 Lighthouse Avenue, Pacific Grove CA 93950, USA*

Received 22 August 2006; accepted 14 September 2006

**Abstract**

Morishita's "multiple analysis" of the whaling issue [Morishita J. Multiple analysis of the whaling issue: Understanding the dispute by a matrix. Marine Policy 2006;30:802–8] is essentially a restatement of the Government of Japan's whaling policy, which confuses the issue through selective use of data, unsubstantiated facts, and the vilification of opposing perspectives. Here, we deconstruct the major problems with Morishita's article and provide an alternative view of the whaling dispute. For many people in this debate, the issue is not that some whales are not abundant, but that the whaling industry cannot be trusted to regulate itself or to honestly assess the status of potentially exploitable populations. This suspicion has its origin in Japan's poor use of science, its often implausible stock assessments, its insistence that culling is an appropriate way to manage marine mammal populations, and its relatively recent falsification of whaling and fisheries catch data combined with a refusal to accept true transparency in catch and market monitoring. Japanese policy on whaling cannot be viewed in isolation, but is part of a larger framework involving a perceived right to secure unlimited access to global marine resources. Whaling is inextricably tied to the international fisheries agreements on which Japan is strongly dependent; thus, concessions made at the IWC would have potentially serious ramifications in other fora.
© 2006 Elsevier Ltd. All rights reserved.

*Keywords:* International Whaling Commission; Natural resource management; Sustainable utilization; Whaling; Fisheries; Whales

## 1. Introduction

In an article that purports to offer a multiple analysis view of the whaling dispute, Joji Morishita [1] gives the Government of Japan's (GOJ) position on whaling as if it were incontestable fact. Morishita's article is in some respects a useful exposition of the elements of the whaling debate and of the changing political environment within the International whaling commission (IWC) from the 1960s to the present day. However, by selectively choosing

the information he presents, ignoring contradictory data, providing "facts" supported by irrelevant citations, trivializing opposing perspectives, and vilifying opponents, Morishita succeeds in creating a discussion of the issue which is in fact nothing more than a one-sided restatement of the GOJ's whaling policy.

Such casuistry is wearyingly familiar to those of us in the IWC's Scientific Committee (SC), where Japan has unsuccessfully attempted to gain endorsement of some very poor science that is in reality just a front for the continued exploitation of whale stocks while the Moratorium on commercial whaling remains in place [2]. Since 1987, Japan has killed almost 10,000 whales in its two scientific whaling programs in the Antarctic and North

*Corresponding author. Alaska Fisheries Science Center, 7600 Sand Point Way NE, Seattle WA 98115, USA.
*E-mail address:* Phillip.Clapham@noaa.gov (P.J. Clapham).

0308-597X/$ - see front matter © 2006 Elsevier Ltd. All rights reserved.
doi:10.1016/j.marpol.2006.09.004

Pacific; this is more than four and a half times the total number killed for research by all other nations combined since 1952.[1] In addition, as we note at the conclusion of this response, there is much more at stake for Japan on the whaling issue than the catching of whales.

In his Introduction, Morishita complains, "Confusion and intentional misuse of arguments are exacerbating the whaling dispute." This is certainly true, but Morishita and the GOJ are themselves frequently guilty of these tactics. For example, the author correctly remarks that the blanket statement "whales are endangered" is misleading in light of the widely differing conservation status of the many species of cetaceans, and labels such simplifications as "simply preposterous". However, no reputable scientist associated with the SC has ever made such a statement. In contrast, we note that Japan frequently promulgates generalizations regarding all aspects of the whaling dispute. For example, the GOJ often states publicly that "whales" consume too much fish. Indeed, in his article (p. 804) Morishita ignores his own admonition about generalization and says, "When stomach contents were analyzed as part of scientific whaling programs, it was found that baleen whales eat a large amount of commercially important fish."

This simplistic statement obscures the complexity of this topic and ignores several key ecological facts:

- Many whales do not eat fish at all; indeed, the greatest biomass of the world's baleen whales live in the Southern Hemisphere, where they primarily consume krill [3].[2]
- The sizes of many whale populations today are at a small fraction of their levels in pre-whaling times when commercial fish populations were considerably larger and much healthier than they are today [3,4].
- The primary predators of fish are not whales, but other fish [5].
- The removal of top predators (such as cetaceans) can cause major ecosystem perturbations, with negative consequences for fisheries [6].
- Human over-fishing (not whales) is the cause of the precipitous decline of commercial fish stocks worldwide [7].

These points have been made repeatedly in various publications and fora, yet Japan continues to promote the idea of competition by and among whale species as the primary justification for its scientific whaling [8,9]. The cynics at IWC have little doubt that Japan had already decided what the results of its research would be long before the first ships left the dock: that whales are abundant and increasing, and since Japanese researchers will inevitably find fish or krill in their stomachs, that whales must be out-competing both humans and each other for fisheries resources. This conclusion, which is simplistic and ecologically flawed [5,10], is lent false credence by Japan's use of ecosystem models. Such models are mathematically dense (and thus are conveniently opaque to non-specialists), but are typically forced to ignore or vastly oversimplify input parameters due to lack of data on numerous ecosystem variables. Consequently, they can provide, at best, only primitive representations of the immensely complex and dynamic marine ecosystems of which whales constitute but one element. Indeed, the SC has concluded, "There is currently no system for which we have suitable data or modeling approaches to be able to provide reliable quantitative management advice on the impact of cetaceans on fisheries or fisheries on cetaceans" [11].

The implication of the competition argument is that abundant whales must be "managed" (i.e. culled) to protect human food security, or to selectively promote the recovery of particularly depleted but commercially valuable species such as the blue whale [8,9]. Yet culling is not only a crude and ineffective method of managing animals in a complex ecosystem, it is antithetical to the objectives of the International Convention for the Regulation of Whaling, and the conservative principles underlying the SC's agreed method of calculating catch quotas, the Revised Management Procedure (RMP).

Morishita's contention that the IWC "clearly acknowledge(s) the scientific contributions of (Japan's) research" is belied by repeated critiques from numerous SC scientists [2,12]. These critiques have pointed out that Japan's research has little relevance to the input variables required by the RMP, and that the questions concerned could be addressed more cheaply and effectively using non-lethal methods (and indeed are in many other international research programs). When 63 members of the SC (representing more than half of the national delegations present) come to this conclusion [13], it can hardly be called a ringing endorsement of Japan's research.

In the article, Morishita states or implies that (high) abundance estimates are frequently agreed upon by IWC, when in reality many of these involve considerable scientific uncertainty and debate. As one example, the GOJ has repeatedly given an estimate of abundance that has humpback whales increasing by almost 17,000 animals, or more than 100% (from 16,211 to 33,010) in temporally adjacent surveys in the IWC's Antarctic management zone known as Area IV [14]. This implausible increase (which is used to support an argument that humpbacks are now out-competing minke whales) is explained by "distributional shifts", although there are no data from the Antarctic or anywhere else to support the occurrence of such a vast and

---

[1]As of April 2006, since 1987 Japan had killed 8973 minke whales, 293 Bryde's whales, 240 sei whales, 43 sperm whales, and 10 fin whales (total 9559 animals). The total catch by all other countries from 1952 to 2006 (including Japan) is approximately 2100 whales. Prior to the IWC moratorium, and like other nations, Japan conducted only small-scale research whaling, with a total catch of 840 whales from 1954 to 1986 (source: IWC).

[2]Ironically, many of the developing countries which have been persuaded through aid or rhetoric to support Japan's "whales versus fish" arguments have EEZs in tropical waters where some species of baleen whales migrate in winter to mate and calve, but where they do not feed at all.

Please cite this article as: Clapham PJ, et al. The whaling issue: Conservation, confusion, and casuistry. Marine Policy (2006), doi:10.1016/j.marpol.2006.09.004

*P.J. Clapham et al. / Marine Policy ∎ (∎∎∎∎) ∎∎∎–∎∎∎*

3

unprecedented change in habitat use by so many whales over any time period, let alone 2 years.[3] This is only one example of the poor science emanating from Japan's scientific whaling programs, and the GOJ's insistence that the SC accept such numbers as real in the face of the most basic scientific common sense betrays the bias and political motivation that underlies its whale research.

Morishita also informs readers (in a statement relegated to a footnote) that an abundance estimate of 760,000 for Antarctic minke whales was "agreed" by the SC in 1990, but adds that this number "is currently under review because of new data accumulated since that time". The parenthetical nature of the wording here obscures the tremendous controversy in this debate. The 760,000 figure came from a decadal set of circumpolar surveys finalized in 1987/88, and included an estimate of the substantial uncertainty around this number. The current analyses from a further set of surveys through the 1990s are suggesting greatly reduced abundance of minke whales, with some predicting a reduction from the earlier point estimate of as much as 65% to 268,000 animals [16]. Indeed, the SC agreed in 2000 that the 760,000 number was no longer appropriate [17], and there has been no resolution of this issue in the past six IWC meetings. To many SC members, the huge discrepancies between the two estimates suggest either an unprecedented decline in the population of minke whales, or that the surveys from which such estimates are derived yield fundamentally unreliable results. Either way, Morishita's obscure rendering of this issue is typical of the manner in which the GOJ ignores or trivializes scientific data and debates that do not support its positions.

Note that the GOJ carefully adjusts the level of its misinformation to the target readership; what is said in journal articles read by scientists is typically far more cautious than the "facts" promulgated to a lay audience. For example, Morishita is careful in his article to note that some whale populations are growing "at most 10% annually", yet on the public website of the GOJ's Institute of Cetacean Research (ICR)[4] (www.icrwhale.org), readers are told that populations of humpback and fin whales are increasing at "14–16%"—rates that the SC has agreed are biologically impossible.[5] Elsewhere, the 760,000 estimate for Antarctic minke whales is often cited by Japan with no

mention of the fact that the IWC no longer considers it appropriate.

In another case of incomplete narrative, Morishita goes on to say that application of the RMP to Southern Hemisphere minke whales would allow catches of "at least 2000 animals for the next 100 years without posing adverse effects on the stock". First, this calculation is contingent upon the much-contested abundance estimate of 760,000 noted above, and would also require currently unavailable data on the manner in which the populations of Antarctic minke whales are divided around their circumpolar distribution. Second, application of a circumpolar abundance estimate is not applicable to the Japanese whaling effort, which has occurred in only a portion of the Antarctic. What he also fails to mention is that if the RMP were applied to Japan's scientific whaling catches in the North Pacific, the current takes—notably of minke whales in Japanese coastal waters—would likely be well above what would be authorized by this procedure. Furthermore, the proposed Japanese catches of humpback and fin whales in the Antarctic will occur in populations that are generally believed to be below 54% of $K$, the minimum threshold below which the RMP does not permit catches.

The article contends, "The group that is economically most dependent on the whaling issue is ironically the extreme anti-whaling NGOs such as Greenpeace". However, not all NGOs are green; there are several pro-whaling groups that are just as embroiled in this controversy; and there are more than enough other environmental problems on which to base fund-raising campaigns. Furthermore, the commercial reliance of the GOJ on a continuation of whaling—currently in the form of scientific permit catches—to keep their aging whaling fleet operational is far more relevant in this context. Left to purely market forces, this industry would likely die since Japan's populace has lost its taste for whale meat and there is currently a growing mountain of unsold product being held in cold storage [20]. Additionally, despite the GOJ's rhetoric about preserving "culturally significant" small-type coastal whaling in Japan, most of the government's resources go into the Southern Ocean scientific whaling enterprise, the last remnant of the old commercial factory ship operations that drove many whale stocks to commercial extinction. As we note below, access to high-seas fisheries resources is of paramount importance to Japan.

In his section on politics, Morishita makes the statement that the US brought up the whaling issue at a 1972 UN conference to turn attention away from defoliation in Vietnam, and supports the idea that this is "widely believed" with a single citation which turns out to be a pro-whaling editorial in the *Japan Times* newspaper.[6] We find it remarkable that *Marine Policy* permitted this sort of

---

[3]Abundance estimates of these same humpback whale populations on their low-latitude breeding grounds to the north provide evidence for lower and biologically plausible increase rates [15].

[4]ICR is a semi-governmental organization that conducts the research on whales killed by Kyodo Senpaku Corporation; it is funded by the Fisheries Agency of Japan. ICR is the permit holder for the two whaling research programs; it lies within the jurisdiction of the Fisheries Agency, and its director is a former official of the latter body.

[5]In a 2006 review, the SC agreed that the maximum plausible annual rate of increase for humpback whales is 10.6% [18]; similar constraints would also apply to fin whales. Despite this, from its scientific whaling program data Japan has reported rates of increase as high as 18.1% (CV = 0.21) and 29.8% (CV = 0.1) per annum for Antarctic humpback and fin whales, respectively [19].

[6]The editorial was written by Mr. K. Yonezawa, who was the IWC Commissioner for Japan from 1977 to 1984, after which he was hired as the Senior Managing Director of Nippon Suisan Kaisha Ltd, the second largest marine products company in Japan.

Please cite this article as: Clapham PJ, et al. The whaling issue: Conservation, confusion, and casuistry. Marine Policy (2006), doi:10.1016/j.marpol.2006.09.004

statement and its attendant "citation" to appear in its pages unchallenged.

In another example of selective information, Morishita cites an opinion poll which purportedly found that 71% of the US public "supported limited and controlled whaling", and generalizes this to the broader statement that when the public is "provided with *objective* information" (italics ours), their views on whaling are not what the NGOs would have us believe. As everyone knows, the answers one gets in a poll depend in part upon the way in which questions are phrased; the poll concerned is 10 years old and its results are contradicted by other surveys which have consistently found broad opposition to whaling among the public in the United States and many other countries. Indeed, a poll conducted in 2006 found opposition to whaling among ten Pacific and Caribbean nations whose governments have been paid by Japan to support its position at the IWC [21].

Morishita accuses environmentalists of using scientific uncertainty about whale stocks "as the basis for calls for the prohibition of whaling." Yet, despite mounting evidence of declining populations, for years this uncertainty was exploited by whaling nations to give the benefit of the doubt to the whalers, with disastrous results. In this light, the Moratorium can be seen as a tardy but appropriately conservative response to the large-scale failures of management and oversight which all but extirpated some whale stocks, and brought some species (such as Antarctic blue whales and Northern Hemisphere right whales) perilously close to extinction.[7] Uncertainty in any data used for management is invariably a given in science, and modern management models are careful to define these uncertainties and to accommodate precaution in the selection of an estimate from within the range of possibilities. The IWC's SC follows exactly such a process in the RMP. Clearly, the lack of defensible and credible ranges of abundance of many whale species remains a cogent disqualifier of proposed management actions to exploit those populations. Japan has been particularly concerned about scientific uncertainty since the 1991 United Nations General Assembly global moratorium on all large-scale high seas drift-net fishing, a ban which was based largely upon the precautionary principle.

Among the major management failures of the past was the absence of an International Observer Scheme (IOS) until 1971, a problem which allowed widespread falsification of whaling catch data. The most egregious example was that of the former USSR, which is now known to have killed well over 100,000 whales illegally in the years 1947–73 [23,24]; these illegal catches hastened the collapse

of some Southern Hemisphere baleen whale populations, and almost extirpated the right whale in the eastern North Pacific [25].[8] Yet the Soviets were neither the only nor the most recent example of such deception: Japan is known to have falsified catch data on sperm and Bryde's whales in its coastal whaling operations [26,27]. For the latter species, these catches occurred until at least 1987, i.e. the year after the IWC Moratorium took effect. Additional details on the extent of past falsification by Japan are currently unknown; it is worth noting that (unlike Russia with the Soviet case) Japan has yet to acknowledge that these falsifications occurred. Furthermore, even after the IOS was instituted in the Southern Hemisphere, Japanese inspectors aboard at least one Soviet factory ship failed to report that the USSR exceeded the IWC sperm whale quota in the 1971/72 Antarctic whaling season.

Morishita tells us that existing international and domestic oversight procedures "are adequate to ensure sustainable whaling" and that the Revised Management Scheme (RMS)[9] "has not been agreed by the IWC because of delaying tactics of anti-whaling governments". Yet one of the biggest delays in implementation of the RMS has arisen from the refusal of Japan and other whaling nations to accept true transparency in the monitoring of whaling. Both Norway and Japan have established DNA databases to archive reference material from legally killed whales as a check on the origin of products found in the market. However, both countries refuse to allow truly independent oversight or third-party monitoring of such databases and sampling schemes, and both take the position that market oversight lies outside the jurisdiction of the IWC. Given the quite recent history of duplicity by Japan and others in catch reporting (and their dramatic parallels in illegal fishing), it is not surprising that the "anti-whaling nations" view such recalcitrance with suspicion.

For many people in this debate, the issue is not that some whales are not abundant, but that the whaling industry cannot be trusted to regulate itself or to honestly assess the status of potentially exploitable populations. It is hard to trust a government agency which frequently serves up nonsensical estimates of abundance and population growth, which refuses to allow independent oversight of its actions, and which pays lip service to the RMP while simultaneously stating that the proper way to manage whales is to cull them.

Throughout his article, Morishita portrays as irrational or hostile any party disagreeing with the GOJ's position. The term "anti-whaling" appears no fewer than 33 times in the article, tied to 14 other words (anti-whaling *organizations, countries, campaign, interests, governments, movement, NGOs, policy, views, side, values, interests,*

---

[7]The basis for the Moratorium is encapsulated in a statement made by some scientists in the 1981 SC report: "Upon reviewing the breadth and depth of uncertainties which exist… not one whale stock assessment exists which is free of the uncertainties described. We view this as untenable and suggest that it is reasonable to consider developing and adopting management regimes, including a cessation of whaling if necessary, which decrease the risk of whaling in the face of such uncertainties."[22]

[8]Japan's response to these revelations has been to publicly question the integrity of the former Soviet biologists who (at considerable personal risk within the Soviet system) meticulously documented these catches.

[9]The RMS includes the set of controls and inspection procedures to be put in place should commercial whaling recommence.

Please cite this article as: Clapham PJ, et al. The whaling issue: Conservation, confusion, and casuistry. Marine Policy (2006), doi:10.1016/j.marpol.2006.09.004

*philosophy,* and *sentiments*). In this view, those who agree with the GOJ are reasonable, bona-fide scientists. In contrast, anyone in the SC or elsewhere who takes a contrary position is branded with any of a series of derogatory terms; these include (to quote from various parts of the article) *emotional, unobjective, extreme, preposterous, sensational, non-experts, fear of Japan, hostile to Japan, Japan-bashers, manipulative, outrageous, unacceptable, egocentric, brain-washed,* and *culturally imperialistic.*

He rejects a priori the concept that many people oppose a resumption of whaling today because they genuinely believe that inadequate controls are in place to ensure that it is truly sustainable. Similarly, Japan's abuse of science to justify escalating catches numbers, and the whaling nations' contention that whales (and other marine mammals[10]) need to be culled [28], leave little room for good-faith negotiations on responsible resource management. These actions, and Norway's recent announcement that it is unilaterally modifying the RMP because it is "too conservative" and gives catches that "are inappropriately small" [29], do little to convince skeptics that the whalers genuinely intend to manage whales in a way that will not repeat the mistakes of the past. In other words, given the recent history and statements of the industry, there is reason enough to distrust current whaling practices without ever needing to stray into issues of differing ethical perspectives about the value of whales, or serious concerns regarding the often protracted time to death of the whales from harpooning.

On the surface, it is difficult to understand the tenacity with which Japan clings to whaling in the face of so much international opposition, or to comprehend the huge expenditure of effort and resources that are currently poured into the issue. As Morishita himself notes, whaling is heavily subsidized by the GOJ, well beyond its potential economic value for the near future. In addition, Japan gives millions of dollars in aid and other support to developing nations in exchange for their membership and pro-Japan votes at the IWC. Whaling continues to ramp up despite excessive supply of, and poor demand for, whale meat [20,30]. Why then do they persist in this endeavor?

Three factors are in play on this issue. First, Japanese domestic cultural values concerning whales are at odds with the anti-whaling "norm" of the international political arena [31]. Second, the control of all decision-making on whaling policy by powerful pro-whaling government agencies is hegemonistic in scope, and this has effectively precluded anti-whaling advocates both inside and outside Japan from exerting influence [31]. Powerful political pressure from within Japan comes from special interest groups, the fishing lobby, the Fisheries Agency and numerous politicians who all want to defend what they

see as a right to secure unlimited access to global marine resources [32]. As a recent review noted, "As long as domestic cultural and political structures remain intact, Japan's pro-whaling policy will continue." [31].

Finally, to understand the importance of whaling to Japan, the issue must be seen not in isolation but in the much broader context of international fisheries policy. Concessions in other management fora could impact whaling; indeed, strict inspection provisions are already in place in some existing fisheries agreements, and the GOJ is clearly resisting their inclusion in the RMS in an effort to resume commercial whaling with as little restriction as possible. But whaling itself represents a potentially slippery slope: a major loss or concession on this issue could potentially have severe ramifications for Japan's extensive and critically important fisheries agreements elsewhere.

Mr. Morishita himself inadvertently illustrated this dilemma in an amusing incident which occurred at the 2001 IWC meeting in London. In an intervention at an SC plenary session, he explained why he disliked a procedure that had been suggested for managing Antarctic minke whales, and concluded by saying that this was "a very bad way to manage southern bluefin tuna." After a pause in which everyone in the room looked up quizzically, he added, "Sorry-wrong meeting." The slip said much about the inextricable connection between whaling and other fisheries issues for the GOJ, and the basic blueprint underlying its approach to the management of a wide range of exploited marine species.

For a nation that is as dependent upon fisheries resources as Japan, this is a critical fight to win. Or to modify the concluding statement of Morishita's article: Japan's fisheries policy can't be protected without whaling.

### Acknowledgments

We thank Doug DeMaster, Paul Wade, and Alex Zerbini for their critical reading of earlier versions of this paper.

### References

[1] Morishita J. Multiple analysis of the whaling issue: understanding the dispute by a matrix. Marine Policy 2006;30:802–8.

[2] Clapham PJ, Berggren P, Childerhouse S, Friday NA, Kasuya T, Kell L, et al. Whaling as science. Bioscience 2003;53:210–2.

[3] Nemoto T. Feeding patterns of baleen whales in the ocean. In: Steele J, editor. Marine food chains. Berkeley, CA: University of California Press; 1970. p. 241–52.

[4] Pauly D, Palomares M-L. Fishing down marine food web: it is far more pervasive than we thought. Bulletin of Marine Science 2005;76:197–211.

[5] Trites AW, Christensen V, Pauly D. Competition between fisheries and marine mammals for prey and primary production in the Pacific Ocean. Journal of Northwest Atlantic Fisheries Science 1997;22:173–87.

[6] Clapham PJ, Link J. Whales, whaling, and ecosystems in the North Atlantic. In: Estes J, Demaster DP, Doak DF, Williams TM, Brownell Jr RL, editors. Whales, whaling, and ecosystems. Berkeley: University of California Press; 2006. p. 241–50.

---

[10]The Japanese Fisheries Agency still permits a cull of Steller sea lions, a species which is classified as endangered by the International Union for the Conservation of Nature.

Please cite this article as: Clapham PJ, et al. The whaling issue: Conservation, confusion, and casuistry. Marine Policy (2006), doi:10.1016/j.marpol.2006.09.004

ARTICLE IN PRESS

6 *P.J. Clapham et al. / Marine Policy ▮ (▮▮▮▮) ▮▮▮–▮▮▮*

[7] Pauly D, Alder J, Bennett E, Christensen V, Tyedmers P, Watson R. The future for fisheries. Science 2003;302:1359–61.

[8] Morishita J, Goodman D. Competition between fisheries and marine mammals-feeding marine mammals at the expense of food for humans. In: Proceedings of the third world fisheries congress, 31 October–3 November 2000, Beijing.

[9] Institute of Cetacean Research. Why whale research? Institute of Cetacean Research 2006: ⟨http://www.icrwhale.org/04-B-jen.pdf.⟩

[10] Clapham PJ, Brownell Jr RL. Potential for interspecific competition in baleen whales. Reports of the International Whaling Commission 1996;46:361–7.

[11] IWC. Report of the Scientific Committee. Journal of Cetacean Research and Management 2004;6(supplement):30.

[12] Gales NJ, Kasuya T, Clapham PJ, Brownell Jr RL. Japan's whaling plan under scrutiny: useful science or unregulated commercial whaling? Nature 2005;435:883–4.

[13] Childerhouse S, et al. Comments on the Government of Japan's proposal for a second phase of special permit whaling in the Antarctic (JARPA II). Journal of Cetacean Research and Management 2006;8(supplement):260–1.

[14] Matsuoka K, Hakamada T, Nishiwaki S. Distribution and abundance of humpback, fin, and blue whales in the Antarctic areas IIIE, IV, V and VIW (35 E-145 W). Document JA/J05/JR 10 available from ⟨http://www.icrwhale.org/eng/JA-J05-JR10.pdf.⟩ 2005.

[15] IWC. Report of the workshop on the comprehensive assessment of Southern Hemisphere humpback whales. SC/58/Rep 5. Journal of Cetacean Research and Management, 2007, in press.

[16] Branch TA, Butterworth DS. Southern Hemisphere minke whales: standardized abundance estimates from the 1978/79 to 1997/98 IDCR-SOWER surveys. Journal of Cetacean Research and Management 2001;3:143–74.

[17] IWC. Report of the Scientific Committee. Journal of Cetacean Research and Management 2001;3(supplement):31.

[18] IWC. Report of the Scientific Committee. Journal of Cetacean Research and Management 2007;9(supplement):37 in press.

[19] Matsuoka K, Hakamada T, Murase H, Nishiwaki S. Current abundance estimates of humpback and fin whales in the Antarctic

Areas IIIE, IV, V, and VIW (35 E–115° W). Paper SC/56/SH11 available from the International Whaling Commission, Cambridge, UK. 2004.

[20] Tabuchi H. Japan faces whale meat glut after boosting catch; Prices plunging. The Canadian Press, February 9, 2006.

[21] WWF survey on attitudes towards commercial whaling in the Caribbean and the Pacific. World Wildlife Fund 2006. ⟨http://assets.panda.org/downloads/wwfresearchsurveycommercialwhaling.pdf.⟩

[22] IWC. Report of the Scientific Committee (p. 57). Reports of the International Whaling Commission 1981;31:31.

[23] Zemsky VA, Berzin AA, Mikhalev YA, Tormosov DD. Soviet pelagic whaling after WWII: review of actual catch data. Reports of the International Whaling Commission 1995;45:131–5.

[24] Yablokov AV, Zemsky VA, Mikhalev YA, Tormosov VV, Berzin AA. Data on Soviet whaling in the Antarctic in 1947–72 (population aspects). Russian Journal of Ecology 1998;29:38–42.

[25] Doroshenko NV. Soviet whaling for blue, gray, bowhead and right whales in the North Pacific Ocean, 1961–79. in: Soviet Whaling Data (1949–79). Moscow: Center for Russian Environmental Policy; 2000. p. 96–103.

[26] Kasuya T. Examination of the reliability of catch statistics in the Japanese coastal sperm whale fishery. Journal of Cetacean Research and Management 1999;1:109–22.

[27] Kondo I, Kasuya T. True catch statistics for a Japanese whaling company in 1965–78; Paper SC/54/O13 available from the International Whaling Commission, Cambridge UK, 2002.

[28] Corkeron P. Fishery management and culling. Science 2004;306:1891.

[29] At the 2004 IWC meeting, Norway submitted a document announcing its intention to modify the Revised Management Procedure; see ⟨http://www.highnorth.no/news/nedit.asp?which = 338.⟩   Further details were given at the 2006 meeting.

[30] Hesse S. Marine management is all at sea. The Japan Times; 2006.

[31] Hirata K. Why Japan supports whaling. Journal of International Wildlife and Policy 2005;8:129–49.

[32] Danaher M. Why Japan will not give up whaling. Pacifica Review: Peace, Security, and Global Change 2002;14:105–20.

Please cite this article as: Clapham PJ, et al. The whaling issue: Conservation, confusion, and casuistry. Marine Policy (2006), doi:10.1016/j.marpol.2006.09.004

# Exhibit 9





Whaling as Science
Author(s): PHILLIP J. CLAPHAM, PER BERGGREN, SIMON CHILDERHOUSE, NANCY A. FRIDAY,
TOSHIO KASUYA, LAURENCE KELL, KARL-HERMANN KOCK, SILVIA MANZANILLA-NAIM,
GIUSEPPE NOTABARTOLO DI SCIARA, WILLIAM F. PERRIN, ANDREW J. READ, RANDALL R.
REEVES, EMER ROGAN, LORENZO ROJAS-BRACHO, TIM D. SMITH, MICHAEL
STACHOWITSCH, BARBARA L. TAYLOR, DEBORAH THIELE, PAUL R. WADE, ROBERT L.
BROWNELL JR.
Reviewed work(s):
Source: *BioScience*, Vol. 53, No. 3 (March 2003), pp. 210-212
Published by: University of California Press on behalf of the American Institute of Biological Sciences
Stable URL: http://www.jstor.org/stable/10.1641/0006-
3568%282003%29053%5B0210%3AWAS%5D2.0.CO%3B2
Accessed: 11/01/2012 16:38

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*University of California Press* and *American Institute of Biological Sciences* are collaborating with JSTOR to
digitize, preserve and extend access to *BioScience*.

http://www.jstor.org

*Viewpoint*

# Whaling as Science

PHILLIP J. CLAPHAM, PER BERGGREN, SIMON CHILDERHOUSE, NANCY A. FRIDAY, TOSHIO KASUYA,
LAURENCE KELL, KARL-HERMANN KOCK, SILVIA MANZANILLA-NAIM, GIUSEPPE NOTABARTOLO DI SCIARA,
WILLIAM F. PERRIN, ANDREW J. READ, RANDALL R. REEVES, EMER ROGAN, LORENZO ROJAS-BRACHO,
TIM D. SMITH, MICHAEL STACHOWITSCH, BARBARA L. TAYLOR, DEBORAH THIELE, PAUL R. WADE, AND
ROBERT L. BROWNELL JR.

**I**n an open letter published last year in the *New York Times*, 21 distinguished scientists (including three Nobel laureates) criticized Japan's program of scientific research whaling, noting its poor design and unjustified reliance upon lethal sampling. In a recent Forum article in *BioScience*, Aron, Burke, and Freeman (2002) castigate the letter's signers and accuse them of meddling in political issues without sufficient knowledge of the science involved in those issues.

As members of the Scientific Committee (SC) of the International Whaling Commission (IWC), we can attest that the signers of the open letter correctly summarized criticisms made by researchers very familiar with Japanese scientific whaling. One such critique (Clapham et al. 2002) was presented and discussed last year at a meeting of the SC. It was authored by SC members representing a broad range of countries, yet mention of this paper and others like it was absent from Aron and his colleagues' commentary, betraying a selectiveness that pervades their article. The authors quote lines from SC reports to support their contention that the IWC regards scientific whaling as valuable, but they fail to acknowledge many other sections that are highly critical of the Japanese program (IWC 1998, 2001, 2003).

Japan's scientific whaling program in the North Pacific (JARPN) was originally described as a feasibility study, but it included no performance measures by which to judge its success or failure. To no one's surprise, it was judged "suc-cessful" by Japan, and the full program (JARPN II) began in 2002. JARPN II involves annual catches of 150 minke whales, 50 Bryde's whales, 10 sperm whales, and 50 sei whales. It is described as a "long-term research programme of undetermined duration" and gives as its primary objective studies of "feeding ecology" and, secondarily, investigations of "environmental pollutants... and stock structure" (Government of Japan 2002).

---

*JARPN II exists to "demonstrate"—
all data to the contrary
notwithstanding—that whales eat too
much fish and therefore should be
culled by more whaling.*

---

Regarding the primary objective, we note that while the IWC has developed a revised management procedure (RMP) for future management of commercial whaling, it is not ecosystem based. IWC does not employ ecosystem-based management; consequently, none of the information derived from the feeding ecology study is relevant to the manner in which IWC assesses and manages whale populations.

Other fundamental problems of the JARPN II study include a lack of testable hypotheses or performance measures; inappropriate use of ecosystem models and failure to include sensitivity analyses and key data on other ecosystem components; selective or inappropriate use of data or methods in estimating whale abundance; unnecessary reliance on lethal sampling; inappropriate geographic sampling for population structure analysis; and unrealistic assessments of the effect of the proposed catches on the populations concerned (some of which may be depleted, and for which no adequate assessment of current status has been undertaken). For full details, see Clapham and colleagues (2002), available at *www.nefsc.noaa.gov/psb/pubs/jarpn2.pdf*.

Overall, JARPN II presumes, on an almost a priori basis, that whales (not humans) are primarily responsible for worldwide declines in fish stocks and ignores the immense complexities inherent in marine ecosystems. In short, it is difficult to escape the conclusion that JARPN II exists to "demonstrate"—all data to the contrary notwithstanding—that whales eat too much fish and therefore should be culled by more whaling. Significantly, when the IWC held a workshop last year to discuss modeling approaches to this issue, the Government of Japan refused to send any of its scientists.

This obstructiveness is not uncommon. Japan has also refused—contrary to common practice in other international management contexts—to allow independent analysis of its raw data. Despite repeated formal requests, obtaining anything more than data summaries, which are unsuitable for analysis, has to date been impossible. Furthermore, Japan has refused to

participate in an IWC working group established to investigate illegal Japanese whaling catches that are known to have occurred in the North Pacific as recently as 1987 (i.e., *after* the IWC passed a moratorium on whaling).

The Japanese program in the Antarctic (JARPA) has similar problems. JARPA has been conducted for 16 years and has to date killed over 5900 minke whales. Yet as was noted in last year's SC discussions, the value of JARPA's work to management is certainly not apparent in its publication record, which is remarkably poor for a scientific effort on this scale. Aron and colleagues' pointing to "over 150 articles" resulting from JARPA is highly misleading: The list to which they refer readers (see *www.whalesci.org/contribution*) includes only a single paper (Kishino et al. 1991) that concerns IWC assessment needs and that is published in an international peer-reviewed journal; 19 similar papers were published by IWC. The remaining 137 "publications" consist of cruise or progress reports (7), unpublished IWC papers (58), SC meeting reports (14), Japanese theses (6), conference presentations (40, many of which repeat the same unrefereed and irrelevant results in multiple forums), and peer-reviewed articles (12) on topics of no value to management (e.g., "post-thawing viability of frozen spermatozoa of male minke whales"). JARPA's failure to publish in international refereed journals says much about the quality and motives of its science.

---

*Today, so little of any significance to IWC management can be obtained only from whaling catches that it is impossible to justify killing animals on this basis, particularly given the many thousands of whaling catch samples already analyzed or archived.*

---

The unnecessary reliance on lethal sampling is a major issue in this debate. The point is not that lethal sampling cannot contribute anything to knowledge of whale populations, or even that there are no data which cannot be obtained by other means; one can always find scientific value in carcasses. Rather the issue is that lethal methods are not required to obtain information needed for population assessment. Today, so little of any significance to IWC management can be obtained only from whaling catches that it is impossible to justify killing animals on this basis, particularly given the many thousands of whaling catch samples already analyzed or archived. Moreover, nonlethal techniques often provide better data at less cost, to both budget and animals. For example, population structure is most reliably studied with genetic analysis, which is routinely conducted using tissue from skin biopsies (Palsboll et al. 1997); lethal sampling is not required for this work. Furthermore, because biopsies can be taken and processed quickly (unlike catches), a biopsy program would substantially increase sample size and analytical power. Aron and

*Viewpoint*

colleagues' claim that logistical difficulties preclude such sampling is baseless; if a whale can be hit with a harpoon, the same target can just as easily be struck with a biopsy dart.

The provision in the International Convention for the Regulation of Whaling that allows member countries to kill whales for research was formulated at a time (the 1940s) when few viable alternatives to lethal sampling existed. Catches under scientific permit provided a means to obtain limited sample sizes that might be used to address specific management issues. In contrast, JARPA and JARPN II appear to be long-term, open-ended whaling programs that keep an industry operating (note also that Japan's Institute of Cetacean Research is primarily funded by sales of whale products from scientific catches).

A key point here is that the scientific whaling provision does not specify a method for calculating sample sizes, nor does it impose any upper limit on catches. As was noted by Clapham and colleagues (2002), it is unlikely that Japan would be authorized to kill the number of whales currently being taken if these "research" catches were calculated under the RMP (the accepted IWC method for specifying catch quotas). With scientific whaling, Japan has the best of both worlds: While waiting for the IWC to implement a scheme allowing commercial whaling to resume, Japan can continue to kill whales, and it can do so at levels that would not be permitted using IWC methods.

In his editorial, Timothy Beardsley paraphrases Aron and colleagues' admonitions and suggests that scientists should "take extraordinary care to acknowledge differences of opinion on science." It is worth asking just how bad science has to be before its quality ceases to be a matter of opinion, by any reasonable standard of independent judgment. Many SC members have contended that Japan's scientific whaling program is so poor that it would not survive review by any major independent funding agency (e.g., the European Commission). We repeat here a previous challenge to the Government

of Japan to submit its research whaling proposals to such third-party review, in which—unlike at the IWC Scientific Committee—a proposal's authors do not play a major role in the writing of the resulting evaluation.

Beardsley's editorial notes that researchers "are right to speak out if they believe commercial whalers are being misrepresented as science." In our view, there has rarely been a more egregious example of this misrepresentation than Japan's scientific whaling program and the article by Aron and colleagues that seeks to defend it.

*The authors are all members of the International Whaling Commission's Scientific Committee. Phillip J. Clapham, Northeast Fisheries Science Center, 166 Water Street, Woods Hole, MA 02543, USA; Per Berggren, Department of Zoology, Stockholm University; S-106 91 Stockholm, Sweden; Simon Childerhouse, Science and Research Unit, Department of Conservation, PO Box 10-420, Wellington, New Zealand; Nancy A. Friday, National Marine Mammal Laboratory, 7600 Sand Point Way NE, Seattle, WA 98115, USA; Toshio Kasuya, Teikyo University of Science and Technology, Uenohara, Yamanashi, 409-0193, Japan; Laurence Kell, CEFAS Lowestoft Laboratory, Pakefield Road, Lowestoft, NR33 HT, United Kingdom; Karl-Hermann Kock, Federal Research Centre for Fisheries, Institute of Sea Fisheries, Hamburg, Germany; Silvia Manzanilla-Naim, SEMARNAT, Blvd. Adolfo Ruiz Cortines 4209, Jardine4s en la Montaña, Tlalpan, Cp 14210, México; Giuseppe Notarbartolo di Sciara, Istituto Centrale per la Ricerca Applicata al Mare, Via di Casaletti 300, 00166 Rome, Italy; William F. Perrin, Southwest Fisheries Science Center, 8604 La Jolla Shores Drive, La Jolla, CA 92037, USA; Andrew J. Read, Duke University Marine Laboratory, 135 Duke Marine Lab Road, Beaufort, NC 28516, USA; Randall R. Reeves, 27 Chandler Lane, Hudson, Quebec J0P 1H0, Canada; Emer Rogan, Department of Zoology and Animal Ecology, University College, Cork, Ireland; Lorenzo Rojas-Bracho, Instituto Nacional de Ecología, c/o CICESE, Apto. Postal 2732, Ensenada, Baja California 22860, México; Tim D. Smith, Northeast Fisheries Science Center, 166 Water Street, Woods Hole, MA 02543, USA; Michael Stachowitsch, Institute of Ecology and Conservation Biology, Department of Marine Biology, University of Vienna, Althanstrasse 14, Vienna A-1090, Austria; Barbara L. Taylor,*

*Southwest Fisheries Science Center, 8604 La Jolla Shores Drive, La Jolla, CA 92037, USA; Deborah Thiele, School of Ecology and Environment, Deakin University; PO Box 423, Warrnambool, Victoria, 3280, Australia; Paul R. Wade, National Marine Mammal Laboratory, 7600 Sand Point Way NE, Seattle, WA 98115, USA; and Robert L. Brownell Jr., Southwest Fisheries Science Center, 1352 Lighthouse Avenue, Pacific Grove, CA 93950, USA.*

## References cited

Aron W, Burke W, Freeman M. 2002. Scientists versus whaling: Science, advocacy, and errors of judgment. BioScience 52: 1137–1140.

Clapham PJ, et al. 2002. The JARPN II program: A critique. Paper SC/54/O26 presented to the IWC Scientific Committee. Available from IWC, The Red House, 135 Station Road, Impington, Cambridge, CB4 9NP, United Kingdom; and from *www.nefsc.noaa.gov/psb/pubs/jarpn2.pdf.*

Government of Japan. 2002. Research plan for cetacean studies in the western North Pacific under special permit (JARPN II). Paper SC/54/O2 presented to the IWC Scientific Committee. Available from IWC, The Red House 135 Station Road, Impington, Cambridge, CB4, 9NP, United Kingdom.

[IWC] International Whaling Commission. 1998. Report of the intersessional working group to review data and results from special permit research on minke whales in the Antarctic, 12–16 May 1997, Tokyo. Reports of the International Whaling Commission 48: 377–412.

———. 2001. Report of the workshop to review the Japanese whale research programme under special permit for North Pacific minke whales (JARPN). Journal of Cetacean Research and Management 3 (suppl.): 375–413.

———. 2003. Report of the scientific committee. Journal of Cetacean Research and Management 5 (suppl.). Forthcoming.

Kishino H, Kato H, Kasamatsu F, Fujise Y. 1991. Detection of heterogeneity and estimation of population characteristics from the field survey data: 1987/88 Japanese feasibility study of the Southern Hemisphere minke whales. Annals of the Institute of Statistical Mathematics 43: 435–453.

Palsbøll PJ, et al. 1997. Genetic tagging of humpback whales. Nature 388: 767–769.

# Exhibit 10

Clapham, P.J. 2011. Is scientific whaling really science? In: Ishii, A. (ed.), *The Anatomy of the Whaling Controversy*, [Kaitai-Shinsho Hogei-Ronso], pp. 115-146. Shin-Hyoron Press, Tokyo [in Japanese].

# How "scientific" is Japan's scientific whaling?

Phillip J. Clapham, Ph.D.
National Marine Mammal Laboratory
Alaska Fisheries Science Center
7600 Sand Point Way NE
Seattle, WA 98115, USA

**Introduction**

Whale research has a long history, beginning with the observations of the Greek philosopher Aristotle 2,400 years ago. However, extensive, detailed scientific investigations of whales did not occur until the 20th century, when modern commercial whaling provided researchers with literally hundreds of thousands of specimens to study.

Today, scientific research on whales is critical to the management of whale populations everywhere, whether or not those populations are being exploited for commercial or other reasons. We need to know many things to properly manage whale populations. How many whales are there? What are the boundaries of a "population", and is there mixing between different populations? Is the population increasing or declining? How often do whales reproduce? How many young ones survive to adulthood? These and many other questions are all important topics for modern whale studies. Research is indeed critically important, but the research must be scientifically credible and, when conducted to assist the management of whales, it must provide information that is relevant to management needs.

When the International Whaling Commission (IWC) passed a moratorium on commercial whaling in 1982, it did so over the strong objections of (among other nations) the Government of Japan (GOJ), which maintained a large capital investment in the form of a whaling fleet. The moratorium took effect in 1986 for coastal whaling, and the 1985/1986 pelagic season. The following year Japan began an extensive program of "scientific" whaling in the Antarctic, stating the importance of gathering data to better manage populations of whales. As is detailed elsewhere in this book, this whaling program was conducted in accordance with Article VIII of the International Convention for the Regulation of Whaling, which allows any government to issue a permit to kill whales for scientific research. As I discuss below, however, Article VIII was never intended to allow large numbers of whales to be killed for this purpose, and when the Convention was signed in 1946 no one could have imagined that it would be used to circumvent a complete ban on commercial whaling. Yet this is exactly what has occurred with the two large scientific whaling programs that are currently operated by the GOJ. Together, these programs have killed more than five times the number of whales that have been taken under Article VIII by all other nations combined. Furthermore, as I will explain, the research under these programs is often of poor quality, and has produced a relatively low level of scientific publications. Finally, the proposed objectives could have been more efficiently met using non-lethal methods, and in most cases the GOJ's studies have little relevance to the management of whales by the IWC.

**Japan's scientific whaling: history and scope**

Immediately after the Moratorium came into full effect in 1986, the GOJ began an effort called the Japanese Research Program in the Antarctic (JARPA) (Government of Japan 1987). The program started in the Southern Ocean in the 1987/88 season, and initial catches were of up to 330 Antarctic minke whales per year; however, beginning in 1995 the catch quota was increased to 440 minkes a year. The JARPA program (including a two year "feasibility study") ran for 18 years, during which time a total of 6,800 minke whales were killed (Table 1).

When JARPA ended in 2004, the GOJ immediately announced plans for a new, substantially expanded scientific whaling effort called JARPA II (Government of Japan 2005, Gales *et al.* 2005). After completion of the first two "feasibility" years, the full-scale program began in the austral summer of 2007/08, with a planned annual kill of up to 935 minke whales, 50 fin whales and 50 humpback whales (although so far the plans to kill humpbacks have been

1

suspended).  Catch quotas for JARPA and JARPA II were set with an allowance of plus or minus 10%; for example, 300 +/- 30 animals.  In most years, the total catch of minke whales was very close or equal to the maximum authorized.

As of the end of the 2007/08 season, JARPA II has killed 1,915 minke whales and 13 fin whales.  Since 1987, therefore, 8,728 whales have been killed in association with Japan's research programs in the Southern Ocean.

Another major scientific whaling program, in the North Pacific, was begun in 1994 (Government of Japan 1994). This program, called JARPN, lasted until 1999, during which 498 common minke whales and one Bryde's whale were killed.  Following this, the GOJ announced a new program, JARPN II, which began in 2000 with a two-year "feasibility study".  The feasibility study was pronounced successful, and in 2002 the full program was initiated.  As with JARPA, the catches of whales in the North Pacific program have increased over the years, from 21 minkes in the first year of the JARPN program to annual totals of up to 222 minkes, 101 sei whales, 51 Bryde's whales and 10 sperm whales in JARPN II.  To date, a total of 2,159 whales (1,228 minkes, 491 sei whales, 395 Bryde's whales and 45 sperm whales) have been killed as part of the JARPN II program.

Thus, the total catch of all whales for scientific research by Japan in the 22 years since the Moratorium (1987 to mid-2008) has been 11,386, or an average of 517 whales per year.  These catches are shown by year, area and species in Table 1.

To put these figures into perspective, the total scientific whaling catch by all nations combined, including Japan, for the 35-year period prior to the Moratorium (1952 to 1986) was about 2,100 whales (Gales *et al.* 2005); this represents an average of about only 60 whales killed per year.  In other words, the GOJ's average catch of 517 whales per year has been more than eight times that of all nations' annual scientific whaling takes prior to the ban on commercial whaling.  The GOJ's total catch for the period is more than five times the number killed for research by all whaling nations since 1952.  Represented yet another way, the GOJ's total catch *every year* now represents more than half the *total* number of whales killed for research, by all nations combined, in the 35 years prior to the Moratorium.

## Objectives of the research

The GOJ's scientific whaling programs have had varying and often changing objectives.  The original goals of the first JARPA program were to determine biological parameters (such as mortality rates) of Antarctic minke whales, and then expanded to study the role of whales in the Antarctic ecosystem.  Later, other objectives were added regarding the effect of environmental changes on cetaceans and determining population structure in minke whales.

When the GOJ presented its proposal for the new JARPA II program to the IWC's Scientific Committee (Government of Japan 2005), it led to considerable controversy.  Members from over half of the national delegations present authored a paper criticizing JARPA II's scientific basis, further noting that it was inappropriate to review the new proposal before Japan had given the IWC an opportunity to assess the results of the preceding 18-year JARPA program (Childerhouse et al. 2006).  As detailed below, that review (which was eventually held in December 2006), concluded that JARPA had "the potential to improve management of minke whales in the Southern Ocean", but that such an outcome had not been realized, despite nearly two decades of effort by a large and well-funded research laboratory in Tokyo (the Institute of Cetacean Research, ICR).

Despite these failings and criticisms, and the fact that the methodologies used in JARPA and JARPA II were almost identical, the GOJ stated in 2007 that the objectives and methods of the full-scale JARPA II program would remain unchanged from the original proposal.

Overall, JARPA II aims to monitor the Antarctic ecosystem by examining how three species of whale (minke, fin and humpback) interact with each other and with their environment (Government of Japan 2005).  The GOJ intends to do this primarily by measuring or estimating parameters such as age, stomach content mass and prey species, blubber thickness and reproductive status of hunted animals, set against very limited measurements of the physical and biological environment from which the whales are taken.  These data are intended for use in computer models that examine the degree of presumed competition among these whales, and to develop a new, multi-species management method.

The ultimate objective of this research is to assess the feasibility of accelerating the recovery of the largest and most valuable whale species (e.g. blue and fin whales) through the culling of less valuable and more numerous species such as minke and humpback whales.  This line of research is being pursued despite the fact that there is little

evidence for competition among the species concerned, that culling is a crude and ineffective method of managing species, and that (as noted below) the models being employed in JARPA II simplify or completely ignore key variables involved in this complex ecosystem.

The final research program, JARPN/JARPN II in the North Pacific, has been similarly criticized at IWC and elsewhere (Clapham *et al.* 2003). Its original objective was to determine population structure of minke whales in the western North Pacific, a goal which to date (14 years later) remains unattained. With JARPN II, the primary emphasis has again shifted to ecosystem research, a goal which has the same problems and limitations that have attended the JARPA and JARPA II programs in the Antarctic.

## Ecosystem research, and arguments about competition with humans and other whales

As noted above, the primary objective of the GOJ's scientific whaling programs today is to study "the role of whales in the ecosystem". The GOJ often states publicly that whales consume too much fish (Morishita 2006). This simplistic statement obscures the complexity of this topic and ignores several key ecological facts:

- Many whales do not eat fish at all; indeed, the greatest biomass of the world's baleen whales live in the Southern Hemisphere, where they primarily consume krill[1] (Nemoto 1970);
- The sizes of many whale populations today are at a small fraction of their levels in pre-whaling times when commercial fish populations were considerably larger and much healthier than they are today (Nemoto 1970, Pauly and Palomares 2005);
- The primary predators of fish are not whales, but other fish (Trites *et al.* 1997);
- The removal of top predators (such as cetaceans) can cause major ecosystem perturbations, with negative consequences for fisheries (Clapham and Link 2006); and,
- Human over-fishing (not whales) is the cause of the precipitous decline of commercial fish stocks worldwide (Pauly *et al.* 2003).

These points have been made repeatedly in many places (e.g. Clapham *et al.* 2007), yet the GOJ continues to promote the idea of competition by and among whale species as the primary justification for its scientific whaling. Many of those who attend the IWC meetings have little doubt that the GOJ had already decided what the results of its research would be long before the first ships left port: that whales are abundant and increasing, and - because Japanese researchers will inevitably find fish or krill in their stomachs - that whales must be out-competing both humans and each other for fisheries resources. This conclusion, which is simplistic and ecologically flawed, is often lent false credence by Japan's use of ecosystem models. Such models are mathematically very complex and thus impossible to understand for non-specialists. Furthermore, the scientists using these models are forced to ignore or greatly oversimplify input parameters due to lack of data on numerous ecosystem variables (notably measurements of the interactions among species). Consequently they can provide, at best, only primitive representations of the immensely complex and dynamic marine ecosystems of which whales constitute but one element. Indeed, the IWC itself has concluded that "there is currently no system for which we have suitable data or modelling approaches to be able to provide reliable quantitative management advice on the impact of cetaceans on fisheries or fisheries on cetaceans" (IWC 2004).

In the last few years, faced with evidence of a declining population of minke whales in the Antarctic (Branch and Butterworth 2001), the GOJ has placed much emphasis on the idea that supposedly abundant humpback whales are out-competing minkes for food, and affecting their ability to effectively forage. Ironically, some years before this argument was made minke whales were portrayed by the GOJ as the super-abundant problem species which were out-competing endangered blue whales and inhibiting their recovery (IWC 1994)!

To date, the only sophisticated investigation of competition among humpback and minke whales in the Antarctic, a tagging and oceanographic study by Dr Ari Friedlaender and his colleagues (Friedlaender *et al.* in press), has

---

[1]Ironically, many of the developing countries which have been persuaded through aid or rhetoric to support the GOJ's "whales versus fish" arguments have EEZs in tropical waters where some species of baleen whales migrate in winter to mate and calve, but where they do not feed at all.

3

provided strong evidence for what is called "niche separation" in the two species: the concept that humpbacks and minkes avoid competition by feeding on aggregations of krill that differ in type, area and depth. Nonetheless, if humpback whales are killed as part of the JARPA II program, the GOJ will undoubtedly show photos of krill in the stomachs of both minkes and humpbacks, and conclude that they must be in competition. Scientifically, this is very similar to examining photos of people all eating fish at the same restaurant, and concluding that they must be in competition with each other, with negative health effects for some of them.

It is significant that the GOJ has refused repeated suggestions to pursue its ecosystem studies in close collaboration with existing projects and organizations that have this focus, and extensive experience in this field. For example, any large-scale program of ecosystem research in the Southern Ocean would benefit greatly from collaboration with studies conducted under the Commission for the Conservation of Antarctic Living Marine Resources (CCAMLR). Yet the GOJ has failed to do this, presumably because the experienced researchers involved with CCAMLR would seriously criticize the GOJ's scientific approach to these issues. This insularity is characteristic of the GOJ's work. It is a telling comment that GOJ scientists never present their work on whales at the biennial conference of the Society for Marine Mammalogy; this is the premier international body in the field, to which virtually all other marine mammal scientists in the world belong.

## How useful are the GOJ's research results?

After more than two decades of scientific whaling in the Antarctic and North Pacific, the GOJ has killed more than 11,000 whales. This sample size is enviably large scientifically, and in any well-designed study should provide enough information to provide reliable answers to many important questions.[2] However, and notwithstanding the GOJ's frequent claims to the contrary, its scientific whaling research programs have yet to provide results that have significantly contributed to the management of whales in the Southern Ocean, despite having such a huge volume of data with which to work.

It is noteworthy that after so many years, the GOJ's record of scientific papers - which is one of the principal measures of the quality and success of research in science - is astonishingly poor. The GOJ's frequent assertions that the research has resulted in numerous papers fail to mention that such papers are heavily represented by arcane and irrelevant research reported in obscure journals. An example is the work of Professor Yutaka Fukui, whose many publications detail, among other things, his attempts to use bovine or other mammalian semen to inseminate minke whale ova (a topic of absolutely no value to management). If one removes from the GOJ's list of papers such irrelevant and scientifically questionable studies, and also removes non-refereed papers submitted to IWC meetings or published in Japanese-language journals, as well as opinion pieces defending scientific whaling, then the number of papers published in international refereed journals as a result of the research whaling programs in the Antarctic and North Pacific is extremely small. Indeed, it represents a very poor return for the money invested by the GOJ and the huge sample of whales killed.

The GOJ repeatedly claims that its research shows, among other things, that minke whale numbers are increasing in the Antarctic, that minkes are out-competing other species, and that whales need to be "culled" in order to limit their impacts on fish stocks (Morishita 2006). In fact, its research shows none of these things, and in the case of Antarctic minke whales, it could not possibly show the third, no matter how hard it tried, as whales in the Southern Ocean eat krill, not fish.

Indeed, independent scientists have pointed out since the inception of the GOJ's first research program that it could not hope to achieve its stated goals. Dr. William de la Mare, an Australian member of the IWC's Scientific Committee, stated in 1989 that the stated goal of determining natural mortality rates in Southern Hemisphere minke whales would provide values of such uncertainty as to be useless. De La Mare's prediction, and the repeated observations by scientists not associated with whaling nations that the quality of the underlying research was extremely poor, were borne out by an IWC workshop held in Tokyo in 2006 to review the eighteen years of results from the JARPA program. The IWC review (IWC 2008) found that the program had failed to achieve any of its

---

[2] It is worth noting that a large-scale non-lethal study of humpback whales in the North Pacific, with similar sample sizes of photographs and biopsy samples, has answered many of the key questions about the abundance and population structure of humpbacks in this ocean basin (Calambokidis *et al.* 2008).

stated objectives.

For example, regarding JARPA's objective to determine population trends in Antarctic minke whales, the workshop's report notes that the program "has not developed any agreed estimates of abundance and trend ... The Workshop noted that the current confidence intervals[3] for the estimates of trend are relatively wide. These results are, therefore, consistent with a substantial decline, a substantial increase, or approximate stability in minke whale abundance in these geographic areas over the period of JARPA ..."

This last sentence is a remarkable statement. In other words, according to the findings of JARPA, minke whales in the Antarctic may be increasing or decreasing significantly in numbers. Or they may not. In short, despite two decades of research, we have little idea about what is actually happening to the population.

Similarly (the Workshop report continues), JARPA's efforts to estimate natural mortality had, as predicted by Dr. De La Mare, produced results of such low precision "that the natural mortality rate had, for practical purposes, not been determined. In particular, even a zero value was not excluded by the analysis." The last sentence here is particularly significant: translated from scientific language, it means that, despite all of the GOJ's efforts, they could not even exclude the possibility that minke whales are immortal![4]

Finally, the IWC Workshop notes that efforts to clarify the role of whales in the Antarctic marine ecosystem had led to "relatively little progress, even allowing for the complexities of the subject."

Overall, after 18 years, a great deal of public money and 6,800 dead whales, the scientific return from the JARPA program has been astonishingly poor. Yet the JARPA II program now continues the work, with similar goals and the same methodology. Similar criticisms have been made of the scientific whaling in the North Pacific, which in 2009 will be subject to a detailed review by the IWC.


## Non-lethal alternatives

At the time the International Convention for the Regulation of Whaling was written (in 1946), a provision (i.e. Article VIII) to allow whaling for scientific purposes was a logical inclusion, because the only way to study whales in those days was to kill them. Article VIII also allowed the killing of animals that were not otherwise legal to catch, such as calves, undersized whales and lactating females. However, the situation has changed radically since then. Today, from a management perspective, there is virtually nothing important that cannot be learned using non-lethal techniques. These new methods, some of which are described below, are usually much cheaper and far more efficient scientifically than lethal sampling. This is very significant, because the IWC's guidelines for scientific whaling include the provision that lethal sampling should be conducted *only* if non-lethal alternatives are unavailable (IWC 2001). The one major advantage to lethal sampling is that proceeds from the sale of whale meat can be used to offset the costs of the research (something that is obviously not possible with non-lethal studies).


### *Biopsy sampling*

For more than 20 years, whale biologists all over the world have conducted detailed studies using skin biopsy samples taken with a small dart fired from a crossbow or rifle. The dart takes a tiny piece of skin and blubber from the whale, then bounces off and floats in the water for retrieval. Although the size of these samples is small (typically about 2-3cm in length and 5-8 mm across), the skin contains enough DNA for thousands of genetic experiments. Using modern molecular techniques, researchers can use a biopsy sample to determine the whale's sex, examine its genetic profile, and even assess its familial relationships to other whales (e.g. Clapham *et al.* 1995, Palsbøll *et al.* 1997, Olavarría *et al.* 2007).

Today, genetic analysis is one of the most widely used and powerful methods for assessing population structure, a key

---

[3]This is a measure of the precision of the results. Narrow confidence intervals indicate high precision in an estimate of abundance or trend, whereas wide intervals show low precision.

[4]Faced with the fact that, after many years of work, one of their principal objectives remained unmet, the GOJ announced in 2008 that data on this topic were "not required" in their future work. A convenient solution!

clement in the management of wildlife. Furthermore, the same biopsy sample that yields so much DNA can also be used for many other studies, including investigations of pollutant levels and diet (e.g. Herman *et al.* 2005). Recently, scientists in the United States have developed a method to determine the age of a whale from biopsy samples (Herman *et al.* in preparation): knowing an animal's age is important to many population studies, and previously this could be assessed only by examining dead whales.

Biopsy sampling is cheap and fast, certainly when compared to the labor and expense involved in killing a whale to get the same samples. It also has the added advantage that individual whales can be sampled again and again over the years to see how certain details (such as diet or pollutant levels) change with time. When you kill a whale, you get only a single data point; not only does this preclude the gathering of additional information over time, but it also often leads to a very biased result. Research using lethal sampling is like attempting to study a human being by taking one photograph or blood sample instead of many, or trying to assess a person's diet by observing him eating only one meal.

### *Photo-identification*

In the early 1970's, U.S. scientists realized that individual whales could be distinguished by variations in natural markings on their bodies. For example, humpback whales have black and white patterns on the underside of their tails that are individually distinctive: as with human fingerprints, no two whales are exactly alike (Katona and Whitehead 1981). If you photograph this pattern, you can recognize an individual whale, and can follow that animal over years or decades, and even over thousand of miles. Scientists all over the world have used this technique to study the behavior, reproduction, movements and migrations of whales. In many cases, the long annual migrations of individual whales have been documented through photographs taken by different researchers in locations thousands of miles apart (e.g. Katona and Beard 1990). This information is critical because it tells us the range of whales, and how their populations are structured (e.g. Stevick *et al.* 2006). Photo-identification can also be used to calculate abundance estimates (how many whales there are in a population). This has been a key technique which has formed the basis of many assessments of whale populations by the IWC and other management organizations.

Today, similar studies are conducted more and more frequently using genotyping, where a biopsy sample is analyzed to obtain the whale's unique genetic "fingerprint" and thus identify the individual. By sampling these genetic profiles repeatedly in different places, we can obtain the information we used to get from photo-identification - as well as all the other biopsy-based results noted above (e.g. Palsbøll *et al.* 1997).

In whaling, the only way to acquire this kind of information is by artificially marking a live whale and then hoping that some of these marks (which are usually uniquely numbered stainless steel cylinders fired into the animal with a shotgun) will be recovered when the whale is killed and butchered. However, many marks are lost during this process, and the technique itself probably kills some whales during marking. Furthermore, even if the mark is successfully recovered from a dead whale, you have at most two pieces of information (the locations and dates of the mark and its recovery). With photo-identification and biopsy sampling, an unlimited number of data points is possible over years or even decades. It must be noted that this would be expensive and logistically demanding for long-term projects conducted in the Antarctic (although a similar large-scale non-lethal study of humpback whales across the entire North Pacific Ocean was successfully funded, and has produced remarkable results (Calambokidis *et al.* 2008)).

### *Other techniques*

Scientists today use many non-lethal methods to study whales. In addition to those mentioned above, techniques include:

- Sightings surveys, where the distribution and abundance of whales is assessed from observations made from ships or airplanes;
- Satellite tagging, where a tag is implanted into the whale's blubber and gives weeks or months of information every day about the whale's movements, sometimes over thousand of miles (Zerbini *et al.* 2006);
- Other tagging, which can provide detailed information on exactly how the whale is moving underwater in three dimensions, for studies of feeding, mating or other behaviors (Nowacek *et al.* 2001);
- Multi-disciplinary studies, which combine many of the above techniques with oceanographic investigations of the whales' environment (Baumgartner *et al.* 2003).

6

None of these important results require lethal sampling, and indeed such sampling is in most cases incapable of obtaining this sort of detailed data about whales.

**Why is Japan conducting scientific whaling?**

Given that non-lethal sampling is more effective scientifically than research based on killing whales, why does the GOJ continue to insist that whaling is necessary to study these animals and manage whale populations?  As we have noted above, the GOJ's research is largely irrelevant to management needs, it frequently fails to meet its own objectives, and the quality of its science has been extensively criticized.

The GOJ argues that they are entitled to conduct their research whaling - in any way - under Article VIII of the 1946 Convention.  However, one of the major questions about scientific whaling has been the original intention of those who wrote the Convention's text: specifically, what did they have in mind with regard to this key provision that allowed whales to be killed for scientific research?  One leading advocate for whaling, the Norwegian scientist Dr. Lars Walløe, recently discussed this in an article written in one of the world's leading scientific journals, *Science* (Morell 2007). There, he was quoted as saying that the originator of Article VIII, Birger Bergersen, the first chair of the IWC, "was thinking that the number of whales a country could take for science was less than 10; he didn't intend for hundreds to be killed for this purpose ... he had in mind, for instance, the possibility of finding a new animal and thus needing to take some in order to describe them scientifically." Thus it seems probable that Article VIII was never intended for large-scale catches of the kind made in recent years by the GOJ.

There are several reasons why the GOJ may have chosen to initiate a large-scale whaling program under the auspices of Article VIII at the time they did.  It may be as simple as the fact that this provides the GOJ with a means to continue to legally provide whale meat to their internal markets, which could also be used to offset the cost of the scientific whaling research program.  Support of this line of reasoning comes from one of the leading Japanese scientists who was working for the GOJ at the time of the Moratorium, Dr. Toshio Kasuya.  Dr. Kasuya has stated that shortly after the Moratorium was enacted in 1982, his laboratory was instructed to design a program of scientific whaling that would allow commercial-scale catches to continue (Kasuya 2008).  Possible additional reasons for a perpetuation of Japan's whaling program, specifically those relating to politics and governmental structure, are given by Hirata (2005) and Clapham *et al.* (2007).

**Conclusions**

To properly manage whale populations, we need to know (among other things) how many animals there are, how the population is structured and whether it is increasing or declining, and what are the biological parameters (such as reproduction and survival) of the animals themselves (i.e. how productive is the species or population?)  After two decades of work and more than 11,000 dead whales, the GOJ has provided very few data with which to reliably answer any of these questions about the species being hunted.  This is hardly surprising given that, instead of using much more effective modern non-lethal methods to study whales, GOJ researchers continue to pursue unreliable techniques and unnecessary lethal sampling.

Today, if one were to design a program of scientific research to meet the objectives set out by the GOJ, that program would have little in common with the studies being conducted using scientific whaling.  As has occurred in many places throughout the world, ecosystem and population studies on Antarctic and North Pacific whale species would be carried out using photo-identification, biopsy sampling for genetics, diet and other analyses, satellite tagging, and integrated, multi-disciplinary investigations which examined the behavior of whales using sophisticated tags in association with detailed oceanographic sampling (e.g. Baumgartner *et al.* 2003).

Unfortunately, the GOJ has failed to bring its science into the modern world, and instead expends a huge amount of effort and money to keep alive an industry that would otherwise likely fail.

**References**

Baumgartner, M.F., Cole, T.V.N., Clapham, P.J. and Mate. B.R. 2003. North Atlantic right whale habitat in the lower Bay of Fundy and on the SW Scotian Shelf during 1999-2001. *Marine Ecology Progress Series* 264: 137-154.

Branch, T.A. and Butterworth, D.S. 2001. Southern Hemisphere minke whales: standardized abundance estimates from the 1978/79 to 1997/98 IDCR-SOWER surveys. *Journal of Cetacean Research and Management* 3:143-174.

Calambokidis, J. et al. 2008. SPLASH: Structure of Populations, Levels of Abundance and Status of Humpback Whales in the North Pacific. Final Report for contract AB133F-03-RP-00078. 57 pp.

Childerhouse, S.J. et al. 2006. Comments on the Government of Japan's proposal for a second phase of special permit whaling in Antarctica (JARPA II). Journal of Cetacean Research and Management 8 (suppl.): 260-261.

Clapham, P.J. et al. 2003. Whaling as science. *Bioscience* 53: 210-212.

Clapham, P.J., Bérubé, M.C. and Mattila, D.K. 1995. Sex ratio of the Gulf of Maine humpback whale population. *Marine Mammal Science* 11: 227-231.

Clapham, P., Childerhouse, S., Gales, N., Rojas, L., Tillman, M. And Brownell, B. 2007. The whaling issue: Conservation, confusion and casuistry. *Marine Policy* 31: 314-319.

Clapham, P.J. and Link, J. 2006. Whales, whaling and ecosystems in the North Atlantic. In Estes J., Demaster D.P., Doak D.F., Williams T.M., and Brownell R.L. Jr., editors. *Whales, whaling and ecosystems.* Berkeley: University of California Press, p. 241-250.

Friedlaender, A.S., Lawson, G.L. and Halpin, P.N. 2009. Evidence of resource partitioning and niche separation between humpback and minke whales in Antarctica. *Marine Mammal Science* (in press).

Gales, N.J., Kasuya, T., Clapham, P.J. and Brownell, R.L. Jr. 2005. Japan's whaling plan under scrutiny: useful science or unregulated commercial whaling? *Nature* 435: 883-884.

Government of Japan. 1987. The program for research on the Southern Hemisphere minke whale and for preliminary research on the marine ecosystem in the Antarctic. Paper SC/39/O 4 presented to the IWC Scientific Committee. Available from International Whaling Commission, Cambridge, UK.

Government of Japan. 1994. Research program for clarification of minke whale stock structure in the northwestern part of the North Pacific. Paper SC/46/NP1 presented to the IWC Scientific Committee. Available from International Whaling Commission, Cambridge, UK.

Government of Japan. 2005. Plan for the second phase of the Japanese whale research program under special permit in the Antarctic (JARPA II). Paper SC/57/O1 presented to the IWC Scientific Committee. Available from International Whaling Commission, Cambridge, UK.

Herman, D.P, Burrows, D.G., Wade, P.R., Durban, J.W., Matkin, C.O., LeDuc, R.G., Barrett-Lennard, L.G. and Krahn, M.M. 2005. Feeding ecology of eastern North Pacific killer whales *Orcinus orca* from fatty acid, stable isotope, and organochlorine analyses of blubber biopsies. *Marine Ecology Progress Series* 302: 275-291.

Hirata K. Why Japan supports whaling. 2005. *Journal of International Wildlife and Policy* 8:129-149.

IWC. 1994. Review of food and feeding habits of Southern Hemisphere baleen whales. *Reports of the International Whaling Commission* 44: 102.

IWC. 2001. Annex Y. Guidelines for the review of scientific permit proposals. *Journal of Cetacean Research and Management* 3 (supplement): 371-372.

IWC. 2004. Report of the Scientific Committee. *Journal of Cetacean Research and Management* 6 (supplement), p. 30.

IWC. 2008. Report of the intersessional workshop to review data and results from Special Permit research on minke whales in the Antarctic, Tokyo 4-8 December 2006. Paper SC/59/Rep 1. Journal of Cetacean Research and management (in press).

Kasuya, T. 2008. Cetacean biology and conservation: a Japanese scientist's perspective spanning 46 years. *Marine Mammal Science* 24 (in press).

Katona, S.K., and Beard, J.A. 1990. Population size, migrations and feeding aggregations of the humpback whale (*Megaptera novaeangliae*) in the western North Atlantic Ocean. *Reports of the International Whaling Commission* (Special Issue 12): 295-305.

Katona, S.K. and Whitehead, H.P. 1981. Identifying humpback whales using their natural markings. *Polar Record* 20: 439-444.

Morrell V. 2007. Killing whales for science? Science 316: 532-534.

Morishita, J. 2006. Multiple analysis of the whaling issue: understanding the dispute by a matrix. *Marine Policy* 30:

8

802-808.

Nemoto, T. 1970. Feeding patterns of baleen whales in the ocean. In Steele J., editor. *Marine food chains*. Berkeley, CA: University of California Press, pp. 241-252.

Nowacek, D.P., Johnson, M.P., Tyack, P.L., Shorter, K.A., McLellan, W.A. and Pabst, D.A. 2001. Buoyant balaenids: the ups and downs of buoyancy in right whales. *Proceedings of the Royal Society of London* B, 268: 1811-1816.

Olavarría, C. *et al.* 2007. Population structure of humpback whales throughout the South Pacific, and the origin of the eastern Polynesian breeding grounds. *Marine Ecology Progress Series* 330: 257-268.

Palsbøll, P.J., Allen, J., Bérubé, M., Clapham, P.J., Feddersen, T.P., Hammond, P., Jørgensen, H., Katona, S., Larsen, A.H., Larsen, F., Lien, J., Mattila, D.K., Sigurjónsson, J., Sears, R., Smith, T., Sponer, R., Stevick, P. and Øien, N. 1997. Genetic tagging of humpback whales. *Nature* 388: 767-769.

Pauly, D., Alder, J., Bennett, E., Christensen, V., Tyedmers, P. and Watson, R. 2003. The future for fisheries. *Science* 302:1359-1361.

Pauly, D and Palomares, M-L. 2005. Fishing down marine food web: It is far more pervasive than we thought. *Bulletin of Marine Science* 76:197-211.

Stevick, P.T., Allen, J., Clapham, P.J., Katona, S.K., Larsen, F., Lien, J., Mattila, D.K., Palsbøll, P.J., Sears, R. Sigurjónsson, J., Smith, T.D., Vikingsson, G., Øien, N. and Hammond, P.S. 2006. Population spatial structuring on the feeding grounds in North Atlantic humpback whales. *Journal of Zoology, London* 270: 244-255.

Trites, A.W., Christensen, V. and Pauly, D. 1997. Competition between fisheries and marine mammals for prey and primary production in the Pacific Ocean. *Journal of Northwest Atlantic Fisheries Science* 22:173-187.

Zerbini, A.N., Andriolo, A., Heide-Jørgensen, M.P., Pizzorno, J.L., Maia, Y.G., VanBlaricom, G.R., DeMaster, D.P., Simões-Lopes, P.C., Moreira, S. and Bethlem, C.P. 2006. Satellite-monitored movements of humpback whales (*Megaptera novaeangliae*) in the Southwest Atlantic Ocean. *Marine Ecology Progress Series* 313: 295-304.

Table 1. Scientific whaling catches by the Government of Japan since the IWC moratorium on whaling. Antarctic whaling seasons are year-forward (e.g. 2000 is 2000/2001). Source: IWC.

| Year | Antarctic | | | North Pacific | | | | |
|------|-------|-----|-------|-------|-----|--------|-------|-------|
|      | Minke | Fin | Total | Minke | Sei | Bryde's | Sperm | Total |
| 1987 | 273 |   | 273 |   |   |   |   |   |
| 1988 | 241 |   | 241 |   |   |   |   |   |
| 1989 | 330 |   | 330 |   |   |   |   |   |
| 1990 | 327 |   | 327 |   |   |   |   |   |
| 1991 | 288 |   | 288 |   |   |   |   |   |
| 1992 | 330 |   | 330 |   |   |   |   |   |
| 1993 | 330 |   | 330 |   |   |   |   |   |
| 1994 | 330 |   | 330 | 21 |   |   |   | 21 |
| 1995 | 440 |   | 440 | 100 |   |   |   | 100 |
| 1996 | 440 |   | 440 | 77 |   |   |   | 77 |
| 1997 | 438 |   | 438 | 100 |   |   |   | 100 |
| 1998 | 389 |   | 389 | 100 |   | 1 |   | 101 |
| 1999 | 439 |   | 439 | 100 |   |   |   | 100 |
| 2000 | 440 |   | 440 | 40 |   | 43 | 5 | 88 |
| 2001 | 440 |   | 440 | 100 | 1 | 50 | 8 | 159 |
| 2002 | 441 |   | 441 | 150 | 39 | 50 | 5 | 244 |
| 2003 | 443 |   | 443 | 151 | 50 | 50 | 10 | 261 |
| 2004 | 441 |   | 441 | 160 | 100 | 51 | 3 | 314 |
| 2005 | 856 | 10 | 866 | 222 | 100 | 50 | 5 | 377 |
| 2006 | 508 | 3 | 511 | 197 | 101 | 51 | 6 | 355 |
| 2007 | 551 |   | 551 | 208 | 100 | 50 | 3 | 361 |
| Total | 8715 |   | 8728 | 1726 | 491 | 396 | 45 | 2658 |
| Overall total, 1987-2007 | | | | | | | | 11,386 |

10

# Exhibit 11



## Japanese whaler ordered to leave Australian waters

Last Updated: Wed, 11 Jan 2012 20:50:00 +1100

The Australian Government has ordered a Japanese whaling ship to leave Australian waters.

The government has confirmed the ship was sitting off the World Heritage Listed Macquarie Island in the Southern Ocean.

Australian Prime Minister, Julia Gillard says Japan has been told its whaling vessels are not welcome in Australian territorial waters.

Meanwhile, an Australian customs ship is heading south to retrieve the three anti-whaling activists who illegally boarded another Japanese ship.

The three Australians scaled the Shonan Maru 2 over the weekend to demand the whaling security ship leave Australian waters.

Japan has decided not to press charges because the men were unarmed and did not cause any damage to the boat.



**PHOTO**
The anti-whaling protest vessel the Ady Gil and the Japanese whaling vessel the Shonan Maru 2 confront one another in Australia's Antarctic Waters on January 6, 2010. [AAP]

Ms Gillard has rejected calls for the Australian Government to send a patrol boat to monitor future whaling seasons on the Southern Ocean.

This service includes material from AAP, Agence France-Presse, APTN, BBC, CNN, Getty, Pacnews, Reuters and other agencies which is copyright and cannot be reproduced, broadcast, rewritten or redistributed without written consent.

©2012 ABC Privacy Policy

# Exhibit 12

🖨 **Print this article** | ⊠ **Close this window**

# Sea Shepherd ship seeks sanctuary from whalers

Andrew Darby, Hobart
January 25, 2012 - 3:00AM

A NEW test for the federal government is looming in the Australian sub-Antarctic, where a Sea Shepherd ship is set to seek sanctuary from pursuit by Japanese whalers.

Advertisement

The anti-whaling group's long-range vessel Bob Barker is again headed for the territorial waters of Tasmania's Macquarie Island, tailed by the harpoon ship Yushin Maru No. 3.

The two vessels circled the island inside the 12-nautical-mile limit of Macquarie's territorial waters earlier this month, continuing a chase that enables the whalers to warn the key factory ship, Nisshin Maru, of Sea Shepherd's location.

After repeated high-level Australian complaints to Tokyo about the incursion, Prime Minister Julia Gillard said she had been advised that the Japanese ship moved outside the 12-mile limit.

The Bob Barker was able to slip away and hunt for the Nisshin Maru further south, until a few days ago when the Yushin Maru No. 3 chased it down once more.

Sea Shepherd's leader, Paul Watson, said yesterday the Bob Barker should reach Macquarie Island some time tomorrow, and it was hoping to lose Yushin Maru No. 3 there.

Meanwhile south-east of Macquarie in the Ross Sea, the Steve Irwin's captain turned to Cold War tactics in an attempt to throw off its pursuer.

Among pack ice, Mr Watson ordered a "Crazy Ivan", a manoeuvre borrowed from Soviet-era submarine warfare, in which a tailed vessel turns 180 degrees on its pursuer.

"They turned and ran like spooked rabbits," Mr Watson said.

"It was hilarious."

He also released more details gained by the three Western Australian men who boarded the Shonan Maru No. 2 recently, who said the armoury on the Japanese ship included semi-automatic weapons, sidearms and rifles.

The Institute of Cetacean Research does not comment on the movements of its ships, but has repeatedly condemned Sea Shepherd tactics.

"Such dangerous actions by these groups are not peaceful protest but unforgivable acts akin to terrorism that threaten human life at sea," according to the ICR.

Mr Watson said that despite being unable to reach the Nisshin Maru he believed that Sea Shepherd was affecting the whale

hunt.

"With two harpoon ships down, and the Nisshin Maru and Yushin Maru on the constant run, combined with the weather and ice conditions, I can certainly see that their kill quotas have been severely reduced," he said.

*This story was found at: http://www.smh.com.au/environment/whale-watch/sea-shepherd-ship-seeks-sanctuary-from-whalers-20120124-1qfmz.html*

# Exhibit 13

# Forget the people, Japan would rather kill whales

BY WILLIAM PESEK
19 Dec, 2011 04:00 AM
Want to know why Japan's earthquake recovery efforts are moving in slow motion? Ask the whales.

Tokyoites have grown accustomed to shocking news items since the earth shook and the oceans rose: the nuclear meltdown has proven far worse than the Government admitted; radioactive cesium made its way into baby food; more leaks were found in the damaged Fukushima reactor; and warnings by seismologists still go unheeded.

Yet the tale of the whales and the $30 million is what proved most disturbing - and shed fresh light on why Japan is either unable or unwilling to undertake the broad reforms needed to avert credit-rating downgrades and reverse deepening deflation.

Japan spent about 2.28billion yen ($29million) on whaling hunting expeditions from funds allocated for recovery from the earthquake and tsunami.

It's a drop in the proverbial bucket, given that the Government plans to spend at least $300billion rebuilding the Tohoku region. It's a highly telling expenditure, though, with significance far beyond the price tag.

The whaling programs carried out each year flout international conventions and dent Japan's reputation, and for very little. Demand for whale meat is negligible: The industry survives because of huge public subsidies. Japan contends that using earthquake funds to boost security for ships will help them elude activists protecting whales. A successful hunt, it's thought, will revitalise local coastal communities.

You know what would help more? Some fresh thinking. The devastation from March 11 required new ways of viewing and addressing Japan's creaky economic model, ageing population and waning competitiveness. It necessitated a reboot of politics, the Government's role in the economy and Japan's change- resistant, consensus-obsessed mindset. What we're seeing instead is an inability to adapt on a national level. Nine months ago, the ground shifted under Japan's feet not only literally, but figuratively. There was a fleeting glimmer of change, a hope that the disaster would end the political and economic stasis that has gripped Japan for more than two decades. Instead, tossing money at every problem without critical thought suggests that Japan is reverting to the wasteful ways that created a massive national debt and little growth to show for it.

One big question that hasn't been tackled: Whether to bother rebuilding parts of Japan's north-east - given that they were dying a slow, steady demographic death anyway - or relocate the communities away from the sea. Rather than grapple with it, Japan is pursuing whaling. But you have to wonder: How many young people who long ago fled to cities like Tokyo are going to rush back to their ancestral homes to become whalers?

Consider what the brain trust in Tokyo is up to. Last month, Standard & Poor's hinted that another credit downgrade is brewing as Japan's public debt, already the developed world's largest, increases unchecked by distracted lawmakers. So how do they spend their time? In tit-for-tat one-upmanship.

In November, a deputy to Defence Minister Yasuo Ichikawa was fired for comparing the relocation of a US airbase on the island of Okinawa to rape. Rather than move on and tend to the many dilemmas facing Japan, lawmakers spent last week crafting censure motions for the ousted official's bosses. That's a week that will never be used for developing strategies to address anemic growth, deflation, a shrinking workforce, Chinese competition or rebuilding needs.

Both story lines, supporting whalers and pointless political posturing, are microcosms of why Japan isn't rising to this year's challenges. What we have is a failure to adapt to a dynamic set of problems that threaten economic well-being.

Take Tokyo Electric Power Company, a poster child of bad management that makes the shenanigans at Olympus Corp look harmless. Tepco's safety failures are responsible for the radiation still leaking into the air and water 210km from Tokyo. Yet Tepco hasn't been nationalised or delisted from the stock exchange. Instead of reform, there's talk of bail-outs.

Japan is a top-down society. Right now, mayors in the north-east need a figure: how much they will get to fix airports, train stations, roads, bridges, schools, hospitals, telecommunications and ports. It's hard to hire architects, assemble construction crews and procure materials when you don't know your budget. Tokyo, instead, is obsessed with political infighting and old remedies for very new quandaries.

Bureaucracy is running amok. There's great confusion about who is handling what phase of reconstruction - the central government or local ones? Rural leaders fed up with all the foot-dragging are finding it's not easy to forge ahead on their own. There are endless stories of towns that want to rebuild schools or hospitals on higher ground to avoid tsunamis only to find that regulations say they must be put up in the same place.

The upshot is that trust is breaking down on too many levels. Companies are reluctant to hire, communities are split between those who want to stay and those tempted to leave, citizens don't buy the nuclear industry's protestations of safety, and cynicism toward officialdom in Tokyo has rarely been higher.

It's not a great environment for economic revival, never mind any semblance of confidence as Europe's crisis foreshadows a global economic slowdown. That's what happens in a country that gives higher priority to killing than to reassuring a traumatised population.

- **William Pesek is a Bloomberg View columnist.**

**Share on
Facebook**

**Tweet on
Twitter**

**Email to
a friend**

**Emergency Management**
Online Emergency Management Degree.
8 & 16 Week Sessions.
www.AMU.APUS.edu/Emergei  AdChoices ▷

# comments

No comments yet. Be the first to comment below.

# post a comment

# Exhibit 14

# (*See* separate CD/ROM)