HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE INSTITUTE OF CETACEAN
RESEARCH, et al.,

              Plaintiffs,

      v.

SEA SHEPHERD CONSERVATION
SOCIETY, et al.,

              Defendants.

CASE NO. C11-2043RAJ

ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion for a preliminary injunction.  Dkt. # 13.  This order also resolves several issues that Defendants raised in their motion to dismiss, although the court will issue a separate order addressing that motion.  The court heard oral argument from the parties on February 16, 2012.  Having reviewed the parties' briefs and the voluminous evidentiary record, the court DENIES the motion for a preliminary injunction for the reasons stated below.

Because this order "grant[s] or refus[es] an interlocutory injunction," the court must make findings and fact and conclusions of law.  Fed. R. Civ. P. 52(a)(2).  The court includes its findings and conclusions in this order, which serves as a memorandum of the court's decision.  Fed. R. Civ. P. 52(a)(1) (permitting findings and conclusions within "an opinion or a memorandum of decision"); *see also FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982) (noting that explicit factual findings are unnecessary).

ORDER – 1

## II.  BACKGROUND

This case concerns a long-enduring standoff in the high seas that has attracted the attention, but not the intervention, of many nations' governments.  Defendant Sea Shepherd Conservation Society ("Sea Shepherd"), headed by Defendant Paul Watson, has used a small fleet of ships under Mr. Watson's command to stymie Plaintiffs' whaling in the Southern Ocean.  Plaintiffs, to whom the court will refer collectively as the "whalers",[1] have their own fleet that kills hundreds of whales each year in the Southern Ocean.  An understanding of each fleet's presence in the Southern Ocean begins with an understanding of international whaling regulation.

### A.      Whaling in the Southern Ocean

The International Convention for the Regulation of Whaling ("Whaling Convention") established the International Whaling Commission ("IWC").  Int'l Conv. for the Regulation of Whaling, Art. III, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 72. Since 1986, the IWC has maintained a moratorium on commercial whaling.  Whaling Convention, Sch. ¶ 10(e).  The moratorium has no binding force; any member nation is free to object to it and disregard it.  Whaling Convention, Art. V.  Japan, a longtime IWC member, initially objected to the moratorium, but withdrew its objection in 1987. Although it purports to eschew "commercial whaling," Japan takes advantage of IWC rules that permit any member nation to issue permits to kill whales for "scientific research."  Whaling Conv., Art. VII.  The IWC has no authority over the permits.  For more than 20 years, Japan has issued a "research" permit that permits the slaughter of hundreds of whales in the Southern Ocean.  Holders of Japan's permits have killed thousands of whales in the Southern Ocean since 1987.  The whalers in this case have been the recipients of Japan's permit for many years.  This season, for example, they have a permit to kill up to 935 minke whales, 50 fin whales, and 50 humpback whales.

---

[1] The Plaintiffs are the Institute of Cetacean Research (a Japanese foundation), Kyodo Senpaku Kaisha Ltd. (a Japanese corporation that charters whaling vessels and sailors to the Institute), and Tomoyuki Ogawa and Toshiyuki Miura, masters of two of the whaling vessels.

ORDER – 2

Compl. (Dkt. # 1), Ex. 1.  There is no evidence that this "research" has produced any work of scientific value.  There is no evidence that killing whales is necessary to perform legitimate scientific research.  There is no dispute that the whalers sell meat from the whales they kill for consumption in Japan.  Using the shelter of Japan's "research" permit, the whalers have sold whale meat despite the IWC's creation of the Southern Ocean Whale Sanctuary in 1994, an additional prohibition on commercial whaling. Whaling Conv., Sch. ¶ 7(b).

Plaintiffs' whaling is the focus of criticism, if not outright condemnation, from many nations' governments.  As recently as last December, the governments of the United States, Australia, New Zealand, and The Netherlands jointly stated that they "remain resolute in [their] opposition to commercial whaling, including so-called 'scientific' whaling, in particular in the Southern Ocean Whale Sanctuary . . . ."  J. Statement on Whaling and Safety at Sea (Dec. 13, 2011) (*http://www.state.gov/r/pa/prs/ ps/2011/12/178704.htm*).  They stated their "disappoint[ment] about the recent departure of the Japanese whaling fleet for the Southern Ocean," and "emphasize[d] that lethal techniques are not required in modern whale conservation and management."  *Id.*  The Buenos Aires Group, consisting of IWC members Argentina, Brazil, Chile, Costa Rica, Ecuador, Mexico, Peru, and Uruguay, declared their "strongest rejection of the hunting of nearly a thousand whales . . . in the Southern Ocean Whale Sanctuary."  Buenos Aires Group J. Statement, Feb. 21, 2011 (*http://portal3.sre.gob.mx/english*) (Press Release No. 51).  The IWC itself has repeatedly passed resolutions criticizing Japan's "research" program in the Southern Ocean.  *See*, *e.g.*, IWC Res. Nos. 1989-3, 1994-10, 2001-7, 2003-1&2, 2005-1, 2007-1 (*http://www.iwcoffice.org/meetings/resolutions/ searchRes.htm*).

Among the world's governments, Australia has taken the most active role in protecting Southern Ocean whales.  In 1999 it created the Australian Whale Sanctuary

ORDER – 3

("AWS"), a swath of the Southern Ocean encompassing all waters within 200 miles of Australia's Antarctic territory.  *See Humane Society Int'l v. Kyodo Senpaku Kaisha Ltd.*, 2008 FCA 3, ¶¶ 5-8 (FCR 2008) (describing creation of AWS).[2]  Because Australia's claim to its Antarctic territory is disputed, only the United Kingdom, France, Norway, and New Zealand recognize the AWS.  *Id.* ¶¶ 13.  That has not deterred Australia's courts.  In January 2008, Australia's Federal Court issued a permanent injunction in a case that the Human Society International brought against the whalers.  The court concluded that the whalers had killed whales in the AWS in violation of Australian law.  *Id.* ¶ 39.  It enjoined the whalers from hunting and killing whales in the AWS.  *Id.* ¶ 55.  The whalers, who refused to participate in the Australian proceedings, do not dispute that they have hunted and killed whales in the AWS since the injunction.  It is not clear whether they have violated the injunction this season.  So far as the record reveals, neither Australia's courts nor other arms of its government have attempted to enforce the injunction.

Australia has recently taken its opposition to Southern Ocean whaling a step further.  It has sued Japan in the International Court of Justice ("ICJ"), contending that Japan's "research" whaling permits violate the Whaling Convention's commercial whaling moratorium and regulation on the Southern Ocean Whale Sanctuary.  ICJ Press Release No. 2010/16 (June 1, 2010) (*http://www.icj-cij.org/docket/files/148/15953.pdf*).  The ICJ is awaiting Japan's response to Australia's pleadings.

**B.    Sea Shepherd's Confrontation with the Whalers**

While the world's governments condemn Antarctic whaling from afar, Sea Shepherd is in the Southern Ocean actively intervening to keep the whalers from their prey.  Whaling season in the Southern Ocean lasts from November or December until February or March. Sea Shepherd has coordinated a campaign to frustrate the whalers'

---

[2] A map of the AWS is available at *http://www.environment.gov.au/coasts/species/cetaceans/conservation/pubs/sanctuary-map.pdf*.

ORDER – 4

efforts in each of the last seven seasons, including this one, dating back to the 2005-2006 season. It also mounted an initial Southern Ocean campaign in 2002.

Sea Shepherd characterizes its Southern Ocean campaigns as "aggressive protests"; the whalers characterize them as terrorism. Whatever label one chooses, there is ample evidence of the tactics that Sea Shepherd uses. The whalers have captured those tactics in photographs and videos; the Animal Planet network has captured them for the past three seasons for use in its "Whale Wars" television program. The court now describes Sea Shepherd's tactics. In doing so, it makes only preliminary findings based on the evidence currently in the record. Based on that evidence, the court describes the facts as the parties would likely be able to prove them at trial.[3]

The whaling fleet consists solely of Japanese-owned, Japanese-flagged vessels, including the NISSHIN MARU ("NM"), a 425-feet-long, 63-feet-wide ship, and three smaller ships, named YUSHIN MARU number one, two, and three ("YM1," "YM2," and "YM3"). The NM is the only ship large enough to hold dead whales. The YM vessels search for, chase, and harpoon whales. It also appears that the whaling fleet uses at least one other large vessel (apparently named SHONAN MARU NO. 2 ("SM2")) devoted solely to resisting Sea Shepherd's tactics. There are more than a hundred crew members who work aboard the whaling fleet's ships.

The Sea Shepherd fleet consists of the BOB BARKER and the STEVE IRWIN, two Dutch-flagged ships that are about 160 feet long, slightly smaller than the YM ships. The BRIGITTE BARDOT, an Australian-flagged 100-foot trimaran, is faster and more maneuverable than the larger boats. Sea Shepherd also uses a number of rigid inflatable

---

[3] The parties have submitted an extraordinary volume of evidence, including hundreds of photographs and videos. A substantial portion of that evidence is hearsay or is questionably authenticated. Rather than address the parties' various evidentiary objections individually, the court notes its discretion to consider otherwise inadmissible evidence in deciding whether to issue an injunction. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (explaining that court may rely on hearsay and other inadmissible evidence). The court's findings today regarding what the parties are likely to prove at trial takes into account the likelihood that they would be able to cure evidentiary deficiencies at trial.

ORDER – 5

boats ("zodiacs") that it launches from the larger ships.  Slightly fewer than a hundred crew members work aboard Sea Shepherd's Southern Ocean fleet.  Fewer than half of them are citizens of the United States.  The Sea Shepherd fleet launches from Australian ports, which are the base of operations for its Southern Ocean campaign.  In prior seasons, both the whaling fleet and the Sea Shepherd fleet have used different vessels (or the same vessels under different names), but the essential composition of the fleets has remained the same.

Sea Shepherd throws glass bottles filled with paint or butyric acid at the whaling ships.  Often, its crew throws the glass projectiles by hand, but they also use large slingshots and other launching devices.  Butyric acid is a foul-smelling but not particularly caustic acid.  Sea Shepherd uses it to make the odor on the whaling ships' decks unbearable for the whaling crew, and also to ruin any whale meat on deck.  The court relies on the declaration of Dr. Greg Phelan, a chemist who declares that butyric acid poses no serious risk to human health, especially in the way that Sea Shepherd uses it.  The glass projectiles themselves, however, are an obvious hazard to anyone who they might hit.  Sea Shepherd does not target the whalers themselves with the projectiles, and there is no evidence that a projectile has ever hit one of the whalers.  There is evidence, however, that projectiles have flown or broken in dangerous proximity to members of the whaling crew.  At least one whaler was splattered with paint when a projectile shattered near him.  Although the whalers claim that members of their crew have been injured by butyric acid, their evidence does not convince the court.[4]  The court credits Sea

_____

[4] The sole "evidence" of injury is the declaration of Tomoyuki Ogawa, the Captain of the NM. He claims that two crew members were injured in a February 2007 attack with butyric acid and smoke bombs, and that three men were "slightly injured" in a March 2008 attack.  Captain Ogawa does not identify the men who were injured, explain what their injuries were, or otherwise substantiate his claims.  The whalers' counsel submitted a declaration (Dkt. # 45) in which he attaches photographs that he claims are evidence of an unnamed whaler injured by butyric acid in an unspecified "previous whale research season."  The photographs show a man with red cheeks that are perhaps slightly swollen.  Counsel also attached an unauthenticated spreadsheet purporting to document acid-induced injuries in 2007, 2008, and 2010.

ORDER – 6

Shepherd's evidence that the whalers have steadfastly refused their requests that they document the injuries they claim.  On this record, it is unlikely that the whalers will prove that Sea Shepherd has ever injured a member of their crew or that Sea Shepherd is likely to injure a crew member in the future.

The whalers hang nets strategically above and alongside the decks of their ships to protect them from the glass projectiles.  Sea Shepherd in turn throws or launches safety flares, sometimes modified with metal hooks, hoping that they will catch on the nets and burn holes in them.  There is no evidence that the flares or the fires they cause have injured or endangered anyone.  Moreover, despite the insistence of the whalers that the fires pose a risk of explosion or other serious damage, their own videos and photographs reveal that they are content to watch the flares burn on the nets, rather than attempt to extinguish them.  There is no evidence that the flares have caused damage to the ships, beyond the holes they burn in the nets.

Sea Shepherd also hurls smoke bombs at the whaling ships.  It is not clear what purpose this serves, other than to annoy the whalers and perhaps slightly obstruct their vision.  Although there is some danger that a hurled smoke bomb could hit and injure a whaling crew member, there is no evidence that the smoke itself is dangerous.  Again, there is no evidence of any injury or damage as a result of the smoke bomb attacks.

Sea Shepherd points what appears to be a high-powered laser at various parts of the whaling ships.  Again, it is not clear what purpose this serves, other than to distract or annoy the whaling crew.  It is possible that the laser could cause damage if its beam struck directly in the eye of a crew member, but that there is no evidence that this has occurred.  The sole member of the whaling crew to submit evidence on this issue admits that a physician found no injury to his eyes.

Sea Shepherd pilots its ships and boats across the bow of the whaling ships while towing lines in an effort to foul the rudder or propeller of the ships.  The evidence

ORDER – 7

suggests that these efforts are rarely successful.  The whalers submitted a single set of underwater photographs from early 2011 showing a line wrapped around the propeller of the YM3, along with some apparent damage to the rudder.  There is no evidence as to the effect this had on the ship and its ability to navigate, and no evidence about what the whalers did to free the propeller or otherwise make repairs.  Sea Shepherd asserts that these efforts do little more than slow the whaling ships.  If Sea Shepherd succeeded in significantly disabling one of the whaling ships, those ships would be in danger if a storm arose or they needed to maneuver around icebergs.  Again, there is no evidence that Sea Shepherd's propeller-fouling efforts have ever caused an injury to anyone.

Finally, Sea Shepherd either intentionally pilots its ships to collide with the whaling ships or pilots them in such a way that a collision is highly likely.  The whalers admit that there have been no collisions this season.  In February 2009, the whalers videotaped a collision between the side of the STEVE IRWIN (then known as the BOB BARKER) and the side of the YM3.  The whalers photographed a February 2010 collision between the same vessels.  Although these collisions between the larger ships make for dramatic video, and appear dangerous, there is no evidence that anyone has been hurt as a result.  Indeed, there is little evidence that the collisions even damage the ships.  In a much-publicized January 2010 incident, a collision between the SM2 and the ADY GILL (a trimaran that previously served the role that the BRIGITTE BARDOT now serves) tore off several feet of the ADY GILL's stern.  Other Sea Shepherd ships rescued the ADY GILL's crew unharmed.  The ADY GILL, however, is now at the bottom of the ocean, although it is not clear whether it sank or Sea Shepherd scuttled it.  Although the parties sharply dispute the events that led to this collision, the court relies on the extensive investigative report of Maritime New Zealand (a maritime fleet akin to the United States Coast Guard).  Maritime New Zealand found the masters of both ships to be at fault.

ORDER – 8

1    The whalers admit to using countermeasures against Sea Shepherd.  They

2    frequently use high-powered water cannons aboard their ships to repel Sea Shepherd

3    ships that come within range.  They have used concussion grenades against Sea

4    Shepherd.  When Sea Shepherd boats towing lines approach, the whalers use grappling

5    hooks to fend them off.  They use the same hooks to fend off Sea Shepherd zodiacs that

6    collide with or come within a few feet of their ships.  They have used bamboo poles to

7    repel the zodiacs at close range.  Sea Shepherd asserts that a whaler beat one of their crew

8    members in the face with a bamboo pole, but has presented no evidence to support that

9    assertion.  The whalers also use long-range acoustic devices ("LRADs"), which produce

10   a sound so loud that it is disabling within a certain range.  There is no evidence that the

11   LRADs have caused injury.  Finally, there is video evidence of one of the whalers hurling

12   an object at Sea Shepherd crew members in a small boat.  The video suggests that the

13   object was a large brass bolt, although Sea Shepherd has produced no competent

14   evidence to prove as much.[5]  Just as there is no evidence of injury to the whaling crew,

15   there is no evidence that the whalers' countermeasures have injured any member of Sea

16   Shepherd's crew.[6]

17   The court has already noted the international condemnation of Plaintiffs' slaughter

18   of whales.  Sea Shepherd's tactics are also the target of international scorn.  In the same

19   joint statement criticizing the whalers, the governments of the United States, Australia,

20   New Zealand, and The Netherlands "condemn dangerous or violent activities from all

21   participants" in the Southern Ocean standoff, and express their "deep[] concern[] that

22   confrontations in the Southern Ocean will eventually lead to injury or loss of life among

---

[5] Sea Shepherd has submitted numerous video excerpts from the "Whale Wars" television series, including one showing a whaler throwing a bolt at a Sea Shepherd boat.  It contends that these clips reflect "unbiased journalism."  Sea Shepherd is highly unlikely to prove that assertion at trial.

[6] The court finds it highly unlikely that Mr. Watson will prove that any member of the whaling crew has ever shot him with a firearm.  Watson Decl. (Dkt. # 60) ¶ 12.

ORDER – 9

protestors . . . and whaling crews." J. Statement on Whaling and Safety at Sea, *supra*. The IWC and the International Maritime Organization have repeatedly condemned Sea Shepherd's tactics. *See*, *e.g.*, IWC Res. Nos. 2006-2, 2007-2, 2011-2; Int'l Mar. Org. Res. MSC.303(87) (May 17, 2010) (*http://www.maritimenz.govt.nz/AdyGil/IMO-resolution.pdf*).

For eight seasons, Sea Shepherd and the whalers have engaged in these risky tactics in the Southern Ocean. It is impossible, on the record before the court, to know how frequently confrontations occur. The record suggests that the whalers do everything they can to elude the Sea Shepherd, and that Sea Shepherd spends a significant part of each season searching for the whaling fleet or chasing it. The whalers use their own vessels to impede that search. Also uncertain is what tactics the parties are using this season. There is video evidence of more bottle throwing, including one incident in which a Sea Shepherd crew member throws a bottle close enough to a whaler using a water cannon to cause the whaler to duck. There is no evidence from this season of collisions or the use of lasers or flares. Sea Shepherd has not, however, disavowed any of the tactics in its arsenal this season. The court finds that there is a substantial risk that Sea Shepherd will use any of the tactics described above at any given time.

**C.     The Whalers Bring Their Dispute with Sea Shepherd to Court.**

What distinguishes this whaling season from the many before it is that the whalers have brought this lawsuit. In December 2011, about the same time that Plaintiffs' fleet made its way to the Southern Ocean for another whaling season, they sued Sea Shepherd and Mr. Watson. Although there are apparently Sea Shepherd entities in other countries, Sea Shepherd in the United States is an Oregon not-for-profit corporation with headquarters in Friday Harbor, Washington. Although it is not clear where Mr. Watson lives when he is not at sea, neither Mr. Watson nor Sea Shepherd contest that this court has personal jurisdiction over them.

ORDER – 10

The whalers sued on December 8, 2011. Six days later, with both the whaling fleet and the Sea Shepherd fleet already at sea, they filed a motion for a preliminary injunction. The injunction they requested would require Sea Shepherd's ships and boats to stay at least 800 meters from their vessels. The injunction would also prohibit attacks on the whaling crew members or its ships, although it seems unlikely that Sea Shepherd could attack anything from 800 meters away.

The whalers preferred that the court decide the motion as early as January, but they cited no particular exigency. They did not explain why a dispute that has lasted the better part of a decade needed to be resolved in less than a month. Sea Shepherd requested months of additional time to attempt to obtain discovery and to file a motion to dismiss. The court granted a little over a month. The parties finished their briefing on February 6. The court spent most of two weeks poring over the dozens of declarations and hundreds of exhibits the parties filed, and attempting to unravel the complex issues of international and domestic law that this lawsuit presents. The court held oral argument on February 16. No party requested an evidentiary hearing.

With this factual and procedural background in mind, the court turns to the whalers' motion for a preliminary injunction.

### III.   ANALYSIS

The whalers seek declaratory and injunctive relief only, asserting four claims. They base their first three claims on international law protecting freedom of navigation at sea, freedom from piracy, and freedom from terrorism. Their fourth claim is for civil conspiracy under Washington law. As the court will discuss later, the whalers' preliminary injunction motion sufficiently invokes only the freedom of navigation and freedom from piracy claim.

ORDER – 11

**A.      Preliminary Injunction Standard**

The court may issue a preliminary injunction where a party establishes (1) a likelihood of success on the merits, that (2) it is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of hardships tips in its favor, and (4) that the public interest favors an injunction.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  A party can also satisfy the first and third elements of the test by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131. (9th Cir. 2011).[7]

**B.      Subject Matter Jurisdiction**

The court's first inquiry must be into its subject matter jurisdiction.  As to the whalers' claims invoking international law, the court has both federal question jurisdiction and admiralty jurisdiction.  28 U.S.C. § 1331; 28 U.S.C. § 1333(1).

The federal statute under which the whalers' claims arise is the commonly known as the Alien Tort Statute ("ATS").  It grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  As the court will discuss in detail later, not all violations of the law of nations give rise to an ATS cause of action.  Nonetheless, the ATS grants district courts subject matter to determine, at a minimum, whether a violation of the law of nations is cognizable via the ATS.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (holding that the ATS is "jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject"); *Sarei v. Rio Tinto, PLC*, No. 02-56256, 2011 U.S. App. LEXIS 21515, at *36 (9th Cir. Oct. 25, 2011)

---

[7] *Winter* overruled Ninth Circuit law that permitted a party to obtain a preliminary injunction merely by proving a "possibility" of irreparable harm  555 U.S. at 22.  Ninth Circuit panels initially raised questions over the scope of the *Winter* ruling.  *See Shepherd v. Weldon Mediation Servs., Inc.*, 794 F. Supp. 2d 1173, 1176-77 (W.D. Wash. 2011) (reviewing cases).  It now appears settled that *Winter* did not "change the requisite showing for any individual factor [in the preliminary injunction analysis] other than irreparable harm."  *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011).

ORDER – 12

(holding that an "ATS case 'arises under' the laws of the United States and calls for the exercise of federal question jurisdiction").

Admiralty jurisdiction has always extended to torts on the high seas, as long as they arise out of traditional maritime activity. *Myhran v. Johns-Manville Corp.*, 741 F.2d 1119, 1120-21 (9th Cir. 1984). Because admiralty jurisdiction extends beyond the borders of the United States, it often incorporates aspects of international law. The law of the sea "is in a peculiar sense an international law, but application of its specific rules depends upon acceptance by the United States." *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953) (quoting *Farrell v. United States*, 336 U.S. 511, 517 (1949)). Sometimes the United States recognizes international maritime law by statute, but courts exercising admiralty jurisdiction also incorporate "international law that is obligatory on all states" into federal common law. *Sarei*, 2011 U.S. App. LEXIS 21515, at *140 (McKeown, J., concurring in part and dissenting in part). Admiralty courts defer to "international maritime law of impressive maturity and universality," which gains the force of law from "acceptance by common consent of civilized communities of rules designed to foster amicable and workable commercial relations." *Lauritzen*, 345 U.S. at 581-82. Like a court considering an ATS claim, a court considering an admiralty claim has subject matter jurisdiction to decide if a claimed violation of international law is cognizable in a United States court.

The whalers' Washington law claims arise between "citizens of a State and citizens or subjects of a foreign state," and thus potentially invoke the court's diversity jurisdiction. 28 U.S.C. § 1332(a)(2). Sea Shepherd contends that the whalers have not surmounted the $75,000 amount-in-controversy requirement for diversity jurisdiction. The whalers' complaint states otherwise, albeit in conclusory fashion. Compl. ¶ 7.2. Nonetheless, a complaint that a plaintiff files in federal court against a diverse defendant invokes diversity jurisdiction unless it appears to a "legal certainty" that the amount in

ORDER – 13

1   controversy is less than $75,000. *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131

2   (9th Cir. 2000). Where a suit seeks "declaratory or injunctive relief, it is well established

3   that the amount in controversy is measured by the value of the object of the litigation."

4   *Hunt v. Wash. St. Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977). The whalers'

5   Washington law claims target Sea Shepherd's fundraising in Washington, which serves in

6   part to fund its Southern Ocean campaigns. Because the whalers seek relief that would

7   keep those funds from the Southern Ocean fleet, it is far from a legal certainty that there

8   is less than $75,000 in controversy here. Moreover, it is far from a legal certainty that

9   preventing Sea Shepherd from causing further damage to the whalers' ships and whaling

10  operations is worth $75,000 or less.

11          Although the court has subject matter jurisdiction over each of the whalers'

12  claims, the court considers only two of them – their claim for a violation of their right to

13  free navigation at sea and for piracy – as a basis for the injunction they request. The

14  whalers expressly disavow reliance on their terrorism claim as a basis for injunctive

15  relief. Pltfs.' Mot. (Dkt. # 13) at 14. The role of their Washington law claim is less clear,

16  but the court finds that it cannot support the injunction they request. The Washington law

17  claim describes a civil conspiracy in which Sea Shepherd uses its Washington

18  headquarters to raise funds to support its Southern Ocean campaigns. Compl. ¶ 42

19  ("[Defendants] use their [Friday Harbor] base to raise millions of dollars to fund their

20  campaign against research whaling. Defendants conspire with each another [sic] and aid

21  and abet each another [sic] in planning, soliciting, recruiting, funding and direction

22  actions to interfere with plaintiffs' activities through wrongful and dangerous means,

23  including assault, battery, and trespass."). To the extent these claims target Sea

24  Shepherd's activities in Washington, they raise no concern, or at least no concern that the

25  parties have identified so far. To the extent these claims target Sea Shepherd's activities

26  on the Southern Ocean, they raise serious questions about the application of Washington

27

28  ORDER – 14

law to conduct on the high seas.  The court is unwilling to assume that Washington law permits it to enjoin conduct in the Southern Ocean, and the whalers have made no attempt to demonstrate that it does.[8]  Even if the whalers are likely to succeed on the merits of their Washington claim targeting Sea Shepherd's Washington activities (and the court does not suggest that they are), the injunction they seek does not target Washington conduct.  The whalers' failure to address these issues is reason enough not to consider further their Washington law claim as a basis for the injunction they request.

## C.    Likelihood of Success on the Merits

The whalers are likely to succeed in proving the facts that the court recounted in Part II.B.  They are likely to succeed on the merits if those facts amount to a cognizable violation of international law.  The court now considers whether the ATS or admiralty law incorporates international law that prohibits Sea Shepherd's conduct in the Southern Ocean.  The court begins with the ATS.

### 1.    Legal Standards for Evaluating ATS Claims

The ATS permits aliens to sue in tort to remedy violations of some (but not nearly all) norms of international law.  Although the ATS was part of the Judiciary Act of 1789, scarcely anyone attempted to invoke it until the late 20th Century.  *Sosa*, 542 U.S. at 712. In its enactment, "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."  *Id.* at 720.  The three paradigmatic violations were offenses against ambassadors, "violations of safe conduct,"[9]

---

[8] Sea Shepherd has all but ignored the whalers' Washington law claim in the motions before the court.  It merely requested that the court exercise the discretion that 28 U.S.C. § 1367(c) affords it to decline supplemental jurisdiction over the Washington law claim, a request premised on its erroneous belief that the court lacks diversity jurisdiction.

[9] To avoid confusion with the whalers' free navigation claim, the court notes that "safe conduct" violations, as they were understood in the late Eighteenth Century, are not violations of the right to safe passage on the high seas.  A "safe conduct" was a right a sovereign granted to an alien to travel freely either in the sovereign's territory or in areas where it had a military presence. Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Col. L. Rev. 830, 873 (2006); *see also Taveras v. Taveraz*, 477 F.3d 767, 773 (6th Cir. 2007).

ORDER – 15

and acts of piracy.  *Id.*  In *Sosa*, the Supreme Court held that the ATS might permit suits for violations of modern norms comparable to these paradigmatic late-18th Century norms of the law of nations.  *Id.* at 725 ("[W]e think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.").  *Sosa* did not identify any international law norm that met this standard.  Many lower courts had done so, however, and the *Sosa* Court explained that its "limit on judicial recognition" of international law norms via the ATS was "generally consistent with the reasoning of many of the courts and judges who faced this issue before it reached this Court."  Among those lower courts was the Ninth Circuit, which held in *Hilao v. Marcos*, that "[a]ctionable violations of international law must be of a norm that is specific, universal, and obligatory."  25 F.3d 1467, 1475 (9th Cir. 1994) (quoted in *Sosa*, 542 U.S. at 732).

Because the court will repeat the "specific, universal, and obligatory" mantra often, it pauses here to consider what it means.  Perhaps the least self-explanatory requirement is that a norm be "obligatory."  The ATS recognizes only those international norms that nations have a *mutual* obligation to recognize.  There are many norms of conduct that every nation recognizes, but not as a matter of mutual obligation.  Every nation prohibits theft, for example, but this universal condemnation "does not incorporate 'the Eighth Commandment, 'Thou Shalt not steal' . . . into the law of nations.'"  *Filartiga v. Pena-Irala*, 630 F.3d 876, 888 (2d Cir. 1980) (quoting *IIT v. Vencap*, 519 F.2d 1001, 1015 (2d Cir. 1975)).  An international norm is "obligatory" when nations enforce it as a matter of "mutual, and not merely several, concern."  *Filartiga*, 630 F.3d at 888; *see also Alvarez-Machain v. United States*, 331 F.3d 604, 619-20 (9th Cir. 2003) (discussing mutuality requirement and citing *Filartiga*), *rev'd on other grounds*, *Sosa*, 542 U.S. at 735 n.24.  An international norm is "universal" when virtually every nation recognizes it.

ORDER – 16

Truly universal acceptance is unnecessary, it suffices that the civilized nations of the world have come to accept the norm. *Alvarez*, 331 F.3d at 620. Finally, an international law norm must be specific. Broad prohibitions are not meaningful where there is insufficient evidence of international agreement about the specific conduct before a court. In *Alvarez*, for example, the court rejected "general prohibitions against restricting an individual's right to freedom and movement and security of person" as a basis for a specific norm against transborder kidnapping. *Id.* at 618-19.

Complicating a court's consideration of an AWS claim is the difficulty of ascertaining norms of customary international law. *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247-48 (2d Cir. 2003) ("[T]he relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges."). A court may consider "the work of jurists and the usage of nations," along with "treaties, the laws of nations[,] and court opinions." *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1383-84 (9th Cir. 1998); *see also Sosa*, 542 U.S. at 733-34 (describing sources of customary international law). There is no authoritative codification of customary international law, because as the phrase suggests, it derives from the "general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source."). *Flores*, 414 F.3d at 248.

The court now briefly surveys the decisions of the federal courts of appeals to illustrate the variety of international law norms that pass muster under the ATS. The *Marcos* court acknowledged a "right to be free from official torture" that satisfied the ATS standard. 25 F.3d at 1475; *see also Filartiga*, 630 F.3d at 885 (holding official torture claim cognizable via ATS). Other violations that courts have found remediable via the ATS include forced labor, genocide, and war crimes. *See, e.g.*, *Doe v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002) (considering forced labor in Myanmar as well as torts committed in furtherance of forced labor); *Sarei*, 2011 U.S. App. LEXIS 21515, at

ORDER – 17

*51 (recognizing international norms against genocide and war crimes); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (considering genocide and other war crimes in Bosnia); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 187 (2d Cir. 2009) (recognizing international norm against non-consensual medical experiments on humans).  Courts have rejected ATS claims based on intranational pollution, theft, transborder kidnapping, a blockade of food and medicine, and racial discrimination.  *See IIT*, 519 F.2d at 1015 (holding theft beyond scope of ATS despite all nations' prohibitions on theft); *Flores*, 414 F.3d at 255-56 (declining to recognize broader "right to life" or "right to health" as well as specific norm against intranational pollution); *Sarei*, 2011 U.S. App. LEXIS 21515, at *78, 81 (rejecting ATS claims based on blockade of food and medical supplies and racial discrimination).

There are many disagreements among the circuit courts as to the scope of the ATS.  For example, while courts generally agree on an ATS cause of action for official torture, they disagree as to whether torture by non-state actors is actionable.  *E.g.*, *Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1096 (D.C. Cir. 2011) (finding claim of torture by Palestinian Authority beyond scope of ATS).  The Ninth Circuit held that an international norm against arbitrary arrest and detention satisfied the ATS standard.  *Alvarez*, 331 F.3d at 621.  It was that aspect of the *Alvarez* decision that the Supreme Court reversed in *Sosa*, holding that the recognition of a prohibition on arbitrary arrest would "support a cause of action for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place . . . ."  *Sosa*, 542 U.S. at 736.  The Court declined to decide whether the ATS recognizes any international norm against unlawful detention, it merely held that a "single illegal detention of less than a day . . . violates no norm of customary international law so well defined as to support the creation of a federal remedy."  *Id.* at 738.  As Justice Scalia observed in his dissent, the Ninth Circuit reached the holdings that the *Sosa* majority rejected by applying the same "verbal formula" that

ORDER – 18

the majority endorsed.  *Id.* at 748.  The circuit courts disagree not only as to whether corporations can be held liable for violations of international law, but as to how to answer the question.  *Compare Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010) (finding no corporate liability after holding that applicable customary international law imposes only individual liability), *with Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 51 (D.C. Cir. 2011) (recognizing corporate liability for ATS violation as a matter of federal common law), *and with Sarei*, 2011 U.S. App. LEXIS 21515, at *55, *68 (recognizing corporate ATS liability for war crimes and genocide).  The Supreme Court will consider *Kiobel* this year.  132 S. Ct. 472 (Oct. 17, 2011) (granting certiorari).[10]

No court has ever considered an ATS claim based on international norms against piracy or interference with marine navigation.  The whalers ask this court to be the first.

## 2.      Do the Whalers State an ATS Claim?

The whalers rely primarily on four international treaties as evidence of international norms against piracy and interference with maritime navigation: the 1982 United Nations Convention on the Law of the Sea ("UNCLOS"), Dec. 10, 1982, 1833 U.N.T.S. 397; the 1958 Convention on the High Seas ("High Seas Convention"), Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82; the 1988 Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation ("SUA"), Mar. 10, 1988, 1678 U.N.T.S. 201; and the International Maritime Organization's International Regulations for Preventing Collisions at Sea (commonly known as the "COLREGS"), Oct. 20, 1972, 28 U.S.T. 3459, 1050 U.N.T.S. 16.[11]  All of these agreements have attained broad

---

[10] Sea Shepherd requested that the court stay this case pending the Supreme Court's decision in *Kiobel*.  No stay is necessary in advance of the court's decision today.  If Sea Shepherd wishes to renew its request for a stay, it must at a minimum acknowledge that *Kiobel* will have no effect on the whalers' claims against Mr. Watson.

[11] The ATS provides jurisdiction over a tort "in violation of the law of nations *or* a treaty of the United States."  28 U.S.C. § 1350 (emphasis added).  The whalers have relied on the treaties they cite solely as evidence of the law of nations, not as sources for a cause of action arising directly from any individual treaty.  The court accordingly does not consider whether any of the treaties provide an individual right to sue.

ORDER – 19

1    international consensus.  More than 150 nations have agreed to UNCLOS, SUA, and the

2    COLREGS; more than 60 have agreed to the High Seas Convention. [12]  The United

3    States has ratified each of these agreements, with the exception of UNCLOS.  The United

4    States has accepted UNCLOS except for its provisions on deep seabed mining.  *Sarei*,

5    2011 U.S. App. LEXIS 21515, at *132-33 n.4 (McKeown, J., concurring) (noting that the

6    "core provisions [of UNCLOS] are generally accepted as customary international law");

7    *United States v. Hasan*, 747 F. Supp. 2d 599, 634 (E.D. Va. 2010).

8            Each of these treaties is evidence of the mutual and nearly universal interest of the

9    nations of the world in regulating conduct on the open seas.  This is no surprise, as

10   maritime traffic is perhaps the prototypical arena in which nations have universal, mutual

11   concern.  Any nation that depends on maritime trade, which is to say virtually every

12   nation, has a selfish interest in ensuring that the vessels carrying its citizens or their cargo

13   can do so expeditiously.  That selfish interest becomes a matter of mutual international

14   concern because only where every nation commits to the enforcement of those norms can

15   any nation ensure the protection of its individual interests.

16           That there are some universal and obligatory norms of international conduct that

17   govern navigation on the high seas, however, is no proof of a specific norm against Sea

18   Shepherd's conduct.  The court now considers whether the whalers have demonstrated

19   sufficiently specific norms. [13]

20   ─────────────────────

21   [12] The court has relied on the United Nations for information on the ratification of the High Seas
     Convention and UNCLOS and on the International Maritime Organization for information on the
     ratification of SUA and UNCLOS.  United Nations Treaty Collection (*http://treaties.un.org/
22   pages/ParticipationStatus.aspx*); Status of Conventions (*http://www.imo.org/About/
     Conventions/StatusOfConventions/Pages/Default.aspx*).

23   [13] Although a court's determination of foreign law is a legal question, Fed. R. Civ. P. 44.1, most
24   courts have placed the burden of demonstrating the content of foreign law on the party seeking to
     rely on it.  *E.g.*, *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006 (5th Cir.
25   1990); *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999); *but see Tobar v. United
     States*, 639 F.3d 1191, (9th Cir. 2011) (noting uncertainty as to "burden of establishing the
26   content of foreign law").  At least one district court within the Ninth Circuit has held that a
     plaintiff invoking the ATS bears the burden to demonstrate the content of international law.  *Doe
27   v. Nestle, S.A.*, 748 F. Supp. 2d 1057, 1143 (C.D. Cal. 2010).

28   ORDER – 20

a.    **ATS Piracy Claim**

The whalers contend that Sea Shepherd's conduct violates international norms prohibiting piracy. *Sosa* suggests that, at least in the late 18th Century, there was an international piracy norm that the ATS would have recognized. 542 U.S. at 720 (noting that "individual actions arising out of prize captures and piracy may well have also been contemplated"). The question before the court is what "piracy" means today as a matter of specific, universal, and obligatory international law. Sea Shepherd argues for a narrow view, claiming that "piracy" is no more or less than robbery at sea. The whalers argue for a broader definition that includes other acts of violence against ships on the high seas. No appellate court has considered the issue. Even among judges in the same district court, there is substantial disagreement. *United States v. Said*, 757 F. Supp. 2d 554 563-566 (E.D. Va. 2010) (finding no modern international consensus on the definition of piracy); *Hasan*, 747 F. Supp. 2d at 640 (holding that "the definition of general piracy under customary international law today is reflected in UNCLOS").

Both *Hasan* and *Said* concerned criminal prosecutions invoking 18 U.S.C. § 1651, which makes "piracy as defined by the law of nations" a crime with a mandatory life sentence. The putative pirates in each case were akin to the eye-patched, sword-wielding marauders familiar from novels and movies depicting a bygone era of ocean travel. The defendants in *Said* approached a United States naval vessel in the Gulf of Aden and shot at it. 757 F. Supp. 2d at 557. The defendants in *Hasan*, "in search of a merchant ship to attack and plunder," opened fire on a United States naval vessel in the Indian Ocean, mistakenly believing it was a merchant ship. 747 F. Supp. 2d at 601. The court in *Said* defined "piracy" as "sea robbery," consistent with its interpretation of the law of nations when Congress enacted § 1651 in 1819. 757 F. Supp. 2d at 562. The court nonetheless considered the modern international definition of piracy, finding it "[u]nsettled." *Id.* at 563. In *Hasan*, by contrast, the court found that § 1651 embraced an evolving view of

"piracy as defined by the law of nations."  747 F. Supp. 2d at 623.  It found the modern

view to be consistent with UNCLOS, which defines piracy as "any illegal acts of

violence or detention . . . committed for private ends" against a ship on the high seas or

persons or property aboard it.  UNCLOS art. 101, 1833 U.N.T.S. 397.  Both *Hasan* and

*Said* provide an excellent overview of the evolving history of piracy as a matter of

international law.  Whether by design or coincidence, Sea Shepherd and the whalers offer

little authority or argument that these two courts did not dissect.

     The court assumes, but does not decide, that the whalers correctly contend that

UNCLOS reflects specific, universal and obligatory international norms prohibiting

piracy.[14]  Reduced to their essence, UNCLOS's anti-piracy provisions target "acts of

violence . . . committed for private ends by the crew or passengers of a private ship . . .

directed against a ship . . . outside the jurisdiction of any State."  UNCLOS, Art. 101.

     The dual UNCLOS requirements that a pirate commit "violence" to serve "private

ends" is fatal to the whalers' ATS claim.  The whalers cite no authority that defines

"private ends."  In the ordinary case, pirates seek financial enrichment, the prototypical

private end.  Sea Shepherd is uninterested in financial gain; it seeks to save the lives of

whales in the Southern Ocean.[15]  One might characterize that goal as a "private end,"

depending on one's point of view.  The whalers present no authority, and the court is

aware of none, that suggests an international consensus on this issue.  Absent an

international consensus that preventing the slaughter of marine life is a "private end," the

court cannot say that there is a specific, obligatory, and universal international norm

---

[14] The whalers also rely on the High Seas Convention, which defines piracy almost exactly as
UNCLOS does and similarly requires the cooperation of signatory nations in repressing piracy.
High Seas Convention arts. 14, 15.  Given the similarity between the two conventions with
respect to piracy, the court declines to discuss them separately.

[15] Sea Shepherd profits from its Southern Ocean campaigns both because Animal Planet pays it
for the privilege of filming "Whale Wars" and because its fundraising efforts no doubt succeed
in part based on the success of its anti-whaling efforts.  Nonetheless, financial gain is not the
purpose of its conduct, it is merely a byproduct.  Sea Shepherd would cease its "piracy"
immediately if the Plaintiffs stopped killing whales.

ORDER – 22

against violence in the pursuit of the protection of marine life.  Even if there were such a norm, it would be incumbent upon the whalers to show that Sea Shepherd's tactics are "violence" within the meaning of customary international law.  Sea Shepherd does not target people, and although its tactics sometimes target the whalers' ships, it is not apparent that the nations of the world would agree that tactics that resemble malicious mischief amount to piratical "violence."

### b.    ATS Safe Navigation Claim

The court transitions from the whalers' piracy claim to their safe navigation claim by examining SUA, a source of international law that bridges the two claims.  SUA makes no explicit mention of piracy.  It does, however, prohibit a series of "unlawful[] and intentional[]" acts that "endanger the safe navigation of [a] ship."  SUA, Art. 3(1).  SUA's prohibitions include "act[s] of violence against a person on board a ship," "caus[ing] damage to a ship or to its cargo," and "plac[ing] . . . on a ship . . . a device or substance which is likely to . . . cause damage to that ship."  SUA, Art. 3(1)(b), 3(1)(c), 3(1)(d).  SUA mandates that all signatories punish these offenses with "appropriate penalties which take into account the[ir] grave nature."  SUA, Art. 5.  The United States, which ratified SUA in 1994, has complied with SUA's mandate by enacting 18 U.S.C. § 2280, which makes each of the offenses in SUA's Article 3 a crime punishable by up to 20 years in prison.  At least with respect to SUA's more serious offenses, courts have recognized the treaty as codifying prohibitions on "acts of piracy" that are "universally condemned."  *United States v. Shi*, 525 F.3d 709, 723 (9th Cir. 2008) (citing 18 U.S.C. § 2280(a)(1)(A) and (B), which prohibit taking control of a ship by force or threat and acts of violence against people that endanger safe navigation).

The court concludes that Article 3 of SUA sets forth specific, universal, and obligatory norms of international law, and is thus cognizable in an ATS suit.  Sea

ORDER – 23

Shepherd offers scant argument to the contrary.  The whalers are not, however, likely to

succeed in proving that Sea Shepherd has violated SUA.

On this record, only two of Sea Shepherd's Southern Ocean tactics potentially

violate SUA.  The use of ropes to foul the propellers of the whaling ships is an act that at

least arguably causes damage to a ship and is likely to endanger its safe navigation.[16]

Although the record reveals several instances in which Sea Shepherd drags lines in front

of a whaling vessel in an apparent attempt to foul its propeller, there is evidence of only

one successful attempt.  That evidence reveals a propeller entangled in rope and a rudder

with apparent damage.  That evidence does not, however, reveal any impediment to the

"safe navigation" of the ship.  There is no evidence that the ship was disabled, even

temporarily, much less that it was disabled in a way that put its crew at risk.  The

evidence before the court does not permit the conclusion that Sea Shepherd's propeller-

fouling tactics are "likely to endanger the safe navigation of a ship."  SUA, Art. 3(1)(c).

The other tactic of concern is Sea Shepherd's maneuvering of its vessels near the whaling

vessels.  These maneuvers create a risk of collision and, in at least a few cases, have

resulted in collisions.  As to Sea Shepherd's smaller vessels, including its trimarans, these

collisions are no danger to the safe navigation of the whaling vessels.  These vessels are

simply too small to endanger the navigation of the whaling ships.  The larger vessels,

however, at least have the potential to cause damage when they collide with the whaling

ships.  The evidence suggests that Sea Shepherd is aware of this risk, because there is

only one documented incident where one of Sea Shepherd's large ships collides with a

whaling ship.  That collision, moreover, was from the side.  While that collision makes

---

[16] No party points to any authority interpreting the language of SUA's Article 3.  With one
exception not relevant here, Article 3's prohibitions apply to acts that are "likely to endanger the
safe navigation of [the targeted] ship."  The whalers appear to interpret "safe navigation"
broadly, suggesting that any interference with their preferred navigational path endangers the
"safe navigation" of their vessels.  Reading SUA as a whole, however, the court concludes that
endangering "safe navigation" is interfering with navigation in a way that puts human safety at
risk.

ORDER – 24

for dramatic video, there is no evidence of damage to the whaling ship, nor is there evidence that the collision endangered the safe navigation of the whaling ship.

Most of Sea Shepherd's Southern Ocean tactics are beyond the scope of SUA. Throwing smoke bombs and glass bottles filled with butyric acid or paint are acts akin to malicious mischief.  As was the case with the whalers' claims based on UNCLOS, there is no evidence of an international consensus that such acts are "violence" within the meaning of SUA.  Even if Sea Shepherd engages in "violence," it does not target people, and its acts are not likely to endanger the safe navigation of any whaling ship.  SUA, Art. 3(1)(b).  The same is true of Sea Shepherd's use of lasers and flares.  While these tactics cause minor damage, and create a small degree of risk to human safety, they do not violate SUA because, at least on this record, the court cannot conclude that they are likely to endanger the safe navigation of any whaling ship.

The whalers point to three other sources of law that they contend support a specific, universal, and obligatory international norm protecting the right to safe navigation.  One is the High Seas Convention, which lists "[f]reedom of navigation" as one of several elements of "[f]reedom of the high seas."  High Seas Convention, art. 2. The High Seas convention imposes several relatively specific rules that protect navigation at sea.  None of them (with the exception of the anti-piracy provisions the court has already addressed) apply to Sea Shepherd's tactics targeted at the whalers.  The High Seas Convention falls well short of establishing a specific, obligatory, and universal norm of maritime navigation that is applicable to the conduct at issue in this case.  The same is true of the whalers' citation to UNCLOS as a source of a right to free maritime navigation.  UNCLOS announces a right to "freedom of navigation" on the high seas, UNCLOS, Art. 87, but the whalers point to no more specific aspect of UNCLOS that applies to Sea Shepherd's conduct here.

ORDER – 25

1    The COLREGS, by contrast, are a detailed statement of the "rules of the road" for

2    maritime traffic.  Hundreds of nations have agreed to abide by the COLREGS, including

3    the United States, Japan, Australia, and the Netherlands.  *Crowley Mar. Servs. v.*

4    *Maritrans*, 530 F.3d 1169, 1172 (9th Cir. 2008) ("The COLREGS provide a 'universal

5    system of sea traffic rules' applicable to vessels in international waters.") (citation

6    omitted).  The COLREGS include a series of navigation rules intended to prevent

7    collisions.  COLREGS R. 4-19.  One rule mandates actions to avoid collisions.

8    COLREGS R. 8.  Admiralty courts in the United States use the COLREGS to determine

9    fault in maritime collision cases.  *Crowley*, 530 F.3d at 1173-77.  The court concludes

10   that the COLREGS state specific, obligatory, and universal norms of maritime

11   navigation.  It is likely that Sea Shepherd violates one or more of the COLREGS when it

12   maneuvers its ships and boats near the whaling ships.

### c.        Sea Shepherd's International Law Defense

14         The court rejects Sea Shepherd's claim that the World Charter for Nature ("Nature

15   Charter") authorizes its tactics in the Southern Ocean or provides any defense in this

16   case.  Among other things, the Nature Charter declares that nations, "public authorities,

17   international organizations, individuals, groups and corporations shall . . . [s]afeguard and

18   conserve nature in areas beyond national jurisdiction."  Nature Charter, G.A. Res. 37/7,

19   U.N. Doc. A/RES/37/7 ¶ 21 (Oct. 28, 1982).  Sea Shepherd claims that this provision

20   authorizes it to act as a "private coast guard" in the Southern Ocean.  Sea Shepherd is

21   mistaken.  To begin, the Nature Charter authorizes nothing.  It is not a treaty or a binding

22   commitment by any nation, it is a resolution of the United Nations General Assembly.

23   General Assembly resolutions can serve as evidence of customary international law, but

24   they bind no one.  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 720 (9th

25   Cir. 1992); *see also Flores*, 414 F.3d at 259-60 (explaining that General Assembly

26   resolutions "do not have the power to bind member States").  Putting that aside, the claim

ORDER – 26

that a generic authorization to safeguard nature is an implicit authorization to use Sea Shepherd's approach finds no support in any source of law.  Whatever solace Sea Shepherd takes from it, the Nature Charter provides no legal authorization for its Southern Ocean tactics and provides it no defense in this case.

### 3.    Admiralty Claims

The court next considers whether the whalers' prospects for success look any different through the lens of admiralty law.  As the court has noted, admiralty law incorporates certain universal rules of international law.  With the exception of the COLREGS, the whalers point to no admiralty court that has recognized any of the other international accords on which they rely.  Indeed, the whalers' invocation of admiralty jurisdiction has so far been largely pro forma.  Focusing their attention on the ATS, the whalers do not suggest that a court sitting in admiralty would apply any different analysis to the scope of their causes of action.

The whalers also ignore the choice-of-law issues that their admiralty law claims raise.  To the extent that the whalers rely on universally-accepted international law, the choice of applicable law is unimportant.  But to the extent they seek particular remedies for those international law violations, or allege violations that are not based on international law, choice of law is critical.  Even where nations agree on substantive legal norms, they are free to define the subsidiary rules that define a cause of action and the remedies for it.  It is possible, to give one hypothetical example, that the courts of the United States would permit an injunction to issue to prevent a maritime tort on the high seas, whereas the courts of Australia would not.

United States law would not apply to the whalers' causes of action based on Sea Shepherd's conduct in the Southern Ocean.  A court considering a "maritime tort claim" must consider several factors that influence its choice of law.  *Lauritzen*, 345 U.S. 571. The so-called "*Lauritzen* factors" are:

ORDER – 27

(1) [the] place of the wrongful act; (2) the flag of the vessel; (3) allegiance or domicile of the injured party; (4) allegiance of the shipowner; (5) place of the contract; (6) inaccessibility of the foreign forum; and (7) law of the forum.

*Pereira v. Utah Transport, Inc.*, 764 F.2d 686, 689 (9th Cir. 1985). The Supreme Court has also directed courts to consider the shipowner's base of operations. *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970). These factors guide choice-of-law determinations in Jones Act claims as well as claims invoking maritime common law. *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959). These factors are not exhaustive, and a court should apply them flexibly in consideration of the circumstances that the case before it presents. *Pereira*, 764 F.2d at 689; *Gund v. Philbrook's Boatyard*, 374 F. Supp. 2d 909, 911 (W.D. Wash. 2005) (engaging in "flexible application" of *Lauritzen* factors). Rather than dwell on the *Lauritzen* factors in this case; it suffices to note that they point away from the choice of the law of the United States. Other than financing and fundraising conduct that is not at issue in this motion, none of the wrongful acts alleged occurred in the United States. None of the vessels involved carry a United States flag. *See Lauritzen*, 345 U.S. at 584 (giving "cardinal importance" to the flag of the vessels involved in a dispute); *Pereira*, 764 F.2d at 689 (following *Lauritzen* and giving "great weight" to the law of the flag). The parties claiming injury are citizens of Japan. There is no suggestion that the courts of Japan, Australia, or the Netherlands are inaccessible to the parties.[17] There is some evidence (in the form of depreciation claimed on Sea Shepherd's United States tax returns) that Sea Shepherd's organization in the United States owns one or more vessels in the Southern Ocean fleet, but the fleet bases its operations from Australia. On this record, United States law would not apply to the

---

[17] At oral argument, counsel for the whalers claimed that they had not sued Sea Shepherd in Japan because they could not assert personal jurisdiction over them. The whalers made no effort to substantiate this assertion with evidence of Japanese law. Courts generally assume "universal jurisdiction" over violations of international law on the high seas. *E.g.*, *Shi*, 525 F.3d at 723 (discussing universal jurisdiction and noting that "federal courts have historically accepted the notion that a pirate may be tried by any state").

ORDER – 28

whalers' admiralty claims.  Whether that makes a material difference in this case is an issue that no party addresses.

In light of these considerations, the court concludes that the whalers' causes of action based in admiralty are not likely to succeed.  Even if the whalers were to address the choice-of-law issues and show that applicable law recognizes both the substantive norms they rely on and the remedies they seek, they would be no more likely to succeed on their admiralty claims than on their ATS claims.

### 4.    Other Impediments to Success on the Merits

Sea Shepherd incorporates the arguments from its motion to dismiss into its opposition to the whalers' injunction motion.  Many of those arguments target the whalers' individual claims, and the court has touched on some of those arguments in its preceding analysis.  Some of Sea Shepherd's arguments, however, are not claim-specific. One example is its challenge to subject matter jurisdiction, which the court has already rejected.  Sea Shepherd also contends that the court must dismiss this action on forum non conveniens grounds, that neither the ATS nor admiralty law authorize a court to issue an injunction, that this dispute presents a non-justiciable political question, that international comity demands that the court not adjudicate this dispute, and that the First Amendment privileges its conduct in the Southern Ocean.  Because Sea Shepherd's success in asserting these defenses would prevent the court from issuing an injunction, the court considers them now.

### a.    Forum Non Conveniens

The application of the forum non conveniens doctrine, which permits a court to dismiss a case when the defendant demonstrates that another nation's tribunals are manifestly more convenient than the courts of the United States, is committed to the court's discretion.  *Monegro v. Rosa*, 211 F.3d 509, 511 (9th Cir. 2000).  The party seeking dismissal must make two showings:  first that there exists an "adequate

ORDER – 29

alternative forum" for the dispute, and second that "the balance of private and public interest factors favors dismissal." *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009).

Sea Shepherd falls well short of carrying its forum non conveniens burden. Sea Shepherd is an American corporation being sued in its home forum.[18] That fact alone weighs strongly against its request for dismissal. *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1229 (9th Cir. 2011). There is nothing before the court sufficient to overcome the presumption that a defendant's home forum is a convenient forum. The crews of the vessels involved in this dispute are made up primarily of citizens of the United States, Japan, and Australia. No forum is substantially better situated than another to compel the attendance of witnesses. The physical evidence is no more difficult to present in the United States than it is in another country. In short, Sea Shepherd has wholly failed to demonstrate that the trial of this action (including pretrial procedures) would be any more convenient in any other forum. *Carijano*, 643 F.3d at 1229 (summarizing factors relating to the private interests of the litigants). Given the whalers' reliance on international law, there is no reason to conclude that any nation's courts are more familiar with the applicable law. Sea Shepherd has made no effort to show that any other nation's courts could resolve this action more quickly, at a lower cost, or with less burden on the court who hears the dispute. *Id.* at 1232 (summarizing public interest factors). Sea Shepherd has not met its burden on its forum non conveniens defense, and the court declines to dismiss this action on that basis.

### b.   The ATS Permits Preliminary Injunctions.

Sea Shepherd cites *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) for the proposition that a court cannot grant injunctive relief in

---

[18] Mr. Watson, the only other Defendant, has offered no evidence about his citizenship or domicile. He does not, however, offer the court any reason to treat the United States, the country in which he founded and incorporated Sea Shepherd, as something other than his home forum.

ORDER – 30

1   an ATS case.  Sea Shepherd is mistaken.  In *Grupo Mexicano*, the Court considered a

2   preliminary injunction preventing the defendant in a breach of contract case from

3   transferring unencumbered assets that the plaintiff believed were essential to satisfy the

4   judgment it hoped to obtain.  527 U.S. at 312-13.  The Court traced the grant of the

5   federal courts' equitable powers to the Judiciary Act of 1789, which invested federal

6   courts with only the equitable power that the High Court of Chancery in England

7   exercised at the time.  *Id.* at 318.  The Court held that a preliminary injunction freezing

8   unencumbered assets for a later judgment was beyond those equitable powers.  *Id.* at 322.

9   It also held that federal courts have no power to "create remedies previously unknown to

10  equity jurisprudence."  *Id.* at 322.

11          If *Grupo Mexicano* prohibits the injunctive relief that the whalers request, Sea

12  Shepherd does not explain why.  It argues that *Grupo Mexicano* stands for the

13  proposition that "preliminary injunctive relief was not accorded to courts of equity in

14  1789."  Defs.' Mot. (Dkt. # 29) at 14.  This is wrong for at least two reasons.  First,

15  *Grupo Mexicano* made no ruling about the availability of preliminary injunctions in

16  1789, it merely held that no "all-purpose prejudgment injunction" was available.  527

17  U.S. at 331.  Second, preliminary injunctions were available in England's High Chancery

18  Court in 1789.  Anthony DiSarro, *Freeze Frame: The Supreme Court's Reaffirmation of*

19  *the Substantive Principles of Preliminary Injunctions*, 47 Gonz. L. Rev. 51, 62-64 (2011).

20          A court adjudicating an ATS claim may issue an injunction, subject to the

21  traditional limits on its equitable discretion.  The ATS itself says nothing about the

22  availability of injunctive relief, and no court has squarely addressed the issue.  To be

23  sure, courts adjudicating ATS claims have issued injunctions.  *Hilao*, 25 F.3d at 1480

24  (affirming preliminary injunction freezing assets).  Courts in ATS cases have also

25  considered injunctions without suggesting that they are categorically unavailable.

26  *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 124 (2d

27

28  ORDER – 31

Cir. 2008) (affirming denial of injunction requiring abatement of chemical nuisance in Vietnam). Federal courts presumptively have the power to enter injunctions. *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."). No one suggests that Congress has limited the power of courts to exercise their equitable powers in ATS cases.

Because the court can grant an injunction in support of an ATS claim, the court need need not consider whether the whalers' admiralty claims provide an independent basis for injunctive relief.[19] As the court has already observed, even if the whalers have viable admiralty claims, they have not shown them to be any broader than their ATS claims.

While there is no categorical bar to an ATS-backed injunction, it is an open question whether the availability of an injunction or any other remedy in an ATS case depends on a choice-of-law analysis. In a diversity case, for example, a party cannot obtain an injunction in federal court if "state law clearly rejects the availability of that remedy." *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988). In an ATS case, the obligation to apply only universal norms of international law means that a court

---

[19]   There was a time when courts, including the Supreme Court, questioned the power of admiralty courts to grant injunctive relief. *Schoenamsgruber v. Hamburg Am. Line*, 294 U.S. 454, 457-58, (1935) ("While courts of admiralty have capacity to apply equitable principles . . . except in limitation of liability proceedings, they do not issue injunctions.") (footnotes omitted); *Marine Cooks & Stewards v. Panama S.S. Co.*, 265 F.2d 780, 785 (9th Cir. 1959) ("It has been specifically held that admiralty can not give injunctive relief."). More recently, particularly after the 1966 merger of federal admiralty, civil, and equity courts, circuit courts have held otherwise. *Farrell Lines v. Ceres Terminals*, 161 F.3d 115, 117 (2d Cir. 1998) ("[W]e now align ourselves with those courts that recognize the authority of an admiralty court to issue injunctions.") (citing authority from First and Fifth Circuits); *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976) ("Whatever may have been the extent of the equitable power of an admiralty court to issue injunctions prior to the 1966 unification of admiralty and other civil actions, there should be little doubt today that courts of admiralty, in proper cases, may invoke the equitable tool of injunction."). The Ninth Circuit has not considered the issue since it decided *Marine Cooks & Stewards* in 1959. Because the whalers' ATS claim gives the court an independent basis to exercise its injunctive power, the court need not decide whether the injunction prohibition from *Marine Cooks & Stewards* remains good law today.

ORDER – 32

need not consider choice of law when determining applicable norms of conduct. But international law does not provide remedies. *Doe*, 654 F.3d at 41-42. For example, when the *Alvarez* court considered what damages were available to a plaintiff subjected to arbitrary detention in Mexico violation of international law, it had to decide whether the law of Mexico or the law of the United States applied. 331 F.3d at 632-35. As this court has already noted, a choice-of-law analysis points to the applicability of another nation's law to Sea Shepherd's conduct in the Southern Ocean. The parties scarcely address this issue, and in light of the court's decision today, the court need not resolve it. It suffices to observe that choice-of-law concerns may preclude the use of an injunctive remedy in this case.

ATS claims that target extraterritorial conduct present additional obstacles to the grant of injunctive relief. In a case like this one, where the injunction would apply extraterritorially, an injunction may be "impracticable." *In re Agent Orange Prod. Liability Litig.*, 373 F. Supp. 2d 7, 46 (E.D.N.Y. 2005) (declining to impose injunction requiring chemical cleanup in Vietnam), *aff'd by Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 124 (2d Cir. 2008). Extraterritorial injunctions also raise concerns of infringement of sovereignty and enforceability. *In re Agent Orange*, 373 F. Supp. 2d at 45.

The court does not, however, find that extraterritoriality concerns are a sufficient reason to withhold injunctive relief in this case. Everyone concedes that were the court to grant the injunction the whalers seek, the court cannot directly enforce it. The court has no armada to dispatch to the Southern Ocean. But even when a court issues an injunction against conduct within its traditional geographical jurisdiction, it rarely if ever enforces the injunction directly. Instead, courts enforce their equitable decrees through contempt proceedings. In this case, both Mr. Watson and Sea Shepherd have consented to this court's jurisdiction over them. The whalers acknowledge that contempt proceedings

ORDER – 33

would be their sole remedy if Defendants were to violate an injunction this court imposed.  The whalers also propose an injunction that would be simple to monitor.  Even from thousands of miles away, it would not be difficult to provide the court with evidence that Sea Shepherd came within 800 meters of a whaling vessel or engaged in specific prohibited tactics.  Moreover, while several nations have an interest in this dispute, the injunction would (with one important caveat) operate on the high seas.  The court could thus craft the injunction so that it does not impinge on any sovereign rights.  To do so, however, the court must respect Australia's claim of sovereignty in the Australian Whale Sanctuary, a claim that the court will consider when it discusses the international comity doctrine.

### c.   The Non-Justiciable Political Question Doctrine

Sea Shepherd also asks the court to dismiss this case because it presents a non-justiciable political question.  The political question doctrine received its modern formulation in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Arakaki v. Lingle*, 477 F.3d 1048, 1066-67 (9th Cir. 2007) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)) (alterations in *Arakaki*).  If a non-justiciable political question is "inextricable from the case," the court must dismiss it.  *Sarei*, 2011 U.S. App. LEXIS 21515, at *40.

The court will not dismiss this case on political question grounds.  The court's primary task in this case is to determine whether Sea Shepherd's Southern Ocean tactics

ORDER – 34

are unlawful.  To do so, it must interpret international law, an enterprise that Congress has committed to the courts via the ATS.  The Supreme Court has already held that a case touching on international whaling controversies is justiciable.  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  In the abstract, it is possible that resolving controversial questions of international law could implicate the political question doctrine.  The judicial standards that apply in an ATS case ameliorate that possibility, however, because a court can only apply international law norms that are specific, universal, and obligatory.  But for the whalers' request for an injunction, this case would present purely judicial questions.  What is the law?  Did Sea Shepherd violate it?  If so, what remedies are available?  Because the court can resolve this case merely by answering plainly judicial questions, no non-justiciable political question mandates dismissal.

Although this *case* does not raise a political question, the injunctive *remedy* that the whalers' request raises some of the concerns underlying the political question doctrine.  Direct enforcement of that injunction is manifestly beyond the power of this court.  The Executive Branch has sole authority to use force or the threat of force on the high seas.  The Executive Branch has declined to interfere in this dispute, even as it has condemned both the slaughter of Southern Ocean whales and Sea Shepherd's anti-whaling tactics.  Whether that is evidence of an Executive Branch decision is debatable, but it is at least conceivable that the Executive Branch would look poorly on this court using its coercive powers to interfere where it has declined to do so.  The court observes that neither the whalers nor Sea Shepherd has sought the input of the Executive Branch. *Compare Sarei*, 2011 U.S. App. LEXIS 21515, at *43-44 (reviewing statements from Department of State and foreign governments regarding impact of case on foreign relations).

ORDER – 35

1    Because only the whalers' request for an injunction implicates the political

2    question doctrine, the court declines to dismiss the case or any aspect of it.  Instead, the

3    court will consider the concerns underlying the political question doctrine as it

4    determines whether to exercise its discretion to enter an injunction.

5                    **d.    International Comity**

6        Whereas the political question doctrine recognizes the balance of power among

7    the three branches of the United States government, courts have recognized a doctrine of

8    international comity that demands respect for the sovereignty of other nations'

9    governments.  *Sarei*, 2011 U.S. App. LEXIS 21515, at *44-45 ("Comity refers to the

10   spirit of cooperation in which a domestic tribunal approaches the resolution of cases

11   touching the laws and interests of other sovereign states.") (quoting *Societe Nationale*

12   *Industrielle Aerospatiale v. United States Dist. Ct. for the S. D. of Iowa*, 482 U.S. 522,

13   544 n.27 (1987)).  With one important exception, this case concerns conduct on

14   international waters in which no nation's government has intervened, and thus does not

15   raise international comity concerns.

16       The exception is Australia, whose legislature has declared whaling unlawful in the

17   AWS, and whose courts have enjoined the whalers from hunting there.  The whalers

18   decline to recognize either Australia's law or the injunction because they dispute

19   Australia's sovereignty in the AWS.  Indeed, the whalers refused to participate in the

20   Australian court proceedings.  But whether the whalers respect Australian law,

21   international comity demands respect for the judgments of foreign courts.  *Avestas v.*

22   *Petroutsas*, 580 F.3d 1000, 1010-11 (9th Cir. 2009).  A court need not defer to a foreign

23   judgment in every case, but it must generally do so.  *Id.* at 1011 (citing *Hilton v. Guyot*,

24   159 U.S. 113, 202 (1895)).

25

26

27

28   ORDER – 36

For reasons of international comity, the court will not grant relief on the whalers' claims to the extent they concern conduct in the AWS.[20]   Regardless of the whalers' view of the Australian injunction, the Australian judiciary has imposed it and expects the whalers to adhere to it.  What penalties, if any, the whalers face for violating the Australian injunction is not this court's concern.  This court's concern is that the whalers ask a United States court to issue an injunction that would help them engage in the very conduct that an Australian court has enjoined.  The court will not grant that request.  At a bare minimum, the court will not issue an injunction (or any affirmative relief) as to the whalers' conduct in the AWS.  In its later analysis, the court will consider whether the whalers' flouting of the Australian injunction is grounds to deny them injunctive relief as to the portions of the Southern Ocean outside the AWS.

**e.   First Amendment**

Sea Shepherd contends that its Southern Ocean campaign is a "protest" that the First Amendment protects.  They cite no authority supporting the notion that the First Amendment protects a right to launch bottles, flares, and smoke bombs at ships, a right to attempt to foul their propellers, or a right to collide with them.  The court is aware of no such authority.  There may be aspects of Sea Shepherd's Southern Ocean conduct that are expressive activity that the First Amendment protects.  Sea Shepherd has made no attempt to explain what those aspects are.  To the extent that the First Amendment provides any grounds for denying or limiting the injunctive relief that the whalers request, Sea Shepherd has failed to provide coherent argument that identifies those grounds.

---

[20]   At oral argument, counsel for the whalers stated that he did not believe that this season's whale hunt was taking place in the AWS.  He declined, however, to assure the court that the whalers would not hunt in the AWS in this season or future seasons.  Moreover, the whalers have not disputed that they have hunted for whales in the AWS in past seasons, despite the injunction.

ORDER – 37

5.      Summary of Likelihood of Success on the Merits

In summary, the court concludes that the whalers are likely to succeed on one narrow aspect of the claims underlying the injunction they request: that Sea Shepherd violates the COLREGS by piloting its ships and boats too close to its ships.  The whalers have no viable cause of action based on UNCLOS or the High Seas Convention.  The court concludes that the whalers have a safe navigation claim based on SUA, but they are not likely to succeed on the merits of that claim.  The court rejects Sea Shepherd's forum non conveniens defense, its argument that injunctions are not available in ATS suits, its request that the court dismiss this case because it presents an inextricable non-justiciable political question, and its First Amendment defense.  The court concludes, however, that international comity dictates that it not grant relief as to any confrontation between the parties in the AWS.

D.      Irreparable Harm

The whalers claim irreparable harm in the form of threatened injury to members of their crew.  Courts recognize physical harm as an irreparable injury.  *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004).  In considering that harm, the court must resolve the tension between its conclusion that Sea Shepherd's tactics create some risk of injury and its conclusion that Sea Shepherd has hurt no one despite using essentially the same tactics for eight whaling seasons.  On this record, injury is possible, but not likely.  In *Winter*, the Supreme Court reminded courts that a mere possibility of irreparable harm does not suffice, and that a party seeking injunctive relief must prove that "irreparable injury is *likely* in the absence of an injunction."  555 U.S. at 22 (emphasis in original).  The sole irreparable harm to which the whalers point, physical injury to its crew, is not likely to occur in the absence of the injunction they request.

Although the court's conclusion regarding the likelihood of irreparable harm applies to the risk of injury arising from all of Sea Shepherd's tactics, the whalers' burden

ORDER – 38

is more specific.  They must show that injury is likely to occur as a result of the tactics that fall within the legal scope of their causes of action.  In the court's view, the conduct most likely to cause injury to the whalers is Sea Shepherd's hurling of various projectiles at the whaling ships.  That conduct, however, is not actionable, at least not as a violation of international law.  Sea Shepherd's actionable conduct – piloting its ships and boats too near to the whaling ships – is less likely to cause an injury.  Sea Shepherd's small boats presents no risk of injury to the whalers.  The navigation of its large ships to collide with or come too close to the whaling ships presents a risk of injury, but there is nothing in the record from which the court could conclude that injury is likely as a result.

That only a few weeks remain in the current whaling season is another factor that makes irreparable harm unlikely.  Although their conflict with Sea Shepherd is longstanding, the whalers chose to wait until this year's whaling season was underway before bringing this case and their injunction motion.  If they expected that the parties could fully brief this extraordinarily complex case and have the court rule on their motion in time to meaningfully affect this year's whaling season, their expectation was unrealistic.  Irreparable harm is not likely on this record, but it is even more unlikely in light of the duration of the remainder of the whaling season.

**E.    The Balance of Hardships**

The balance of hardships favors the whalers, if only because Sea Shepherd has provided virtually no evidence of a hardship to it.  Absent an injunction, the whalers will continue to be the victims of Sea Shepherd's harassment.  Many of the hardships of which the whalers complain are beyond the scope of the international law on which they rely.  But when balancing the hardships, the court need not confine itself to those hardships that are independently actionable.

Sea Shepherd, by contrast, points to no hardship that it will suffer if the court imposes an injunction.  The whales that Sea Shepherd seeks to protect will suffer, but that

ORDER – 39

1   is not a harm to Sea Shepherd.  The court defers discussion of the harm to the whales

2   until it discusses the public interest.  Focusing on its own harm, Sea Shepherd speculates

3   that its donors will cease their financial support if the court enjoins their tactics in the

4   Southern Ocean.  They offer no evidence that any donor has conditioned current or future

5   support of Sea Shepherd on Sea Shepherd's use of the tactics at issue in this motion.  The

6   injunction the whalers pray for would not exclude Sea Shepherd from the Southern

7   Ocean, or prevent Sea Shepherd from attempting to preserve marine life.  It would simply

8   require Sea Shepherd to accomplish its mission by different means.  Sea Shepherd has

9   not proven that this is a hardship.  Indeed, it might well be a benefit to Sea Shepherd to

10  find a way to protect Southern Ocean whales without engaging in the tactics over which

11  the whalers have sued.

12  **F.      The Public Interest**

13          The public interest weighs against issuing an injunction in this case. The public

14  interest no doubt favors the right of ships and their crew to travel freely on the open seas.

15  But that interest is tempered by two countervailing interests:  the preservation of marine

16  life and the interest in avoiding judicial interference in international political

17  controversies.  In exercising its equitable discretion, a court must "pay particular regard

18  for the public consequences in employing the extraordinary remedy of injunction."

19  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

20          If the court were to grant the whalers their injunction, more whales would die.

21  This is not in the public interest.  Were the court to confine itself to considering the

22  public interest of the United States, the preservation of whales is unquestionably

23  important.  Whaling is illegal in all sovereign waters of the United States, and marine

24  mammals in general are subject to strict protections. *See* Marine Mammal Protection Act,

25  16 U.S.C. §§ 1361-1423h.  Beyond its sovereign waters, the government of the United

26  States has resolutely opposed all but subsistence whaling, and has repeatedly decried

27

28  ORDER – 40

1    whaling in the Southern Ocean.  Considering the public interest of nations beyond the

2    United States yields no different result.  Virtually every nation has condemned both

3    whaling in general and the slaughter of whales in the Southern Ocean specifically.

4            Putting aside the public interest in the conservation of marine life, the court

5    believes that the public interest favors the resolution of this Southern Ocean dispute by

6    means other than the intervention of a United States court.  Although the political

7    question doctrine does not prevent the court from resolving the whalers' substantive

8    international law claims, their request for an injunction to remedy their claims raises an

9    international political question.  So far, every government with an interest in this dispute

10   has declined to intervene directly.  Australia and New Zealand, the two nations in closest

11   geographical proximity to the dispute, have not intervened directly.  They have been

12   content to apply political pressure (and, in Australia's case, to file suit in the ICJ).  The

13   United States, which has not only a naval force but the coercive power to target Sea

14   Shepherd's operations within its borders, has similarly confined its intervention to the

15   political arena.  Japan, whose citizens and ships are allegedly at risk, has also chosen to

16   employ political countermeasures rather than its coercive power.  It is not in the public

17   interest for a United States court to exercise its discretion to bring its modest coercive

18   powers to bear when every nation has declined to do so.

19   **F.    Unclean Hands**

20           Sea Shepherd raises the equitable defense of unclean hands.  In its view, Plaintiffs'

21   "illegal" whaling in the Southern Ocean is reason enough for the court to deny the

22   injunction they seek.  A party has unclean hands when it is "tainted with inequitableness

23   or bad faith relative to the matter in which he seeks [equitable] relief."  *Jarrow Formulas,*

24   *Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) (quoting *Precision Instr.*

25   *Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).  Unclean hands is not

26

27

28   ORDER – 41

1  "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense."

2  *Id.*

3          Outside of the AWS, Sea Shepherd cannot prevail on an unclean hands defense

4  predicated on its assertion that the whalers' annual slaughter is "illegal."  Outside of the

5  AWS, the sole body that purports to exercise authority over whaling in the Southern

6  Ocean is the IWC.  The IWC forbids commercial whaling in the Southern Ocean, an edict

7  that the whalers at least superficially heed.  The IWC allows Japan to issue "research"

8  permits to kill whales and permits the commercial sale of the meat harvested in this

9  "research."  The whalers conduct their hunt under the auspices of Japan's permits.  Many

10  members of the IWC assert that this "scientific" whaling is a thin veneer for the

11  commercial slaughter of whales.  The IWC has not, however, withdrawn Japan's

12  authorization to issue the permits or amended its charter to prohibit the sale of "research"

13  meat.  Absent an unambiguous edict from the IWC or other international authority, this

14  court cannot resolve Sea Shepherd's illegal whaling charge.  Australia's suit against

15  Japan in the ICJ raises precisely this charge, but it will likely be years before the ICJ

16  decides that suit.  International comity demands that the court leave the dispute over the

17  legality of Southern Ocean "research" whaling to the ICJ.

18          Inside the AWS, the whalers' activity is not only in violation of the laws of

19  Australia, it violates an Australian court's injunction.  This court has already decided that

20  international comity demands that it not consider the whalers' request for an injunction to

21  aid conduct that is in violation of the Australian court's injunction.  The remaining

22  question is whether the whalers' derogation of the Australian injunction provides the grist

23  for a determination that it has unclean hands that bar it from receiving injunctive relief

24  outside of the AWS.

25          The court concludes that Sea Shepherd is likely to prevail on its unclean hands

26  defense, and that this defense bars the whalers from seeking equitable relief.  In flouting

27

28  ORDER – 42

1  the Australian injunction, the whalers demonstrate their disrespect for a judgment of a

2  domestic court.  Now they turn to another nation's domestic courts in search of an

3  equitable decree that they expect Sea Shepherd to heed.  In the whalers' view, their

4  violation of the Australian injunction should have no consequences, whereas Sea

5  Shepherd's violation of the injunction they seek should place it in contempt of court.

6  Although the court would deny this injunction motion even ignoring the whalers' unclean

7  hands, their unclean hands are an independent reason that the court declines to use its

8  equitable power to aid them.

### IV.   CONCLUSION

10      For the reasons stated above, the court DENIES the whalers' motion for a

11  preliminary injunction. Dkt. # 13.

12      Finally, the court cautions anyone reading this order that the court suggests no

13  approval of Sea Shepherd's methods or its mission.  In particular, the court acknowledges

14  that its finding that injury to the whalers is not likely will provide little comfort to a

15  whaler struck in the head by an errantly launched bottle, burned by a misguided flare, or

16  injured in a collision between ships.  This is to say nothing of the risk to Sea Shepherd's

17  crew, although they at least voluntarily confront that risk.  A combination of tactical

18  choice and luck has kept the crew members involved in this dispute safe for eight

19  whaling seasons.  For the sake of all involved, the court hopes that Sea Shepherd's luck

20  does not run out.

21      The court does not approve of Sea Shepherd's tactics, it has merely declined to

22  award the extraordinary relief that the whalers requested in this motion.  That relief is not

23  extraordinary merely in the sense that every preliminary injunction is a form of

24  extraordinary relief, it is extraordinary in the sense that the whalers asks the court to do

25  what perhaps no United States court has ever done.  They ask the court to use its

26  injunctive power to enforce international law to quell not merely a dispute between

27

28  ORDER – 43

people from different nations, but a dispute that arises from an international political controversy.  The nations of the world have condemned both the whalers and Sea Shepherd but have chosen not to intervene directly.  The court suggests no criticism of that choice; it merely observes that the whalers ask this court to do what no nation will do.  It asks this court to condemn Sea Shepherd's conduct not merely with words, but with its injunctive power.  The court will not do so.

DATED this 19th day of March, 2012.

_____

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 44