```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
 2                           IN SEATTLE

 3    ------------------------------------------------------------

 4    THE INSTITUTE OF CETACEAN      )
      RESEARCH, et, al.,             )
 5                                   )   No. C11-2043RAJ
                     Plaintiffs,     )
 6                                   )
                                     )
 7       v.                          )
                                     )
 8    SEA SHEPHERD CONSERVATION      )
      SOCIETY, et al.,               )
                                     )
 9                   Defendants.     )

10
      ------------------------------------------------------------
11
                    TRANSCRIPT OF PROCEEDINGS
12
      ------------------------------------------------------------
13

14             BEFORE THE HONORABLE RICHARD A. JONES
                UNITED STATES DISTRICT COURT JUDGE
15

16                      February 16, 2012

17

18    APPEARANCES:

19    For the Plaintiff:        John F. Neupert
                                M. Christie Helmer
20                              MILLER NASH

21    For the Defendant:        Daniel P. Harris
                                Charles P. Moure
22                              Rachel Buker
                                HARRIS & MOURE
23

24

25
```

1        THE CLERK:  We are here in the matter of the

2    Institute of Cetacean Research et al. versus Sea Shepherd

3    Conservation Society, et al. cause number 11-2043,

4    assigned to the court.  If counsel could please rise and

5    make your appearances.

6        MR. NEUPERT:  John Neupert on behalf of the

7    plaintiffs, your Honor.  Seated at counsel table with me

8    is Chris Helmer, also on behalf of the plaintiffs.

9      If I could introduce our guests from Japan

10   representing the plaintiffs here at this time.

11   Ms. Ohmagari is assistant director of ICR.  Seated next to

12   her is Mr. Makoto Ito, the president of Kyodo Sempaku.

13   Seated next to him is Mr. Iwasaki, attorney for

14   plaintiffs, from Japan.  And seated behind him is

15   Mr. Ishikawa, who has been a past cruise leader.

16        THE COURT:  Thank you.  Thank you all for being

17   here this morning.

18        MR. HARRIS:  Good morning, your Honor.  Dan Harris

19   here today on behalf of defendants Sea Shepherd and Paul

20   Watson.  To the right of me is Ms. Rachel Buker,

21   co-counsel; Ms. Susan Hartland, who is the administrative

22   director of Sea Shepherd U.S.A.; Mr. Nicholas Makhani, who

23   is the Sea Shepherd U.S.A. CFO; Ms. Kim McCoy, Sea

24   Shepherd U.S.A.'s legal director.  And standing on the end

25   is my co-counsel, Charles Moure.

1           THE COURT:  Good morning to all of you.  Thank you
2    for being here.
3        Before we begin, I believe a few words with
4    introductory remarks are appropriate to set the tone and
5    give the parties a little more clarity as to how this
6    proceeding will be conducted, and what the court will
7    expect from the parties by way of argument.
8        I will begin this proceeding, first of all, with an
9    admission.  I have spent many years on the bench and I
10   have seen a lot of cases in my career on the bench.  I can
11   tell you I have never seen a case like this.  I can say
12   with a degree of certainty that I doubt few other judges
13   have considered issues like this in their careers as well.
14       I have never considered whether to interfere with
15   activities occurring tens of thousands of miles away on
16   the high seas.  As near as I can tell, no United States
17   court has ever imposed an injunction under the
18   circumstances before me.  The closest scenarios that I
19   have seen, from the few courts who have issued
20   injunctions, were dealing with circumstances to protect
21   salvage operations.
22       There are several factors that make this an extremely
23   complicated case.  I think that listing all of them would
24   probably take most of the morning, and we don't have time
25   to do that, so I am going to focus on just a few of the

1   critical areas.

2        The first is that I am being asked to interpret

3   international law, to see if there are any norms against

4   the Sea Shepherd's conduct that are universally accepted

5   by the civilized nations of the world.  That is the

6   inquiry under the Alien Tort Statute.  And it is no simple

7   matter.  I would note that every time a Court of Appeals

8   seems to address this question, they feel the compunction

9   to write a 100-page opinion.

10       Now, that kind of exhaustive analysis of the law is

11   something that is difficult for any trial court to

12   undertake, and it is especially difficult with the

13   expedited context of a preliminary injunction.  This

14   matter was filed, I believe, on December 22nd, which was

15   really just a matter of a few weeks ago.  So this court

16   has had an aggressive schedule to try and give the parties

17   the opportunity to get the matter before the court and

18   give the parties some answer as to the court's position

19   with respect to the issues presented.

20       The second issue is that the international law that

21   the parties are talking about, specifically international

22   law about free navigation on the open sea and piracy, has

23   never been the subject of a civil case.  So I don't have

24   any help from other courts who have had to consider

25   questions like the ones before me.

1          Moreover, many of the cases the lawyers have cited as

2     helpful are distinguishable in many ways, and prove in

3     some cases to be of little value.  To be honest with you,

4     it would be a stretch to apply some of their analysis to

5     the issues now before me.

6          Third, both parties agree on the criteria this court

7     must consider in granting a preliminary injunction.  Now,

8     two of the criteria require this court to balance the

9     hardships upon the respective parties and to consider the

10    public interest.

11         Now, typically in the application of a preliminary

12    injunction that is a straightforward task.  But it is

13    complicated here because, it seems plain to me, if I grant

14    the injunction that plaintiffs are requesting, then the

15    plaintiffs will, without a doubt, continue to engage in

16    their activity of killing whales.

17         The plaintiffs insist that I am not supposed to

18    consider the legality or illegality of the whaling

19    activities.  In my assessment, I believe it would be

20    inappropriate for me to consider the balance of hardships

21    or the public interest without considering the

22    environmental consequences in this case.

23         Now, it is clear to me that a substantial portion of

24    the world believes it is very much not in the public

25    interest to continue killing whales in the southern ocean.

1    It is also clear to me that the environmental harms like

2    the killing of hundreds of whales are relevant in the

3    balance of hardships.  So please understand in this

4    context I must consider this aspect of the facts.

5        Now, the legal questions I have to consider before I

6    can decide to issue the preliminary injunction are

7    extremely difficult and extremely complicated.  By

8    contrast, the factual issues are not so complicated.  The

9    parties have put together a very comprehensive collection

10   of videos and photographs, which I have seen, and I have

11   reviewed that evidence.  And while the parties have many

12   disputes, I think they agree on what is happening between

13   them in the southern ocean.  I think it is also abundantly

14   clear from the videos that have been presented to this

15   court that there is no question of the activities that are

16   taking place.

17       So with that, I believe I must comment on the factual

18   situation.  I am doing that so the parties don't spend

19   much time in describing the factual background.  Please

20   understand I have read your briefs.  I can give you a word

21   of caution, and perhaps it is a word of advice, it is not

22   in your best interest to restate or read portions of your

23   briefing to the court.  That is of very little value to

24   this court.  I am familiar with the facts of this case, so

25   I am going to ask you to spend your time in perhaps a

1   different and more beneficial way to help educate the

2   court in other areas.

3        Now, it is clear to me what the Sea Shepherd is doing

4   in the southern ocean has the potential to be dangerous to

5   human life.  The southern ocean is a dangerous place in

6   and of itself.  I think everyone agrees that the Sea

7   Shepherd's tactics make it a little more dangerous under

8   the circumstances of what they are engaging in.  I think

9   it is self-evident by the videos presented by the parties.

10        It is apparent to me the Sea Shepherd would prefer

11   that people not get hurt.  I think that is restated over

12   and over again in the declarations and in the videos that

13   have been presented to this court.  Also, there is no

14   evidence that they have ever done anything with the

15   intention of hurting anyone.  I think, again, that is

16   borne out in the videos and declarations.

17        I think the court has to take a practical

18   consideration of the evidence before me.  When you throw

19   or launch glass bottles at a ship with people on deck you

20   put every one of them at risk of injury.  This is

21   particularly so when you use large slingshot-type devices

22   to project bottles, with unpredictable results as to where

23   they will land or if they will cause injury to any other

24   person.

25        This is also true when you launch flares, intended to

 1    start the netting covering the deck on fire.

 2        You put people at risk of injury also when you point

 3    laser beams at the bridge of a vessel.

 4        You put people at risk of injury when you use thick

 5    ropes in an attempt to disable the rudder or propeller of

 6    a ship.  You put people at risk of injury because they

 7    will be unable to maneuver through storms and through ice

 8    flows.  One of the videos specifically shows a large

 9    iceberg or large ice chunks in the ocean.  I think it is

10    self-evident the potential harm that could cause if the

11    ship was unable to maneuver through that.

12        Also, when you pilot your boats too close to the

13    whaling boats there is a serious risk of injury, a lesson

14    I think that is abundantly clear from the collision with

15    the Ady Gil two seasons ago.

16        Now, to be honest, what the Sea Shepherd is doing, it

17    appears to me, some of it is closer to what I would

18    characterize as petty vandalism.  I am talking now about

19    the paint bomb attacks and the smoke bombs.  Most of what

20    they are doing does put people at risk of injury in that

21    ocean area.

22        Now, having said all that, no one has been hurt so

23    far, even after seven or eight seasons in this conflict.

24    Now, whether that is because the Sea Shepherd's efforts to

25    avoid injury have proven to be true, that they are careful

1  in trying to avoid injury, or just plain luck, or a

2  combination of the two, I can't say for certain.  I can

3  only say that the plaintiffs have failed to show or

4  provide any specific evidence of a personal injury to

5  anyone.  That doesn't mean that I shouldn't issue an

6  injunction, it is just an observation by the court at this

7  point in time.

8      I am going to open this up to oral argument.  I will

9  have plaintiffs go first, since they are the parties

10  asking for the extraordinary relief.

11      Now, I am going to give you a few areas to steer clear

12  of.  Again, I am going to give you some tentative rulings

13  in that regard that will help you in the argument.

14      First, I don't need to hear any more about subject

15  matter jurisdiction.  It is pretty clear to the court that

16  I do have subject matter jurisdiction under the Alien Tort

17  Statute and admiralty jurisdiction as well.  That does not

18  mean the plaintiffs have a case, it just means that I have

19  jurisdiction to decide whether or not they have a case.

20      Second, I don't need to hear any more about the First

21  Amendment.  Even if this case were being conducted because

22  of activities in the Puget Sound area, as opposed to the

23  southern ocean, it is clear to me that the First Amendment

24  does not give the Sea Shepherd the right to throw things

25  at ships or interfere with their navigation.  I don't need

1    to hear any more of that argument.

2        Other than those restrictions, I will leave it to the

3    parties to pursue the type of argument that you would like

4    to engage in.

5        Also, I am going to put a time restriction on your

6    argument before this court.  I suspect the parties could

7    go on all morning, all afternoon, and continue through the

8    balance of the week.  That is not going to take place.

9    You have an hour to make your arguments.  Your time will

10   be recorded by the in-court deputy.  If at any point in

11   time you would like to inquire of what is left or what is

12   available, please ask permission from the court to

13   inquire, and I will give you the chance to do so.

14       Again, counsel, a strong word of caution:  I have read

15   your briefs.  I have looked over your briefs a few times

16   as a matter of fact.  And while I would like to hear the

17   parties make aggressive and strong advocacy on behalf of

18   their clients, again, I don't need to hear you read your

19   briefs.  This is a complicated case.  I need you to help

20   me understand your case in a different way.  So please

21   keep those thoughts in mind.

22       Counsel for the plaintiff, I have given you the

23   court's preliminary thoughts.  I have also indicated that

24   you have the opportunity to go first.  So with those

25   thoughts, you may begin.

1      Counsel, I will have some questions.  If they do fit

2  in the flow of your argument -- I will let you proceed

3  with your argument, but I may interrupt you and I may have

4  some questions at the conclusion of your argument.

5      Counsel, please proceed.

6          MR. NEUPERT:  Thank you, your Honor.  I appreciate

7  the court's introductory remarks and clarification on

8  issues that you don't need to have us address this

9  morning.

10     With respect to the three areas you identified as

11  creating some difficulty to the court, let me begin with

12  the last one.  Perhaps I should conclude with that, but

13  let me begin with it, because I think it is very

14  important.

15     The balance of hardships.  You indicated that you

16  thought it appropriate to take into account an

17  environmental considerations as to whether or not to grant

18  an injunction.

19     I think it is important to recognize that the taking

20  of whales is going to continue, whether or not this court

21  issues an injunction.  So the court's grant or denial of

22  an injunction will not have any effect on the activities

23  of the plaintiffs with respect to what's permitted under

24  international law.

25     What the denial of an injunction will do will continue

1    to put seamen at risk of serious injury.  That's what

2    should be considered in the balance of hardships.  This

3    case is not about economic interests, this case is not

4    about whaling interests, this case is about one thing

5    only, and that is safety at sea.

6        I have some videos that I was going to display, and I

7    may during the course of the argument, but I think it is

8    important to keep the focus of what plaintiffs' case is

9    all about.  The focus is protecting people at sea, people,

10   as you already have recognized, by going to the southern

11   ocean have put themselves in harm's way in some respect.

12   But defendants have no right to increase the risk of harm.

13       I will display one video.  This is what has happened.

14           THE COURT:  Counsel, if you are going to show a

15   video, it would be beneficial to identify it by exhibit.

16           MR. NEUPERT:  This is, your Honor, Docket Number

17   72, Exhibit 2.  This is events which occurred on

18   January 12 or 11, I believe, on the high seas, to the

19   Shonan Maru.  Focus on the seamen in the front.  They are

20   throwing bottles.

21       As you see the progression of the bottles, the person

22   throwing them throws them lower, throws them higher,

23   throws them higher yet still, and the last one, but for

24   the crewman having ducked, could have hit him in the head.

25       Now, they say they have no intent to injure, but you

1   cannot watch that sequence of video and conclude that the

2   person throwing the bottle was not trying to hit the

3   person who was on the bow of the ship.

4       That's Seaman Abe.  There is no reason why Seaman Abe

5   should be put at risk of having his head hit by a bottle

6   flung by the defendant.  So when you consider the balance

7   of hardships, consider Seaman Abe, because he is the one

8   being put at risk.

9       Yes, the defendants protest the taking of whales.  And

10  you have indicated that you need to give some

11  consideration to that factor.  I guess I don't understand

12  how the court can balance that issue against human safety,

13  because it is human safety that has always been put at the

14  top of the law's desire to provide protection.  And that

15  is what we are seeking here.

16      So when you consider the public interest, I would ask

17  the court to focus on what is at stake, and that is the

18  safety and the security of over a hundred people on the

19  high seas.  Those people are going to continue their

20  operations until the end of the season, regardless of what

21  this court does.  They should be able to continue their

22  operations free from the risk of harm.  That's the reason

23  we are here.

24      There are other places that are going to consider the

25  legal issue of whaling.  From reading the materials, you

1    are aware of the International Court of Justice case which

2    is pending.  The outcome of that case is far beyond the

3    scope of this proceeding to predict or even consider,

4    because those pleadings are not even public.

5        The issue in this case is not whether or not whaling

6    is legal or not.  We cited the one case which stands for

7    the proposition that this court cannot consider the

8    validity of a sovereign act of Japan, having issued a

9    special permit in Japan.  So it is assumed for purposes of

10    this proceeding that what is happening is valid, legal and

11    authorized.  There is a legal way to challenge that.

12        Just because timber protesters protest clear-cutting,

13    and may challenge the right of a logging company to

14    clear-cut, doesn't give the timber protesters the right to

15    spike the trees.  Courts in those contexts consider the

16    environmental factors, but what always comes out ahead is

17    the protection of human safety.

18        The same is true in all the other contexts in which

19    violence has been used to protest things that people have

20    strong beliefs about, whether it be the abortion

21    protesters, whether it be war protesters, whether it be

22    civil rights protesters.  In all of those circumstances,

23    no matter what is in the balance, what always comes out in

24    the end is protection of human safety.

25        Now, protection of human safety can be done here

1   consistent with the defendants' rights to engage in

2   legitimate protest activities.

3       So in fashioning injunctive relief, what the court can

4   do is consider the defendants' desire to protest and the

5   plaintiffs' desire to protect human life and property.

6       What we have proposed by way of injunctive relief is

7   the 800-meter perimeter.  That perimeter will allow the

8   defendants to film activities, to observe activities.

9   They can use that film for whatever publicity they seek to

10  bring to the question.  They can engage in legitimate

11  protest activities from a distance.  That will insure the

12  safety not only of the plaintiffs' crew, but will insure

13  the safety of the defendants' people.

14      Mr. Watson's desire to interfere with the operations

15  of plaintiffs has put his own people at risk on the high

16  seas.  That is his choice.  That is those people's choice.

17  But an injunction in this case, which would protect human

18  life at sea, can be granted consistent with the

19  defendants' lawful rights to observe, protest and

20  whatever.

21      In balancing the hardships, I think there is an easy

22  path for the court to balance the hardships in a manner

23  that is required by law, permitted by law, but still grant

24  the plaintiffs the relief that is necessary.  It would be

25  very unfortunate if we left this courtroom today and

1   somebody be injured tomorrow.  These activities, as I say,

2   are going to continue, but they need to be continued in a

3   way that assures that people do not suffer as a

4   consequence.

5        THE COURT:  Let me ask you a question, counsel, at

6   this point that I think it is appropriate.  What do you

7   envision by way of enforcement?  In other words, if the

8   court were to grant your request and impose an 800-meter

9   restriction, and I am assuming that the defendants in this

10  case would continue in their activities and violate that

11  order, what does enforcement look like for you down the

12  road, in terms of what you would expect this court to do?

13       MR. NEUPERT:  First, I would hope that the

14  defendants would abide this court's injunction.  The rule

15  of law must mean something.  But if the defendants choose

16  to disregard this court's order, given the fact that

17  defendants are residents of the state of Washington, they

18  have assets in the state of Washington, they have

19  personnel in the state of Washington, the court's powers

20  of contempt could be applied against those assets, could

21  be applied against the individuals here at counsel table.

22     There is a way, depending on the nature of the

23  violation, how serious it is, how repetitive it is, all of

24  the facts and circumstances --  The reason this case is

25  here is because the defendants are here.  The defendants

1  have raised millions of dollars, and continue to raise

2  dollars to support their activities.  This court's

3  injunctive power and contempt power can affect those

4  operations.  I suspect that if the defendants were to

5  deliberately and flagrantly violate this court's order

6  that the donations of people would soon dry up.

7      This is a 501(c)(3) organization.  There are

8  restrictions on their ability to engage in activities.

9  Disregard of a court order, I'm sure, would have some

10  impact on their 501(c)(3) charter, would have an impact on

11  their ability to raise money.  And so I think there are

12  serious consequences that can be imposed on the defendants

13  and their assets if they were to violate the court order.

14          THE COURT:  Counsel, that tees us into a different

15  area.  What is your proof that the Sea Shepherd, a United

16  States corporation, is actually responsible for the

17  activity that is happening in the southern ocean?  In

18  other words, you have a lot of allegations about funding,

19  but do you have any proof that money donated to the United

20  States Sea Shepherd entity is being used to support what

21  is happening in the southern ocean?  Aren't there Sea

22  Shepherd entities around the planet?

23          MR. NEUPERT:  There are, your Honor.  At least

24  that's what defendants have asserted.  We have not put

25  into this record the financial statement of Sea Shepherd

1   Australia, which they contend is one of the operations at

2   play here.  I can tell the court, having seen the

3   financial statements of Sea Shepherd Australia, which we

4   secured from a public agency in Australia, Sea Shepherd

5   Australia does not have any assets of any significant

6   respect.  I think they showed on their balance sheet

7   something less than 6,000 or $60,000 in assets.

8       In the record, and I may not be able to find it at my

9   fingertips, I have put in a declaration, in which we

10  attached to that declaration a number of financial

11  statements -- excuse me, tax returns from public records

12  that we secured.  Those tax returns show that Sea Shepherd

13  Seattle, I will call it, is the funding arm of the

14  activities.

15      In our brief --  Let me see if I can find it quickly.

16  I will look for it in a second, your Honor.  But in my

17  declaration we put into the record tax returns filed, I

18  think, as late as October of 2011, in which those tax

19  returns itemized for the IRS the use of the millions of

20  dollars raised by the Sea Shepherd.

21      The statements in those returns are to the effect that

22  they have spent over $6 million in their southern ocean

23  operations using what are described as "our ships."  The

24  ships identified as "our ships" are the three ships that

25  have been at issue in the prior campaign, and that are at

1    issue in this campaign.

2        So in terms of a direct connection between Sea

3    Shepherd Washington and the activities in the southern

4    ocean is the declarations of the defendant themselves,

5    that say the $6 million that they raise from tax-free

6    donations have been used to fund the southern ocean

7    operations, including "our ships."  And they also take

8    depreciation under U.S. tax laws on those same ships.

9            THE COURT:  It is a minor point, counsel, but some

10   of those ships almost look --  They look fairly exotic.

11   Just the purchase of some of those ships I see could have

12   cost a substantial amount of money without funding

13   specific activities.  Is there a distinction between the

14   two?  It is not a major issue, but how do you distinguish

15   between purchasing vessels and directing activities?

16           MR. NEUPERT:  Mr. Watson, we must remember, is a

17   defendant.  Mr. Watson is the president of Sea Shepherd

18   Washington.  He is in the southern ocean, as we speak.  He

19   is the person who you have seen on the various videos

20   directing the activities of crew and other people in the

21   southern ocean.

22       We put in videos from the Whale Wars in which

23   Mr. Watson is sitting in his room on the Steve Irwin

24   talking to the other captains and the other crew members,

25   trying to orchestrate how they are going to interfere

1   with -- the navigation of the Bob Barker, so Bob Barker

2   can escape the trailing ship.  You can see Paul Watson

3   saying:  "That's a good plan.  Let's do that.  Let's get

4   more boats out there.  Where is this other dingy?  Why

5   isn't that dingy out there with its ropes trying to foul

6   the props and rudders of the ship?"

7        So there is no question on this record, as a

8   preliminary matter anyway, that Mr. Watson directs the

9   activities on the southern ocean, that Sea Shepherd

10  Washington funds those operations, and that the ships

11  which are owned -- at least as declared on the tax

12  records, are owned by Sea Shepherd Washington, are the

13  vehicles for achieving the interference which puts people

14  at risk.

15            THE COURT:  Thank you, counsel.  Please continue.

16            MR. NEUPERT:  I was talking about the balance of

17  hardships.  I think I have covered that point, unless the

18  court has other questions in that regard.

19       Working back up the order that you provided as issues,

20  which is the juror being required or asked to interpret

21  international law of freedom of navigation and piracy, and

22  that those matters have never been the subject of a civil

23  case, and that many of our cases are distinguishable.

24       I guess let me begin addressing that matter.  Let me

25  do it this way:  You said at the outset that you have

1  admiralty jurisdiction, which you do.  Admiralty

2  jurisdiction is centuries old.  One of the fundamental

3  principles of admiralty jurisdiction is dealing with the

4  consequences of collisions.  There are rules and

5  regulations that have been adopted over those many

6  centuries with respect to freedom of navigation on the

7  high seas and the duty -- the absolute duty to avoid the

8  risk of collision.

9      So whether this court were going to be called on to

10  interpret the COLREGS, or the High Seas Convention, or any

11  of the other treaties which we have cited, the court need

12  not go that far.  The court could issue an injunction in

13  this case at this time simply on the premise that the

14  fundamental law of the sea, as recognized for hundreds of

15  years, is that there is a duty to avoid collision.  And

16  that duty means you must navigate your vessel and not put

17  the other vessel at risk.

18      And if that were the scope of the court's injunction,

19  and the 800 meters -- make it 800 meters, make it some

20  other distance, that would prevent them from being able to

21  launch the projectiles that you have seen them launch with

22  their devices.

23      Now, we have never had to deal with whether they can

24  launch them from 800 meters or 400 meters or 200 meters,

25  but my suspicion is that a distance of 800 meters would

1  assure not only freedom from risk of collision but it

2  would erase any ability to launch glass projectiles

3  against the ship and crew.

4      So if you look at just the simple law of the sea, the

5  absolute, unmistakable century's old duty to avoid

6  collision, this court could base its injunction on that

7  simple legal principle.

8          THE COURT:  Why wouldn't damages be the remedy, as

9  opposed to injunctive relief?

10          MR. NEUPERT:  Well, damages may be a remedy for

11  paint damage to a ship, having to repaint it.  But damages

12  is not a remedy for losing propulsion on the high seas

13  when there are icebergs on the horizon.  That is the most

14  serious -- that is one of the most serious risks.

15      We have put in the record pictures of the propeller

16  intertwined with wire ropes.  So far a ship has not

17  permanently lost propulsion and navigation, but Captain

18  Miller's declaration has pointed out should a ship in

19  those waters lose propulsion and navigation, because they

20  are so distant from ocean-going tug assistance, the ship

21  would be basically at mercy on the high seas for several

22  days.

23      Given that weather can change dramatically in that

24  part of the world, that in and of itself puts the ship at

25  serious risk of injury, along with everybody aboard.  That

1   is not the nature of an injury that is compensable by a

2   monetary award.

3       While we have not cited any case that says the court

4   exercising admiralty jurisdiction can enter injunctions to

5   avoid the risk of future collisions, what we have put in,

6   and I don't think it is seriously disputed, is that a

7   fundamental principle of admiralty law is the duty to

8   avoid collision.

9       Well, it is not too far of a stretch or leap to say if

10  there is a duty to avoid collision, and the defendants

11  have engaged in a repeated pattern of risking collision,

12  that a proper remedy to enforce the legal obligation to

13  avoid the risk of collision is to avoid risk of collision,

14  and to conduct yourselves accordingly.

15      Because the defendants in this case have proven that

16  they will continue to resist all means by which we have

17  been able to keep them at bay, an 800-meter safety

18  perimeter is the way to do it.

19      Given that, Captain Miller, who has over 40 years of

20  experience in this area, says that is something that is

21  appropriate under these circumstances.

22      Going back to what is an undisputable, if you will,

23  legal basis to grant injunctive relief, I would submit

24  that one of them, very simple, centuries old duty to avoid

25  collision.

1       Now, if you want to go a step beyond that, we have

2   cited to the court several treaties, all of which have

3   within them -- the COLREGS explicitly, the others

4   implicitly, all of them have within them the same

5   fundamental obligation, which is, ships have the right of

6   free and safe passage on the high seas, with certain

7   exceptions.  The certain exceptions are primarily

8   exceptions granted in favor of warships, not private

9   militiamen.

10      International law has recognized what has been

11  admiralty law forever.  International law has codified

12  what is recognized admiralty law in the various treaties

13  and conventions that we have cited.  Like I say, all of

14  them have, either explicitly or implicitly, this

15  fundamental obligation to abide free and safe navigation

16  on the high seas.  Unless you are a warship, and then you

17  have grounds as a warship to intercept another vessel.

18      The defendants are not warships, nor do they have

19  rights of state, despite their citation to the UN World

20  Charter and so forth.

21      So admiralty, duty to avoid collision, is a basis for

22  the injunctive relief.  That doesn't really, I don't

23  think, require much interpretation of international law.

24      Piracy, that is something that is presented by the

25  papers, and is new and different.  The criminal cases

1   which the parties have cited are cited because there is no

2   other law to cite.  U.S. law criminalizes piracy against

3   The Law of Nations.  Because Congress has incorporated The

4   Law of Nations as the definition of piracy, that brings in

5   The Law of Nations.  And over the last 100 or 200 years

6   courts haven't had much obligation or responsibility for

7   interpreting what is piracy.

8       With the Somalia situation, that has now been brought

9   front and center, and the courts are dealing with it.  And

10  the courts deal with these issues as common law courts

11  have from the beginning.

12      You have the 1820 decision of the U.S. Supreme Court,

13  the Smith decision, in which the court went on about what

14  was piracy then.  Courts have not been called upon, as the

15  two Virginia judges noted, since then.

16      But the two Virginia judges in the cases cited, one

17  ruled that conduct, which we have pleaded and demonstrated

18  in this case, constitutes piracy against The Law of

19  Nations.  The other court said, no, you have to have

20  robbery in order to have piracy.  And now that issue is on

21  appeal.

22      What is different in our case from the two Virginia

23  cases is that in our case the defendants have actually

24  physically boarded the ship.  In January, as we put into

25  the record, the Steve Irwin facilitated three people from

1    Australia boarding the Shonan Maru No. 2 in an effort to

2    have the Shonan Maru No. 2 have to turn back to Australia

3    to put those people ashore.  That was intended solely for

4    the purpose of affecting the navigation of the Shonan Maru

5    No. 2, so the Shonan Maru No. 2 could no longer follow the

6    ship, and they could escape their tail, and then go find

7    the Nisshan Maru, which is what their objective is.

8        So you have a physical boarding in this situation.

9    You didn't have that in the two cases in Virginia.

10       And we put into the record, and I could show the

11   court, if you like, where just within the last month they

12   have attempted to attach physical devices to the Shonan

13   Maru No. 2 in an effort to affect the navigation of the

14   vessel.

15       These were what they call Shepherd's crooks, with long

16   wire ropes that tail from the --  They hook it on to the

17   rail, and it tails behind the ship, and they hope when the

18   ship turns those will get in the rudder or propeller.

19       And so we have physical attachment, if you will, to

20   the vessel.  We have physical boarding of the vessel.  And

21   while there may not be an intent to rob, there certainly

22   is an intent to affect the navigation of the ship.  That

23   is piracy.  That is modern day piracy.

24       While there is not a lot of precedent to guide the

25   court, there are these two decisions from Virginia which

1    go into the history of all of this in great depth.   The

2    Hasan case applied the treaty to conclude this was modern

3    day piracy.

4           THE COURT:   Counsel, if you had to compare the

5    activities -- the two Virginia cases to the activities in

6    this case, don't we find ourselves in a remarkably

7    different set of factual circumstances, compared to the

8    degree of activity, force and violence, compared to what

9    was done in this particular case?

10          MR. NEUPERT:   In a manner of degree, yes.   But it

11   is not matters of degree that are important.   It is

12   whether or not you have fundamental, underlying facts

13   which satisfy the elements, if you will, of the tort of

14   piracy.   The elements, as stated in the convention, are

15   illegal acts of violence, detention, or any act of

16   depredation committed for private ends by the crew or the

17   passengers of a private ship.

18      We have acts of detention.   We have acts of violence.

19   We have acts of depredation, which may differ as a matter

20   of degree from shooting an AK 47.   But when you launch,

21   with a high speed launcher, bottles at the heads of

22   crewmen, while you approach them violently with a fast

23   ship, that is akin to what the Somali pirates do in their

24   waters.   Some the acts of violence, detention or

25   depredation are present in this case.

1          THE COURT:  Counsel, don't you see a remarkable

2    difference between someone approaching you with an AK 47

3    and someone throwing beer bottles with butyric acid?

4          MR. NEUPERT:  Yes.  It is a matter of degree.

5    Does it satisfy the underlying act of violence?  Yes, it

6    does.

7       I grant the court that there is a difference.  Is it a

8    difference of a sufficient kind to make a legal

9    difference?  I would argue that it is not.  Because what

10   the law of piracy is intended to do is to protect ships in

11   navigation on the high seas from having their navigation

12   interfered with by violence, whatever kind of violence may

13   be necessary under the circumstances, for private

14   purposes.  One of the arguments the defendants have made

15   in response to the motion for preliminary injunction is

16   that if you enjoin us we won't be able to raise money.

17       Well, what private end --  I mean, that satisfies the

18   proof of the private end if you need proof further than

19   the private end of trying to interfere with the navigation

20   of the ship.  But the proof of the private end, one of the

21   elements of the treaties and conventions, is present in

22   this case in spades.  And that is, they engage in this

23   conduct, interfere with the operations, to achieve their

24   private goal of ending the taking of whales.  They engage

25   in this conduct for the private end of raising millions of

```
1   dollars so they can go out and buy more ships and carry on
2   more campaigns, whether it be a campaign against whales, a
3   campaign against dolphins, a campaign against any sort of
4   activity they dislike.
5       The elements of the tort, the elements of a violation
6   of what dozens of countries have defined as piracy, are
7   present in this case.
8       I can't argue that --  These aren't AK 47s.  I can't
9   argue that they don't do this with the intent of taking
10  over the vessel and going off like a privateer in the old
11  days.  But they do engage in this conduct with the intent
12  of interfering with the navigation of a vessel on the high
13  seas who has the absolute right to engage in navigation
14  free of the risk of people boarding them at night.
15      When you have people approaching your ship at high
16  speed, with weapons, you don't know what is going to
17  happen.  That's one of the reasons why we have this law of
18  piracy.
19      And, yes, there is butyric acid in one bottle.  What's
20  in the next bottle?  There is no guarantee these
21  defendants in order to achieve their objectives won't
22  ratchet up the risk of harm to the plaintiffs.
23      So Seaman Abe, who is on the bow of the ship doing his
24  job, he doesn't know what is in that bottle.  He shouldn't
25  have to worry about what is in that bottle, your Honor,
```

1    because the defendants have absolutely no right to throw

2    it.  And that's the issue here, do they have a right to

3    engage in violence?  Will the rule of violence trump the

4    rule of law?  And it should not.

5        So we have the right of free navigation, the right to

6    be free from piracy.

7        Let me just say, while we haven't gone to great

8    lengths to explicate our state law claims, I believe that

9    at trial we would be entitled to the same

10   relief, permanent injunctive relief, and preliminary

11   injunctive relief for that matter, under basic state law

12   that says you cannot in the state of Washington raise

13   money, engage in planning to commit torts against vessels

14   on the high sea.

15       Clearly they couldn't do it to commit a tort in Puget

16   Sound.  Clearly they couldn't do it to commit a tort three

17   or 12 miles off the state of Washington.  Is it really any

18   different if they do it 5,000 miles from here?

19       The state law of Washington is that people in

20   Washington must abide Washington law, and Washington law

21   does not permit people to engage in assaults, batteries or

22   trespass, or to conspire to commit assaults, batteries or

23   trespass.  And that is pleaded in our case, because all of

24   those elements are in the complaint.  And Washington State

25   law would permit this court to grant the same injunctive

1    relief.

2        If this was an abortion protest case, they wouldn't be

3    entitled to engage in the physical conduct -- in the

4    physical contact in order to prevent an abortion protester

5    from visiting an abortion clinic.  They can't do that

6    against a seaman who is just doing his job on a ship,

7    wherever that ship is.  They can't use the state of

8    Washington as a haven for launching violence on the high

9    seas.  That is the basic predicate of the state law claim.

10   It is a basic predicate basically of all the claims, but

11   it is one that is connected to the state of Washington.

12       Going to the question of the Alien Tort Statute, you

13   indicated you do have jurisdiction under the Alien Tort

14   Statute.  I grant you that every -- it seems like every

15   judge that has to address the Alien Tort Statute does have

16   to a write a 100-page opinion.  At least the appellate

17   courts do.  But they have disinterest, and that's why they

18   get to be 100 pages.

19       The Alien Tort Statute is evolving.  It does allow the

20   court the right to enforce what is internationally

21   accepted norms, provided they have a sufficiently detailed

22   obligation associated with it.  I think that we have, at

23   least on the freedom of navigation and the piracy claims,

24   established that there is a well accepted body of

25   international law -- customary international law that

1    recognizes that individuals cannot do the things that

2    these individuals are doing.

3        Like I said a little bit earlier, under the law of

4    admiralty, I think this court could clearly grant the

5    injunctive relief that we are asking in this case.  That

6    being:  Please, just avoid the risk of collision.  Please

7    don't put our crew at risk.  Film us all you want.  Take

8    your helicopter from the Steve Irwin, or the Bob Barker,

9    do your flyovers, film whatever you want, use the film for

10   whatever you want to use it for, but don't put people at

11   risk.  It is just not acceptable.

12       I think I have addressed the court's questions so far.

13   If there are other questions, I would be happy to address

14   those.

15           THE COURT:  I do have a few other questions,

16   counsel, if you have finished your presentation.

17           MR. NEUPERT:  I have finished my presentation.

18           THE COURT:  Let me ask you a few questions,

19   counsel.  I have identified that balancing hardships as an

20   issue for this court.  If the purpose of the Institute of

21   Cetacean Research is truly research, why have I not seen

22   any documented evidence of how defendants' activities are

23   interfering or disrupting your ability to conduct

24   research?

25           MR. NEUPERT:  Well, the objective of the

1  injunction, your Honor, is to protect property and life.

2  That is the objective.  We didn't bring this case under a

3  theory of, if you want, tortious interference with

4  business opportunity.  We could have easily pleaded a case

5  of tortious interference with business opportunity.  We

6  have the opportunity to engage in legal research -- or

7  research on the high seas, you are interfering with that.

8  That is not the predicate of the case.  You haven't seen

9  any evidence from us on that subject because that is not

10  the predicate of the case.  The predicate of the case is

11  we have crew and passengers who are put at daily risk of

12  serious harm that must stop.  That's what is at risk.  We

13  have put ample evidence of that before you.

14     So I don't think this scientific research is --  In

15  our view it is a red herring.  They would like to turn

16  this case into a case about the validity of the permit,

17  about the validity and value of scientific research on

18  whales.  But the court should not wade into that quagmire

19  in a situation in which the court is being asked to do one

20  thing, and one thing only, and that is to protect property

21  and life.

22     The balance that one strikes in property and life at

23  risk cases are usually the First Amendment, or a

24  constitutional right.  In those cases, as you noted from

25  the outset, the balance is easily struck.  The First

1  Amendment is highly valued and highly protected.

2      But even when there is an established, fundamental

3  constitutional right at issue, courts never say in the

4  name of freedom of speech you can put human life at risk.

5  There is no case that has been cited to this court, and

6  there is no case which could be cited to this court, that

7  says because I strongly believe in something, and because

8  I believe I have a right to make my belief known to the

9  world, that I can use violence in order to persuade

10  everybody that my belief is better than your belief.

11      Even in those situations where recognized

12  constitutional rights are at stake, courts always find the

13  balance of hardship tips in favor of human life and

14  property.  That's why I think the balance is fairly easily

15  struck in this case.

16          THE COURT:  Counsel, I'm not sure if you are

17  prepared to answer this question.  Are any of your whaling

18  activities this year taking place in the Australian

19  whaling sanctuary?

20          MR. NEUPERT:  I can't answer that factually.  I

21  would suspect --  Let's assume that it did.  I can't say

22  that it did, and I am not saying that it did.  Because

23  these ships move, and I have not gone to the trouble of

24  trying to figure out where the Nisshan Maru is or has

25  been.  So I can't answer the court's question.  We can get

1   an answer to the court's question if the court believes it

2   is necessary.

3          THE COURT:  Counsel, here is where I'm going:  It

4   appears to the court, from what has been submitted, that

5   the Australian federal court has issued an injunction

6   against your clients from hunting whales in the Australian

7   whale sanctuary.  It does not appear that they are abiding

8   by that injunction, perhaps, by what you have represented

9   to the court.

10     So my question to you is, why should your clients be

11  able to ask a different court for an injunction that helps

12  them in light of a decision of that type?  Again, I am

13  getting into the balancing of the equities in this case

14  and the unclean hands argument.

15         MR. NEUPERT:  I understand the court's question.

16  I guess my first comment is, that order from the federal

17  court in Australia was an order taken by way of default.

18  The issue presented by that case, as to whether or not

19  Australia law was applicable under the circumstances, was

20  answered by that court in the positive, but without the

21  benefit of actual litigation of the issue.  Kyodo Sempaku,

22  who was the defendant in that case, did not appear.

23         THE COURT:  That was a voluntary choice?

24         MR. NEUPERT:  A voluntary choice, yes.  Under well

25  established principles of collateral estoppel, a judgment

1    from the court, taken by way of default, does not have any

2    claim or issue preclusive effect because the issue was not

3    actually litigated.  So while there is that decision, as a

4    matter of U.S. law, in terms of applying well established

5    principles of issue and claim preclusion, the judgment by

6    default is for all intents and purposes a legal nullity.

7    So that is point number one.

8        Point number two is, even if that issue were to be

9    present in this case, and I submit that it is not,

10   Australia domestic law is not at issue.  The question is

11   international law, the right of people and property to be

12   free of the risk of harm.  That issue was not present in

13   the Australian case.

14       There has been no law cited to this court which would

15   suggest that, even in Australia, if this sort of action

16   was brought, whether -- an Australian judge would say,

17   well, this may be the Australian whale sanctuary, but I am

18   not going to let you throw bottles at people's heads just

19   because you don't like what they are doing.

20       If the prosecuting people in Australia want to enforce

21   their domestic law, they can do that.

22       But the principal response to the court's question is

23   twofold:  There is no issue or claim preclusion by reason

24   of that judgment.  This is about human safety, free

25   passage at sea, not whether or not there is a right to

1    take whales, whether it be in the southern ocean or the

2    southern ocean sanctuary, or any other place.

3        Again, the defendants would like to turn this case

4    into a whaling case.  The way the case is presented to the

5    court, it is not a whaling case.  It is a case about

6    people not being put in harm's way.

7            THE COURT:  Let me ask you another question,

8    counsel.  Preliminary injunctions usually involve some

9    urgency to address the issue.  Now, it appears to this

10   court that there has actually been many years since there

11   has been any specific application to any court for

12   specific intervention or relief, and certainly for

13   injunctive relief.  Now, if you truly believe that

14   irreparable harm was going to take place, doesn't it seem

15   logical that the pursuit of the type of relief that you

16   are seeking from this court would have occurred sooner?

17   From what I have seen from the documentation and the

18   videos presented to this court, while the vessels may have

19   improved in quality, to look closer to the James Bond or

20   Jules Verne type vessel, to disrupt the activities, it

21   appears that there has been a fair amount of consistency

22   to the activities which have been the same type of

23   throwing of beer bottles with acid, the flour projections,

24   the laser lights.  Some of the activities seems to be

25   fairly consistent, counsel.  Why should the court treat

1    this with the --  I am mostly talking about the

2    irreparable harm and the urgency component, counsel.

3              MR. NEUPERT:  Let me show you this, your Honor.

4              THE COURT:  Tell me what you are showing me,

5    counsel, by way of an exhibit.

6              MR. NEUPERT:  This is Docket Number 14,

7    Exhibit 132, your Honor.

8         Let me finish with this, your Honor.  This is from

9    Docket 38, Exhibit 18.  This is from the perspective of

10   Gojira, which is one of the defendants' vessels, now the

11   Bridget Bardot.  We can't edit this stuff out from the

12   Whale Wars.

13        "That's what you get for trying to run us over."  That

14   ship placed itself in front of the Nisshan Maru

15   intentionally so that it could launch flares against the

16   netting in order to burn a hole to make it possible for

17   the next flare to come through the hole.  That is

18   intentional conduct that puts a ship at sea at very high

19   risk of fire or explosion.

20        In the past we have not sought injunctive relief.  In

21   the past we have tried other avenues to address the

22   situation.  As the supplemental Ito declaration

23   establishes, it was with great reluctance that the

24   plaintiffs came into the U.S. courtroom in order to try to

25   secure some relief that puts their crew and ships at harm.

1    The statement by the Sea Shepherd person that, "We

2  need to flare them up, let's have a little barbecue," that

3  attitude, your Honor, is what puts people at risk of

4  serious injury.  At some point a person confronted with

5  this kind of conduct on a repetitive basis says enough is

6  enough.

7    And while the plaintiffs have tried other avenues to

8  obtain the relief that is necessary under these

9  circumstances, those other avenues were exhausted this

10  fall, as the supplemental Ito declaration demonstrates.

11    In the last season the defendants were successful in

12  driving the defendants (sic) off the southern ocean

13  because of the substantial risk of harm that the crew was

14  being put to.

15    This season, after the diplomatic efforts were

16  exhausted, they chose the only path open to them, which is

17  to sue the defendants where they are, where they have

18  assets and people at risk, to try to get what should be a

19  fundamental right recognized, that you don't put people in

20  harm's way over a strongly-held belief.

21    That fundamental premise exists in all of these

22  treaties and conventions.  It exists in all of the law

23  that has been cited to this court.  It is the court's

24  obligation and duty is to protect human life and property,

25  balancing what is in the balance.

1    But when what's in the balance is a claim of unlawful

2    whaling, not any establishment of unlawful whaling, but

3    when it is just a claim of unlawful whaling, that claim

4    has little in its favor, when on the other side of the

5    scale is human life and property.

6         THE COURT:  Counsel, you continue to present that

7    point to the court.  As I go through the documentation

8    that has been provided regarding the concern for potential

9    injury, there have been some broad claims of injury, broad

10   representations of harm to crew.  If you claim that you

11   have crew members who have been injured by Sea Shepherd

12   tactics, then this court has not seen a single picture of

13   an injury or medical record of any specific injury to any

14   crew member.  Can you explain why, counsel?

15        MR. NEUPERT:  Let me just see if I can do this,

16   your Honor.  This is in the record.  That is crewman

17   Kumung (phonetic).

18        THE COURT:  Exhibit, counsel?

19        MR. NEUPERT:  Docket 45, Exhibit 3.  This is

20   another picture of the same person.  This is after a

21   butyric acid bottle was thrown.  That is in the record.

22   We have not put more in the record because, frankly, is

23   this really down to how many people have been injured, how

24   seriously have they been injured, or is this about trying

25   to prevent a serious future injury?

1      The incendiary device establishes without a doubt that

2  there is a serious risk of serious harm to the plaintiffs

3  and their ships.

4      Butyric acid, again, is it harmful?  We haven't

5  conducted discovery as to what the concentration levels

6  they use are and so forth.  Can I tell you that we have

7  dozens of injured crewmen?  No, I can't tell you that.

8  But that should not matter, your Honor.  That should not

9  matter one whit.

10      What is at issue is whether or not future conduct is

11  going to be allowed to occur that does put people at

12  serious risk.  You noted at the outset, using glass

13  projectiles with high powered launchers --  The only

14  reason you would use glass is because it will break.  And

15  when it breaks, all kinds of bad things happen, or can

16  happen.  Whether a crewman gets hit in the head with a

17  bottle because he didn't see it coming or he didn't duck

18  fast enough, or whether the next bottle has too much

19  butyric acid in it, too high of a concentration and it

20  gets in somebody's eyes, that's what we are trying to

21  prevent, something happening in the future.  We are not

22  here for damages for something that happened in the past.

23  We are here to try to prevent somebody from getting hurt.

24  That's all we ask.

25              THE COURT:  Okay.  Two more questions, counsel.

1    One is, piracy is supposed to be one of the well

2    established norms of international law.  And we have

3    already addressed this to some extent.  But do you have

4    any example of any court actually issuing an injunction to

5    stop or prevent piracy?

6              MR. NEUPERT:  No.

7              THE COURT:  My last question, counsel.  It seems

8    to me the nation with the greatest interest to putting a

9    stop to the Sea Shepherd's activity is Japan.  As far as I

10   know, and from what has been provided to this court,

11   neither Japan's courts, nor its military, nor any other

12   part of its government has done anything about this.  Why

13   should the United States courts be intervenors in this

14   type of activity?

15             MR. NEUPERT:  Because these defendants are subject

16   to this court's jurisdiction in the state of Washington,

17   and these defendants are not subject to the jurisdiction

18   of the courts in Japan.

19             THE COURT:  Thank you, counsel.  Counsel, thank

20   you for answering the court's questions, and your

21   presentation.

22      Counsel, I will let you go a few minutes, but we will

23   take a morning recess probably in about 15, 20 minutes.  I

24   will give you advance warning so you won't think I'm rude.

25   But we will take a morning recess for all parties

1    involved.

2           MR. HARRIS:   That's fine, your Honor.

3       The vessels at issue in this case are flagged in the

4    Netherlands and in Australia, and they are owned by Dutch

5    and Australian entities.   And they are staffed by a mostly

6    volunteer crew that come from all around the world.

7       The Sea Shepherd itself is really four entities, Sea

8    Shepherd U.S.A., Sea Shepherd Australia, Sea Shepherd

9    England and Sea Shepherd Netherlands.   Sea Shepherd U.S.A.

10   does not own any of the vessels at issue in this case.

11      Sea Shepherd U.S.A. has helped fund those vessels, but

12   there is no evidence in this case that the actions that

13   have gone on out on the southern ocean are directed from

14   Sea Shepherd U.S.A.'s office.

15      Sea Shepherd U.S.A. is a 501(c)(3) entity, and for the

16   last 30 years there have been a number of entities,

17   including plaintiffs, who have tried to get that 501(c)(3)

18   status lifted from Sea Shepherd, by arguing that Sea

19   Shepherd engages in violent activities, and nobody has

20   ever succeeded.

21      Paul Watson is a Canadian citizen who resides in

22   Washington, that is true, but the activities that he

23   engages in out on the southern ocean have their

24   formulation and their genesis in Australia where the

25   vessels take off from.

1        We are here today because plaintiffs want this court

2   to referee what goes on between Australian and Dutch and

3   Japanese vessels in the southern ocean.  We are here today

4   because plaintiffs want this court to sanction their

5   killing of whales.

6        We are here, rather than in Australia, which is a more

7   appropriate forum, because plaintiffs know they would lose

8   in Australia.

9        Plaintiffs claim to need an injunction to protect the

10  safety of their crew and to protect their vessel from

11  damages.  As for the alleged safety of the crew, I note as

12  a preliminary matter that the crew are not plaintiffs in

13  this case, and that plaintiffs have not cited any case law

14  that would entitle them to sue on their crew's behalf.

15       As for alleged damaged to plaintiffs' vessels, that is

16  a classic case of what can be covered by monetary remedy.

17  Plaintiffs' damages in that situation are the costs of

18  their vessel repairs.  They have even submitted receipts

19  showing those exact costs.

20       Even if we assume that these plaintiffs here today can

21  seek a preliminary injunction on behalf of the crew, there

22  is no strong evidence of a safety risk.

23       We respectfully disagree with this court's view that

24  there is a risk.  Plaintiffs say that defendants engage in

25  violence, but that is not the case.  Sea Shepherd has been

1    using the same methods for 30 years, and they have never

2    injured anyone.

3         Mr. Neupert is up here talking about, well, what if

4    Sea Shepherd puts something new in the bottles?  Well,

5    what if Sea Shepherd starts bombing these vessels with

6    F-16s?  That is not what we are here to discuss.  We are

7    here to discuss past performance and how that indicates

8    future performance.  Past performance is no guarantee of

9    future performance, but it is the only indicator that we

10   have.  Sea Shepherd has been using the same methods

11   against plaintiffs for the last eight years, and no whaler

12   has ever been injured.

13        The plaintiffs put on a couple of videos, and a

14   picture of a crew member, right in front of me right now,

15   who was allegedly injured by butyric acid.  He looks quite

16   healthy to me.

17        When this case was first brought plaintiffs kept

18   talking about how they would give us medical evidence.

19   They have given us none.  The videos that they showed, one

20   was unclear, it appeared to be someone throwing a bottle.

21   It is not clear that someone threw a bottle.  If someone

22   threw a bottle, that clearly goes against Sea Shepherd's

23   policies.  They are not to throw anything directly at

24   anyone.

25        The barbecue quote, that was years ago.  And that is

1    also not condoned by Sea Shepherd.  That's what we are

2    talking about here.  It is what Sea Shepherd does, not

3    what one rogue volunteer may have done three or four years

4    ago.

5         THE COURT:  Wasn't the videotape counsel showed

6    the court activities that took place just last year?

7         MR. HARRIS:  I don't believe that's correct, your

8    Honor.  In fact, I believe the videotape showing the flare

9    must have been at least two or three years old, because it

10   is my understanding that all of the video that plaintiffs

11   presented to this court came from either the first or the

12   second season of Whale Wars, which I believe is now -- the

13   next season, which will be starting very soon, will be its

14   fifth season.

15        THE COURT:  How about the bottle that was

16   thrown, where the gentleman had the hose, and he had to

17   duck in order to avoid being hit by a projectile, wasn't

18   that last year?

19        MR. HARRIS:  I don't know when that was.  Let me

20   talk briefly about the bottle.  Mr. Neupert talks about

21   the butyric acid being in glass bottles to injure people.

22   He made that up.  They are in glass bottles because if

23   they were in plastic bottles it would injure the ocean and

24   injure the fish.

25     The reality is the Sea Shepherd strives not to injure

 1    anyone or any creature.  If that bottle was thrown

 2    directly at someone, that goes against Sea Shepherd's

 3    policy.  Can I stand here today and tell you if Sea

 4    Shepherd goes out there for the next five years one bottle

 5    will not be thrown at one whaler?  No, I cannot tell you

 6    that.  But what I can tell you is, if one bottle is thrown

 7    at one whaler, the person who throws that bottle will be

 8    instantly terminated as a Sea Shepherd volunteer.  Every

 9    single policy manual that Sea Shepherd has makes it very

10    clear that sort of thing is to be avoided.

11            THE COURT:  Counsel, was that person terminated?

12            MR. HARRIS:  I have no idea.  I am not even sure

13    that Mr. Neupert's testimony regarding that video is

14    accurate.

15       What we are really dealing with here is a situation

16    where Sea Shepherd is out at sea doing what it can to stop

17    the killing of whales.  If that includes throwing a bottle

18    at someone, that is not okay.  We would have no problem

19    with an injunction against my clients saying don't throw

20    bottles at anyone.

21       Plaintiffs talk about the bottles being dangerous, and

22    the bottles being thrown, but if I were to take a bottle

23    in this courtroom right now, and throw it at that window

24    over there, it wouldn't be dangerous.  Nobody would get

25    hurt.  That's really what is going on.  These bottles are

1   not to be thrown when anyone is on board the deck.

2          THE COURT:  Counsel, how do you control that?  If

3   you have a slingshot, a device you guys have used, or your

4   clients have used, once that slingshot tosses that

5   projectile, there is no aiming that appears to be

6   involved.  It is just shooting up in the air.  Where it

7   lands, it lands.

8          MR. HARRIS:  Well, that may be true, but that

9   slingshot should not be pulled back if there are people on

10  the deck of the Japanese whaling vessels.

11     I think what is really important here, and I am going

12  to come back to it time and time again, is that Sea

13  Shepherd has been out there doing this for 30 years, and

14  no one has been injured.  Sea Shepherd has been out there

15  doing this against the Japanese whalers for eight years,

16  and no one has been injured.

17     In fact, this picture of this person who was allegedly

18  injured by butyric acid, I don't believe it.  The reason I

19  don't believe it, your Honor, is because I have been

20  through a trial against these people already.  I helped

21  oversee the defense of Peter Bethune, who was charged

22  originally with terrorism in Japan.  They dropped that

23  claim, I might add.  In that case the prosecutor and the

24  plaintiffs, who were working hand-in-glove with the

25  prosecutor, kept talking about injury to the Japanese

```
 1   whalers.  In the end they had nothing.

 2       The evidence seemed to show that the injury they

 3   claimed had been caused by Sea Shepherd had actually been

 4   caused by something that a Japanese crew member had tried

 5   to throw at the Sea Shepherd crew and the wind had blown

 6   it back in his face.

 7       I think that highlights the situation we are facing

 8   right here, which is that the plaintiffs are before this

 9   court asking for a preliminary injunction, putting forth

10   what is, frankly, rather bizarre and unsubstantiated

11   evidence.  Some picture of some guy and an American lawyer

12   saying this person was injured due to butyric acid?  That

13   is not evidence.  That is not enough for this court to

14   jump into an international political matter and issue an

15   injunction against a defendant here for actions that are

16   going on 3,000, 4,000 miles away.

17       Let's very briefly talk about that injunction.  What

18   is that injunction going to be, stay 800 meters away?  The

19   plaintiffs claim they want it to be 800 meters away

20   because defendants can still film from that distance.  No,

21   they want it to be 800 meters away so they can keep

22   killing the whales.

23       And how will that be enforced?  Will it be enforced

24   against Sea Shepherd Australia?  Is it going to be

25   enforced against Sea Shepherd UK?  Is it going to be
```

1    enforced against Sea Shepherd Netherlands?  I don't see

2    how that can happen.

3        Plaintiffs keep talking about legality not being an

4    issue here.  Plaintiffs try to equate what they are doing

5    with clear-cutting and with abortion.  Wrong.

6    Clear-cutting is clearly legal in this country.  Abortion

7    is clearly legal in this country.  So interfering with

8    those two things is very different from what Sea Shepherd

9    does.

10        Plaintiffs, rather than being clear-cutters, are

11   really essentially heroin dealers.  If they were coming

12   before this court asking this court to help protect their

13   turf so they could continue dealing in heroin, I think the

14   legality would be at issue.  I don't even think that would

15   be a close call.  That is why your Honor has raised the

16   issue of legality.

17        So returning now to what Sea Shepherd has been doing

18   for the last 30 years.  I think it is important that we

19   talk about it.  Sea Shepherd has thrown stink bombs and

20   paint bombs, and every once in a while it seeks to foul

21   the poachers' props.  So what?  None of these things have

22   ever harmed anyone.  And that is because none of these

23   things are dangerous.  Sea Shepherd trains its crews to

24   avoid injury, and that training has paid off.

25        We have talked a bit about the butyric acid.  The

 1   plaintiffs have admitted that they had have no evidence it
 2   is harmful.  We have submitted evidence that it is
 3   harmless.
 4       The paint bombs.  Come on.  It is paint.  Not only
 5   that, and plaintiffs fail to mention this, the paint bombs
 6   have never been thrown at anyone.  They are thrown at the
 7   side of the whaling vessels where the big, giant signs say
 8   research.  It is red paint to bloody the sign that says
 9   research.
10       The prop fouling.  The prop fouling sounds bad.  When
11   it works, it could be bad.  It could be bad if these were
12   small ships.  What we are dealing with here is small
13   amounts of ropes, and a volunteer crew --  The reality is
14   that Sea Shepherd has never really succeeded in fouling
15   anyone's props.  There have been a time or two where the
16   rope has gotten tangled and the vessels have had to slow
17   down for maybe 15 to 30 minutes.  But talking about a ship
18   being stopped with icebergs and all that, that is pure
19   speculation.  There is no evidence of that.
20           THE COURT:  Counsel, let me stop you and ask a
21   question.  I thought I saw in the exhibits a clear
22   indication that a prop had been completely entangled in a
23   considerably large rope.  Are you representing to the
24   court that that was not an accurate depiction of what took
25   place, or that wasn't the activities of your client?

1          MR. HARRIS:  No, your Honor.  What I am
2   representing to this court is that there has never been a
3   time where a Japanese whaling vessel has been forced to a
4   complete stop by prop fouling.  All that has ever happened
5   is they have been slowed down.  These Japanese whaling
6   vessels are some of the most sophisticated high tech
7   vessels ever made.  Sea Shepherd's attempts at prop
8   fouling are really more symbolic than anything else.  It
9   would not be right to issue a preliminary injunction based
10  on that without there being any solid evidence of any
11  potential harm from that.
12     As your Honor well knows, Sea Shepherd has filed
13  extensive briefing seeking a dismissal of plaintiffs'
14  entire case as a matter of law.  I am not going to rehash
15  that briefing, but I will note that we, again, call on
16  this court to honor international comity by honoring the
17  Australian federal court's decision finding plaintiffs'
18  whaling illegal.
19     We also ask this court to defer ruling on anything in
20  favor of the pending World Court case between the nations
21  of Australia and Japan regarding the legality of whaling.
22     We also note that the Ninth Circuit has stated that
23  there can be no preliminary injunctions in admiralty, and
24  that no court has ever granted a preliminary injunction
25  under the Alien Tort Statute.

1      As your Honor knows, there are four elements

2  plaintiffs must satisfy to get their injunctive relief.

3  The first of which is, they must prove a likelihood of

4  succeeding on the merits.  They are not going to succeed

5  on the merits.  They have no chance of prevailing on their

6  interference with navigation claim.  And the reason for

7  that is because there has been no interference with

8  navigation.  Plaintiffs are freely navigating.

9      In fact, even as we speak, plaintiffs ships are out

10  cruising the southern ocean in pursuit of Sea Shepherd's

11  vessels.  Sea Shepherd does not seek to interfere with

12  plaintiffs' navigation.  Sea Shepherd seeks only to

13  interfere with plaintiffs' illegal killing of whales.

14          THE COURT:  Let me stop you there, counsel.  Two

15  of the video clips I have seen show an incident from the

16  past season where the vessel, I believe named Steve Irwin,

17  was, what I would characterize as, basically smashing into

18  the side of one of the whaling ships.  I don't think there

19  is any question, counsel, it was your client's ship that

20  maneuvered into the plaintiffs's ship.  Now, in the briefs

21  you portrayed this as a whaling ship maneuvering into your

22  vessel or smashing into your vessel.  It doesn't look that

23  way in the video.  Is there something I am missing in the

24  video?

25          MR. HARRIS:  I am not sure of the particular video

1    to which you are referring, but I do know that there has

2    been a lot of smashing that has gone on between the

3    vessels out at sea.  I will concede that some of that

4    smashing has been brought about by Sea Shepherd.  But what

5    I will also point out is that none of that smashing has

6    ever impeded a Japanese whaling vessel.

7        And our expert, your Honor, Captain James Cushman, who

8    was a captain in the U.S. Coast Guard, has testified that

9    what Sea Shepherd does out there is safe.

10       If we are talking about the same video, it would be

11   like an eight year old -- it would be like a tiny car

12   bumping into a building.  The Japanese whaling ships are

13   huge, the Sea Shepherd's ships are tiny.  Bumping the

14   Japanese whaling ships has never impeded their navigation.

15            THE COURT:  Just so we are clear, counsel, I am

16   not talking about one of the rubberized vessels.  I am

17   talking about a steel vessel that maneuvered into the left

18   quarter panel of the vessel.  It seemed like it was a

19   pretty hard knock at that point in time.

20            MR. HARRIS:  Those hard knocks happen all the time

21   up in Alaska with fishing, certainly in the old days

22   before the quota system.

23       It is my understanding in that video the Japanese

24   whaling vessel went forward as though nothing had ever

25   happened.  It is also not clear to me that bumping was

1    deliberate on the part of the Sea Shepherd.

2        Turning now to the piracy claim.  Piracy requires

3    violence.  It requires intentional violence.  It requires

4    intentional violence for private gain.  What is private

5    gain?  Private gain is monetary gain.  Sea Shepherd is not

6    out there for monetary gain.  Yes, it makes money off the

7    Whale Wars show, but that money is used for the real goal,

8    and that is to stop the whaling.  That is why Sea Shepherd

9    is out there.  That is not a private gain, that is a

10   public good.

11       The Netherlands, Australia, New Zealand, Japan and

12   Chili are all signatories to the United Nations law of the

13   sea.  And that law gives each of those countries the

14   right --  In fact, it imposes upon them the duty to stop

15   piracy.  None of these countries have ever sought to stop

16   Sea Shepherd from doing anything.  Sea Shepherd boats go

17   to port in most of these countries every year.  Not once

18   has a Sea Shepherd boat ever been prevented from leaving.

19       Would this really be the case if Sea Shepherd were

20   engaging in violence -- I'm sorry, in piracy?  Of course

21   not.  Not even the Japanese Coast Guard, as your Honor

22   himself pointed out, has ever sought to stop the Sea

23   Shepherd.  And that's because the Sea Shepherd is not

24   engaging in piracy.

25       Plaintiffs talk about three people having boarded a

 1   Japanese whaling vessel this past season.  That is unfair,

 2   and that is a red herring.  Those three people were not

 3   Sea Shepherd personnel.  They were from some other -- some

 4   newly formed timber, or something like that, environmental

 5   group out of Australia.  Sea Shepherd is not responsible

 6   for everybody in the world.

 7       The plaintiffs skipped over their terrorism claim,

 8   probably with good reason.  They know they have no chance

 9   of prevailing on that.  They really ought to be ashamed

10   for even bringing it.  Calling what Sea Shepherd does

11   terrorism is an insult to the thousands of Americans and

12   others who have died at the hands of real terrorists.

13       Terrorism is defined as the intentional use of death

14   or serious bodily injury to terrorize people so as to

15   exert influence on their government.  Your Honor correctly

16   called it when he stated that Sea Shepherd has

17   consistently made clear their efforts to avoid any sort of

18   harm to anyone.  If Sea Shepherd were terrorists, why

19   would they advertise that they are trying not to harm

20   anyone?  That is a ridiculous claim.

21       And I note that plaintiffs, working with the Japanese

22   government, made that same sort of claim a couple of years

23   ago, and then dropped it.

24       Plaintiffs' state law claims are so vague that there

25   is no way even to know what they are, so there is no way

 1    even to talk about that today.

 2        Moving on to the second factor, the likelihood of

 3    irreparable harm.  If what Sea Shepherd is doing is so

 4    horrible and so needing of rapid fire relief, why did

 5    plaintiffs wait eight years to do anything about it?  And

 6    even then, why did plaintiffs wait until the beginning of

 7    whaling season to file this lawsuit?

 8        Plaintiffs' answer to that is that their culture made

 9    them do it.  No way.  What made them do it was that they

10    now have $30 million in tsunami relief funds burning a

11    hole in their pockets.  They wanted to bring this action

12    right when they knew Sea Shepherd would be least able to

13    defend against it.  Plaintiffs waited until all of Sea

14    Shepherd's key personnel and assets were diverted out at

15    sea, and then they pounce.  Plaintiffs delay in filing

16    this case, standing alone, is conclusive proof of no

17    likelihood of irreparable harm.

18        Now, your Honor asked plaintiffs why they waited.

19    Plaintiffs never answered.  Instead, plaintiffs flashed a

20    video from two, three years ago.  That is not an answer.

21    In fact, that is an answer of why didn't --  That just

22    leads to another question.  Why didn't they file it two or

23    three years ago right after that video came out?

24        And let's talk about the videos for a moment.

25    Plaintiffs have been filming Sea Shepherd every single day

1    for the last eight years.  All they can come up with are

2    those two videos?  That is not a lot.

3        What are the whalers claiming will be the irreparable

4    harm anyway?  Your Honor asked that question, and

5    rightfully so.  Are they seeking lost profits?  That is

6    something that would be irreparable harm.  No, they are

7    not.  They are not because they are supposedly killing

8    these whales for research.

9        What about the irreparable harm to the research?  No,

10   they are not seeking that either.  Why?  Because that

11   would require that they actually come up with evidence

12   that they are conducting research, and they cannot.

13       Their only claim of irreparable harm is damage to

14   their vessels for which there is clearly a monetary

15   remedy, and speculative discussion regarding what might

16   some day happen to their crews.  Not to themselves, but to

17   their crews.  There is no irreparable harm here.

18       The third factor, balance of hardships.  If Sea

19   Shepherd is liable for all that the whalers claim,

20   plaintiffs or their crew would have all sorts of remedies.

21   They could sue Sea Shepherd for monetary damages, for any

22   damages to their vessels, and their crew could sue for

23   their personal injuries.  They can seize Sea Shepherd's

24   ships around the world.  They can seize Sea Shepherd in

25   Japan.

1      Mr. Neupert stood up here and said there is no

2  jurisdiction -- Japan doesn't have jurisdiction over Sea

3  Shepherd.  That cannot be true.  If Sea Shepherd is

4  directing activities against a Japanese vessel, surely

5  Japan would have jurisdiction over that.

6      They can also seek or secure diplomatic relief, which

7  they have been trying to do for the last eight years.  But

8  nobody wants anything to do with them.

9      More importantly, what plaintiffs are doing is

10  illegal.  That alone means that the balance of hardships

11  tips in favor of the defendants.

12      Sea Shepherd will be devastated if it can no longer

13  seek to stop plaintiffs from engaging in their

14  slaughtering of whales.  And that's all Sea Shepherd wants

15  here.  They don't care about distance.  They don't care

16  about filming.  They don't care about throwing bottles,

17  throwing paint.  What Sea Shepherd wants to do is get in

18  the way of the Japanese whalers who are illegally and

19  brutally slaughtering whales.

20      And let's now talk about the public interest which

21  defendants --

22          THE COURT:  Counsel, before you go into public

23  interest, let's take our morning recess.

24  (At this time a short break was taken.)

25          THE COURT:  Please continue.

1          MR. HARRIS:  Thank you, your Honor.  At the

2    beginning of this hearing your Honor made clear that the

3    court considered the illegality of whaling at issue in

4    this case.  And in response to that, plaintiffs counsel

5    stood up here and stated that no matter how this court

6    rules, plaintiffs whaling will continue regardless.  That

7    is not really true.

8        The reason that is not true is the very same reason

9    plaintiffs have brought this action.  Last year Sea

10   Shepherd was unbelievably effective in stopping defendants

11   (sic) from killing whales -- I'm sorry, stopping

12   plaintiffs from killing whales.  Plaintiffs sought to kill

13   more than a thousand whales last year, and Sea Shepherd

14   was able to reduce that count to 17 percent.  That's how

15   effective Sea Shepherd was.

16       So a ruling here will have an impact on the killing of

17   whales.  A ruling here will likely mean that the next year

18   there will be -- and my math is probably wrong on this,

19   but there will probably be something like 83 percent more

20   whales killed if Sea Shepherd is not allowed out there.

21       Plaintiffs are not here for speculative safety

22   reasons.  They are here to stop Sea Shepherd from going

23   out at all.  That's the 800 meters that their expert

24   claims is necessary.

25       And let me talk very briefly about their expert.

1    Their expert is in London.  They would not let us depose

2    him here in Seattle.  Why did they pick an expert in

3    London?  I don't know.  Why did they pick an expert whose

4    entire career has been in the freight industry?  He

5    doesn't have a bit of experience in the fishing industry,

6    which is exactly what we are dealing with here.

7         If I could, your Honor, I would like to make one

8    correction.  During the break I was able to talk with

9    someone from Sea Shepherd, and they explained to me that

10   incident where it appears as though the Steve Irwin

11   intentionally collided with -- I forget which Japanese

12   whaling vessel.  The explanation for that is that it was

13   not intentional, that the two vessels came close to each

14   other, and the propulsion from the giant Japanese whaling

15   vessel literally sucked the Sea Shepherd in, and that's

16   what caused them to bump.  But it was really nothing more

17   than a fender bender.

18        Turning now to the public interest element, and this

19   is surely the element on which I could talk all day.  But

20   I promise I am not going to.  Plaintiffs are engaging in

21   illegal whaling.  Both Chili and Australia have told

22   plaintiffs never to enter their waters, and have told them

23   if they do so they will be arrested.  Plaintiffs are

24   outlaws.  The public interest is never served by siding

25   with the outlaw.

1     The public interest will not be served by allowing

2  plaintiffs to continue brutally killing whales and

3  threaten to push them to the brink of extinction.  The

4  world public has made its views on this known.

5     In 1986 the International Whaling Commission issued a

6  moratorium on commercial whaling so as to stop the

7  killings.  At various times governments of the United

8  States, Australia, New Zealand, the Netherlands, Argentina

9  Brazil, Chili, Costa Rica, Ecuador, Mexico, Panama, Peru,

10  Uruguay, and many others, have all called on plaintiffs to

11  stop killing whales for commercial purposes, and to stop

12  lying about their research.

13     The plaintiffs killing of whales is wreaking a

14  permanent and irreparable harm to the ocean, to the

15  whales, to the marine ecosystem, and to those human beings

16  who see such slaughters as demeaning to us as human

17  beings.

18     I saw that one of our nation's leading ocean

19  conservation organizations filed an amicus brief this week

20  that sets out in great detail the harm plaintiffs are

21  causing with their unrelenting killing of whales, and how

22  those killings fly directly in the face of public

23  interest.  I hope this court considers that brief in

24  making its ruling.

25     Plaintiffs' retort on the public interest prong is

1    simply that the world needs order, order above all else.

2    Plaintiffs not only place order above morality in the

3    public interest, they also completely ignore that it is

4    them who are causing the chaos, it is them -- it is the

5    Japanese whalers who are acting in contravention of

6    international law and an Australian federal court order.

7    If they want order, all they need do is stop.

8         Most importantly, a Seattle court should not be tasked

9    with preserving order in the southern ocean among foreign

10   flagged vessels.  An American court should not be

11   refereeing the interaction of foreign-flagged vessels way

12   out there.

13        Our constitution reserves foreign policy to the

14   executive branch.  It would go against the public interest

15   were this court to involve itself in foreign policy

16   matters that are already being handled by our Secretary of

17   State.

18        In addition to the four elements specifically required

19   for a preliminary injunction, plaintiffs also must have

20   done equity to get equity.  Put another way, plaintiffs

21   cannot get the equitable relief they seek with unclean

22   hands.  And plaintiffs' hands are anything but clean.

23   They are literally and figuratively stained with blood.

24        Plaintiffs have lied about conducting research.  They

25   are killing whales for commercial gain and to advance an

1  ultranationalist agenda.  We submitted multiple articles

2  from the world's leading whale scientists, including

3  leading whale scientists from NOAA, all of whom agree that

4  the best way to research whales is to keep them alive for

5  additional research.  All of them agree that the Japanese

6  whalers are perpetuating a fraud by claiming to engage in

7  research.

8      Plaintiffs are killing threatened and endangered

9  species, specifically humpback and fin whales.  That can

10  not be in the public interest.

11      Governments around the world see the whalers for the

12  brutal killers that they are, and they have condemned them

13  again and again.

14      It is plaintiffs who are out there engaging in

15  intentional violence.  It is plaintiffs who attack Sea

16  Shepherd volunteers.  They have attacked Sea Shepherd

17  volunteers with grappling hooks, with bamboo poles, with

18  nuts, with bolts, with long-range acoustical devices that

19  can cause all sorts of problems, high-pressure water

20  canons and concussion grenades.  They cannot come in here

21  and complain about Sea Shepherd.

22      In fact, there is a Sea Shepherd crew member who was

23  injured by a Japanese whaler who swatted at him, beat him

24  about the face with a bamboo stick.  And it is my

25  understanding that Sea Shepherd crew member will very soon

1  be intervening in this lawsuit to bring a personal injury

2  action against the plaintiffs.  In fact, the lawyer for

3  that injured party is in the courtroom here today.

4      In early 2010 plaintiffs used one of their massive

5  vessels to split a Sea Shepherd vessel in two.  Now, whose

6  fault that was is inconclusive.  As near as I can tell at

7  this point, the New Zealand maritime report essentially

8  blamed both sides.  But if you look at the video, what is

9  clear is that after the Japanese whaling vessel split the

10  Sea Shepherd vessel in two, and this is the Ady Gil that

11  we are talking about, as that vessel was sinking the

12  Japanese whaling ship was spraying the crew of the Ady Gil

13  with water cannons to prevent them from getting off

14  safely.  That is the unclean hands we are dealing with

15  here.

16      Plaintiffs should not be asking this court to rule on

17  these issues.  This is not your fight.  This is not our

18  fight.  The world sees plaintiffs for what they are.  And

19  the world has told plaintiffs time and time again to stop.

20  The law and facts should compel this court to reach the

21  same conclusion.

22          THE COURT:  Counsel, does that complete your

23  presentation?

24          MR. HARRIS:  It does, your Honor.

25          THE COURT:  I have a few questions.  One question

1    that I will ask you and plaintiffs' counsel is, what is

2    your understanding of when the whaling season will finish

3    this year?  I know that is an unpredictable determination,

4    a lot depends on the weather.  What is your best guess?

5            MR. HARRIS:  My best guess, which is probably not

6    all that good a guess, would be that the season will end

7    early to mid-March.

8            THE COURT:  We are talking about a matter of weeks

9    at this point?

10           MR. HARRIS:  That is my understanding.

11           THE COURT:  Counsel, has any government ever

12   actually indicated its support or approval of your

13   activities in the southern oceans?

14           MR. HARRIS:  It depends on how you define that.

15   The governments of New Zealand --  I would argue this most

16   governments have.  The governments of New Zealand,

17   Australia, United States, have all in various ways helped

18   Sea Shepherd.

19      When Mr. Bethune was wrongly imprisoned in Japan on

20   terrorism charges a couple of years ago, the New Zealand

21   government spoke out about that.  I believe the Australian

22   government did as well.

23      But, generally, governments have pretty much said we

24   don't like what is going on out there, and said very

25   little more.  Meaning, they don't like the fact that the

1    Japanese whalers are out there killing whales.

2          THE COURT:  But there is no government endorsement

3    of the specific tactics that have been utilized by your

4    clients; is that correct?

5          MR. HARRIS:  That is almost certainly correct.  I

6    don't know why a government would ever necessarily endorse

7    the actions of a relatively small not-for-profit one way

8    or the other.

9          THE COURT:  Counsel, there are several references

10   in the record to Sea Shepherd entities.  This morning I

11   asked counsel about the composition.  But based on your

12   understanding of the structure, can you tell me about Sea

13   Shepherd's corporate structure, in other words, how the

14   U.S. Sea Shepherd entity fits in?  That is not real clear

15   from what is before me.

16         MR. HARRIS:  It is not clear from what I have

17   seen.  What I will say is, if this court issues an

18   injunction against Sea Shepherd U.S.A., Sea Shepherd

19   U.S.A. intends to fully abide by that injunction.

20      What I will also say is, based on what I have seen,

21   that injunction will be toothless.  The reason it will be

22   toothless is, though it is true that Sea Shepherd U.S.A.

23   gets a lot of funding in the U.S., it is also true that

24   these vessels are owned by foreign entities, registered in

25   foreign countries to foreign entities.  It would be

1   nothing for the Sea Shepherd corporate structure to shift

2   in such a way as to make it so that the U.S. entity does

3   nothing more than serve as a funding organization to buy

4   vessels.  In fact, near as I can tell, that is a lot of

5   what the U.S. organization does.  And most of what goes on

6   out in the southern ocean is directed by Sea Shepherd

7   Australia.

8       Now, whether Sea Shepherd Australia has 6,000 or

9   60,000 or 6 million in its bank account, I don't know.

10  What I do know is that Paul Watson is the president of Sea

11  Shepherd Australia, sits on the board of Sea Shepherd

12  Australia.  Every single time I have talked to a leading

13  figure on one of the Sea Shepherd boats, that person has

14  an accent, and that person is not an American, and that

15  person got on the ship in Australia, and those ships go to

16  port in Australia.  That is really where this case should

17  have been brought.

18      And plaintiffs no doubt would have brought that case

19  if they weren't forum shopping.  They know that the

20  Australian courts do not like them.  They know that the

21  Australian courts have already issued rulings that they

22  have completely ignored.  They know that the Australian

23  public doesn't like them.  This case should be in

24  Australia or Japan.

25          THE COURT:  Thank you, counsel.

1          MR. HARRIS:  Thank you, your Honor.

2          THE COURT:  Counsel, for the plaintiffs, I will

3    give you just a few minutes for rebuttal.  Also, counsel,

4    if you could begin -- I will ask you, do you have any

5    different read in terms of when the whaling season will

6    end this year?

7          MR. NEUPERT:  Yes.  The permit, which is Exhibit 1

8    to the complaint, expires at the end of March.  And I

9    believe the expectation is to use the permit in accordance

10   with its terms.  So the season will end when the

11   authorization of the permit ends.

12       The court asked some questions about corporate

13   structure.  During the time I was listening to counsel's

14   argument I found the citation I wanted to give the court,

15   which is found in my declaration, Docket Number 52.

16   Attached to that as Exhibit 2 and Exhibit 3 are filings

17   with the Oregon Department of Justice, and the Washington

18   authorities.  This document is dated October 27th, 2011,

19   just a few months ago.  This document, Exhibit 2, Page 6,

20   notes that the Sea Shepherd, the defendant here, had

21   expenses of $6.1 million, which they used to take our

22   ships, the Steve Irwin, Bob Barker and a charter vessel,

23   the Ady Gil down to the southern ocean.  That is "our

24   ships."

25       Exhibits 2, at Page 31 has reference to the 2010/11,

1    just last season, the Antarctic Whale Defense Campaign, in

2    which they state here, "At this time we took our ships,

3    the Steve Irwin, the Bob Barker and the Gojira, down

4    there,".

5        They also appreciate "our ships" on their U.S. tax

6    forms.  The ownership of these ships on this record, we

7    have established, is more likely than not the defendant

8    who is before the court.

9        I want to put this in context, which is, this is a

10   motion for preliminary injunction.  We have had no

11   discovery conducted.  Based on the tax filings, based on

12   the depreciation on U.S. tax returns of these ships, these

13   ships are these defendants', before the court, ships.

14       I also want to point out that Paul Watson is before

15   this court.  Paul Watson is the person who directs all of

16   the activities of all of these entities, whatever they

17   are.  So the court has in personam jurisdiction over

18   Mr. Watson.

19       I just heard counsel say if an injunction is issued,

20   the injunction will be abided, which is, in my view, good

21   news.

22       The court asked questions about has any governmental

23   agency endorsed --

24            THE COURT:  Counsel, let's to be clear.  I think

25   he said it would be abided by the entity in the United

1    States.  I don't think he made any representation that

2    went beyond that, particularly referencing the entity that

3    exists in other countries.

4         MR. NEUPERT:  I didn't take his statement to have

5    any binding effect on any entity or party other than those

6    before this court.

7        You asked whether there was any endorsement by any

8    governmental agency of the conduct of the Sea Shepherd.

9    The answer was basically no.

10       We heard a lot about whaling.  I can't address all of

11   the rhetoric about whaling.  I can point the court to the

12   resolution of the International Whaling Convention in July

13   of last year.  The International Whaling Commission

14   stated, quote, "The resolution of differences on issues

15   regarding whales and whaling should not be pursued through

16   violent actions that risk human life and property at sea."

17   That's my declaration, Docket Number 19, Exhibit 4,

18   Exhibit 2, at Page 2.

19       The entity who these defendants say they are promoting

20   the interest of, the entity who has authority over whaling

21   in accordance with the convention, the entity that has --

22   must have as much, if not more, at stake in this

23   controversy, it has specifically said it condemns the

24   actions of these defendants, that these matters should be

25   resolved by means other than through violent actions that

1   risk human life and property at sea.  And that's why we

2   are here.

3       There was this comment about delay.  The court had a

4   similar comment earlier, which I hope I adequately

5   addressed.  But there is no coast guard in the southern

6   ocean.  There is no police force in the southern ocean.

7   The way to get relief is to come before a court with

8   jurisdiction to enforce the rule of law.  That is what we

9   are seeking here.

10      The court made reference to the Fourth Circuit case in

11  which an injunction on the high seas was issued.  That was

12  in a salvage case.  If a court in a salvage case, where

13  the only thing at risk is the ability to control a wreck

14  site, and to salvage the ship in an efficient, economic

15  way, if the only issue at risk in that case is a property

16  interest in the salvage operation, and a court in the

17  Fourth Circuit would issue an injunction to prevent

18  lawlessness, which is the court's words, on the high seas,

19  if a court will do that where a property interest is at

20  risk, a court should, where life and property is at risk

21  on a daily basis, do so, when we have demonstrated beyond

22  a doubt that there is serious risk.

23      The videos that I showed you of the throwing of the

24  bottle at the ship was less than a month ago.  The video

25  that I showed you of the launching of the incendiary

1  devices was February of 2011.  Those facts were

2  established in this record.

3      The recent activity of the defendants demonstrate that

4  they are putting the plaintiffs at serious risk.  Counsel

5  himself said that the prop fouling, "When it works, could

6  be bad."  "When it works, it could be bad."

7      We are here to make sure it doesn't work, because they

8  have repeatedly engaged in prop fouling this season, like

9  they have in past seasons.

10      The court said haven't you seen a picture of a fouled

11  prop?  Well, Exhibit 8 to the complaint is a picture of a

12  fouled prop from last season.  There is a substantial

13  basis in this record for the contingents that we have

14  made.

15      There is one final point I want to make, unless the

16  court has some other questions.  The court has obviously

17  seen the ramming which occurred in 2009.  And there has

18  been a contention made in this case that that ramming was

19  somehow accidental.  That is a photograph of the side of

20  the Steve Irwin in which he has visibly portrayed ships

21  rammed.  Those are his words, not ours.  Those are his

22  words.

23      And the left flag, Japanese flag, is the Yushin Mura

24  No. 3.  That is the vessel that was rammed in the video,

25  in which we see Mr. Watson turning the wheel of the Steve

 1    Irwin sharply to the right, saying, "Let's get those

 2    bastards."  We put that evidence into the record.  They

 3    responded to our evidence.  They did not deny the words of

 4    Mr. Watson, "Let's get those bastards."  He himself admits

 5    that he caused his ship to ram the Yushin Mura No. 3.

 6        The last and final point.  This notion that somehow

 7    Seaman Abe, who is getting his head thrown at, should be

 8    before this court, as opposed to the master of the ship,

 9    or the owner of the ship, or the employer of the crew.

10    Seaman Abe doesn't need to be here.  We have alleged in

11    our complaint in Paragraph 4 that Captain Ogawa and

12    Captain Miura, as masters, are responsible for the safety

13    of the crews of their vessels while at sea.  They are.  So

14    are the masters' employers, who are before this court.

15        The people before this court are the people

16    responsible for the safety of people like Seaman Abe.  And

17    they are here before the court to ask this court to enjoin

18    conduct which is illegal, which poses a risk daily to

19    people at sea.  It violates every tenet of the laws of

20    admiralty.  The plaintiffs ask this court to enjoin that

21    conduct.

22        Yes, there is only a few weeks left in this season,

23    but in those few weeks lots of harm can occur if they are

24    not enjoined.

25            THE COURT:  Thank you, counsel.  If there is

1    nothing further from the parties, the court has given each

2    side the opportunity to make oral argument, and I do

3    appreciate the responses that have been provided by each

4    of the parties to this court.

5        The question is, where do we go from here by way of a

6    ruling from this court?  Now, I have already shared with

7    you the fact that the courts of appeal that have had the

8    opportunity to address these issues have authored 100-plus

9    pages in their opinions.  There is, however, in this

10   particular case a certain amount of urgency and need for

11   resolution of the issues and motions before this court.

12       The reason I asked the parties how long the whaling

13   season would last is for a very specific purpose, because

14   that would test the urgency of the need for resolution of

15   this issue.

16       I think it would be unrealistic for the parties to

17   believe that this court would give you its written opinion

18   today with details and specifics of the actual ruling from

19   this court.

20       I believe, however, it is appropriate to give the

21   parties a tentative ruling from this court to give you

22   some idea of what direction you should take from this day

23   forward, at least through the balance of the whaling

24   season.

25       Now, I have indicated at the very beginning of this

1    process the two areas of greatest concern for this court

2    as to whether or not a preliminary injunction should be

3    issued at this time.  It is this court's ruling,

4    considering the public interest and the hardships, that

5    the court is going to deny the motion for preliminary

6    injunction.

7        The court will give the details and specifics of that

8    ruling at the appropriate time when an order is actually

9    authored.  I expect that the details will be forthcoming

10   in the next few weeks.  We will give it our very best

11   effort to have it done in a modest amount of time.  But,

12   again, with the timing and the delays that were caused

13   because of the actual date that this was filed, I believe

14   it was December 22nd, we are not in a position to advance

15   this any further or quicker than we actually will be

16   doing.

17       Now, the court is not going to give a tentative ruling

18   on the motion to dismiss at this point in time.  The court

19   needs a little bit more time to go through the specific

20   issues that have been raised and the argument provided by

21   counsel.  So the court will address that in the same order

22   when the court addresses the motion to deal with the

23   preliminary injunction.

24       Again, from the court's perspective, the motion for

25   preliminary injunction has been denied, an order will be

 1     forthcoming in a relatively short period of time.

 2          With that, thank you.  We will be in recess.

 3                         (Adjourned.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4

5

6

7

8
              I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____
                                     Barry L. Fanning
13

14

15

16

17

18

19

20

21

22

23

24

25