UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE INSTITUTE OF CETACEAN RESEARCH, et al., | CASE NO. C11-2043JLR |
| Plaintiffs, | ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS |
| v. | |
| SEA SHEPHERD CONSERVATION SOCIETY, et al., | |
| Defendants. | |
| SEA SHEPHERD CONSERVATION SOCIETY, | |
| Counterplaintiff, | |
| v. | |
| THE INSTITUTE OF CETACEAN RESEARCH, et al., | |
| Counterdefendants. | |

ORDER- 1

## I.   INTRODUCTION

This matter comes before the court on Defendant Paul Watson's motion to dismiss (W. Mot. (Dkt. # 183)) and Defendant Sea Shepherd Conservation Society's ("Sea Shepherd") motion to dismiss (SSCS Mot. (Dkt. # 186)).  Defendants argue that Plaintiffs' (collectively, "Cetacean") claims are moot and unripe.  (*See generally* Watson Mot.; SSCS Mot.)  Having considered the submissions of the parties, the balance of the record, and the relevant law, and considering itself fully advised, the court DENIES both motions.

## II.   BACKGROUND

This is a case about whaling in the Antarctic.  In general, the International Whaling Commission has adopted a moratorium on commercial whaling.  (ICJ Ruling (Dkt. # 175-1) ¶ 100.)  Under Article VIII of the International Convention for the Regulation of Whaling ("Convention"), however, this moratorium does not apply to whale hunting conducted in compliance with a scientific research permit granted by a signatory of the Convention.  (*Id.* ¶ 55); *see also* International Convention for the Regulation of Whaling [*hereinafter* Convention] art. VIII, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 74.  On a yearly basis, Japan has issued permits authorizing lethal research to Plaintiff The Institute of Cetacean Research ("the Institute") under the scientific research program known as "JARPA II."  (Fujise Decl. (Dkt. # 189) ¶¶ 4-5.)  The other plaintiff, Kyodo Senpaku Kaisha, Ltd. owns the ships that The Institute uses in its research whaling.  (*Id.*)  Each permit covers one whaling season, which runs during the

1   austral summer from December of one year to March of the next.  (*Id.* ¶ 5.).  The Institute

2   is the only entity that receives such permits from Japan.  (*Id.* ¶ 4.)

3        Defendants Sea Shepherd Conservation Society and former Sea Shepherd

4   Executive Director Paul Watson oppose Cetacean's killing of whales.  (*See* Watson 1st

5   Decl.  (Dkt. # 60) ¶ 16).)  To that end, each whaling season Defendants' vessels harass

6   and interfere with Plaintiffs' fleet on the open sea.  (*See* Compl. (Dkt. # 1) ¶ 15.)

7   Cetacean alleges that Sea Shepherd's tactics include ramming Cetacean's ships, dragging

8   ropes in the water to disable propellers, and directing smoke bombs, flares, butyric acid-

9   filled containers, and lasers at Cetacean's ships.  (*Id.*)

10       Seeking to abate Defendants' conduct, Cetacean sued for injunctive and

11  declaratory relief under the Alien Tort Statute, 28 U.S.C. § 1350, and state law.  (*See*

12  *generally id*.)  Cetacean contends that Sea Shepherd's acts amount to piracy and violate

13  international agreements regulating conduct on the high seas.  (*See generally id.*)  The

14  district court initially denied Cetacean's request for a preliminary injunction and

15  dismissed its piracy claim.  (*See* 3/19/12 Orders (Dkt. ## 95, 96).)  On appeal, the Ninth

16  Circuit issued a preliminary injunction pending ruling on the merits.  (9th Cir. PI (Dkt.

17  # 118).)  This injunction prevents Defendants from "physically attacking any vessel

18  engaged by [Cetacean]" and "from navigating in a manner that is likely to endanger the

19  safe navigation of any such vessel."  (*Id.*)  On the merits, the Ninth Circuit reinstated

20  Cetacean's piracy claim and ordered that the Ninth Circuit's preliminary injunction

21  "remain in effect until further order of this court."  (9th Cir. Op'n (Dkt. # 135).)

22       In the interim, Plaintiffs brought a motion for contempt in the Ninth Circuit,

1   arguing that Defendants' actions during the 2012-13 whaling season violated the Ninth

2   Circuit's preliminary injunction.  (*See Institute of Cetacean Research v. Sea Shepherd*,

3   No. 12-35266 (9th Cir.) ("9th Cir. Dkt.") # 37.)  The Special Master assigned to the

4   motion issued a Report and Recommendation recommending that Defendants not be held

5   guilty of contempt.  (*See* 9th Cir. Dkt. # 44, R&R (Dkt. # 314).)  The Special Master

6   found that, although the harassment of Plaintiffs' fleet continued during the 2012-13

7   season, that campaign was directed and controlled by Sea Shepherd Australia, an

8   independent foreign entity with a separate board of directors and independent financial

9   resources, and that Defendants had satisfactorily withdrawn all financial and

10  administrative support from that campaign.  (*See generally* R&R.)  Oral argument on the

11  parties' objections to the Special Master's Report and Recommendation is scheduled for

12  the end of October, 2014.  (Dkt. # 192.)

13          Meanwhile, in March, 2014, the International Court of Justice ("ICJ") held that the

14  special permits granted by Japan in connection with JARPA II do not fall within the

15  provisions for scientific research programs established by Article VIII of the Convention,

16  and that, as a result, Japan has breached its obligations under the Convention.  (ICJ

17  Ruling ¶ 274.).  The ICJ ruled that Japan must refrain from granting any further permits

18  in pursuance of the JARPA II program.  (*Id.*)  The ICJ stated:  "It is to be expected that

19  Japan will take account of the reasoning and conclusions contained in this Judgment as it

20  evaluates the possibility of granting any future permits under Article VIII, paragraph 1, of

21  the Convention."  (*Id.* ¶ 246.)

22          Japan has announced that it will abide by the ICJ's decision.  *See* International

ORDER- 4

1    Court of Justice, Whaling in the Antarctic (Australia v. Japan:  New Zealand intervening)

2    [Remarks by the Agent of Japan, Koji Tsuroka], *available at*

3    http://www.mofa.go.jp/ecm/fsh/page2e_000012.html.  Japan has cancelled JARPA II,

4    and, as a result, will not issue permits authorizing lethal take for the upcoming 2014-15

5    whaling season.  (*See* Plf's Mem. (Dkt. # 176) at 4-5; 4/16/14 Trans. (Dkt. # 182) at 9.)

6        Japan's official policy towards future research programs, as set forth in a public

7    statement issued by Japan's Minister for Agriculture, Forestry, and Fisheries, declares

8    Japan's intent to undertake a new scientific research program for the 2015-16 whaling

9    season that complies with the ICJ ruling.  (*See* Dkt. # 191-2 at 2 ("Kagawa Aff."), 3-5

10   ("Policy Stmt.").)  To that end, Japan will submit its new Antarctic research program to

11   the Scientific Committee of the International Whaling Commission for review by autumn

12   of 2014.  (Policy Stmt. ¶ 2; *see also* Committee Rep. (Dkt. # 188-4) at 5-6 (Scientific

13   Committee's May, 2015, report preparing for review of Japan's proposal).)  Meanwhile,

14   Cetacean intends to engage in a sighting survey in the Southern Ocean during the 2014-

15   15 season.  (Fujise Decl. ¶ 2).  Cetacean submitted a proposal for this survey to the

16   Commission's Scientific Committee earlier this year.  (*See* Proposal (Dkt. # 189-1).)

17       In recognition of the factual and legal overlap between the merits of this action

18   and the contempt proceedings ongoing in the Ninth Circuit, proceedings before the

19   district court are currently stayed.  (*See* 4/28/14 Order (Dkt. # 181).)  The court, however,

20   granted Defendants permission to bring a motion addressing whether the ICJ's ruling has

21   rendered this case moot and/or unripe.  (*Id.*)  Defendants' motions are now before the

22   court.  (*See* SSCS Mot.; Watson Mot.)

# III.   ANALYSIS

## A.   Pending Ninth Circuit Proceedings

This court previously declined to permit Defendants to bring a motion premised on *Kiobel v. Royal Dutch Petroleum Co.*, --- U.S.----, 133 S. Ct. 1659 (2013) because the issue of subject matter jurisdiction is currently pending in the Ninth Circuit contempt proceedings.  (*See* 4/28/14 Ord. at 6-7).  Cetacean argues that, similarly, the court should refrain from considering this motion because the issue of mootness has also been raised in the contempt proceedings.  (*See* Resp. (Dkt. # 187) at 18-19.)  This argument misapprehends the substance of the contempt proceedings.  In fact, the Ninth Circuit will have no occasion to pass on the overall justiciability of Cetacean's claims.  In the contempt proceedings, Defendants have raised mootness with respect to a single narrow issue:  Cetacean's request for a coercive, civil sanction in the form of a fine.  (*See* 9th Cir. Dkt. # 346 at 3.)  Specifically, Defendants argue that the cessation of whaling activities for the upcoming season vitiates the need for a sanction to coerce compliance with the preliminary injunction regulating Defendants' activity on the high seas.  *See id.*  The question of appropriate remedies regarding alleged violations of the Ninth Circuit's injunction, however, is distinct from the questions raised in this motion:  whether Cetacean's claims for injunctive and declaratory relief under the Alien Tort Statute (and, by extension, under certain international norms and treaties) and state law are moot and/or unripe.  As such, this situation does not raise the same specter of potentially conflicting judgments as does Defendants' attempts to challenge subject matter

1  jurisdiction under *Kiobel*.  Accordingly, the court will address the merits of Defendants'

2  motion.

3  **B.    Mootness**

4        **1.  Mootness standard**

5        A case is moot when "the issues presented are no longer 'live' or the parties lack a

6  legally cognizable interest in the outcome."  *City of Erie v. Pap's A.M.*, 529 U.S. 277,

7  287 (2000); *see also Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001).

8  "The underlying concern is that, when the challenged conduct ceases such that there is no

9  reasonable expectation that the wrong will be repeated, then it becomes impossible for

10 the court to grant any effectual relief whatever to the prevailing party."  *City of Erie*, 529

11 U.S. at 287; *see also S. Or. Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1133-34

12 (9th Cir. 2004).  Stated another way, the "central question" is "whether changes in the

13 circumstances that prevailed at the beginning of litigation have forestalled any occasion

14 for meaningful relief."  *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir.

15 2005); *see also Doe No. 1 v. Reed*, 697 F.3d 1235, 1238 (9th Cir. 2012).

16       "The party asserting mootness bears the burden of establishing that there is no

17 effective relief remaining that the court could provide."  *S. Oregon Barter Fair*, 372 F.3d

18 at 1133-34; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

19 U.S. 167, 190 (2000).  "The Supreme Court has emphasized that the doctrine of mootness

20 //

21 //

22 //

ORDER- 7

1  is more flexible than other strands of justiciability doctrine."[1]  *Jacobus v. Alaska*, 338

2  F.3d 1095, 1103 (9th Cir. 2003).  The reason for this flexibility is that "by the time

3  mootness is an issue, the case has been brought and litigated, often . . . for years.  To

4  abandon the case at an advanced stage may prove more wasteful than frugal."  *Friends of*

5  *the Earth*, 528 U.S. at 190.

6       When, as here, changed circumstances call into question a plaintiff's ability to

7  continue the activity for which it seeks protection, courts evaluate (1) the plaintiff's stated

8  intentions and, (2) whether "insurmountable barriers" prevent the plaintiff from resuming

9  the activity.  *See* Clark, 259 F.3d at 1011-12.  For instance, in *Clark*, the defendant

10  argued that a challenge to an ordinance restricting adult cabarets was moot because the

11  plaintiff's license to operate a cabaret had expired and his business was closed.  *See id.*

12  Nonetheless, because plaintiff's "stated intention [was] to return to business," the court

13  held that he "still ha[d] a legally cognizable interest in the outcome of this lawsuit

14  sufficient to allow him to seek injunctive relief."  *Id.*; *see also id.* at n.9.  The court found

15  that the added step of applying for a new license and paying a license fee "[was] not an

16  insurmountable barrier and thus not enough to moot [his] case."  *Id.* at 1012.

17       Similarly, in *Southern Oregon Barter Fair*, the defendant argued that a challenge

18  to a permit requirement for mass gatherings was moot because the plaintiff Fair had not

19  applied for a permit, or staged any other mass gathering, for eight years.  *See* 372 F.3d at

20  

21  [1] Mr. Watson's reply brief supports his mootness arguments with numerous cases addressing the injury-in-fact prong of standing.  (*See* Watson Reply (Dkt. # 197) at 5-7.)  Standing and mootness, however, are not interchangeable inquiries.  *See Friends of the Earth*, 528 U.S. at 190.  Specifically,

22  "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."  *Id.*

1   1133.  The court noted that the case "would be moot if the Fair had entirely ceased to

2   operate, left the business, and no longer sought or intended to seek a license."  *Id.*  The

3   court, however, found that the Fair had "a sufficient ongoing interest in the outcome of

4   the case to avoid mootness" due to the Fair's "stated intention" to return to business, as

5   well as the "ongoing efforts the Fair ha[d] made to arrange another gathering," which

6   included holding smaller events to raise funds and seeking an alternative venue.  *Id.*

7   Although the defendant contended that future enforcement against the Fair was

8   "speculative," the court disagreed, finding that the funding and venue barriers were not

9   "insurmountable."  *Id.* (quoting *Clark*, 259 F.3d at 1011-12.)  Because the court could not

10  conclude that there was "no reasonable expectation that the state will enforce the

11  [challenged] Act against the Fair again," the case was not moot.  *Id.*

12         In contrast, the Ninth Circuit has found cases to be moot only when the plaintiff

13  proves unable or unwilling to continue engaging in the activity for which it originally

14  sought relief.  *See, e.g.*, *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1130 (9th

15  Cir. 2005) (finding case was moot where, pursuant to the parties' settlement agreement,

16  the plaintiff agreed to discontinue its use of the advertisements in question); *Blair v.*

17  *Shanahan*, 38 F.3d 1514, 1518-19 (9th Cir. 1994) (finding case moot because plaintiff, a

18  former panhandler, had obtained employment and "no longer wishe[d] to engage in the

19  activity proscribed by the statute that he [was] challenging"); *Blair v. Shanahan*, 38 F.3d

20  1514, 1519 (9th Cir. 1994) (finding case was moot because plaintiffs did not allege that

21  they planned to hold any future events in contravention of the challenged resolution).

22

### 2. Application to Cetacean's claims

Here, Defendants argue that Cetacean's claims are moot because Cetacean will not engage in the activity for which it seeks protection—namely, whale hunting—during the 2014-15 season.  Defendants overlook the facts that Cetacean intends to resume whaling during the next season, which starts in December 2015, and that the impediments to Cetacean doing so fall far short of the "insurmountable barriers" required by the Ninth Circuit in similar contexts.[2]

Turning first to the question of stated intentions, the government of Japan has publicly announced that its official policy towards future whale research is to develop a new program for the 2015-15 whaling season that complies with the standards set forth in the ICJ ruling.  (*See* Policy Stmt.)  Specifically, Japan's Minister for Agriculture, Forestry, and Fishes statement in April, 2014, maintains that "Japan has confirmed its basic policy of pursuing the resumption of commercial whaling, by conducting research

_____

[2] Defendants effectively seek to confine the mootness inquiry to the 2014-15 season, arguing that while Plaintiffs' claims for the 2014-15 season are moot due to the lack of lethal takes, Plaintiffs' claims with respect to future seasons are simultaneously unripe.  (*See* Watson Mot. at 5; SSCS Mot. at 5-8.)  In response, Cetacean argues that its claims for the 2014-15 season are not moot because Defendants may harass the sighting survey vessels that Cetacean plans to deploy.  (*See* Resp. at 12; Fujise Decl. ¶ 3).  In reply, Plaintiffs supply for the first time declarations averring that they do not oppose nonlethal research.  (*See* Watson Decl. (Dkt. # 199) ¶ 3; West Decl. (Dkt. # 200-1) ¶ 8.)  New evidence, however, may not be raised in reply briefs, and courts have discretion to strike any new material that is raised.  *See, e.g.*, *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 (9th Cir. 1993) (striking portions of a reply brief that presented new information); *Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996).

Although Defendants attempt to apply the mootness inquiry only to the 2014-15 season, the court is not required to operate within such an artificial constraint.  *See Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) (finding that plaintiffs' intent to continue the protected activity in question in the future was relevant to mootness and "cannot be read to constitute a separate, unripe claim").  Because the court is able to decide mootness based on Cetacean's likely ability to resume whaling in subsequent seasons, the court finds it unnecessary to address stand-alone arguments regarding the 2014-15 season at this time.  For the same reason, the court declines to decide whether to strike the new evidence raised in Defendants' reply briefs.

1   whaling . . .” and that “Japan will further . . . an earnest review of the designs of the

2   whale research programs in the Antarctic . . . with the aim of submitting new research

3   programs to the Scientific Committee of the International Whaling Commission (IWC)

4   by the autumn this year, which reflects the criteria mentioned in the judgment.” *Id.*

5   Moreover, the Deputy Director-General of the Fisheries Agency of Japan testifies that, as

6   explained in the official policy statement, Japan is committed to “conducting research

7   whaling (which includes lethal take and other research methods)” from the year 2015 on.

8   (Kagawa Aff. ¶¶ 2, 3.)

9       Japan has issued all prior permits for research whaling, both under JARPA II and

10  earlier programs, to The Institute of Cetacean Research.  (Fujise Decl. ¶ 4.). No other

11  entity besides The Institute has obtained a permit from Japan.  (*Id.*)  The Director General

12  of The Institute testifies that, in accordance with Japan’s official policy statement, the

13  Institute intends to ask the government of Japan to issue permits to engage in both lethal

14  and nonlethal research whaling for the 2015 and future seasons.  (*Id.*)  In the meantime,

15  The Institute will continue its research by engaging in a sighting survey in the Southern

16  Ocean.  (Fujise Decl. ¶ 2; Proposal.)

17      In *San Lazaro Association*, the Ninth Circuit held that although the plaintiff had

18  been disqualified from participating in the Medi-Cal program that formed the basis of the

19  suit for five years, the case was not moot because “on the record before [the court], there

20  is no basis for concluding that [the plaintiff] will not seek to participate in the Medi-Cal

21  program at the end of the five-year period.” *San Lazaro Ass’n, Inc. v. Connell*, 286 F.3d

22  1088, 1096 (9th Cir. 2002).  Here, there is every indication that Cetacean will seek to

1   participate in the next year's whaling season, and no basis in the record for concluding

2   that it will not.  As such, as required by *Clark* and *Southern Oregon Barter Fair*,

3   Cetacean's "stated intentions" are to return to the whaling in the near future, and

4   "ongoing efforts" are directed to meeting that goal.  *See Clark*, 259 F.3d at 1011-12; *S.*

5   *Or. Barter Fair*, 372 F.3d at 1133.

6       Turning next to question of barriers to Cetacean's resumed whaling, Defendants

7   identify at least three potential barriers:  (1) the Convention's requirement that the

8   International Whaling Commission's Scientific Committee review new Article VIII

9   research permits, (2) Japan's need to address the concerns identified in the ICJ ruling, and

10  (3) international pressure against lethal research.  None of these barriers is

11  insurmountable.

12      First, contrary to Defendants' assertions, the Scientific Committee does not

13  approve (or disapprove) Article VIII scientific research permits.  The Convention merely

14  requires contracting governments to make proposed permits available to the

15  Commission's Scientific Committee for review and comment prior to issuance.  (ICJ

16  Ruling ¶ 47.)  The Scientific Committee, however, is not empowered to make any

17  binding assessment regarding research programs.  (*Id.*)  Rather, the Scientific Committee

18  communicates its views to the Commission in the form of reports or recommendations.

19  (*Id.*)  Although the Commission is, in general, empowered to make recommendations to

20  signatory nations, these resolutions are also not binding.  (*Id.* (quoting Convention art.

21  VI).)  Indeed, the text of Article VIII does not require a contracting government to

22  receive permission from the Commission before issuing a scientific research permit.  *See*

1  Convention, art. viii, ¶ 1.  Therefore, it appears that the barriers that Cetacean faces due

2  to the required Scientific Committee review are temporal, not substantive.

3       Annex P to the Convention sets forth the process by which the Scientific

4  Committee reviews special permit proposals.  (*See* Annex P (Dkt. # 188-5).)

5  Specifically, new proposals are submitted to the Scientific Committee at least six months

6  prior to the Annual Scientific Committee Meeting; a specialist workshop prepares a

7  report on the proposal; the Committee discusses the report at the Annual Meeting; and a

8  revised report is submitted to the International Whaling Commission and becomes public

9  in accordance with the Commission's rules.  (*Id.* at 3-4.)

10       Here, the Report of the Scientific Committee issued in May, 2014, confirms that

11  Japan has requested that a special permit for its new Antarctic research program for the

12  2015-16 season be reviewed at the Scientific Committee's 2015 Annual Meeting, that

13  Japan will submit the new proposal to the Scientific Committee in October or November

14  of 2014, and that Japan is prepared to cover the necessary costs for convening the

15  requisite workshop in Tokyo in January or February of 2015.  (Committee Rep. at 5-6.)

16  The official policy statement by Japan's Minister for Agriculture, Forestry, and Fishes

17  agrees that Japan aims to submit its new Antarctic research program to the Scientific

18  Committee in autumn of this year.  (*See* Policy Stmt.)

19       Consequently, at this stage, it appears that the government of Japan is well on its

20  way to timely complying with Annex P and obtaining the requisite Scientific Committee

21  review for the 2015-16 season.  Defendants have put forth no evidence showing

22

1  otherwise.  As such, any barriers to obtaining a permit that Cetacean faces due to the

2  Scientific Committee review appear to be minimal.

3          Second, Defendants' assertion that Japan will be unable to design a lethal take

4  research program that ameliorates the deficiencies identified in the ICJ Ruling is

5  overstated.  The ICJ Ruling acknowledged that Japan would likely implement future

6  research permits and did not impose additional restrictions on such permits beyond those

7  already contained in Article VIII.  (ICJ Ruling ¶ 246.)  The ICJ also recognized that

8  "Article VIII expressly contemplates the use of lethal methods . . . ."  (*Id.* ¶ 83.)

9  Accordingly, the ICJ found that "the fact that a programme uses lethal methods despite

10  the availability of nonlethal alternatives does not mean that a special permit granted for

11  such a programme necessarily falls outside Article VIII."  (*Id.* ¶ 137.)  Moreover, because

12  the parties agreed that nonlethal methods were not a feasible means to examine some

13  types of data collected in JARPA II, the ICJ found that there was "no basis to conclude

14  that the use of lethal methods is per se unreasonable in the context of JARPA II."

15  (*Id.* ¶¶ 133, 135.)  Therefore, going forward, the use of lethal take is not necessarily

16  foreclosed.

17          Beyond that, Defendants have put forth no evidence—and made no substantive

18  argument—showing that Japan will be unable to address the ICJ's concerns regarding

19  JARPA II, which include concerns over the program's discrepancy between target and

20  actual sample sizes, open-ended nature, extensive target sample sizes, lack of

21  consideration of nonlethal methods, lack of scientific output, and lack of collaboration

22  with other researchers. (*Id.* ¶¶ 224-27).  To the contrary, Japan believes it can fashion a

1    program that complies with the ICJ's concerns. (*See* Policy Stmt.; Kagawa Aff. ¶¶ 2, 3).

2    Nor have Defendants shown that addressing the ICJ concerns will necessarily satisfy their

3    own objections to Japan's research operations.[3]   Additionally, the court notes that,

4    because the Commission does not possess veto power over signatories' issuance of

5    scientific permits, it appears that whether Japan's new program passes muster under the

6    ICJ's standards could be established only by a second round of litigation.  But it goes

7    without saying that any later-identified deficiencies would not preclude issuance of the

8    permit in the first place.  On this record, the court cannot conclude that the ICJ Ruling

9    constitutes an insurmountable barrier to Cetacean's continued whaling.  *See Clark*, 259

10   F.3d at 1011-12; *S. Or. Barter Fair*, 372 F.3d at 1133.

11          Third, Defendants' contention that "international pressure" will convince Japan to

12   abandon its research program is unsupported.  Although international anti-whaling

13   sentiment is well-documented (*see, e.g.*, PI Order (Dkt. # 95) at 3), Defendants'

14   assertions as to the effect of that pressure on the government of Japan are speculative.

15          In sum, Defendants have not carried their burden to show that Cetacean lacks a

16   legally cognizable interest in the outcome of this suit.  *See S. Or. Barter Fair*, 372 F.3d at

17   1133-34; *City of Erie*, 529 U.S. at 287.  Cetacean's stated intention is to resume whaling

18   next season, and Defendants have not established any insurmountable barriers that stand

19   in Cetacean's way.  *See Clark*, 259 F.3d at 1011-12.  All indications are that the delay in

20

21   [3] For example, the catch limit for minke whales under JARPA II was 850 whales.  (ICJ Ruling
     ¶ 231).  Crediting Defendants' strenuous objections to all killing of whales, it seems unlikely that
22   Defendants would find even a substantially lower catch limit unobjectionable.  (*See, e.g.*, West Decl. ¶ 8
     ("[Sea Shepherd] continues to oppose the killing of whales as a matter of principle."))

ORDER- 15

1  lethal whaling caused by the ICJ ruling is only temporary.  Because there is a reasonable

2  expectation that Defendants will again engage in the challenged conduct against

3  Cetacean, it remains possible for the court to grant effectual relief to Cetacean, either in

4  the form of an injunction or declaratory judgment.  *See City of Erie,* 529 U.S. at 287; *S.*

5  *Oregon Barter Fair*, 372 F.3d at 1134.

6        Additionally, the federal court system, at both the trial and appellate level, has

7  already invested over two years of effort in adjudicating this controversy, the end result

8  of which is a hard-won preliminary injunction in favor of Cetacean and an appreciable

9  degree of fact-finding relevant to the merits.  (*See, e.g.*, JSR (Dkt. # 173) at 7-8 (agreeing

10  that discovery conducted during the contempt proceedings will reduce discovery

11  necessary at the district court level).)  Abandoning the case now only to revisit the issues

12  in the fall of 2015 with a clean slate would prove more wasteful than frugal.  *See Friends*

13  *of the Earth*, 528 U.S. at 190.  Accordingly, the court finds that Cetacean's claims are not

14  moot.[4]

15

16  _____

    [4] Defendants' contentions that Cetacean fails to show Defendants will continue to be involved in future anti-whaling campaigns improperly seeks to shift the burden of showing mootness to Cetacean. (W. Reply at 8; SSCS Reply (Dkt. # 200) at 6); *see Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1174 (9th Cir. 2009) ("The EPA's attempt to reverse this burden is insufficient to show mootness.").  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth*, 528 U.S. at 189.  "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (internal punctuation omitted).  In accordance with this principle, the standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent:  A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*  The "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.*  Here, Defendants have not carried their "heavy burden" of showing it is "absolutely clear" that they will no longer interfere with Cetacean's Antarctic whaling—especially because Defendants disengagement from the most recent campaigns was precipitated solely by the Ninth Circuit's

1  **C.    Ripeness**

2      As is frequently the case, the court must now investigate the question of ripeness

3  in addition to that of mootness.  *See Jacobus v. Alaska*, 338 F.3d 1095, 1104 (9th Cir.

4  2003).  Ripeness has two components: constitutional ripeness and prudential ripeness.  *In*

5  *re Coleman*, 560 F.3d 1000, 1004 (9th Cir. 2009).  The court addresses each component

6  in turn below.

7      **1.  Constitutional Ripeness**

8      "For a suit to be ripe within the meaning of Article III, it must present concrete

9  legal issues, presented in actual cases, not abstractions."  *Colwell v. Dep't of Health &*

10  *Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (internal punctuation omitted).  "The

11  issues presented must be definite and concrete, not hypothetical or abstract."  *In re*

12  *Coleman*, 560 F.3d 1000, 1005 (9th Cir. 2009).  "Through avoidance of premature

13  adjudication, the ripeness doctrine prevents courts from becoming entangled in abstract

14  disagreements."  *Wolfson v. Brammer*, 616 F.3d 1045, 1057 (9th Cir. 2010).

15      Here, Cetacean challenges specific, well-defined conduct by Defendants that

16  occurs in a particular factual context:  namely, Defendants' interference with Cetacean's

17  whaling vessels in the Southern Ocean using tactics including ramming Cetacean's ships,

18  dragging ropes in the water to disable propellers, and directing smoke bombs, flares,

19  butyric acid-filled containers, and lasers at Cetacean's ships.  (*See* Compl. ¶ 15.)  As

20  such, the legal issues of whether Defendants' actions constitute piracy and violate

21
22  preliminary injunction.  (*See* R&R at 9-22 (detailing Defendants' preparations for the  2012-13 campaign prior to the Ninth Circuit's ruling and their subsequent attempts to distance themselves from the campaign so that the campaign could continue free from the Ninth Circuit's preliminary injunction).)

1   international agreements regulating conduct on the high seas are definite and concrete.

2   The fact that Cetacean will not be able to continue lethal take of whales until next season

3   does not move this dispute into the realm of abstract and hypothetical disagreements that

4   courts should avoid.  *See Wolfson*, 616 F.3d at 1057.

5          This is true for several reasons.  First, Cetacean will be undertaking nonlethal

6   research in the form of sighting surveys during the immediate 2014-15 season.  (Fujise

7   Decl. ¶ 2.)  Cetacean alleges that Defendants have previously attacked at least one vessel

8   employed by Cetacean for nonlethal research.  (Compl. ¶ 15.1 ("In February 2007, the

9   M/V ROBERT HUNTER . . . rammed a sighting vessel used by ICR for nonlethal

10  research."))  Cetacean's requested relief is not limited to its vessels engaged in lethal

11  take.  (*See, e.g.*, *id*. ¶ 25.1 (requesting injunctive relieve preventing Defendants from

12  "physically attacking any vessel engaged by plaintiffs in the Southern Ocean."))  And

13  Cetacean remains concerned for the welfare of its vessels in the upcoming season.

14  (Fujise Decl. ¶ 3.)  As such, Cetaceans' claims are not premature.[5]

15         Second, even if Cetacean were not undertaking nonlethal research in the upcoming

16  season, its claims predicated on future seasons of whaling are not so hypothetical or

17  abstract as to be unripe.  It is true that "[w]here a dispute hangs on future contingencies

18  that may or may not occur, it may be too impermissibly speculative to present a

19  justiciable controversy."  *In re Coleman*, 560 F.3d at 1005.  However, "[t]hat a

20

21  _____

        [5] In reply, Defendants supply for the first time declarations averring that they are not opposed to
    nonlethal research and do not intend to interfere with nonlethal research operations.   (*See* Watson
    Decl. ¶ 3; West Decl. ¶ 8.)  Leaving aside the fact that new evidence may not be submitted in reply,
22  *Tovar*, 3 F.3d at 1273, Defendants' declarations go to the merits of Cetacean's request for injunctive relief
    and do not render this action unripe.

1 contingency is involved is not fatal to ripeness." *Sandell v. F.A.A.*, 923 F.2d 661, 664

2 (9th Cir. 1990).  At times, "common sense indicates that review should be afforded even

3 though the ultimate injury to the complaining party depends on the occurrence of further

4 events." *Id.*

5   Accordingly, the Ninth Circuit held that a dispute over a loan discharge was ripe

6 even though injury to the plaintiff would occur only upon her completion of her plan

7 payments, because "plan completion [was] a single factual contingency—not a 'series of

8 contingencies' rendering the decision 'impermissibly speculative.'"  *In re Coleman*, 560

9 F.3d at 1005 (quoting *Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1273

10 (9th Cir.1981)).  Similarly, a district court held that a challenge to the predator control

11 portion of a program to protect sage grouse was ripe even though any killing of predators

12 would only begin based on test results reached after the program was initiated.  *Comm.*

13 *for Idaho's High Desert v. Collinge*, 148 F. Supp. 2d 1097, 1100 (D. Idaho 2001).  The

14 court noted that because two prior surveys had indicated predation was a problem,

15 initiation of predator control was "highly likely," and, as such, was a "'contingent future

16 event' only in a highly technical sense." *Id.*

17   So, too, here.  Rather than a "series of contingencies," the only contingency to

18 Cetacean's continued injury by Defendants' interference is reception of a research permit

19 for lethal take.  *See In re Coleman*, 560 F.3d at 1005.  As the above discussion regarding

20 mootness shows, such a contingency is highly likely to occur.  *See* Section III.B.2.  At

21 this stage, the most significant hurdle appears to be Japan's timely submission of the

22 permit to the Commission's Scientific Committee for review.  Nothing in the record

1    shows that Japan will not meet that deadline—indeed, the record suggests otherwise.

2    (*See* Policy Stmt.; Kagawa Aff. ¶¶ 2, 3; Fujise Decl. ¶ 4; ICJ Ruling ¶ 47; Committee

3    Rep. at 5-6.)  Moreover, the temporary delay in whaling will not prejudice the court's

4    ability to decide the substantive legal issues:  Defendants' maritime conduct over the

5    previous few years will form an adequate factual record for review.  *See Sandell*, 923

6    F.2d at 664.  Because the court's legal analysis will be tethered to a specific, existing

7    factual context, Cetacean's claims are not "impermissibly speculative."  *See In re*

8    *Coleman*, 560 F.3d at 1005.  The case is constitutionally ripe.

9       **2.  Prudential Ripeness**

10      The Supreme Court recently called into question the continued viability of the

11   prudential ripeness doctrine.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334

12   (U.S. 2014) ("To the extent respondents would have us deem petitioners' claims

13   nonjusticiable on grounds that are 'prudential,' rather than constitutional, that request is

14   in some tension with our recent reaffirmation of the principle that a federal court's

15   obligation to hear and decide cases within its jurisdiction is virtually unflagging.")

16   (internal punctuation omitted) (quoting *Lexmark Int'l, Inc. v. Static Control Components,*

17   *Inc.,* 572 U.S. ----, 134 S.Ct. 1377, 1386 (2014)).  Nonetheless, absent more definitive

18   guidance from the Supreme Court, and out of an abundance of caution, the court

19   addresses prudential ripeness here.

20      The question of prudential ripeness requires a court "to first consider the fitness of

21   the issues for judicial review, followed by the hardship to the parties of withholding court

22   consideration."  *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829,

1   837 (9th Cir. 2012).  Unlike Article III ripeness, which is jurisdictional, prudential

2   considerations of ripeness are discretionary.  *Thomas v. Anchorage Equal Rights*

3   *Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc).

4          Turning to the first prong, "the purpose of the 'fitness' test . . . is to delay

5   consideration of the issue until the pertinent facts have been well-developed in cases

6   where further factual development would aid the court's consideration." *In re Coleman*,

7   560 F.3d at 1009.  Here, as discussed in the preceding section, further factual

8   development would not aid the court's consideration of the legal issues presented in this

9   case. *See* Section III.C.1.  The pertinent facts—Defendants' and Plaintiffs' altercations in

10  the Southern Ocean—while hotly disputed, are well-developed, and, indeed, the Special

11  Master appointed by the Ninth Circuit has already engaged in some relevant fact-finding.

12  (*See* JSR at 7-8.).  Because this is not an abstract disagreement but rather involves the

13  application of well-defined law to an existing case and controversy, Plaintiffs' claims are

14  fit for adjudication. *See Oklevueha Native Am. Church*, 676 F.3d at 838.

15         "As Plaintiffs' claims are fit for review now, we do not reach the second factor of

16  the prudential ripeness inquiry—hardship to the parties in delaying review." *Id.*

17  "Hardship serves as a counterbalance to any interest the judiciary has in delaying

18  consideration of a case." *Id.*  Because the court "can identify no interest in delaying

19  review of Plaintiffs' claims, the hardship that would be imposed by any delay is not

20  relevant." *Id.*  Accordingly, the court finds that Plaintiffs' claims should not be dismissed

21  on prudential ripeness grounds.

22

ORDER- 21

1          **IV.    CONCLUSION**

2          For the foregoing reasons, the court DENIES Paul Watson's motion to dismiss

3   (Dkt. # 183) and Sea Shepherd's motion to dismiss (Dkt. # 186).

4          Dated this 21st day of July, 2014.

5

6

7          _____

           JAMES L. ROBART
8          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22