1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   INSTITUTE OF CETACEAN
     RESEARCH, et al.,

11                              Plaintiffs,

12          v.

13   SEA SHEPHERD CONSERVATION
14   SOCIETY, et al.,

15                              Defendants.

CASE NO. C11-2043JLR

ORDER

16          **I.   INTRODUCTION**

17          This matter comes before the court on four dispositive motions and two discovery

18   motions.  Plaintiffs The Institute of Cetacean Research ("the Institute"), Kyodo Senpaku

19   Kaisha, Ltd., and Tomoyuki Ogawa (collectively, "Plaintiffs")[1] move to dismiss all six of

20   _____

21          [1] Defendants have asserted counterclaims, meaning Plaintiffs are also counterclaim
22   defendants and Defendants are also counterclaim plaintiffs.  For simplicity, the court refers to the
     parties based on the initial claim filed.  When discussing counterclaims, "Plaintiffs" also includes

ORDER- 1

1   Defendants Sea Shepherd Conservation Society ("SSCS") and Paul Watson's

2   (collectively, "Defendants") counterclaims.  (*See* MTD (Dkt. # 255); MTD Resp. (Dkt.

3   # 263); MTD Reply (Dkt. #265).)  Alternatively, Plaintiffs moved for partial summary

4   judgment on Defendants' fifth counterclaim, in which SSCS seeks damages for

5   intentional or negligent destruction of property.  (*See* 7/16/15 MPSJ (Dkt. # 257); 8/3/15

6   MPSJ Resp. (Dkt. # 262); 8/7/15 MPSJ Reply (Dkt. # 264); *see also* 2ACC ¶¶ 87-93.)[2]

7   Plaintiffs' July 16, 2015 motion for partial summary judgment incorporated by reference

8   Plaintiffs' still-pending April 9, 2015 motion for partial summary judgment, which also

9   sought dismissal of SSCS's counterclaim for damages, and which the parties fully

10  briefed.  (*See* 4/9/15 MPSJ (Dkt. # 228); 4/27/15 MPSJ Resp. (Dkt. # 231); 5/1/15 MPSJ

11  Reply (Dkt. # 232).)  Finally, Defendants moved for judgment on the pleadings on all of

12  Plaintiffs' claims.  (*See* MJP (Dkt. # 260); MJP Resp. (Dkt. # 266); MJP Reply (Dkt.

13  # 267).)

14        Defendants also filed two discovery motions.  The first seeks to compel

15  production from the Plaintiffs.  (*See* MTC (Dkt. # 271); MTC Resp. (Dkt. # 277); MTC

16  Reply (Dkt. # 283).)  The second asks the court to confirm that Defendants have

17

18

19  Hiroyuki Komura, a defendant to Defendants' counterclaims.  (2d Am. Counterclaims ("2ACC")
    (Dkt. # 250) ¶ 1, at 16.)  Defendants allege Mr. Komura was the master of the Shonan Maru No.

20  2 when it collided with the Ady Gil in 2010 (*id.* ¶ 10), but Mr. Komura has not asserted any
    claims against Defendants (*see generally* FAC).

21        [2] Defendants' second amended answer and second amended counterclaims were filed
    conjunctively and paragraph numeration restarts in the section stating counterclaims.

22  Accordingly, the court refers to the second section of that filing as the second amended
    counterclaims and cites it accordingly.  (*See* 2ACC ¶¶ 1-100, at 16-45.)

1  unilaterally terminated the confidentiality agreement between the parties.  (*See* MTCT

2  (Dkt. # 272); MTCT Resp. (Dkt. # 280); MTCT Reply (Dkt. # 286).)

3      Having considered the submissions of the parties, the appropriate portions of the

4  record, and the relevant law, and having heard oral argument on December 15, 2015, the

5  court GRANTS IN PART and DENIES IN PART the various motions, as detailed herein.

6                              **II.   BACKGROUND**

7  **A.   Procedural History**

8      Plaintiffs filed this case on December 8, 2011, invoking jurisdiction under the

9  Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and seeking to enjoin Defendants' alleged

10  dangerous behavior on the high seas in the Antarctic.  (Compl. (Dkt. # 1).)  Defendants

11  answered and counterclaimed, seeking to enjoin Plaintiffs and collect damages for

12  Plaintiffs' comparable actions.  (Ans. (Dkt. # 94).)  Following motions practice and a

13  hearing, this court denied Plaintiffs' motion for a preliminary injunction on March 19,

14  2012.  *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 860 F. Supp. 2d

15  1216 (W.D. Wash. 2012).  After Plaintiffs appealed that order, this court stayed

16  proceedings on February 1, 2013.  (Stay (Dkt. # 131).)  The Ninth Circuit reversed this

17  court's denial of a preliminary injunction on February 25, 2013, instituting a preliminary

18  injunction "until further order" of the Ninth Circuit.  *Inst. of Cetacean Research v. Sea*

19  *Shepherd Conservation Soc'y*, 708 F.3d 1099, 1106 (9th Cir. 2013).  The Ninth Circuit

20  insubstantially amended and superseded that order on May 24, 2013.  *Inst. of Cetacean*

21  *Research v. Sea Shepherd Conservation Soc'y* (*Cetacean I*), 725 F.3d 940 (9th Cir.

22  2013).

1    This case remained stayed while Plaintiffs brought contempt proceedings in the

2  Ninth Circuit.  On December 19, 2014, the Ninth Circuit held SSCS, Mr. Watson, and

3  several non-parties to this suit liable for civil contempt.  *Inst. of Cetacean Research v.*

4  *Sea Shepherd Conservation Soc'y* (*Cetacean II*), 774 F.3d 935, 959 (9th Cir. 2014).  The

5  Ninth Circuit issued a contemporaneous decision rejecting several peripheral challenges

6  to the injunction.  *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*

7  (*Cetacean III*), 588 F. App'x 701 (9th Cir. 2014) (unpublished).[3]

8    On March 31, 2015, this court lifted its stay.  (3/31/15 Min. Entry (Dkt. # 243).)

9  Plaintiffs filed the operative first amended complaint on May 1, 2015 (*see* FAC (Dkt.

10  # 234)), and Defendants answered that complaint and asserted counterclaims on June 30,

11  2015 (*see* FAC Ans. (Dkt. # 250); 2ACC).  On June 4, 2015, pursuant to the Ninth

12  Circuit's directive in *Cetacean II*, this court imposed coercive sanctions on the parties

13  that had violated the injunction.  (Sanct. Order (Dkt. # 239).)  The case then proceeded,

14  and the parties have since filed the motions addressed herein.

15  **B.    Factual Background[4]**

16    This is a case between Antarctic whalers and environmentalists that oppose

17  whaling.  The Institute is a Japanese foundation that performs lethal whaling in the

18  Southern Ocean.  (*See* FAC ¶¶ 3, 10.)  Kyodo Senpaku, a Japanese corporation, owns the

19    [3] Under Ninth Circuit Rule 36-3(a), this unpublished opinion is precedential for this case.

20  *See* Ninth Cir. R. 36-3(a).

21    [4] The facts of this case are largely undisputed.  Thus, although the court is cognizant of
the differing inferential and evidentiary standards applied to the various motions presented here,
the facts as presented here come from the parties' pleadings.  Except where specified, this factual

22  narrative is consistent with both parties' pleadings.

1  whaling vessels used by the Institute, and Mr. Ogawa is the Master of the Nisshin Maru,

2  the "mother" ship of the Institute's whaling operations. (*See id.* ¶¶ 4-5.)

3      In 1982, the International Whaling Commission adopted a moratorium on

4  commercial whaling, which took effect in 1986. (ICJ Ruling (Dkt. # 175-1) ¶ 100; *see*

5  *also* 2ACC ¶ 16.) Under Article VIII of the International Convention for the Regulation

6  of Whaling, however, this moratorium does not apply to whale hunting conducted in

7  accordance with a "special permit" granted for purposes of scientific research by a

8  signatory of the Whaling Convention. International Convention for the Regulation of

9  Whaling [*hereinafter* Whaling Convention] art. VIII, Dec. 2, 1946, 62 Stat. 1716, 161

10  U.N.T.S. 74; (*see also* ICJ Ruling ¶ 55.) From 1987 to 2014, through a series of

11  programs entitled JARPA and JARPA II, Japan has issued special permits to the Institute

12  on an annual basis. (*See* ICJ Ruling ¶¶ 99-100.) These special permits allow the Institute

13  to perform lethal whaling in the Southern Ocean.[5] (*See* FAC ¶ 11.) The Institute

14  performs its Southern Ocean whaling operations from roughly December to March of

15  each year. (*See id.* ¶ 12.)

16      Mr. Watson founded SSCS and served as its executive director until the Ninth

17  Circuit issued its injunction. (*See* FAC ¶ 7; FAC Ans. ¶ 7; 2ACC ¶ 6.) SSCS's mission

18  is "to end the destruction of habitat and slaughter of wildlife in the world's oceans." (*See*

19  2ACC ¶ 2.) To that end, from 2005 to 2012, SSCS collaborated with foreign Sea

20

21  _____

22      [5] JARPA II, which replaced JARPA in 2005, allows the Institute an annual take of up to
935 minke whales, up to 50 fin whales, and up to 50 humpback whales. (*See* FAC ¶ 24.)

1  Shepherd entities[6] "on campaigns aimed at exposing and impeding [the Institute's] illegal

2  killing of whales in the Southern Ocean." (*Id.* ¶ 28.)  Those campaigns sought to "locate

3  and follow" the Institute's whaling ships, "and frustrate its . . . whale hunt." (*Id.*)

4  Defendants take the position that notwithstanding the Institute's special permits from

5  Japan, their whaling is nonscientific and thus contravenes the Whaling Convention and

6  other international law. (*See id.* ¶¶ 19-20.)

7      Defendants' campaigns led to several nautical confrontations between Plaintiffs

8  and Defendants.  (*See* FAC ¶¶ 13-21; 2ACC ¶¶ 35-38.)  The parties dispute who was the

9  aggressor in these interactions, but the acts allegedly taken by one or both parties include

10  ship ramming; throwing bottles of butyric acid, grappling hooks, glass bottles of paint,

11  and smoke bombs and other incendiary devices; illegal boarding; targeting with flares,

12  long-range acoustic devices, and water cannons; fouling rudders and propellers; assault;

13  stabbing with bamboo poles; and general unsafe navigation.  (*See* FAC ¶¶ 15, 20; 2ACC

14  ¶¶ 35-38, 41, 43.)  Plaintiffs have obtained preliminary injunctive relief against

15  Defendants' acts of piracy and unsafe navigation.  *See Cetacean I*, 725 F.3d at 947.  The

16  preliminary injunction bars Defendants from "physically attacking any vessel engaged by

17  Plaintiffs . . . in the Southern Ocean . . . or from navigating in a manner that is likely to

18  endanger the safe operation of any such vessel."  *Inst. of Cetacean Research v. Sea*

19  *Shepherd Conservation Soc'y* (*Cetacean Injunction*), 702 F.3d 573, 573 (9th Cir. 2012);

20

21      [6] SSCS inspired a "loosely organized global conservation movement" of foreign entities
that bear similar names. (2ACC ¶ 3.)  The court refers to the defendant in this action as "SSCS,"
whereas it refers to SSCS's foreign counterparts—which are non-parties—as "Sea Shepherd."

22  (*See id.*)

1  *Cetacean I*, 725 F.3d at 947 (ordering that the Ninth Circuit's injunction pending appeal

2  in *Cetacean Injunction* "remain in effect until further order of" the Ninth Circuit).

3  Furthermore, Defendants are "[i]n no event" to "approach [P]laintiffs any closer than 500

4  yards when [D]efendants are navigating on the open sea." *Id.* In subsequent

5  proceedings, the Ninth Circuit found Plaintiffs in contempt of the injunction, *see*

6  *Cetacean II*, 774 F.3d at 959, and this court issued civil contempt sanctions on Plaintiffs

7  (*see* Sanct. Order).

8      In March of 2014, the International Court of Justice ("ICJ") ruled that JARPA II is

9  noncompliant with the Whaling Convention. (*See* ICJ Ruling.) In response, Japan

10  declined to grant any special permits for the 2014-15 season, and Plaintiffs performed

11  only sighting surveys. (*See* FAC ¶ 31.) Japan then developed a new plan for granting

12  special permits entitled NEWREP-A. (*See id.*; 2ACC ¶ 27.) NEWREP-A lasts 12 years,

13  beginning in the 2015-16 whaling season, and allows the Institute to kill up to 333 minke

14  whales—but no other whale species—annually. (*See id.*) A scientific panel at the IWC

15  has found that NEWREP-A—like JARPA II—lacks a scientific basis. (2ACC ¶ 60.)

16      Plaintiffs intend to recommence whaling in the 2015-16 season with a new special

17  permit under Japan's NEWREP-A program. (FAC ¶ 31, 2ACC ¶ 60.) Defendants have

18  pledged to abide by the preliminary injunction and "do not plan to ever participate again

19  in a Southern Ocean whale-protection campaign." (Not. of Compliance (Dkt. # 248) at 2;

20  2ACC ¶ 5.) Nonetheless, foreign Sea Shepherd entities have continued their campaigns,

21  allegedly with funding provided by SSCS. (*See* FAC ¶ 50.3; FAC Ans. ¶ 44.) The

22

1  parties seek permanent injunctive relief protecting them from each other's allegedly

2  unlawful behavior.

3       Both parties argue that the other has violated international law against perpetrating

4  and funding piracy and unsafe navigation.  (FAC ¶¶ 34-52; 2ACC ¶¶ 69-74, 82-86,

5  94-100.)  These claims and counterclaims rely on substantially the same treaties and

6  agreements to establish a law of nations prohibiting such behavior.[7]  (See id.)

7  Furthermore, Defendants seek to enjoin Plaintiffs' whaling as either a violation of

8  international law established by the Whaling Convention, or as constituting piracy.  (See

9  2ACC ¶¶ 59-68, 75-81.)  Besides these claims for violations of the law of nations,

10 Plaintiffs seek injunctive relief for Defendants' maritime torts (see FAC ¶¶ 53-56), and

11 Defendants seek damages for Plaintiffs' tortious destruction of Defendants' property (see

12 2ACC ¶¶ 87-93).  Both sides argue on various grounds that dismissal of all adverse

13 claims is appropriate.  The court details these motions individually below.

14 //

15 //

16 //

17 //

18 ─────────────────────

19 [7] The primary international agreements on which the parties base their arguments include
   the United Nations Convention on the Law of the Sea [hereinafter UNCLOS], Dec. 10, 1982,
20 1833 U.N.T.S. 397; the Convention for the Suppression of Unlawful Acts Against the Safety of
   Maritime Navigation [hereinafter SUA Convention], Mar. 10, 1988, S. Treaty Doc. No. 101-1,
21 1678 U.N.T.S. 222; the United Nations International Convention for the Suppression of the
   Financing of Terrorism [hereinafter Financing Convention], Dec. 9, 1999, 2178 U.N.T.S. 197;
   the Convention on the International Regulations for Preventing Collisions [hereinafter
22 COLREGS], Oct. 20, 1972, 28 U.S.T. 3459, 1050 U.N.T.S. 18; and the Whaling Convention.

**C.     Legal Standards**

Two of the instant motions seek complete dismissal—Defendants' motion for judgment on the pleadings and Plaintiffs' motion to dismiss. These motions seek dismissal on three general bases: under Rule 12(b)(1), for lack of subject matter jurisdiction; under Rule 12(b)(6), for failure to state a claim; and under Rule 12(c), for failure to state a claim. The court first lays out those legal standards.[8]

1.     Under Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction is either facial or factual. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The court accepts the factual allegations in the complaint as true, and the nonmoving party is entitled to have those facts construed in the light most favorable to it. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). However, if the moving party "convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201

---

[8] To the extent the court substantively addresses the other pending motions, which seek partial summary judgment and resolution of discovery disputes, the court sets forth the legal standard governing those motions in the relevant subsection below.

1  (9th Cir. 1989)).  In either instance, the party asserting its claims in federal court bears

2  the burden of establishing subject matter jurisdiction.  *See Kokkonen v. Guardian Life*

3  *Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

4       2.  Under Rule 12(b)(6)

5       When considering a motion to dismiss under Federal Rule of Civil Procedure

6  12(b)(6), the court construes the complaint in the light most favorable to the nonmoving

7  party.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir.

8  2005).  The court must accept all well-pleaded allegations of material fact as true and

9  draw all reasonable inferences in favor of the plaintiff.  *See Wyler Summit P'ship v.*

10  *Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  "To survive a motion to

11  dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

12  claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

13  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Telesaurus*

14  *VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).  "A claim has facial plausibility

15  when the plaintiff pleads factual content that allows the court to draw the reasonable

16  inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 663.

17       The court, however, need not accept as true a legal conclusion presented as a

18  factual allegation.  *Id.* at 678.  Although the pleading standard announced by Federal

19  Rule of Civil Procedure 8 does not require "detailed factual allegations," it demands more

20  than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing

21  *Twombly*, 550 U.S. at 555).  A pleading that offers only "labels and conclusions or a

22

1  formulaic recitation of the elements of a cause of action" will not survive a motion to

2  dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Id.*

3      3.  Under Rule 12(c)

4      Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on

5  the pleadings after the pleadings are closed.  *See* Fed. R. Civ. P. 12(c).  A court "must

6  accept all factual allegations in the complaint as true and construe them in the light most

7  favorable to the non-moving party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir.

8  2009) (citation omitted); *see also Yakima Valley Mem'l Hosp. v. Wash. State Dep't of*

9  *Health*, 654 F.3d 919, 925 (9th Cir. 2011) (explaining that the court "assume[s] the facts

10  alleged in the complaint are true").  "Judgment on the pleadings is properly granted when

11  there is no issue of material fact in dispute, and the moving party is entitled to judgment

12  as a matter of law."  *Id.*; *see Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir.

13  2011).

14      When a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after an

15  answer has been filed, or when it is functionally equivalent to a motion to dismiss for

16  failure to state a claim, the same standard applies to both.  *Dworkin v. Hustler Magazine*

17  *Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *see Seabright Ins. Co. v. Matson Terminals,*

18  *Inc.*, 828 F. Supp. 2d 1177 (D. Haw. 2011) (observing that the motions differ in time of

19  filing but are otherwise functionally identical and require same standard of review).

20  Dismissal for failure to state a claim "is proper if there is a 'lack of a cognizable legal

21  theory or the absence of sufficient facts alleged under a cognizable legal theory.'"

22

1  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v.*

2  *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

3  **III.    DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

4  **A.    Background**

5        Defendants seek judgment on the pleadings as to all five of Plaintiffs' claims.

6  They argue that *Kiobel v. Royal Dutch Petroleum Co.*, --- U.S. ---, 133 S. Ct. 1659

7  (2013), narrowed the ATS's scope and thereby rendered Plaintiffs' claims for freedom of

8  safe navigation and piracy outside of this court's subject matter jurisdiction. (*See* MJP at

9  12-18.)  In the alternative, Defendants contend that there is no enforceable international

10  norm against endangering safe navigation, and that claim (1) therefore fails on the merits.

11  (*See id.* at 7-12.)  Defendants also dispute whether the Financing Convention supports a

12  private right of action, either on its own or as a manifestation of an enforceable

13  international norm.  (*See id.* at 18-21.)  As to Plaintiffs' maritime tort claims, Defendants

14  argue the pleadings are insufficient because they fail to provide important information for

15  purposes of analyzing maritime jurisdiction or choice of law.  (*See id.* at 21-24.)  Finally,

16  Defendants and Plaintiffs agree that the court resolved claim (5), which seeks coercive

17  contempt sanctions, in its June 4, 2015, order.  (*Id.* at 24; MJP Resp. at 16; Sanct. Order

18  at 2.)

19  **B.    Analysis**

20        1.  Claim (1):  Freedom of Safe Navigation

21        Because Defendants' *Kiobel* argument implicates the court's subject matter

22  jurisdiction, the court analyzes that argument first.

1       a. *ATS Jurisdiction Post-*Kiobel

2       Defendants argue that the ATS, as interpreted in *Kiobel*, places Plaintiffs' claim

3  for freedom of safe navigation outside of this court's subject matter jurisdiction. (MJP at

4  12-16.)  The Supreme Court decided *Kiobel* on April 17, 2013, shortly after the Ninth

5  Circuit reversed this court's denial of a preliminary injunction. *See Cetacean I*, 725 F.3d

6  at 940.  Plaintiffs do not dispute that *Kiobel* narrowed federal court jurisdiction under the

7  ATS, but they argue that *Cetacean III* and prior determinations by this court nonetheless

8  dictate the outcome on the issue. (MJP Resp. at 6-8.)  Even if not, Plaintiffs argue that

9  *Kiobel* does not foreclose subject matter jurisdiction in this court.

10      i.   Mandate Doctrine

11      "For the sake of efficiency and consistency, a decision of an appellate court on a

12  legal issue must be followed in all subsequent proceedings in the same case." *Snow-Erlin*

13  *v. United States*, 470 F.3d 804, 807 (9th Cir. 2006) (internal quotations omitted).

14  However, this rule—called the rule of mandate—recognizes that district courts "'are

15  often confronted with issues that were never considered by the remanding court.'"

16  *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (quoting *Biggins v.*

17  *Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997)).  Accordingly, district courts are

18  empowered to determine "anything not foreclosed by the mandate, and, under certain

19  circumstances, an order issued after remand may deviate from the mandate . . . if it is not

20  counter to the spirit of the circuit court's decision." *Kellington*, 217 F.3d at 1092-93

21  (internal citations and quotations omitted).  Nonetheless, the court's first point of

22  reference is the Ninth Circuit's prior rulings in the case.

1    Given this case's timeline, the Ninth Circuit had a meaningful opportunity to

2 address the implications of *Kiobel* only during the contempt proceedings.  There is no

3 mention of *Kiobel* in *Cetacean II*; only *Cetacean III* discusses *Kiobel*'s impact.[9]  The

4 whole of the memorandum opinion's discussion of *Kiobel* reads:

5      *Kiobel* concerns the reach of the Alien Tort Statute, which provides that
       "[t]he district courts shall have original jurisdiction of any civil action by an
6      alien for a tort only, committed in violation of the law of nations or a treaty
       of the United States." 28 U.S.C. § 1350.  We construe the Defendants'
7      argument, which is not adequately briefed, as a challenge to the district
       court's jurisdiction to hear the Plaintiffs' claims.  We also reject this
8      argument.  The Plaintiffs' piracy claims fall within the ambit of the Alien
       Tort Statute because piracy is a violation of the law of nations.  *See Sosa v.*
9      *Alvarez–Machain*, 542 U.S. 692, 720 (2004) (noting that Congress "may
       well" have had actions arising out of piracy in mind when it enacted the
10     Alien Tort Statute); *United States v. Smith*, 18 U.S. 153, 161, (1820) ("The
       common law, too, recognises and punishes piracy as an offence, not against
11     its own municipal code, but as an offence against the law of nations, (which
       is part of the common law,) as an offence against the universal law of
12     society, a pirate being deemed an enemy of the human race.").

13 *Cetacean III*, 588 F. App'x at 702.[10]

14    Defendants argue that although "various defendants in the contempt action raised

15 *Kiobel*," the Ninth Circuit intended to leave its application to this court.  (MJP at 14.)  In

16    _____

17    [9] The Ninth Circuit also mentions *Kiobel* in its August 13, 2013 order (*see* Dkt. # 162 at
       1-2) but performs no analysis that has any bearing here.

18    [10] Although the quoted language from *Cetacean III* refers to "piracy," the Ninth Circuit's
       prior rulings in this case make clear that the reference to Plaintiffs' "piracy claims" includes
19     Plaintiffs' claim for safe navigation on the high seas.  *See Cetacean I*, 725 F.3d at 942-44
       (analyzing what constitutes piracy, and concluding that unsafe navigation and more direct acts of
20     violence suffice), 945 ("The district court overlooked the actual language of the Convention,
       which prohibits 'endanger[ing] safe navigation.'  This requires only that [SSCS] create
21     dangerous conditions, regardless of whether the harmful consequences ever come about."
       (internal citations omitted) (alterations in original)).  Accordingly, notwithstanding the Ninth
22     Circuit's use of the term "piracy," the foregoing analysis applies equally to Plaintiffs' claim for
       endangering safe navigation.

ORDER- 14

1  light of the language above, the court disagrees.  Although the Ninth Circuit recognized

2  the "inadequate briefing" and rejected the *Kiobel* argument in summary fashion, its

3  language is unequivocal—the Court considered and rejected Defendants' post-*Kiobel*

4  jurisdictional argument because piracy on the high seas has historically been within the

5  federal courts' jurisdiction under the ATS.  *See Cetacean III*, 588 F. App'x at 702.  There

6  is no indication that the Ninth Circuit sought to have this court reconsider the *Kiobel*

7  argument.  *Id.*  Moreover, if the ATS does not confer jurisdiction over Plaintiffs' claims,

8  the Ninth Circuit's injunction would be outside its own power—an implication the Court

9  of Appeals is unlikely to have overlooked.  The court accordingly concludes that the

10  Ninth Circuit intended for its analysis of *Kiobel* to be part of the mandate to this court.

11  Nonetheless, in light of the "inadequate briefing" recognized in *Cetacean III* and the

12  court's ongoing obligation to assess its own subject matter jurisdiction, *see* Fed. R. Civ.

13  P. 12(h)(3), the court performs its own analysis of whether *Kiobel* places Plaintiffs'

14  claims outside the jurisdictional reach of the ATS.

15  　　　　　　　　　ii.  *Kiobel* and the ATS

16  　　　　The court's own analysis confirms that *Cetacean III* accurately analyzed the

17  post-*Kiobel* scope of the ATS.  Understanding *Kiobel*'s jurisdictional limitations begins

18  with the substantive limitations on ATS claims imposed in *Sosa v. Alvarez–Machain*, 542

19  U.S. 692 (2004).  In *Sosa*, the Supreme Court determined that the ATS is jurisdictional

20  and does not set forth a "new cause of action for torts in violation of international law."

21  *Id.* at 713.  This determination could have rendered the ATS "stillborn," which would

22  allow claims only when provided for by "a further statute expressly authorizing adoption

1    of causes of action." *Id.*  The Court instead concluded that the ATS authorizes "federal

2    courts to hear claims in a very limited category defined by the law of nations and

3    recognized at common law." *Id.* at 712-13.

4            The *Sosa* Court found that the Congress that enacted the ATS envisioned three

5    paradigmatic violations of the law of nations: "violation of safe conducts, infringement

6    on the rights of ambassadors, and piracy." *Id.* at 724.  Those causes of action are not

7    static, however, and the primary holding of *Sosa* is that "courts should require any claim

8    based on the present-day law of nations to rest on a norm of international character

9    accepted by the civilized world and defined with a specificity comparable to" safe

10   conduct, rights of ambassadors, and piracy.[11]  *Id.* at 725; *see also Kiobel*, 133 S. Ct. at

11   1671 (Breyer, J., dissenting) ("*Sosa* essentially leads today's judges to ask:  Who are

12   today's pirates?").  To apply this standard, "courts focus on whether a contemporary

13   international legal norm underlying a proposed ATS claim is 'specific, universal, and

14   obligatory.'"  *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1019 (9th Cir. 2014) (quoting *In

15   re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)).  *Sosa* also

16   cautioned courts to consider "practical consequences" when determining whether to

17   recognize a cause of action under the ATS.  *Sosa*, 542 U.S. at 732; *see also Doe I*, 766

18   F.3d at 1019.

19   _____

20   [11] "The body of international law that supplies the norms underlying an ATS claim is
     often referred to as customary international law." *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013,
21   1019 (9th Cir. 2014) (internal quotations omitted); *see also Abagninin v. AMVAC Chem. Corp.*,
     545 F.3d 733, 738 (9th Cir. 2008) ("The law of nations is synonymous with 'customary
     international law,' and violations of international law must contravene a norm that is specific,
22   universal, and obligatory." (internal citations omitted)).

1    *Kiobel* left intact *Sosa*'s analytical framework to determine whether a cause of

2    action lies, but it altered the jurisdictional analysis under the ATS.  133 S. Ct. at 1663.

3    The plaintiffs in *Kiobel* alleged that human rights violations in Nigeria violated

4    customary international law.  *Id.* at 1662-63.  The Supreme Court analyzed "whether a

5    claim may reach conduct occurring in the territory of a foreign sovereign," and held that

6    "the presumption against extraterritoriality applies to claims under the ATS."  *Id.* at 1664,

7    1669.  In other words, the underlying cause of action—which courts analyze under the

8    *Sosa* framework—must provide a "clear indication of extraterritoriality" in order for the

9    ATS to grant jurisdiction over the claim.  *Id.* (citing *Morrison v. Nat'l Australia Bank*

10   *Ltd.*, 561 U.S. 247, 265 (2010)).  Whereas "[a]pplying U.S. law to pirates . . . does not

11   typically impose the sovereign will of the United States onto conduct occurring within

12   the territorial jurisdiction of another sovereign," applying American law to alleged human

13   rights violations in Nigeria would certainly do so.  *Id.* at 1667.  Accordingly, the *Kiobel*

14   Court concluded that the alleged violations did not "touch and concern" the United

15   States, did not overcome the presumption against extraterritoriality, and were thus outside

16   of the federal jurisdiction conferred by the ATS.  *Id.*

17        Defendants assert that there "is no piracy exception to the rule announced in

18   *Kiobel*," and that therefore the court does not have jurisdiction over claims (1) and (2)

19   because the claims do not "touch and concern" the United States.[12]  (MJP at 17.)

20   _____

21        [12] SSCS is headquartered in Washington and organized in Oregon, and Mr. Watson is a
     permanent resident of the United States.  (FAC ¶¶ 6-7.)  Thus, to the extent the *Kiobel* Court
22   sought to prevent the United States from becoming a "safe harbor" for pirates and other enemies

1   Although the *Kiobel* Court deliberately "le[ft] open a number of significant questions

2 regarding the reach and interpretation of the" ATS, 133 S. Ct. at 1669 (Kennedy, J.,

3 concurring), the *Kiobel* opinion's discussion of piracy belies Defendants' assertion, *see*

4 *id.* at 1667.[13]  The Court recognized that when Congress passed the First Judiciary Act in

5 1789, "[p]irates were fair game wherever found, by any nation, because they generally

6 did not operate within any jurisdiction." *Id.*  In other words, Congress recognized that

7 piracy occurs "on the high seas, beyond the territorial jurisdiction of the United States or

8 any other country." *Id.* (recognizing that the Supreme Court "has generally treated the

9 high seas the same as foreign soil for purposes of the presumption against extraterritorial

10 application").  Nonetheless, the Court used "[p]iracy . . . on the high seas" as the

11 paradigmatic example of a cause of action in which the ATS *does* extend jurisdiction

12 extraterritorially. *Id.*; *see also id.* at 1666 (contrasting piracy with violations of safe

13 conduct and infringements on the rights of ambassadors, neither of which has any

14 "necessary extraterritorial application").

---

16 of mankind, this action touches and concerns the United States at least minimally. *See Kiobel*, 133 S. Ct. at 1671 (Breyer, J., concurring in the judgment) (citing *Sosa*, 542 U.S. at 732).

17     [13] Several federal district courts have read *Kiobel* to exempt piracy claims from its "touch and concern" analysis. *See, e.g., Shell Offshore Inc. v. Greenpeace, Inc.*, No. 3:15-cv-00054-

18 SLG, 2015 WL 3745641, at *3 (D. Alaska June 12, 2015) ("The Court finds that the alleged conduct in the Complaint, even if it is not piracy, is sufficiently akin to piracy so as to fall within

19 that exception to the presumption against extraterritoriality, particularly when the extraterritorial scope of the Court's jurisdiction is extended only to the high seas."); *Mwani v. Laden*, 947

20 F. Supp. 2d 1, 4 n.3 (D.D.C. 2013) ("This is aside from acts involving pirates or occurring on the high seas, for which jurisdiction under the ATS remains."); *Sexual Minorities Uganda v. Lively*,

21 960 F. Supp. 2d 304, 322 n.7 (D. Mass. 2013) ("In extreme cases, piracy for example, *Kiobel* noted that the ATS would provide jurisdiction over claims against foreign nationals for tortious

22 conduct committed wholly in a foreign country, on the ground that it carried less direct foreign policy consequences." (internal citations omitted)).

1    *Kiobel* thus makes clear that although the presumption against extraterritoriality

2    applies to the ATS, the presumption does not bar claims for piracy on the high seas. *Id.*

3    at 1667 ("We do not think that the existence of a cause of action against [pirates] is a

4    sufficient basis for concluding that other causes of action under the ATS reach conduct

5    that does occur within the territory of another sovereign; pirates may well be a category

6    unto themselves.").[14]  This conclusion is consonant with the prudential considerations

7    highlighted in *Kiobel*, in that the high seas are "beyond the territorial jurisdiction of the

8    United States or any other country," and thus "[a]pplying U.S. law to pirates . . . does not

9    typically impose the sovereign will of the United States onto conduct occurring within

10   the territorial jurisdiction of another sovereign." *Id.*  The court therefore concludes that

11   even if the Ninth Circuit did not intend its brief discussion of *Kiobel* in *Cetacean III* to be

12   binding, the court has jurisdiction over claim (1) under the ATS.

13        b.    *"Safe Navigation" as an Enforceable International Norm*

14   Defendants also attack Plaintiffs' claim for "safe navigation" (*see* MJP at 7-12) by

15   arguing that "freedom from safe navigation on the high seas" (*see* FAC ¶¶ 34-39.3) is

16   insufficiently "specific, universal, and obligatory" to qualify as an enforceable

17   international norm, *see Sosa*, 542 U.S. at 732.  Plaintiffs respond that the Ninth Circuit

18   conclusively determined this question in *Cetacean I* when it stated: "Cetacean has done

19

20   _____

       [14] An alternative to framing piracy as an exception to the presumption against
21   extraterritoriality is to infer from the United States' historical treatment of piracy on the high
     seas a "clear indication of extraterritoriality" of that cause of action.  This interpretation would
22   overcome—rather than create an exception to—the presumption announced in *Kiobel*.  Both
     characterizations yield the same result in this case.

1   nothing to acquire the rights to safe navigation and protection from pirate attacks; they

2   flow automatically from customary international law and treaties." (*See* MJP Resp. at 6

3   (quoting *Cetacean I*, 725 F.3d at 947).)

4       Defendants again seek to relitigate an issue that the Ninth Circuit considered and

5   determined.  In *Cetacean I*, the Ninth Circuit analyzed Plaintiffs' likelihood of

6   succeeding on the merits of their safe navigation claim.  *See Cetacean I*, 725 F.3d at

7   944-45.  Defendants recognize this inquiry but contend that it "assumed, without

8   deciding, that [Plaintiffs] had stated a claim for safe navigation," and therefore is not

9   binding. (*See* MJP Reply at 9.)  Nowhere does the Ninth Circuit identify such an

10  assumption, and indeed, such an assumption is incompatible with the Ninth Circuit's

11  analysis of Plaintiffs' likelihood of success on the merits.  *See Cetacean I*, 725 F.3d at

12  944-45.

13      Defendants argue that *Snow-Erlin* supports their argument that the Ninth Circuit

14  left this issue undecided.  (*See* MJP Reply at 9.)  In *Snow-Erlin*, the Ninth Circuit

15  expressly "took the claim *as alleged* on the face of the complaint . . . in order to decide

16  solely the underlying statute of limitations question," then remanded to the district court.

17  470 F.3d at 808.  On remand, the district court recharacterized one of the plaintiff's

18  claims over the plaintiff's objection that the Ninth Circuit had already decided the issue.

19  *See id.* at 807.  On a second appeal, the Ninth Circuit affirmed this recharacterization

20  because in the first appeal the Ninth Circuit had *assumed* the claim was proper, and

21  therefore the Night Circuit's first determination was not binding. *See id.*  In *Cetacean I*,

22  by contrast, the Ninth Circuit made no such assumption.

ORDER- 20

1        Instead, the Ninth Circuit analyzed Plaintiffs' likelihood of succeeding on the

2    merits of their safe navigation claim and concluded that this court abused its discretion in

3    determining that Plaintiffs were unlikely to succeed.  *See Cetacean I*, 725 F.3d at 944-45.

4    The premise that Plaintiffs' safe navigation claim is legally cognizable is necessary to the

5    Ninth Circuit's conclusion that the claim had a likelihood of success on the merits.

6    Moreover, *Cetacean I* expressly analyzes the SUA Convention, UNCLOS, and

7    COLREGS, and the Ninth Circuit concludes that those agreements support claims under

8    the ATS for piracy and unsafe navigation.  *See Cetacean I*, 725 F.3d at 945 ("The SUA

9    Convention prohibits acts that endanger, or attempt to endanger the safe navigation of a

10   ship. . . .  The COLREGS state obligatory and universal norms for navigating ships so as

11   to avoid collision.").  In other words, the Ninth Circuit "actually . . . decided the matter,

12   explicitly or by necessary implication," in *Cetacean I*.  *Snow-Erlin*, 470 F.3d at 807.  This

13   circumstance distinguishes this case from *Snow-Erlin*.  The court is therefore bound by

14   *Cetacean I*'s conclusion that safe navigation satisfies *Sosa*.

15        2.  Claim (2):  Freedom from Piracy

16        The *Kiobel*-based jurisdictional argument analyzed above comprises Defendants'

17   only challenge to Plaintiffs' claim for freedom from piracy.  For the reasons stated above,

18   the court concludes that (1) the Ninth Circuit previously determined that *Kiobel* does not

19   eliminate the court's subject matter jurisdiction, *see supra* Part III.B.1.a.i.; and (2) even if

20   the Ninth Circuit's laconic determination was not intended to bind this court on remand,

21   *Kiobel* demonstrates that the presumption against extraterritoriality does not preclude

22   claims for piracy on the high seas, *see supra* Part III.B.1.a.ii.  Accordingly, the court

1  denies Defendants' motion for judgment on the pleadings as to Plaintiffs' claim for

2  freedom from piracy.

3       3.  Claim (3):  Freedom from Terrorism

4       Defendants next seek dismissal of Plaintiffs' freedom from terrorism[15] claim.  (*See*

5  MJP at 18-21.)  Plaintiffs' amended complaint is not crystal clear as to the cause of action

6  and theory of liability.  (*See* FAC ¶¶ 48-52.)  However, Plaintiffs clarify their legal theory

7  in their response to Defendants' motion for judgment on the pleadings.  (*See* MJP Resp.

8  at 8-12.)  Plaintiffs contend that the Financing Convention sets forth two norms that

9  qualify as customary international law under the ATS.  (*See* MJP Resp. at 8-12.)  Article

10 2, Section 1 of the Financing Convention states:

> Any person commits an offence . . . if that person by any means, directly or
> indirectly, unlawfully and wilfully, provides or collects funds with the
> intention that they should be used or in the knowledge that they are to be
> used, in full or in part, in order to carry out:
>
>   (a) An act which constitutes an offence within the scope of and as
>   defined in one of the treaties listed in the annex; or
>
>   (b) Any other act intended to cause death or serious bodily injury to
>   a civilian, or to any other person not taking an active part in the
>   hostilities in a situation of armed conflict, when the purpose of such
>   act, by its nature or context, is to intimidate a population, or to
>   compel a government or an international organization to do or to
>   abstain from doing any act.

---

[15] This title for Plaintiffs' third claim comes from the amended complaint, although it
inaptly describes what is in reality a claim for funding both piracy and unsafe navigation in
contravention of the law of nations. (*See* FAC at 25; *id.* ¶¶ 48-52.) At oral argument, all parties
acknowledged the Ninth Circuit did not address this claim on appeal.

ORDER- 22

1  Financing Convention art. 2 § 1, Annex.[16]  Plaintiffs argue that Defendants violated

2  Section 1(a) by providing funding, ships, and other assets to foreign Sea Shepherd

3  entities, with the intent that those assets be used to commit piracy and unsafe navigation

4  in violation of the SUA Convention.  (*See* FAC ¶¶ 50.1, 50.3.)  Plaintiffs also allege that

5  Defendants violated Section 1(b) by providing those assets "in an effort to compel the

6  government of Japan to cease its authorization of research whaling."  (*Id.* ¶ 50.2.)  The

7  court analyzes these claims in turn.

8

9

------

10  [16] As used in the Financing Convention, "funds" means "assets of every kind, whether
tangible or intangible, movable or immovable, however acquired."  Financing Convention art. 1,

11  § 1.  The treaties listed in the annex to the Financing Convention are:

12      1. Convention for the Suppression of Unlawful Seizure of Aircraft, done at The
Hague on 16 December 1970.

13      2. Convention for the Suppression of Unlawful Acts against the Safety of Civil
Aviation, done at Montreal on 23 September 1971.

14      3. Convention on the Prevention and Punishment of Crimes against
Internationally Protected Persons, including Diplomatic Agents, adopted by the

15  General Assembly of the United Nations on 14 December 1973.
    4. International Convention against the Taking of Hostages, adopted by the
General Assembly of the United Nations on 17 December 1979.

16      5. Convention on the Physical Protection of Nuclear Material, adopted at Vienna
on 3 March 1980.

17      6. Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving
International Civil Aviation, supplementary to the Convention for the Suppression

18  of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 24
February 1988.

19      7. Convention for the Suppression of Unlawful Acts against the Safety of
Maritime Navigation, done at Rome on 10 March 1988

20      8. Protocol for the Suppression of Unlawful Acts against the Safety of Fixed
Platforms located on the Continental Shelf, done at Rome on 10 March 1988.

21      9. International Convention for the Suppression of Terrorist Bombings, adopted
by the General Assembly of the United Nations on 15 December 1997.

22  Financing Convention Annex.

1

    a. *Funding Violations of the SUA Convention in Violation of Article 2, Section 1(a) of the Financing Convention*

2

3

Defendants allegedly provide funds to foreign Sea Shepherd entities with the

intent that Sea Shepherd entities commit piracy or endanger safe navigation. (*Id.* ¶¶ 50.1,

4

50.3.) Plaintiffs contend these acts contravene a specific, universal, and obligatory

5

international norm, as required to sustain a cause of action under the ATS. *See Sosa*, 542

6

U.S. at 732; Financing Convention art. 2 § 1. As analyzed above, the Ninth Circuit

7

concluded, based upon international norms expressed in the SUA Convention, UNCLOS,

8

and COLREGS, that Plaintiffs' allegations of piracy and endangering safe navigation are

9

sufficient to sustain a private action under the ATS. *See supra* Part III.B.1.a. (citing

10

*Cetacean I*, 725 F.3d at 945). The Financing Convention expressly prohibits

11

intentionally or knowingly funding such activities, with specific reference to violations of

12

the SUA Convention. *See* Financing Convention art. 2 § 1, Annex. This similarity in

13

offenses—*funding* piracy and unsafe navigation versus *perpetrating* piracy and unsafe

14

navigation—leads the court to conclude that violation of Article 2, Section 1(a) of the

15

Financing Convention satisfies *Sosa*'s specificity requirement.[17]

16

17

18

---

19

[17] Defendants spend significant verbiage arguing that there is no international norm against terrorism that is sufficient to ground an ATS claim. (*See* MJP at 19-20; MJP Reply at 9-11.) The court is persuaded by that argument and finds it relevant to analyzing whether Article II, Section 1(b) of the Financing Convention can ground a claim under the ATS. *See infra* Part III.B.3.b. In contrast to the broad swath of Section 1(b), however, Section 1(a) proscribes funding violations of nine *specific* international agreements. *See* Financing Convention art. 1 § 1(a), Annex. This norm is narrowly drawn in comparison to Section 1(b), which leads the court to conclude that Defendants' arguments about the definition and acceptance of an international norm against terrorism are inapplicable to the court's analysis of Section 1(a).

20

21

22

1    It is less clear that the norms expressed in Section 1(a) are "universal" and

2    "obligatory." *See Sosa*, 542 U.S. at 732.  The three district courts that have addressed

3    whether the norms expressed in the Financing Convention are sufficiently universal and

4    obligatory have reached differing conclusions.  Section 1(a), which also proscribes

5    funding violations of the Bombing Convention, contributed to the Eastern District of

6    New York's conclusion that there is a specific, universal, and obligatory international

7    norm against financing civilian bombings.  *See Almog v. Arab Bank, PLC*, 471

8    F. Supp. 2d 257, 276-80 (E.D.N.Y. 2007).  The court noted that the Financing

9    Convention "has been ratified by over 130 countries, including the United States." *Id.* at

10   277.  However, the court also gave weight to corresponding norms expressed in the

11   Geneva Conventions and several literary sources; in other words, the *Almog* court's

12   determination that the norm expressed in the Financing Convention was universal and

13   obligatory relied in part on other sources of international law.  *See id.* at 277-78.

14       On the other hand, the Southern District of Florida has expressly concluded that

15   "the Financing Convention does not establish a *universally accepted* rule of customary

16   international law" because it has not been ratified by an "overwhelming majority" of

17   states. *Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792

18   F. Supp. 2d 1301, 1318-19 (S.D. Fla. 2011) (citing *Flores v. S. Peru Copper Corp.*, 414

19   F.3d 233, 256 (2d Cir. 2003)).  At the time the *Chiquita* court evaluated the Financing

20   Convention, only 111 nations—58 percent of the world—had ratified the treaty. *Id.* at

21   1319.  The court also reasoned that the "many declarations and reservations, i.e., non-

22   consents and varying interpretations" undermined the Financing Convention's

1   evidentiary value. *Id.*   The court accordingly concluded that financing terrorism is not

2   actionable under the ATS. *Id.* at 1321; *see also Barboza v. Drummond Co.*, No.

3   06-61527-CIV, 2007 WL 8025825, at *11-12 (S.D. Fla. July 17, 2007) (concluding that

4   financing terrorism is an insufficient cause of action because terrorism is too vague and

5   internationally disputed to constitute an enforceable customary international law).

6       Two facets of *Almog* distinguish it from *Barboza* and *Chiquita*: the specificity of

7   the putative international norm and the evidentiary support for the norm outside of the

8   Financing Convention.   As compared to this case, the court finds *Almog*'s facts more

9   analogous and rationale more persuasive.   Both *Barboza* and *Chiquita* reject arguments

10   that "financing terrorism" violates a universal and obligatory international norm. *See*

11   *Barboza*, 2007 WL 8025825, at *11 ("Unlike the plaintiffs in *Almog*, Plaintiffs here have

12   asserted only claims of terrorism in general, not acts of terrorism as specifically defined

13   in a recognized norm of customary international law."); *Chiquita*, 792 F. Supp. 2d at

14   1318 ("*Almog* is . . . distinguishable in that the court there did not recognize an ATS

15   claim for terrorism in general . . . . Rather, *Almog* rested its holding on . . . suicide

16   bombings and assassinations of civilians.   Indeed, the court explained that its holding

17   was . . . not based upon a cause of action for 'terrorism' generally."). In contrast, the

18   financing violations in *Almog* are specific to the Bombing Convention. *See Almog*, 471

19   F. Supp. 2d at 277-78, 280.   Plaintiffs' claim under the Financing Convention similarly

20   alleges funding a violation of a treaty listed in its Annex. *See* Financing Convention art.

21   2 § 1(a), Annex; *see also supra* Note 16.   This specificity lessens the relevance of

22   Defendants' argument—and the conclusions in *Barboza* and *Chiquita*—that "the

ORDER- 26

1  Financing Convention neither codifies nor creates an international-law norm against

2  terrorism or financing terrorism." (MJP at 19 (citing *Chiquita*, 792 F. Supp. 2d at 1318).)

3         Several reasons distinct from the Financing Convention bolster the conclusion that

4  the international norm against funding piracy and unsafe navigation is universal and

5  obligatory. *See Sosa*, 542 U.S. at 734 (quoting *The Paquete Habana*, 175 U.S. 677, 700

6  (1900)) ("[W]here there is no treaty and no controlling executive or legislative act or

7  judicial decision, resort must be had to the customs and usages of civilized nations; and,

8  as evidence of these, to the works of jurists and commentators." (alterations in original)).

9  First, piracy itself is the paradigmatic example of a violation of customary international

10 law. *Sosa*, 542 U.S. at 724-25. Although funding piracy is a different offense, the close

11 relation between the two provides some evidence of general acceptance of a norm against

12 funding piracy. *See Almog*, 471 F. Supp. 2d at 280-85 (combining the analysis of an

13 international norm against civilian bombings, as stated in the Bombing Convention, with

14 the analysis of an international norm against *financing* civilian bombings, as stated in the

15 Financing Convention). Furthermore, the SUA Convention provides for aiding and

16 abetting liability, which bolsters this inference and evidences acceptance of a norm

17 against funding piracy and unsafe navigation. *See* SUA Convention art. 2 § 2.2 ("Any

18 person also commits an offence if that person . . . abets the commission of any of the

19 offences [previously identified]."). Finally, unlike in *Barboza* and *Chiquita*, the various

20 //

21 //

22 //

1   countries' reservations and declarations[18] to the Financing Convention largely pertain to

2   unrelated components of the Convention. *See Almog*, 471 F. Supp. 2d at 282;

3   Declarations and Reservations to the Financing Convention, *available at*

4   https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-

5   11&chapter=18&lang=en (listing only 21 of the 187 current parties to the Financing

6   Convention as objectors to its incorporation of the SUA Convention). The court

7   therefore concludes that the international norm against financing piracy and unsafe

8   navigation is sufficiently specific, universal, and obligatory to sustain a cause of action,

9   and the court denies Defendants' motion for judgment on the pleadings as to that claim.

10          The court reaches this determination mindful of the Supreme Court's admonition

11   to exercise "judicial caution when considering the kinds of individual claims that might

12   implement" ATS jurisdiction. *Sosa*, 542 U.S. at 725. Foreign affairs consequences, in

13   which the judiciary impinges on the legislative and executive branches, are an important

14   reason to exercise such caution. *See id.* at 727-28. Nevertheless, the Ninth Circuit has

15   already concluded claims (1) and (2), for piracy and unsafe navigation, state enforceable

16   international norms. *See Cetacean I*, 725 F.3d at 944-45; *supra* Part III.B.1.b. Given that

17   reality, the court foresees no unrealized foreign policy implications from recognizing

18

19

   ---

20          [18] A reservation is "a unilateral statement made by a state . . . whereby it purports to

21   exclude or modify the legal effect of certain provisions of that agreement." *See* Restatement
     (Third) of Foreign Relations Law of the United States § 313 cmt. a (1987). A state may also
     issue a declaration, which is often similar to a reservation except that it "purports to be an

22   'understanding,' an interpretation of the agreement in a particular respect." *Id.* cmt. g.

1  claims for *financing* piracy and unsafe navigation, and thus comity concerns do not alter

2  the court's conclusion on this claim.

3      b.  *Funding Terrorism in Violation of Article 2, Section 1(b) of the Financing Convention*

4      Plaintiffs also allege that Defendants have funded "acts intended to cause death or

5  serious bodily injury to a civilian" with the purpose of compelling the Japanese

6  government to cease authorizing research whaling.  (FAC ¶¶ 49.2, 50.2 (citing Financing

7  Convention art. 2 § 1(b)).)  Defendants characterize this as a claim for financing terrorism

8  and argue that no specific, universal, and obligatory international norm against

9  terrorism—or financing terrorism—exists.  (*See* MJP at 19-21.)  Plaintiffs mount an

10 inapposite opposition, arguing that the court "is not being asked to *create* a definition of

11 'terrorism'" because the Financing and SUA Conventions do so.  (MJP at 11.)  This

12 inaccurately describes Section 1(b), however, which in contrast to Section 1(a) does not

13 incorporate the specific "treaties listed in the annex" to the Financing Convention.

14 *Compare* Financing Convention art. 2 § 1(b) *with id.* § 1(a).

15      The court agrees with the numerous federal courts that have concluded, post-*Sosa*,

16 that there is no enforceable international norm against terrorism.  *See, e.g., Chiquita*, 792

17 F. Supp. 2d at 1316-19; *Barboza*, 2007 WL 8025825, at *10-11; *Krishanthi v.*

18 *Rajaratnam*, No. 09-CV-05395 (DMC-JAD), 2010 WL 3429529, at *10-11, *13 (D.N.J.

19 Aug. 26, 2010).  Terrorism defies a narrow definition.  *See United States v. Yousef*, 327

20 F.3d 56, 106-08 (2d Cir. 2003).  Furthermore, acceptance of norms against terrorism is

21 disuniform.  *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984)

1    ("While this nation unequivocally condemns all terrorist attacks, that sentiment is not

2    universal.  Indeed, the nations of the world are so divisively split on the legitimacy of

3    such aggression as to make it impossible to pinpoint an area of harmony or consensus.").

4    A putative norm against financing terrorism is likewise insufficiently "specific, universal,

5    and obligatory."  *See Sosa*, 542 U.S. at 732-33.  The court therefore dismisses Plaintiffs'

6    claim (3) to the extent it seeks to broadly enjoin financing terrorism.

7           4.  Claim (4):  Maritime Law Claims

8           Defendants also contend that Plaintiffs' maritime tort claims should be dismissed

9    for insufficient pleading.  Specifically, Defendants contend that Plaintiffs' pleadings fail

10   to establish maritime jurisdiction and fail to include sufficient facts to analyze the

11   applicable law.  (*See* MJP at 21-25; *see also* FAC ¶¶ 53-56.)  Defendants provide little

12   argument on maritime jurisdiction, except to the extent that the jurisdictional analysis

13   happens to overlap with choice-of-law analysis.  (*See* MJP at 21.)  Defendants cite prior

14   language from the court that Plaintiffs' "invocation of admiralty jurisdiction has so far

15   been largely pro forma."[19]  (3/19/12 Order (Dkt. # 95) at 27; *see also* MJP at 21-22.)

16   However, the court concluded in the same order that it has subject matter jurisdiction

17   over Plaintiffs' admiralty claims.  (*See* 3/19/12 Order at 13.)  Defendants have not

18   indicated any change that would render infirm the court's conclusion.  (*See* MJP at

19   21-22.)  Accordingly, the court rejects Plaintiffs' effort to dismiss the maritime claims for

20   lack of subject matter jurisdiction.

21   _____

22          [19] When referring to jurisdiction, "admiralty" and "maritime" are synonymous.  *See*
*Admiralty and Maritime Jurisdiction*, Black's Law Dictionary (10th ed. 2014).

1    Defendants also contend that Plaintiffs' "vague [maritime] claim fails to plead

2    facts necessary . . . to engage in the choice-of-law analysis that would be required for the

3    identification and adjudication of any maritime common-law tort claim." (MJP at 21.)

4    The *Lauritzen* factors provide guideposts for a court performing choice-of-law analysis

5    on a maritime common law claim. *See Lauritzen v. Larsen*, 345 U.S. 571, 583-93 (1953).

6    The factors are: (1) place of the wrongful act; (2) law of the flag, i.e., nationality of the

7    vessels; (3) allegiance or domicile of the injured; (4) allegiance of the defendant

8    shipowner; (5) place of contract; (6) inaccessibility of foreign forum; and (7) law of the

9    forum. *Id.* This list is non-exhaustive, and the Supreme Court has added to it the

10   shipowner's base of operations. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306,

11   308-09 (1970). Moreover, not all factors merit equal consideration. *See, e.g., Lauritzen*,

12   345 U.S. at 584-85 (explaining the "cardinal importance" of the law of the flag, which is

13   dispositive as to the applicable law unless "some heavy counterweight" overcomes it).

14   Defendants contend that because Plaintiffs' amended complaint "includes no reference to

15   the flags flown by any of the vessels in the alleged events"—a "cardinal" factor in

16   performing choice of law analysis—it is "impossible to determine from the face of the

17   Complaint what body of substantive law should apply to the [maritime tort] claims . . .

18   which alone is sufficient to" entitle Defendants to judgment on the pleadings.[20] (MJP at

19   22-23.)

20

_____

21       [20] Although Plaintiffs' operative complaint makes no textual reference to the flags flown
22   by the ships, Plaintiffs attached as exhibits photos of Defendants' ships with flags painted on
     them for ships they have "sunk" (*see* FAC Ex. 1 (Dkt. # 234-1) at 1) and "rammed" (*see* FAC

1    However, Defendants make no showing that applying *any* potentially applicable

2  law would entitle Defendants to dismissal.  Indeed, the only argument Defendants make

3  regarding foreign law is that if the court were to apply Australian law, "it would need to

4  consider the fact that the Institute has been enjoined by an Australian court from whaling

5  in the Australian Whale Sanctuary, and has been flouting this injunction since 2008."

6  (*See* MJP at 24.)  Although Defendants repeatedly insist that Australian law would

7  require the court to "consider" this injunction, they never articulate what the *impact* of

8  doing so would be—even after Plaintiffs pointed out this omission in their opposition.

9  (*Compare* MJP Resp. at 15-16 & n.16 *with* MJP Reply at 12.)

10    Choice of law will be an important aspect of this case, but Defendants have failed

11  to demonstrate that it is outcome-determinative.  Accordingly, the court denies

12  Defendants' motion for judgment on the pleadings as to Plaintiffs' maritime tort claims.

13    5.  Claim (5):  Coercive Contempt Sanctions

14    On June 4, 2015, the court issued an order granting in part and denying in part

15  Plaintiffs' requests for remedial contempt sanctions.  (*See* Sanct. Order at 2.)  Both sides

16  agree that this resolved the issues presented in claim (5).  (*See* MJP at 24; MJP Resp. at

17  16.)  Accordingly, the court dismisses this claim without prejudice.

18  **C.    Determination**

19    The court GRANTS IN PART and DENIES IN PART Defendants' motion for

20  judgment on the pleadings.  The court grants the motion and DISMISSES WITHOUT

21

22  Ex. 2 (Dkt. # 234-2) at 1).  Two of the ships that have been "rammed" appear to be the Yushin
Maru No. 1 and the Yushin Maru No. 3, both of which appear beneath Japanese flags.  (*See id.*)

ORDER- 32

1   PREJUDICE Plaintiffs' ATS claims for funding terrorism, *see supra* Part III.B.3.b., and

2   Plaintiffs' claim seeking coercive contempt sanctions, *see supra* Part III.B.5.  The court

3   denies the motion in all other respects.

4       Neither side has addressed whether Plaintiffs should be granted leave to amend

5   their claims, and such leave is to be freely given.  *Bowles v. Reade*, 198 F.3d 752, 757

6   (9th Cir. 1999).  However, Plaintiffs agree that claim (5) is moot, and amended

7   allegations cannot save claim (3) insofar as it seeks to enjoin financing terrorism because

8   such claims are not cognizable as a matter of law.  *See supra* Parts III.B.3.b., III.B.5.  The

9   court therefore concludes that amendment would be futile and declines to grant leave to

10  amend.  *See Bowles*, 198 F.3d at 758 (permitting denial of leave to amend where

11  amendment would be futile).

12  **IV.   PLAINTIFFS' MOTION TO DISMISS**

13  **A.   Background**

14      Defendants assert six counterclaims[21] against Plaintiffs:  (1) violation of an

15  international norm against whaling (*see* 2ACC ¶¶ 59-68); (2) freedom from piracy (*see*

16  *id.* ¶¶ 69-74); (3) pirate whaling (*see id.* ¶¶ 75-81); (4) freedom of safe navigation on the

17  high seas (*see id.* ¶¶ 82-86); (5) intentional and/or negligent destruction of property,

18  brought only by SSCS (*see id.* ¶¶ 87-93); and (6) freedom from terrorism, brought against

19  only the Institute and Kyodo Senpaku (*see id.* ¶¶ 94-100).  Plaintiffs assert that

---

21,22  [21] Except where otherwise specified, all Defendants assert these counterclaims against all Plaintiffs.  Additionally, where used in this section, "Plaintiffs" includes Mr. Komura, the former master of the Shonan Maru No. 2. *See supra* Note 1.

1  Defendants lack standing to bring counterclaims (1)-(4) and (6) (*see* MTD at 6-14); fail to

2  state a claim for relief in counterclaims (1)-(6) (*see* MTD at 5-6, 14-23); and cannot bring

3  counterclaim (5) because it is time-barred (*see* MTD at 4).

4  **B.     Analysis**

5       1.   Standing

6       Plaintiffs argue Defendants lack Article III standing[22] to bring counterclaims

7  (1)-(4) and (6).  (*See* MTD at 6-14.)  If Defendants lack Article III standing, this court

8  lacks subject matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

9  (1992); *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 974 (9th Cir. 2009).

10           *a.   Legal Standard*

11      "To establish Article III standing, an injury must be 'concrete, particularized, and

12  actual or imminent; fairly traceable to the challenged action; and redressable by a

13  favorable ruling.'"  *Clapper v. Amnesty Int'l USA*, --- U.S. ---, 133 S. Ct. 1138, 1147

14  (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

15  More concisely, these requirements are known as injury, causation, and redressability.

16  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 540 (2007) (Roberts, C.J., dissenting).

17  Because Defendants seek "declaratory and injunctive relief only" under counterclaims

18  (1)-(4) and (6), "there is a further requirement that they show a very significant

19  _____

20      [22] "Standing jurisprudence contains two strands: Article III standing, which enforces the
    Constitution's case-or-controversy requirement, . . . and prudential standing, which embodies
21  'judicially self-imposed limits on the exercise of federal jurisdiction.'"  *Elk Grove Unified Sch.
    Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).
22  The court's use of the term "standing" herein refers to Article III standing, as neither party has
    raised prudential standing.

1  possibility of future harm; it is insufficient for them to demonstrate only a past injury."

2  *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996); *see also*

3  *Lujan*, 504 U.S. at 562-64 ("[T]he affiants' profession of an 'inten[t]' to return to the

4  places they had visited before—where they will presumably, this time, be deprived of the

5  opportunity to observe animals of the endangered species—is simply not enough.").

6       In environmental cases, injury "is satisfied if an individual adequately shows that

7  she has an aesthetic or recreational interest in a particular place, or animal, or plant

8  species and that that interest is impaired by a defendant's conduct." *Ecological Rights*

9  *Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing *Friends of the*

10  *Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182-83 (2000)). "While

11  generalized harm to the forest or the environment will not alone support standing, if that

12  harm in fact affects the recreational or even the mere aesthetic interests of the plaintiff,

13  that will suffice." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (citing

14  *Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972)).  An organization can have standing

15  to sue on behalf of its members, but only if "it or its members would be affected in any of

16  their activities or pastimes." *Sierra Club*, 405 U.S. at 735.

17       As the parties invoking jurisdiction over their counterclaims, Defendants bear the

18  burden of establishing standing. *See Lujan*, 504 U.S. at 561.

19       b.  *SSCS's "Members"*

20       As a threshold matter, Plaintiffs argue that SSCS has not alleged that it has

21  "members," and thus SSCS does not have standing under *Sierra Club*.  (*See* MTD at 7-9.)

22  An association "has standing to bring suit on behalf of its members when:  (a) its

members would otherwise have standing to sue in their own right; (b) the interests it

seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs argue that SSCS fails to "allege that it is an organization with members

(because it is not)." (MTD at 7.)  SSCS responds that its employees and volunteers are

"members" in the relevant sense, and that by planning future whale-watching trips to the

Southern Ocean, SSCS's employees and volunteers satisfy element (a).  (*See* MTD Resp.

at 9.)

The law is not so formalistic as to preclude employees and volunteers from

counting as members for purposes of associational standing.  *See Hunt*, 432 U.S. at 345

("[W]hile the apple growers and dealers are not 'members' of the Commission in the

traditional trade association sense, they posses all of the indicia of membership in an

organization.").  The "indicia of membership" identified in *Hunt* are that the putative

members "alone elect the members of the Commission; they alone may serve on the

Commission; they alone finance its activities, including the costs of this lawsuit, through

assessments levied upon them." 342 U.S. at 344-45.  However, the Ninth Circuit does

not treat these specific indicia as necessary, instead focusing on the general principle that

"[a]ssociational standing is reserved for organizations that 'express the[] collective views

and protect the[] collective interests' of their members." *Fleck & Assocs., Inc. v.*

*Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Hunt*, 432 U.S. at 345)

(alterations in original); *see also Int'l Union, United Auto., Aerospace, & Ag. Implement*

1  *Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) ("[T]he doctrine of associational

2  standing recognizes that the primary reason people join an organization is often to create

3  an effective vehicle for vindicating interests that they share with others."); *Oregon*

4  *Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (reasoning that although the

5  putative members "do not have all the indicia of membership that the *Hunt* apple growers

6  and dealers possessed," there were sufficient indicia of membership "to satisfy the

7  purposes that undergird the concept of associational standing:  that the organization is

8  sufficiently identified with and subject to the influence of those it seeks to represent as to

9  have a personal stake in the outcome of the controversy" (internal quotations omitted)).

10      SSCS makes clear that its mission is "to end the destruction of habitat and

11  slaughter of wildlife in the world's oceans" (2ACC ¶ 2), and that its employees—most of

12  whom are volunteers—buy into and impact that mission (*see, e.g., id.* ¶ 32).  The footage

13  submitted as an attachment to Defendants' counterclaims makes clear the commitment

14  that SSCS's members have to its cause.  (*See* 2ACC ¶ 19, Ex. 2 (Dkt. # 250-2) (DVD on

15  file with the court).)  Thus, although SSCS makes minimal allegations about its financial

16  contributions or managerial structure, the court finds that Defendants plead sufficient

17  facts to allow the court to reasonably infer that "the organization is sufficiently identified

18  with and subject to the influence of those it seeks to represent as to have a personal stake

19  in the outcome of the controversy." *Mink*, 322 F.3d at 1111.  The court therefore rejects

20  Plaintiffs' argument that SSCS lacks standing to assert counterclaims on behalf of its

21  employees and volunteers.

22

c. *Counterclaims (1) and (3): Whaling and Pirate Whaling*

Plaintiffs contend Defendants have failed to allege imminent injury and thus lack standing to seek injunctive relief.[23]  (*See* MTD at 9-11.)  The Supreme Court has stated that an environmentalist organization's members do not demonstrate "actual or imminent" injury by declaring a general intent to visit impacted locations.  *See Lujan*, 504 U.S. at 564.  *Lujan* arose out of the district court's denial of the defendant's motion for summary judgment for lack of standing.  *See id.* at 559.  The plaintiffs submitted affidavits that demonstrated two members' general intent to return to the affected areas. *See id.* at 563-64.  The Supreme Court disregarded the affiants' past visits and concluded that a mere intent to return to the area—"without any description of concrete plans, or indeed any specification of *when* the some day will be"—is "simply not enough" to support the "imminent injury" element of standing.  *Id.* at 564.

At the motion to dismiss stage, however, the burden on claimants asserting standing is not so demanding; indeed, "general factual allegations of injury resulting from [Plaintiffs'] conduct" may suffice.  *See Lujan*, 504 U.S. at 561 (differentiating between a motion to dismiss and a motion for summary judgment, at which point the claimant "can no longer rest on such "mere allegations," but must "set forth" specific facts by affidavit or other evidence (citing Fed. R. Civ. P. 56(e))); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 n.3 (1992) ("*Lujan*, since it involved the establishment of injury in fact at the *summary judgment* stage, required specific facts to be adduced by sworn

---

[23] Because Plaintiffs mount a facial attack on Defendants' standing, the court accepts as true the allegations in Defendants' counterclaims.  *See Meyer*, 373 F.3d at 1039.

1    testimony; had the same challenge to a generalized allegation of injury in fact been made

2    at the pleading stage, it would have been unsuccessful."); *Levine v. Vilsack*, 587 F.3d

3    986, 996-97 (9th Cir. 2009) ("[A] court's obligation to take a plaintiff at its word at [the

4    motion to dismiss] stage in connection with Article III standing issues is primarily

5    directed at the injury in fact and causation issues.").  The court is, however, limited from

6    interpreting the complaint so liberally that it extends subject matter jurisdiction beyond

7    the bounds of Article III.  *See W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.

8    1981).

9              Defendants allege plans comparable to those at issue in *Lujan*.  As a threshold

10   matter, it is minimally relevant that Defendants' members allegedly "routinely traveled to

11   the Southern Ocean to observe the whales" and "have suffered severe emotional distress

12   when observing [the Institute's] violent slaughter of the whales."  (2ACC ¶ 63.)  It

13   "proves nothing" that a claimant seeking injunctive relief "had visited" the relevant areas

14   in the past.  *Lujan*, 504 U.S. at 564.  Furthermore, Defendants aver that they "do not plan

15   to ever participate again in a Southern Ocean whale-protection campaign."  (2ACC ¶ 5.)

16   Defendants' do intend, however, to "return to the Southern Ocean to observe and enjoy

17   the whales, while participating in future campaigns not directly related to whale-

18   protection" (*id.* ¶ 63), but this declaration states only "some day" intentions that are no

19   more concrete than those in *Lujan*, *see* 504 U.S. 563-64.  On the other hand, Defendants

20   clarify that their "planned campaigns over the next three years" will "monitor, research,

21   and protect the vital krill population" in the Southern Ocean.  (2ACC ¶ 63.)  It is

22   reasonable to infer that these "planned campaigns" will occur with regularity over the

1  next three years (*see* 2ACC ¶ 63)—like Defendants' prior anti-whaling campaigns—and

2  not "sometime in the next three years" as Plaintiffs infer (*see* MTD at 10). Defendants

3  therefore provide a more concrete plan to return to the area than that was at issue in

4  *Lujan*. (*Id.* ¶ 63.) It is reasonable to infer that Defendants' planned, imminent travels to

5  the Southern Ocean will seek out minke whales, and that by diminishing their overall

6  population Plaintiffs would cause aesthetic injury to Defendants. *See Lujan*, 504 U.S. at

7  566-67 ("It is even plausible—though it goes to the outermost limit of plausibility—to

8  think that a person who observes or works with animals of a particular species in the very

9  area of the world where that species is threatened by a federal decision is facing such

10 harm, since some animals that might have been the subject of his interest will no longer

11 exist." (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4

12 (1986))).

13     The court also rejects Plaintiffs' argument that Mr. Watson has not alleged

14 causation as to counterclaims (1) and (3). (*See* MTD at 11-12.) Defendants'

15 counterclaims, construed in Defendants' favor, allege planned, future trips on the part of

16 Mr. Watson as well as other members of SSCS. (*See, e.g.*, 2ACC ¶ 63 ("Watson intends

17 to participate in some of these [planned] campaigns.").) The impact of an annual taking

18 of 333 minke whales could very well disrupt the ecosystem that Mr. Watson and other

19 SSCS members plan to visit. *See Lujan*, 504 U.S. at 566-67; *Japan Whaling*, 478 U.S. at

20 230 n.4.

21     Further factual development may demonstrate that Defendants' alleged aesthetic

22 injury or causation are too speculative or abstract to be cognizable. Of particular concern

ORDER- 40

1   is the immense size of the Southern Ocean in comparison to the 333 minke whales that

2   the Japanese government authorized the Institute to kill annually under NEWREP-A.

3   (*See* 2ACC ¶ 28; *see also* MTD at 12.)  However, in this facial challenge to standing at

4   the motion to dismiss stage, the court takes Defendants' allegations as true and construes

5   those allegations in Defendants' favor.  *See African Am. Contractors*, 96 F.3d at 1207.

6   Accordingly, the court concludes Defendants have sufficiently demonstrated imminent

7   injury and causation as to counterclaims (1) and (3).[24]

8          *d.  Counterclaims (2), (4), and (6): Committing and Financing Violations of International Norms Against Piracy and Unsafe Navigation*

9        On the other hand, Defendants have not demonstrated a likelihood of future injury

10  for counterclaims (2) and (4), which seek to enjoin future piracy and unsafe navigation by

11  Plaintiffs.[25]  Defendants have indicated that they intend to abide by the preliminary

12  injunction, which bars Defendants from navigating within 500 yards of Plaintiffs.  (*See*

13  Not. of Compliance at 2); *Cetacean Injunction*, 702 F.3d at 573; *Cetacean I*, 725 F.3d at

14  947.  Defendants also "do not plan to ever participate again in a Southern Ocean

15  whale-protection campaign (regardless of whether or not they are enjoined)."  (2ACC

16  ¶ 5.)  Defendants nonetheless indicate a "direct interest in pursuing declaratory and

17  injunctive relief against" Plaintiffs "in relation to" piracy and unsafe navigation.  (*Id.*)

18

 

19

20  [24] Because the court concludes Defendants have standing for counterclaims (1) and (3), the court expresses no opinion on whether Defendants might have standing as "next friend on behalf of the Southern Ocean whales."  (MTD Resp. at 16-17; *see also* MTD at 13-14.)

21  [25] The actions underlying counterclaims (2), (4), and (6) do not cause the aesthetic injury

22  discussed in Part IV.B.1.c., and therefore that injury cannot confer standing for those counterclaims.  *See Lujan*, 504 U.S. at 560.

1   Defendants' pleadings—and their statements at oral argument that future campaigns in

2   the Southern Ocean are unplanned and nascent—belie the continued viability of this

3   purported "direct interest." The lack of allegations indicating imminent proximity with

4   Plaintiffs' vessels leads the court to conclude that even at the pleading stage, there is no

5   "actual or imminent" injury sufficient to confer standing to Defendants on counterclaims

6   (2) and (4). *See Lujan*, 504 U.S. at 564.

7        First of all, counterclaims (2) and (4) seek injunctive relief as to Sea Shepherd

8   vessels, and not SSCS vessels. (*See* 2ACC ¶¶ 74, 86.) As Defendants make clear, these

9   are "independent entities." (*See* 2ACC ¶ 3.) Sea Shepherd is not a party to this suit, and

10  Defendants have provided no reason SSCS would have standing to sue for actions taken

11  against Sea Shepherd vessels. Plaintiffs' motion to dismiss identifies this issue (*see* MTD

12  at 3, 12-13), and Defendants address it in their response with reference to the equitable

13  principles that underlie injunctive relief (*see* MTD Resp. at 18-19). But the elements of

14  Article III standing are not equitable; they are constitutionally mandated components of a

15  "case or controversy" over which federal courts assume subject matter jurisdiction.

16  *Lujan*, 504 U.S. at 560.

17       Moreover, the court cannot reasonably infer from Defendants' allegations that

18  Plaintiffs have ever sought out Defendants on the high seas to commit acts of piracy or

19  unsafe navigation. Indeed, Defendants repeatedly make clear that Defendants initiated

20  proximity, not Plaintiffs. (*See* 2ACC ¶¶ 1 ("[Plaintiffs] have a history of protecting their

21  illegal operations with violent and dangerous attacks *on those who seek to monitor and*

22  *impede them.*"), 32 ("Manned by an international crew consisting largely of volunteers,

1  Sea Shepherd vessels *attempted to locate and follow [the Institute]'s fleet*, and impede its

2  illegal whale hunt."), 35 (Sea Shepherd vessels have used various tactics over the years *to*

3  *impede [the Institute]*'s illegal killing of whales, the most successful of which has been *to*

4  *follow the NISSHIN MARU*, in order to prevent the transfer of whales from the harpoon

5  ships to the NISSHIN MARU for commercial processing.  In the past, *Sea Shepherd has*

6  *approached the ICR ships* and attempted to throw onto their decks bottles of butyric

7  acid.") (emphases added).)  Although Defendants make plausible allegations that

8  Plaintiffs *attacked* Defendants, Defendants' pleadings indicate those attacks were "[i]n

9  response to efforts by SSCS and other Sea Shepherd entities to expose and impede

10  [Defendants'] illegal whaling." (*Id.* ¶ 38.)  The types of damage Defendants allege—

11  endangering safe navigation (*id.* ¶¶ 40, 43, 46, 52), firing long-range acoustic devices and

12  water cannons (*id.* ¶¶ 41, 46), ramming (*id.* ¶¶ 42, 46, 49), throwing items like grappling

13  hooks and stun grenades (*id.* ¶¶ 49-50), stabbing (*id.* ¶¶ 49-50), and fouling rudders and

14  propellers (*id.* ¶¶ 49, 51-52)—require proximity.

15      Defendants' only alleged future intentions in the vast Southern Ocean are krill

16  campaigns. (*See id.* at 37.)  During those campaigns, Defendants intend to observe the

17  native whales and "monitor, research, and protect against the depletion of the krill

18  population"—none of which indicates any propensity or reason to approach Plaintiffs'

19  ships.[26] (*Id.*)  Accepting as true Defendants' pledge to end their whaling campaigns, the

20

———————————————

21      [26] At oral argument, Defendants raised several novel potentialities regarding future
    aggression by the Plaintiffs.  For instance, positing that Defendants frequently develop

22  campaigns on short notice, counsel reasoned that future (currently unplanned) campaigns could

1 court sees no reason to believe that injury to Defendants from Plaintiffs' piracy or unsafe

2 navigation is imminent.[27]  *See Lujan*, 504 U.S. at 564.  Accordingly, the court concludes

3 Defendants lack standing to assert counterclaims (2) and (4).[28]

4

_____

5 oppose poaching.  Such a campaign could bring Defendants to the perimeter of the 500-yard
injunctive buffer to observe the Institute's whaling.  If the injunction remains flowing in only one
6 direction, Defendants argue, Plaintiffs could approach Defendants, harassing them with the threat
of contempt sanctions.  First of all, this concern is mislaid in light of the language of the
7 injunction, which prohibits Defendants from "approach[ing] [P]laintiffs any closer than 500
yards when [D]efendants are navigating on the open sea."  *Cetacean Injunction*, 702 F.3d at 573
8 (establishing an injunction pending appeal); *see also Cetacean I*, 725 F.3d at 947 (maintaining
the injunction until further order of the Ninth Circuit).  The situation Defendants posit—
9 Plaintiffs approaching Defendants—does not violate this clear term of the injunction.  Second, to
reiterate—and notwithstanding Defendants' statement to the contrary at oral argument—
10 Defendants' pleadings raise no inference that Plaintiffs initiated proximity on the open sea.  (*See
generally* 2ACC.)  Accordingly, insofar as Defendants abide by the injunction, there is no
11 indication of "imminent injury" Plaintiffs will inflict upon Defendants.  Should Plaintiffs inflict
such an injury, it could give Defendants a cause of action for damages, but without any
12 indication of future likelihood the court cannot conclude Defendants have standing to seek
injunctive relief.

13    [27] Defendants argue that this result is inconsistent or unfair if—and given the court's
conclusion above, because—Plaintiffs have standing to bring their claims for funding and
14 perpetrating piracy and unsafe navigation.  (*See, e.g.*, MTD Resp. at 18.)  This inconsistency is
illusory and the perceived unfairness is irrelevant.  Although the parties dispute who initiated
15 piratical contact, the pleadings agree that Defendants initiated proximity on the high seas.  (*See*
2ACC ¶¶ 1, 32, 35.)  Defendants profess that—with or without the Ninth Circuit's injunction—
16 they will no longer pursue their anti-whaling campaigns in the Southern Ocean.  (*See id.* ¶ 5.)
Defendants' allegations—including their promised abstention from future campaigns—receive a
17 presumption of truth when evaluating Plaintiffs' motion to dismiss.  *See Iqbal*, 556 U.S. at 678.
Those allegations make it unreasonable to believe that Defendants will suffer imminent injury
18 from Plaintiffs' alleged behavior.  However, Defendants' allegations are irrelevant when
evaluating a motion to dismiss Plaintiffs' claims.  Additionally, Defendants' voluntary cessation
19 does not deprive the court of power to hear and determine Plaintiffs' case for injunctive relief.
*See Laidlaw*, 528 U.S. at 189; *Walling v. Helmerich & Payne*, 323 U.S. 37, 42-43 (1944).
20 Plaintiffs' pleadings thus provide no indication that Defendants will cease their piratical
behavior, demonstrating a strong likelihood of imminent injury, whereas Defendants profess in
their pleadings the intent to abide by the injunction, making imminent injury unlikely.

21    [28] Because the court concludes Defendants lack standing to assert counterclaim (2), it
expresses no opinion on whether Defendants state a cognizable claim for relief.  (*See* MTD at
22 19-20.)

ORDER- 44

1        In a related vein, Defendants fail to allege imminent injury, and thus lack standing,

2    for counterclaim (6).  (*See* 2ACC ¶¶ 94-100 (leveling claims against the Institute and

3    Kyodo Senpaku for violating the Financing Convention).)  Counterclaim (6) seeks

4    injunctive relief against the Institute and Kyodo Senpaku for raising money to "perform

5    acts of violence against persons aboard Sea Shepherd vessels." (*Id.* ¶ 98.)  Sea Shepherd

6    is distinct from SSCS, and is not a party to this case.  (*Id.* ¶ 3.)  Moreover, as the court

7    concludes above, Defendants have not demonstrated imminent injury from the Plaintiffs'

8    piracy or unsafe navigation.  By extension, they have not demonstrated imminent injury

9    from the Institute and Kyodo Senpaku funding such activities.  For these reasons, the

10    court concludes Defendants lack standing to assert counterclaim (6).[29]

11        2.  Subject Matter Jurisdiction as to Counterclaim (1): Whaling

12        Although Defendants have demonstrated standing to bring their counterclaim for

13    whaling, the court concludes the ATS does not confer subject matter jurisdiction over that

14    claim.  The court "presume[s] that a cause lies outside [its] limited jurisdiction," and the

15    burden is on the party asserting jurisdiction to demonstrate otherwise. *Kokkonen*, 511

16

---

17        [29] Even if Defendants had standing, counterclaim (6) is subject to dismissal for failure to
state a claim.  Defendants state several conclusory allegations, which the court does not consider.
18    *See Iqbal*, 556 U.S. at 678; (2ACC ¶¶ 97 ("[The Institute and Mr. Senpaku] have engaged in
violations of the Financing Convention and, unless enjoined, are likely to continue to do so."); 98
19    ("Specifically, [the Institute and Mr. Senpaku] have unlawfully and willfully provided or
collected millions of dollars intending that they be used to carry out acts in violation of the SUA
20    Convention.").)  The only relevant fact Defendants allege is that the Japanese government—a
non-party to this suit—diverted tens of millions of dollars to the whaling industry, some of which
21    were used to "provide extra security for the [Institute's] whaling fleet." (*See* 2ACC ¶ 99
(internal quotations omitted).)  This is not an allegation about the Institute or Kyodo Senpaku
22    and does not give rise to a reasonable inference of liability, and accordingly counterclaim (6)
also fails on its merits.

1   U.S. at 377.  Rather than demonstrate subject matter jurisdiction, however, Defendants

2   themselves argue that "the presumption against extraterritorial application as applied by

3   the Supreme Court in *Kiobel* might preclude this" counterclaim.  (MTD Resp. at 8.)  In

4   opposition to this argument, Defendants posit that if the court has jurisdiction over

5   Plaintiffs' injunctive action, it must have jurisdiction over Defendants' counterclaim.

6       The court disagrees.  For reasons explained above, a piracy claim under the ATS is

7   different than one for other international norms.  *See supra* Part III.B.1.a.ii.  Even

8   assuming "[w]haling for commercial purposes, and the killing of endangered species"[30]

9   (*see* 2ACC ¶ 61) constitute sufficiently well defined and accepted international norms

10  under *Sosa*, *Kiobel* requires a clear statement of extraterritoriality in order to enforce that

11  international norm abroad.  *Kiobel*, 133 S. Ct. at 1669.  Defendants all-but concede no

12  such clear statement exists, and thus the court concludes it lacks subject matter

13  jurisdiction under the ATS to adjudicate counterclaim (1).[31]

14

---

15  [30] At oral argument, Defendants recast this putative international norm more narrowly—
16  as against the killing of endangered and threatened whales for commercial purposes in an
    internationally designated whale sanctuary.  This is not the norm Defendants identify in their
    counter-complaint (*see* 2ACC ¶¶ 59-68 (identifying "[w]haling for commercial purposes" and
17  "the killing of endangered species" as specific, universal, and obligatory norms of international
    law), or in their briefing (*see* MTD Resp. at 7-8, 13-16 (same))).  Because the court concludes it
18  lacks subject matter jurisdiction over counterclaim (1), it expresses no opinion whether any of
    these putative international norms satisfies *Sosa*.

19
    [31] The Supreme Court's caution toward international comity and foreign relations further
20  supports this conclusion.  *See Kiobel*, 133 S. Ct. at 1664; *Sosa*, 542 U.S. at 725.  Since 1987,
    Japan has expressed at least tacit disagreement with the international norm that Defendants
21  advance.  (*See* ICJ Ruling ¶¶ 99-100.)  Australia asserts jurisdiction over the Southern Ocean and
    has issued its own rulings regarding whaling there, which are contrary to Japan's special permits
22  under which the Institute currently whales.  (*See* Not. of Supp. Authority (Dkt. # 290) at 2, Ex. A
    (Dkt. # 290-1) at 1-2.)  These circumstances illustrate the delicate international situation

3. <u>Failure to State a Claim for Relief</u>

The court now turns to Plaintiffs' arguments that counterclaims (3) and (5) fail to state a claim for relief.

*a. Counterclaim (3): Pirate Whaling*

Defendants' third counterclaim attempts to characterize Plaintiffs' whaling as piracy, and thus to shoehorn whaling into an enforceable international norm. (*See* 2ACC ¶¶ 75-81.) The court is unpersuaded by this creative effort. As a threshold matter, by characterizing Plaintiffs' whaling as "piracy," Defendants avoid the threshold jurisdictional barrier which led the court to dismiss counterclaim (1). *See supra* Part IV.B.2. However, the court concludes Defendants' whaling allegations do not constitute piracy.

Defendants argue that Plaintiffs' whaling constitutes "acts of 'violence, detention [and] depredation' in furtherance of 'private ends.'" (*Id.* ¶ 80 (quoting *Cetacean I*, 725 F.3d at 943).) Even assuming this is true, Defendants' definition omits the requirement that such acts be committed "against another ship or aircraft, or against persons or property on board such ship or aircraft." UNCLOS art. 101; *see also Cetacean I*, 725 F.3d at 943. Plaintiffs base their motion to dismiss counterclaim (3) on this element, and Defendants respond only that "the Institute plunders and pillages the whales that [Defendants] have sought to protect, and in that sense, its piracy is 'directed against' [Defendants] and their ships." (MTD Resp. at 22.) This suggestion stretches the clear

surrounding the propriety and legality of whaling in the Southern Ocean—one in which an American federal court should be reluctant to intervene.

1    meaning of piracy beyond reason.  Among other nonsensical results, Defendants'

2    interpretation would allow any seaman with a special affinity for a sea creature—say, a

3    tuna—to state a piracy claim against a fisherman.  In light of the narrow construction the

4    Supreme Court has directed in the realm of customary international law, the court cannot

5    go so far.  *See Sosa*, 542 U.S. at 725.  Accordingly, the court finds Defendants have

6    failed to state a claim for "pirate whaling," and the court dismisses counterclaim (3).

7              b.  *Counterclaim (5): Destruction of Property*

8         Plaintiffs argue that counterclaim (5), which seeks damages for Defendants'

9    negligent or intentional destruction of property (*see* 2ACC ¶¶ 87-93), should be

10   dismissed to the extent it refers to Sea Shepherd—and not SSCS—vessels (*see* MTD at

11   5-6).[32]  According to Defendants, two incidents give rise to damages liability:  (1) the

12   Shonan Maru No. 2 rammed the Ady Gil in January 2010 (*see* 2ACC ¶ 42); and (2) the

13   Yushin Maru No. 3 rammed the Bob Barker in February 2010 (*see id.* ¶ 41).  SSCS

14   alleges it operated the Ady Gil "under a very favorable charter agreement" (*see* 2ACC

15   ¶ 33), which Plaintiffs concede supports a claim in favor of Defendants (*see* MTD at 5

16   n.3).  Defendants also seek to recover damages for harm to the Bob Barker, the crews of

17   the Ady Gil and the Bob Barker, and "other Sea Shepherd vessels and equipment."

18   (2ACC ¶¶ 88, 91-93.)  Plaintiffs contend, however, that SSCS does not allege a

19   _____

20   [32] Plaintiffs also argue the entirety of counterclaim (5) should be dismissed on
     statute-of-limitations grounds.  (*See* MTD at 4.)  In doing so, Plaintiffs incorporate their
21   arguments from their motions for partial summary judgment.  (*See id.* (referencing 4/9/15
     MPSJ).)  Rather than parse Plaintiffs' motion for summary judgment for the portions properly
22   considered at the motion to dismiss stage, the court addresses these arguments below.  *See infra*
     Part V.

1  proprietary interest in any of those items except the Ady Gil, and thus cannot state a

2  claim for damages.  (*See* MTD at 5 (citing *Nautilus Marine, Inc. v. Niemela*, 170 F.3d

3  1195, 1196 (9th Cir. 1999).)

4         Defendants respond by citing Plaintiffs' amended complaint, which alleges both

5  that the Bob Barker was an "SSCS vessel" during the 2009-2010 whaling season (Am.

6  Compl. ¶ 15.3), and that SSCS subsequently granted the Bob Barker to foreign Sea

7  Shepherd entities (*see, e.g., id.* ¶ 27).  Defendants also contend that their answer admits

8  ownership of the Bob Barker by stating that "it had 'employed' the Bob Barker in the

9  Southern Ocean as late as the 2011-2012 season."  (MTD Resp. at 25 (quoting FAC Ans.

10 ¶ 20).)  However, merely "employ[ing]" the ship during the relevant period does not

11 entail a proprietary interest.  Moreover, the court does not consider the complaint or

12 answer thereto in a motion to dismiss counterclaims—only the "counter complaint, any

13 exhibits thereto, and matters which may be judicially noticed."  *See Aagard v. Palomar*

14 *Builders, Inc.*, 344 F. Supp. 2d 1211, 1214 (E.D. Cal. 2004).  Whereas Defendants may

15 be correct that counterclaim (5) "could easily be amended to specifically allege that the

16 SSCS had a proprietary interest in the Bob Barker in 2010," that allegation is not

17 currently among the pleadings the court may consider.  (MTD Resp. at 25.)  Accordingly,

18 the court dismisses the portions of counterclaim (5) that seek recompense for damages to

19 any individual or vessel other than the Ady Gil.

20       4.  Failure to Serve

21       Additionally, Plaintiffs argue that Mr. Komura should be dismissed as a party

22 because he has never been served.  (*See* MTD at 6.)  Defendants make no representation

ORDER- 49

1 that they have made any effort to serve Mr. Komura in the almost four years that have

2 passed since his summons issued. (*See* MTD Resp. at 23 n.11; Summons (Dkt. # 99).)

3 Instead, they argue that they have "no time limit for effecting service on [Mr.] Komura"

4 because he is located in a foreign country. (MTD Resp. at 23 n.11); *see also* Fed. R. Civ.

5 P. 4(m) (exempting "service in a foreign country" from the 120-day deadline); *Lucas v.*

6 *Natoli*, 936 F.2d 432, 432 (9th Cir. 1991). The Ninth Circuit reads Rule 4(m) to

7 completely exempt foreign defendants from the 120-day service deadline. *See Lucas*,

8 936 F.2d at 432; *cf. Lozano v. Bosdet*, 693 F.2d 485, 488-89 (5th Cir. 2012) (reading

9 *Lucas* to conclude that "when the defendants are foreign, an unlimited window-of-

10 opportunity for service . . . exists," and rejecting that interpretation in favor of a "flexible

11 due diligence" standard). However, this does not preclude the court from "setting a

12 reasonable time limit for service in a foreign country to properly manage a civil case."

13 *Baja Devs. LLC v. TSD Loreto Partners*, NO. CV-09-756-PHX-LOA, 2009 WL

14 2762050, at *1 (D. Ariz. Aug. 26, 2009); *see also Logtale, Ltd. v. IKOR, Inc.*, No.

15 C 11-5452 CW, 2013 WL 4427254, at *7 (N.D. Cal. Aug. 14, 2013) (analyzing whether a

16 party's failure to serve a foreign defendant over an eleven month period was "deliberate"

17 and whether opposing parties were prejudiced by the delay).

18        Because Rule 4(m) does not set a deadline for service in a foreign country, and the

19 court has not previously set a deadline for service, the court will not dismiss Mr. Komura

20 at this time. *See Lucas*, 936 F.2d at 432. However, Defendants' apparent failure to make

21 any efforts at service troubles the court, which will not allow an unlimited time for

22 service. *See Baja Devs.*, 2009 WL 2762050, at *1-2 (noting that "Plaintiff has offered to

1   provide specifics of its service attempts"); *Nylok Corp. v. Fastener World Inc.*, 396 F.3d

2   805, 807 (7th Cir. 2005) ("[T]he amount of time allowed for foreign service is not

3   unlimited."). The court therefore DIRECTS Defendants to effect service on Mr. Komura

4   by April 30, 2016. If Defendants cannot do so, they are to file a status report detailing

5   their efforts to serve Mr. Komura, at which point the court may revisit whether dismissal

6   is appropriate for failure to serve.

7   **C.      Determination**

8          The court GRANTS IN PART and DENIES IN PART Plaintiffs' motion to

9   dismiss. The court DISMISSES WITHOUT PREJUDICE counterclaims (2), (4), and (6)

10  for lack of standing, DISMISSES WITHOUT PREJUDICE counterclaim (1) for lack of

11  subject matter jurisdiction, DISMISSES WITHOUT PREJUDICE counterclaim (3) for

12  failure to state a claim, and DISMISSES WITHOUT PREJUDICE those aspects of

13  counterclaim (5) that seek redress for damages to any individual or vessel other than the

14  Ady Gil, for failure to state a claim.

15         Neither party has addressed whether Defendants should have leave to amend their

16  counterclaims, and such leave is to be freely given. *Bowles*, 198 F.3d at 757. The court

17  therefore GRANTS Defendants thirty (30) days from the filing of this order to amend

18  their counterclaims to remedy the deficiencies identified herein. If Defendants opt to

19  amend their counterclaims, they should be clear what past and future events involve

20  SSCS entities as opposed to Sea Shepherd entities, because Defendants have not

21  demonstrated a basis for standing as it relates to Sea Shepherd. Given this order's

22  thorough discussion of the pleading deficiencies in Defendants' second amended

1   counterclaims, the court will treat similar shortcomings in future pleadings as evincing

2   the futility of further amendment.

## V.   PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIM (5)

Plaintiffs seek partial summary judgment on counterclaim (5).  Plaintiffs first

moved for partial summary judgment on April 9, 2015, seeking to dismiss part of

counterclaim (5) on statute-of-limitations grounds.  (*See generally* 4/9/15 MPSJ.)  On

July 16, 2015, Plaintiffs moved for partial summary judgment on the entirety of

counterclaim (5), incorporating by reference their April motion for partial summary

judgment.  (*See* 7/16/15 MPSJ.)

The court has dismissed the portions of counterclaim (5) that seek damages for

attacks on Sea Shepherd vessels, as opposed to SSCS vessels.  *See supra* Part IV.B.3.b.

Part of Plaintiffs' motions for partial summary judgment are therefore moot.  Moreover,

the Western District of Washington's local rules prohibit filing "contemporaneous

dispositive motions, each one directed toward a discrete issue or claim" without leave of

the court.  Local Rules W.D. Wash. LCR 7(e)(3).  This rule seeks to avoid the

inefficiencies caused by duplicative dispositive motions and circumvention of the court's

page limits.  In light of the court's ruling herein, which moots part of the motion, and

because of the circuitous internal references in the relevant motions, the court finds it

inefficient to consider them at this juncture.  Accordingly, the court DENIES both

motions for partial summary judgment WITHOUT PREJUDICE to reraising the issues

that remain in light of this order.

## VI.   DEFENDANTS' MOTION TO COMPEL

Defendants move to compel Plaintiffs to respond to Defendants' third interrogatories and produce documents responsive to Defendants' third requests for production ("RFPs"). (*See* MTC at 1.)  Plaintiffs broadly object to this discovery, in part on the grounds that Defendants' defenses and counterclaims lack merit, and thus the information is irrelevant. (*See* MTC Resp. at 4-13.)  This order clarifies which of Plaintiffs' and Defendants' claims and counterclaims can move forward, removing the hypothetical element from counsel's arguments as to relevance.  Accordingly, the court finds moot or inapposite many of the arguments and defenses propounded in the relevant briefing.  The court therefore DENIES the motion WITHOUT PREJUDICE to reraising any disputes that the parties cannot resolve at a meet and confer held in light of this order.

## VII.   DEFENDANTS' MOTION TO CONFIRM TERMINATION OF CONFIDENTIALITY AGREEMENT

On July 13, 2015, Defendants provided notice to Plaintiffs of their intent to terminate the confidentiality agreement that the parties entered into in July 2012. (*See* MTCT at 1; *see also* 9/14/15 Neupert Decl. re MTCT (Dkt. # 281) ¶ 2, Ex. 1 ("Confidentiality Agreement").)  Plaintiffs take the position that Defendants cannot unilaterally terminate the confidentiality agreement. (*See* MTCT Resp. at 2.)

The agreement at issue was never entered as a court order. (*See generally* Dkt.).  Judge Jones, who presided over the case when the parties reached the agreement, does not enter confidentiality agreements as orders of the court. (*See* 9/14/15 Neupert Decl. re MTCT ¶ 4, Ex. 2 ("Jones Rules") at 1.)  Judge Jones' policy is to "enforce the parties'

1   agreement regarding confidentiality of documents as it would enforce any agreement

2   between the parties," so long as it comports with Local Rule 5(g).  (*Id.* (citing Local

3   Rules W.D. Wash. LCR 5(g)).)  Judge Jones did not, however, "transform th[e]

4   agreement into an order of the court."  (*Id.*)

5        Pursuant to Judge Jones' rules, the court understands the agreement as a simple

6   contract and interprets it accordingly.  (*Id.*)  In opposition to the motion, Plaintiffs make a

7   series of arguments that indicate not that the contract is interminable, but that the contract

8   applies indefinitely to documents produced while the contract was in effect.  (*See, e.g.*,

9   MTCT Resp. at 5 ("[T]he intent that the Agreement is not subject to unilateral

10  termination is demonstrated by the fact that the terms 'survive the final termination of

11  this proceeding,' indicating that the parties intended the agreement to run either in

12  perpetuity or, at a minimum, until some point after the conclusion of litigation.").)  But

13  Defendants concur that "discovery produced while the [agreement] was in force will

14  continue to be treated according to its terms."  (MTCT at 4.)

15       Concerning whether the agreement is terminable as applied to future discovery,

16  Plaintiffs only point out that it is "silent on the subject of termination," and argue that if it

17  had been a court order, it would not have been terminable at will.  (*Id.*)  These arguments

18  miss the point.  The agreement is a private contract without a termination clause.  (*See*

19  *generally* Confidentiality Agreement.)  With reasonable notice, a "contract for continuing

20  performance" that fails to "specify the intended duration" is "terminable-at-will by either

21  party after a reasonable time."  *See Cascade Auto Glass, Inc. v. Progressive Cas. Ins.*

22  *Co.*, 145 P.3d 1253, 1256 (Wash. Ct. App. 2006) (citing *Robbins v. Seattle Peerless*

1   *Motor Co.*, 268 P. 594, 594 (Wash. 1928)).  There is no termination clause in the

2   agreement, and Plaintiffs do not dispute that Defendants provided Plaintiffs with

3   reasonable notice.  (*See generally* MTCT Resp.)  Accordingly, the court concludes that

4   the contract is terminated.  The court will, however, enforce the agreement as to

5   previously produced documents, insofar as the agreement comports with the Local Rules.

6        The court GRANTS Defendants' motion to confirm the termination of the

7   confidentiality agreement.  At oral argument, the parties indicated a willingness to seek

8   common ground on a stipulated protective order.  If they fail in that endeavor, the court

9   will consider the parties' positions and craft an appropriate protective order on its own.

10                          **VIII.    CONCLUSION**

11        The court GRANTS IN PART and DENIES IN PART Defendants' motion for

12   judgment on the pleadings (Dkt. # 260), GRANTS IN PART and DENIES IN PART

13   Plaintiffs' motion to dismiss (Dkt. # 255), DENIES Plaintiffs' motions for partial

14   summary judgment on Defendants' fifth counterclaim (Dkt. ## 228, 257), DENIES

15   Defendants' motion to compel (Dkt. # 271), and GRANTS Defendants' motion to

16   confirm termination of the confidentiality agreement (Dkt. # 272).[33]  The court GRANTS

17   //

18   //

19

20   [33] Any party seeking to file a further motion in this case should notify opposing counsel
     of the nature of the proposed motion and seek leave of the court by filing a submission of no
21   more than two pages.  (*See* Min. Ord. (Dkt. # 289).)  Within two days, computed in accordance
     with the Local Rules, the other party may file a response of no more than two pages.  *See* Local
22   Rules W.D. Wash. LCR 6(a).  The court will then schedule a telephone conference to consider
     allowing the motion to be filed.

ORDER- 55

1  Defendants 30 days to amend their counterclaims.  The court DIRECTS Defendants to

2  serve Mr. Komura by April 30, 2016.

3      Dated this 20ᵗʰ day of December, 2015.

4

5                                    JAMES L. ROBART
                                     United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 56